## UNITED STATES DISTRICT COURT
## DISTRICT OF SOUTH CAROLINA
## FLORENCE DIVISION

| | |
|---|---|
| NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE, INC. by and through its MYRTLE BEACH BRANCH,<br><br>SIMUEL JONES,<br><br>LESLIE STEVENSON, and<br><br>CEDRIC STEVENSON,<br><br>      Plaintiffs,<br><br>          v.<br><br>CITY OF MYRTLE BEACH, a municipal corporation within the State of South Carolina, and<br><br>CITY OF MYRTLE BEACH POLICE DEPARTMENT, a department of the City of Myrtle Beach<br><br>      Defendants. | **COMPLAINT**<br><br>Demand For Jury Trial<br><br>Civil Action No.   <u>4:18-554-TLW</u> |

## COMPLAINT FOR DAMAGES, DECLARATORY AND INJUNCTIVE RELIEF AND DEMAND FOR JURY TRIAL

Plaintiffs National Association for the Advancement of Colored People ("NAACP"), by and through its Myrtle Beach Branch; Simuel Jones; Leslie Stevenson; and Cedric Stevenson bring this action against Defendants City of Myrtle Beach ("City") and the City of Myrtle Beach Police Department for declaratory judgment, injunctive relief, and damages for discrimination and the deprivation of rights secured by the Constitution of the United States and statutory law in violation of 42 U.S.C. §§ 1981, 1983, 2000d.

## NATURE OF THE ACTION

1.      Each year, during the month of May, hundreds of thousands of motorcycle enthusiasts from around the country gather in the Myrtle Beach, South Carolina area for each of two separate motorcycle rallies. In the middle of the month, motorcycle enthusiasts gather for the Myrtle Beach Bike Week Spring Rally ("Harley Week"). The vast majority of the Harley Week participants are white, and the area welcomes them. Two weeks later, over the Memorial Day weekend, motorcycle enthusiasts gather for Atlantic Beach Bikefest ("Black Bike Week"). The vast majority of Black Bike Week visitors are African American and the event historically has been met with opposition and resistance from the City of Myrtle Beach and many local businesses.

2.      The hostility toward Black Bike Week has led to a number of restrictive governmental policies that were first challenged by the NAACP and individual Black Bike Week attendees in an action filed in this Court in 2003. That suit alleged that the City of Myrtle Beach imposed an unequal and unjustified traffic plan during Black Bike Week and that the plan was motivated by racial discrimination, interfered with the rally, and discouraged participation. The plaintiffs in that case argued that Black Bike Week should be treated the same as Harley Week. Chief United States District Court Judge Terry Wooten found that the differences in the traffic plans between Black Bike Week and Harley Week were likely motivated by race and therefore likely unconstitutional. Chief Judge Wooten granted the plaintiffs' motion for a preliminary injunction and ordered the City to implement similar traffic plans for the two events. The parties in that action ultimately settled the case with the City agreeing to a consent order that required the City to maintain similar operations plans for Black Bike Week and Harley Week for the following five years.

3.      Just five years after the consent order expired, the City resumed its differential treatment of the motorcycle rallies. The size of the crowds and the behavior of the participants were similar to each other, but the differences in the City's policies for the two events are even greater than the differences that Chief Judge Wooten found as likely motivated by discriminatory intent.

4.      The City does not implement a formal traffic plan for Harley Week and the mostly white participants are essentially able to travel around the Myrtle Beach area just as they would on any other day of the year. During Black Bike Week, however, Ocean Boulevard – a major thoroughfare that runs the length of Myrtle Beach adjacent to the beach which is a focal point for the motorcycle rallies – is reduced to a single lane of one-way traffic. And during the late night hours of the event, all motorists entering Ocean Boulevard are forced into a 23-mile loop that has just one exit.

5.      Because of the traffic restrictions, a drive down Ocean Boulevard on Saturday night of Black Bike Week could take as long as five hours. During Harley Week, a hotel guest who wanted to drive to a restaurant one mile north on Ocean Boulevard could turn out of the hotel's driveway and be there in a few minutes. During Black Bike Week, that same guest going to the same restaurant would have to turn south on Ocean Boulevard and navigate a 23-mile loop that could take hours.

6.      The City also maintains significantly different levels of law enforcement between the two bike rallies. During the 2017 Black Bike Week as many as 800 law enforcement officers, including many from other jurisdictions, patrolled the City. Less than a tenth of that number were present for 2017 Harley Week.

3

7.     The City's motivation for the policies is clear: it seeks to make Black Bike Week sufficiently unpleasant for the mostly African-American motorcyclists that they stop attending and the event ceases to exist.

8.     The City can proffer no legitimate explanation for its different policies. The one-way Ocean Boulevard traffic plan and the 23-mile loop in place during Black Bike Week serve no useful traffic- or safety-related purpose. Instead, they have the opposite effect by leading to increased frustration and anxiety for motorists and pedestrians attending Black Bike Week and making it nearly impossible to traverse the Boulevard or surrounding area.

9.     With no legitimate traffic- or safety-related justification for the traffic plan, the City points to violence that occurred during the 2014 Memorial Day weekend as an explanation. However, no link was drawn between the violence and Black Bike Week and that violence was not abnormal for the City, which has seen a general increase in gun violence and shootings in the last several years. The increasing violence has extended to Harley rallies and other events in Myrtle Beach. Even if gun violence were an explanation for different City policies during Black Bike Week, the implementation of an exasperating and frustrating traffic system that traps people in their cars for hours would not be a rational response to such violence.

10.     Defendants' discriminatory policies and conduct in connection with Black Bike Week have deprived Plaintiffs of their rights to equal treatment and full protection under federal and state law. Accordingly, Plaintiffs seek declaratory and injunctive relief as well as compensatory damages stemming from Defendants' violations of 42 U.S.C. § 1981, 42 U.S.C. §1983, and 42 U.S.C. 2000d.

## JURISDICTION AND VENUE

11.     This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331, 1343(a), and 2201 and 42 U.S.C. § 2000d-2.

12.     Venue is proper in the District of South Carolina pursuant to 28 U.S.C. § 1391(b)(2) because a substantial portion of the events or omissions giving rise to the claims occurred in this District.

## PARTIES

### I.     Plaintiffs

13.     Plaintiff the NAACP is a membership-based, domestic non-profit corporation organized under the laws of the State of New York in 1911. The NAACP has its principal place of business at 4805 Mt. Hope Drive, Baltimore, Maryland. As one of the oldest and largest civil rights organizations in the nation, the purpose of the NAACP is to ensure the elimination of all racial barriers that deprive African-American citizens of the privileges of equal civil and constitutional rights in the United States.

14.     The NAACP brings this case through its Myrtle Beach branch, which has been a leading advocate for equal protection and due process rights of African-American and other minority residents and visitors in the Myrtle Beach area.

15.     The NAACP and its Myrtle Beach branch are membership-based organizations. They have received multiple complaints from NAACP members and other visitors to Myrtle Beach regarding discrimination against African Americans during Black Bike Week.

16.     Plaintiff Simuel Jones is an African-American resident of Chicago, IL. Mr. Jones has been adversely affected by the acts, policies, and practices of Defendants and their agents. Mr. Jones travelled from Illinois to South Carolina to attend the 2015-2017 Black Bike Weeks. Mr. Jones had attended numerous previous Black Bike Weeks. Mr. Jones was offended,

inconvenienced, and otherwise adversely affected by the traffic restrictions and police presence implemented by Defendants during the 2015-2017 Black Bike Weeks. Mr. Jones plans to travel to Myrtle Beach to attend the 2018 Black Bike Week.

17.    Plaintiff Leslie Stevenson is an African-American resident of Suwanee, GA. Mrs. Stevenson travelled from Georgia to South Carolina to attend the 2016 and 2017 Black Bike Weeks. Mrs. Stevenson was offended, inconvenienced, and otherwise adversely affected by the traffic restrictions and police presence implemented by Defendants during the 2016 and 2017 Black Bike Weeks.

18.    Plaintiff Cedric Stevenson is an African-American resident of Suwanee, GA. Mr. Stevenson travelled from Georgia to South Carolina to attend the 2016 and 2017 Black Bike Weeks. Mr. Stevenson was offended, inconvenienced, and otherwise adversely affected by the traffic restrictions and police presence implemented by Defendants during the 2016 and 2017 Black Bike Weeks.

## II.    Defendants

19.    Defendant City of Myrtle Beach, South Carolina  is a municipal corporation duly organized and existing under the laws of South Carolina. The City maintains its principal office at Myrtle Beach City Hall, located at 937 Broadway Street, Myrtle Beach, South Carolina. The City operates under a Council-Manager city government where a City Council sets policy that is carried out by a City Manager hired by the Council. City officials have responsibility for the development and implementation of the Black Bike Week traffic plan and law enforcement operations plan. The City is a recipient of federal funds, from the United States Department of Justice, that it provides to the City of Myrtle Beach Police Department which conducts law enforcement activities in Myrtle Beach, including during Black Bike Week.

20.     Defendant City of Myrtle Beach Police Department is a department of the City of Myrtle Beach, South Carolina. The Department is located at the Ted C. Collins Law Enforcement Center, 1101 North Oak Street, Myrtle Beach, South Carolina. The Myrtle Beach Police Department is overseen by a Police Chief, who is appointed by the City Manager. The City of Myrtle Beach Police Department has responsibility, in conjunction with other City officials, for the development and implementation of the Black Bike Week traffic plan and law enforcement operations plan.

21.     The City of Myrtle Beach Police Department is a program or activity within the meaning of 42 U.S.C. § 2000d-4a and is a recipient of federal funds from the United States Department of Justice. Those funds are used for the Department's law enforcement activities in Myrtle Beach, which include the planning, implementation, and enforcement of the traffic and operations plan during Black Bike Week.

## FACTUAL BACKGROUND

### I.    Motorcycle Rallies in Myrtle Beach

22.     For the last several decades, two large motorcycle rallies have been held in the Myrtle Beach area each spring: "Harley Week" and "Black Bike Week." Ocean Boulevard, a major avenue that runs parallel to the beach and through the heart of Myrtle Beach, has become a focal point of the two weekends. During the bike weeks, like other weekends during the year, Ocean Boulevard attracts tourists visiting the businesses along the strip and accessing the beach.

#### A.    Harley Week

23.     Harley Week began in the 1940s with a small gathering of bikers in the town of North Myrtle Beach. For many years, the gathering consisted of several hundred bikers racing up and down the beach during the day and having a beach bonfire at night.

7

24.     The number of bikers attending the gathering increased over the years and more events began to occur in the City of Myrtle Beach. By the late 1980s, Myrtle Beach had become the central gathering place for the Harley Week bikers.

25.     In recent years, Harley Week has occurred in mid-May and drawn hundreds of thousands of participants to the Myrtle Beach area. Harley Week typically extends over ten days, with the last weekend attracting the largest crowds. Since its inception, the vast majority of Harley Week participants have been white.

26.     Harley Week has, at times, been marred by violence. In the 1990s there were several armed standoffs between outlaw motorcycle gangs attending the rally and Myrtle Beach police.

27.     Nonetheless, Harley Week bikers have historically been welcomed by Myrtle Beach resorts, hotels, restaurants, and other merchants. Businesses advertise biker week specials and "Welcome Bikers" signs spring up around the City in the days preceding the event.

28.     Harley Week bikers regularly drive or "cruise" through the City of Myrtle Beach along Ocean Boulevard, from 29th Avenue North to 29th Avenue South, a distance of approximately five miles. Cruising is a central aspect of Harley Week as bikers display their motorcycles to spectators gathered on the sidewalks and at hotels along Ocean Boulevard. For decades, cruising Ocean Boulevard has been an attraction to visitors during motorcycle rallies and other weekends throughout the year.

29.     For the last several Harley Weeks, Ocean Boulevard has been open to vehicles traveling in either direction, with traffic flow regulated in the same manner as any other day of the year. The City has not recently implemented a special traffic or operations plan for Harley

Week. In 2017, approximately 60 law enforcement officers policed Myrtle Beach during the weekend.

**B.**    **Black Bike Week**

30.    Black Bike Week, also known as the Atlantic Beach Bike Festival, began in the 1980s. The event is located in Atlantic Beach, a predominately African-American beach town located between Myrtle Beach and North Myrtle Beach. The area was historically segregated and Atlantic Beach was one the few beaches in the South that permitted African Americans. Fences ran across the beach to prevent blacks from walking north or south from the black beach to neighboring white beaches.

31.    Black Bike Week, which was created by a black biker organization called the Carolina Knight Riders, grew throughout the years and by the late 1990s encompassed much of the greater Myrtle Beach area. Many Black Bike Week attendees now stay in Myrtle Beach and in the hotels along Ocean Boulevard.

32.    Black Bike Week, which is now held each year around Memorial Day, attracts hundreds of thousands of participants. The vast majority of individuals participating in Black Bike Week are African American.

33.    It is common for Black Bike Week attendees to drive or "cruise" through the City of Myrtle Beach along Ocean Boulevard. As during Harley Week, Black Bike Week participants cruise to display their motorcycles to spectators gathered on the sidewalks and at hotels along Ocean Boulevard.

**II.**    **History of Hostility Toward Black Bike Week Based on Stereotypes and Racism**

34.    As Black Bike Week expanded from Atlantic Beach to Myrtle Beach in the mid-1990s, white Myrtle Beach City officials and leaders of Myrtle Beach's hospitality industry

began to exhibit overt hostility toward the event. The prejudice against Black Bike Week stood in sharp contrast to the explicit, public welcoming of Harley Week bikers.

35.     City officials implemented special rules and policies in an effort to prevent Black Bike Week activities from occurring in Myrtle Beach and to otherwise discourage African Americans from visiting Myrtle Beach. These efforts, which are based on racial stereotyping, have been ongoing for decades.

36.     Mark McBride, Myrtle Beach Mayor from 1998 to 2005, was a vocal Black Bike Week critic, advocating for the elimination of Black Bike Week events in Myrtle Beach. Mayor McBride lobbied the state of South Carolina to deploy the National Guard to Myrtle Beach in an attempt to intimidate Black Bike Week participants. Mayor McBride also demanded and obtained a greater police presence during Black Bike Week. Mayor McBride never sought the same police or National Guard presence for Harley Week or any other special events in Myrtle Beach.

37.     Mayor McBride's efforts were successful, as the presence of hundreds of police officers created a hostile and intimidating environment throughout the festival.

38.     Beginning in 1998, the City of Myrtle Beach introduced a restrictive traffic pattern that was only implemented during Black Bike Week and did not apply during Harley Week or other festivals. The traffic pattern included prohibiting two-way traffic along Ocean Boulevard, closing lanes of Ocean Boulevard to vehicular traffic, and barring parking throughout the area. These restrictions caused significant gridlock, severely limited the ability of Black Bike Week attendees to move freely throughout the area, made participants feel unwelcome, and interfered with their enjoyment of "cruising" along Ocean Boulevard.

39.    The City policies in opposition to Black Bike Week were, in part, a response to community and business opposition to the event. In 2002, for example, the Myrtle Beach Chamber of Commerce provided 30-page color brochures for Harley Week participants. The brochure included a "Welcome Letter" from the chief of police urging visitors to attend Harley Week. In contrast, during Black Bike Week that year, the Chamber distributed a two-page flyer listing the City's traffic laws and the locations of local jails.

40.    Businesses also took their own discriminatory actions in opposition to Black Bike Week. Restaurants closed or provided different terms during Black Bike Week. For example, in 1998, business leader and restaurants owner, J. Edward Fleming, explained in a letter to the Chamber of Commerce his intention to close his restaurants over Memorial Day weekend because of the attendees of Black Bike Week. His letter stated that he would rather take the business loss than have to tolerate serving Black Bike Week visitors, calling the event's attendees an "illiterate group of people."

41.    In a similar vein, The Yachtsman, a popular hotel on Ocean Boulevard, required Black Bike Week guests to sign a 34-page guest contract, outlining punitive measures for any violations of the hotel's policies. This contract was not required on any other nights of the year. The Yachtsman also charged its highest rates of the year during Black Bike Week, $100 more per night than during Harley Week.

## III.    Litigation Against the City of Myrtle Beach for Its Black Bike Week Activities

42.    Despite Myrtle Beach's clear intent to drive Black Bike Week from the City, the Black Bike Week community persisted in trying to continue its strong traditions and not bow in the face of public pressure to cease the event.

43.     Their efforts included the filing, on May 20, 2003, of a lawsuit in the United States District Court for the District of South Carolina against the City of Myrtle Beach and then Police Chief, Warren Gall, alleging that the differential treatment of the predominantly African-American attendees of Black Bike Week deprived them of their constitutional rights ("the 2003 Litigation").

44.     On May 9, 2005, Judge Terry Wooten granted the plaintiffs' motion for a preliminary injunction to enjoin the City from using its restrictive traffic pattern. *See Nat'l Ass'n for the Advancement of Colored People, Inc. v. City of Myrtle Beach*, No. 4-03-1732-12, 2006 WL 2038257 (D.S.C. May 9, 2005) (Doc. No. 85)**.**

45.     In granting the preliminary injunction, Judge Wooten examined the traffic plans used for Harley Week and Black Bike Week. At that time, the City limited a five mile stretch of Ocean Boulevard to one-way traffic during Black Bike Week. In contrast, during Harley Week, two-way traffic was permitted for the entire length of Ocean Boulevard. *Id*. at *2.

46.     Judge Wooten determined that the Black Bike Week and Harley Week events were similarly situated. *Id*. at *3-*5, *7.  In reaching this conclusion, Judge Wooten relied upon expert testimony that there were no significant differences, based on size, age, or crowd behavior, between the visitors for Black Bike Week as compared to Harley Week that would warrant the differences in the traffic plans. *Id*. at *3. He also relied on statements by City officials that the events were similar. *Id*. at *4.

47.     Judge Wooten further concluded that the City could use the same traffic plan during Black Bike Week that it employed for Harley Week and other large festivals. *Id*. at *3.

48.     The Court also analyzed whether there was evidence indicating that the City was motivated by discriminatory intent, and found that there was significant evidence to support such a conclusion. *Id*. at *4-*5.

49.     This evidence included the fact that Black Bike Week was the only weekend of the year in Myrtle Beach where African-American visitors clearly outnumbered white visitors and was the only weekend when the City implemented a one-way traffic plan. As a result, the City's Black Bike Week actions disproportionately affected African Americans. *Id*. at *4.

50.     The Court also focused on statements made by City of Myrtle Beach officials demonstrating that the nature of the attendees of the event was discussed and considered when implementing the traffic plan for Black Bike Week. *Id*. at *5. This included comments about Harley Week tourists being "more law abiding" than Black Bike Week tourists, that holding Black Bike Week visitors to certain expectations would result in fewer attendees because all those visitors wanted to do was have a party, and that Black Bike Week tourists "party differently" and "wanted to take over the street." *Id*. The Court determined that these statements were made in connection with the plan for Black Bike Week and revealed that race may have been a motivating factor in implementing the traffic plan. *Id*.

51.     Finally, the Court determined that the City had not established any compelling reasons for a different traffic plan during Black Bike Week. In particular, the Court found that the defendants had not provided evidence that the one-way traffic plan would reduce congestion or provide more accessibility for emergency vehicles as compared to the traffic pattern used for Harley Week. *Id*. at *6-*7.

52.     The Court's findings regarding the traffic plan relied on plaintiffs' traffic expert, Dr. David B. Clarke, who explained that the traffic plan for Black Bike Week resulted in

congestion and difficulty for drivers and that there was no reason that the traffic plan used for
Harley Week would not work during Black Bike Week. *Id*. at *6. The Court also cited to
plaintiffs' other experts, retired police chiefs Willie R. Williams and Mitchell W. Brown, who
opined that the traffic plan during Black Bike Week exacerbated gridlock, created anxiety and
frustration for bikers and motorists, and created an environment that undermined public safety.
*Id*. Chief Williams and Chief Brown also opined that the Harley Week traffic plan could be used
for Black Bike Week and that there was no reason for the difference in treatment of the two
weekends. *Id*.

53.     Judge Wooten concluded that no one could dispute the fact that the Black Bike
Week visitors were being treated differently than the Harley Week visitors and that race was
likely a motivating factor for the differing treatment. *Id*. at *3.

54.     Based on his findings that Harley Week and Black Bike Week were similarly
situated events and that race was likely a motivating factor in the different traffic plans for the
two events, Judge Wooten found that there was a likelihood that the plaintiffs would prevail on
their claims of alleged violations of the Equal Protection Clause and that the public interest
would be served by granting a preliminary injunction and requiring the defendants to maintain a
substantially similar traffic plan for the two weekends. *Id*. at *7-8.

55.     After the Court's ruling, the parties in the 2003 Litigation entered into a
settlement agreement that required the City to use the same traffic restrictions, patterns, or plan
on Ocean Boulevard during both Harley Week and Black Bike Week. The Court retained
jurisdiction for the purposes of enforcing the Settlement Agreement and Order through July 31,
2010.

IV.    **Defendants' Discriminatory Treatment of Black Bike Week From 2015 Through 2017**

56.    After the 2014 Black Bike Week and fewer than five years after the 2003 Litigation settlement expired, Defendants began to revive their campaign to eliminate Black Bike Week. The City spurred the creation of the "BikeFest Task Force" to implement a new operational plan for the weekend.

57.    On April 28, 2015, the Myrtle Beach City Council passed an "extraordinary events" ordinance, §19-190, et. seq. This ordinance allows the City Council to declare certain events as extraordinary, triggering special governmental powers including requesting financial resources from other governments, hiring private security officers and requiring hotels and businesses to do the same, establishing pedestrian and vehicular road blocks and diversions, and establishing and enforcing "no cruising" zones.

58.    Currently, the ordinance has a general definition for extraordinary events, but then specifically identifies only Black Bike Week as an extraordinary event: "[t]he motorcycle event, however named or styled, that occurs immediately preceding Memorial Day by 96 hours, and including Memorial Day and the day after, may be declared to be an extraordinary event."

59.    A new traffic plan was created for the 2015 Black Bike Week that was far more restrictive and created substantially greater difficulties for Black Bike Week attendees than any previous plan and was significantly more onerous than the plan the Court found likely discriminatory in the 2003 Litigation. The traffic plan implemented for the 2015 Black Bike Week event serves no useful purpose for traffic congestion management. The 2015 Traffic Plan was marked by two primary aspects: (1) Ocean Boulevard being limited to a single, one-way lane for the entirety of Black Bike Week and (2) a mandatory 23-mile loop for all traffic entering

15

Ocean Boulevard from approximately 10 p.m. to 2 a.m. during the Friday, Saturday, and Sunday nights of Black Bike Week.

60.     The City has subsequently used the 2015 Traffic Plan for the 2016 and 2017 Black Bike Weeks and has stated that it will use the 2015 Traffic Plan for the 2018 Black Bike Week ("current Black Bike Week Traffic Plan").

A.     **Traffic Limited to A Single Lane on Ocean Boulevard**

61.     Under the current Black Bike Week Traffic Plan, traffic on Ocean Boulevard is restricted to a single lane of southbound traffic during the entire weekend. No northbound traffic is allowed and the remaining lanes of Ocean Boulevard are closed to public travel. During the day and evening of Black Bike Week the only entrances to and exits from Ocean Boulevard are at the few cross streets with traffic signals on Kings Highway, which runs parallel to Ocean Boulevard. All other entrances are barricaded.

62.     The single lane traffic plan significantly hampers vehicle movement and increases traffic congestion. The plan reduces capacity on the road significantly. This further exacerbates traffic congestion. Severely limiting access to and from Ocean Boulevard via intersecting cross streets forces traffic to stay on Ocean Boulevard for unnecessarily long distances, increasing the load on the street. During the early evening periods of Black Bike Week, the one lane restriction on Ocean Boulevard caused travel times between 29th Avenue North and 29th Avenue South to increase significantly.

B.     **Traffic Is Forced Onto a 23-Mile Loop On Friday, Saturday, and Sunday Nights**

63.     In addition to having Ocean Boulevard limited to a single southbound lane, the current Black Bike Week Traffic Plan creates a mandatory 23-mile traffic loop for any vehicle

entering Ocean Boulevard from the hours of 10 p.m. to 2 a.m. on the Friday, Saturday, and Sunday nights of Black Bike Week.



64.    The 23-mile loop begins at the intersection of 29th Avenue North and Ocean Boulevard (Point B in Figure 1). The loop runs south along the length of Ocean Boulevard until it intersects with Kings Highway. Motorists are then forced to travel north on Kings Highway until turning left on Harrelson Boulevard. The loop follows Harrelson until after it becomes George Bishop Parkway and intersects with South Carolina 501. The loop travels west on 501 until the intersection of South Carolina 501 and 31 (the Carolina Bays Parkway). At that point, drivers can exit the loop and leave the area. However, drivers seeking to return to Ocean Boulevard have to travel north on the Carolina Bays Parkway until they turn onto the Robert Grissom Parkway, which returns drivers to a point where the loop turns left on 29th Avenue North and back to Ocean Boulevard.

65.     The loop forces any driver entering Ocean Boulevard at 29th Avenue North or anywhere south of that point to drive the entire length of the loop or exit at the intersection of 501 and the Carolina Bays Parkway.  While turns onto Ocean Boulevard from intersecting roads are prohibited, Myrtle Beach visitors exiting restaurants, hotels, or other businesses onto Ocean Boulevard are caught in the loop.

66.     As a result, a person staying at an Ocean Boulevard hotel during Black Bike Week and wishing to travel, for example, to a restaurant a mile north of his hotel from 10 p.m. to 2 a.m. must drive south on Ocean Boulevard and around the 23-mile loop until he ends up north of his hotel.

67.     The loop creates unreasonable delays and undue inconvenience, and increases the traffic load on affected streets.

68.     In addition, the City interferes with pedestrian access along Ocean Boulevard during Black Bike Week. The City installs barriers between the sidewalk and the road from 29th Avenue North to 29th Avenue South, preventing participants who attend the festivities as pedestrians from interacting with those cruising the strip.

69.     In implementing the current Black Bike Week Traffic Plan, the City asserts that the plan is intended to keep vehicles moving, ease congestion in the City, and make the weekend safer and more controllable. In reality, the plan has precisely the opposite effect.

70.     The current Black Bike Week Traffic Plan exacerbates traffic problems and undermines public safety by creating anxiety and frustration. Rather than easing traffic, the 23-mile loop is the source of significant congestion, long traffic jams, driver discomfort, and prevents access to restaurants, entertainment venues, and hotels. Travel time around the traffic

loop on the Saturday night of the 2017 Black Bike Week was measured to be as long as over six hours.

71.     The current Black Bike Week Traffic Plan also fails to achieve any of the national norms for traffic management, which include facilitating the free flow of vehicles, minimizing gridlock, and providing for public safety.

72.     The current Black Bike Week Traffic Plan makes participants feel unwelcome, interferes with their enjoyment of driving and walking along Ocean Boulevard, interferes with their ability to freely access hotels, vacation rentals, restaurants and other venues along Ocean Boulevard and throughout the Myrtle Beach area, and otherwise impedes the Black Bike Week events over Memorial Day weekend.

## V.     The Black Bike Week Traffic Plan is Significantly More Restrictive Than the Traffic Plan the Court Found Likely Discriminatory and Unjustified in the 2003 Litigation

73.     The traffic plan that the Court found likely unconstitutional in 2005 required "that all traffic travel southbound on Ocean Boulevard for approximately five miles. Exit points off Ocean Boulevard during this five mile stretch are restricted." Court Order at 2. The current Black Bike Week Traffic Plan maintains those same requirements but adds several more: (1) the previous plan allowed two lanes of one-way traffic (where Ocean Boulevard is four lanes) while the current Black Bike Week Traffic Plan further reduces traffic to a single lane; (2) the previous plan allowed right hand turns off of Ocean Boulevard at multiple intersections while the current Black Bike Week Traffic Plan allows no turns during Friday, Saturday, and Sunday nights between 10 p.m. and 2 a.m.; and (3) the previous plan had no significant traffic control measures once motorists left the stretch of Ocean Boulevard between 29th Avenue North and 29th Avenue

South while the current Black Bike Week Traffic Plan forces all motorists entering Ocean Boulevard to travel a 23-mile loop that allows only one point of exit.

74.    The additional restrictions in the current Black Bike Week Traffic Plan make travel around the Myrtle Beach area substantially more difficult than the previous plan that was considered by the Court and have an even greater effect of discouraging potential Black Bike Week participants from travelling to the area for the event than the restrictions under the previous plan.

75.    The plaintiffs' expert from the 2003 Litigation, Dr. David Clarke, whom the Court relied upon when concluding that the previous traffic plan was likely discriminatory observed and assessed the current Black Bike Week Traffic Plan during the 2017 Black Bike Week. Dr. Clarke concluded that the traffic measures imposed by the City of Myrtle Beach in 2017 had an even more negative effect on traffic flow in the Myrtle Beach area than the traffic measures imposed under the previous traffic plan. Dr. Clarke found that the current Black Bike Week Traffic Plan hinders the flow of traffic and that roads in the area experienced substantially worse performance than they would have without the traffic restrictions. Limiting Ocean Boulevard to a single southbound lane guaranteed severe congestion because the single lane was inadequate to accommodate the traffic. Dr. Clarke concluded that the current Black Bike Week Traffic Plan resulted in added travel time and inconvenience to motorists in the area.

76.    Dr. Clarke further concluded that, as under the previous traffic plan considered by the Court, there is no traffic-related reason that can justify the current Black Bike Week Traffic Plan. It appears to Dr. Clarke that the sole purpose for the current Black Bike Week Traffic Plan is to discourage travel and visitors in the area during Black Bike Week. The traffic pattern

imposed by the City is not warranted by the behavior, crowd size, or any other characteristic of the Black Bike Week festival attendees.

77.     Retired police chiefs Willie R. Williams and Mitchell W. Brown, who were also considered by the Court when finding the previous traffic plan likely unconstitutional, also reviewed the current Black Bike Week Traffic Plan during the 2017 Black Bike Week. They similarly concluded that they would never have designed or approved such a traffic management plan. The Chiefs also concluded that the current Black Bike Week Traffic Plan could only have been designed as an effort to frustrate motorists and discourage potential visitors from traveling to the area. The Chiefs found that the design of the current Black Bike Week Traffic Plan was worse and had more harmful effects than the plan at issue in the 2003 Litigation.

78.     Again, as in the 2003 Litigation, the City can provide no legitimate justification for the highly restrictive traffic plan during Black Bike Week.

**VI.     The City Of Myrtle Beach Imposes Minimal Traffic Restrictions During Harley Week.**

79.     In contrast to the highly restrictive current Black Bike Week Traffic Plan, Harley Week has no formal traffic plan. During Harley Week, motorists are able to drive the road freely in both directions just as they would be able to during most other days of the year. Harley Week participants are able to cruise up and down and turn on and off Ocean Boulevard as well as access their hotels, vacation rentals, restaurants, and other entertainment without restriction. Defendants also do not put up police barriers between pedestrians and motorists, except in a limited area around the downtown amusement parks.

80.     Without the traffic restrictions, motorists on Ocean Boulevard could travel the road with minimal impediments and were never forced into a traffic loop that would require them to travel miles from the most direct route to their destinations.

81.     As Judge Wooten found during the 2003 Litigation, Harley Week and Black Bike Week are similarly situated. The number of people attending the events is not significantly different. The behavior of the crowds during the two events is similar and there are no other differences in the characteristics of the two events that would justify different traffic management plans.

82.     No traffic forecasts were done that suggested different traffic management needs for the two events. Dr. Clarke confirmed during his review of the 2017 Bike Weeks that there was no evidence that Black Bike Week produced traffic demands that were any different from the traffic demands during Harley Week.

83.     Dr. Clarke's assessment of traffic during the two weekends led to a conclusion that Ocean Boulevard and other area streets experienced better performance with no traffic restrictions in place during Harley Week than with the traffic restrictions under the current Black Bike Week Traffic Plan.

84.     In comparing the two events and the traffic patterns used during them, Dr. Clarke concluded that the current Black Bike Week Traffic Plan served no useful purpose for traffic management during Black Bike Week.

85.     Chiefs Brown and Williams also concluded based on personal observation that the two events were similar and that behaviors of the participants were similar. The Chiefs observed no reason to implement different traffic management for Black Bike Week and Harley Week.

86.     As in the 2003 Litigation, the City can provide no explanation for maintaining different traffic plans for Harley Week and Black Bike Week.

**VII.    The City of Myrtle Beach Maintains an Unequal and Unjustified Police Presence During Black Bike Week**

87.    Defendants deploy significantly more police during Black Bike Week than during any other Myrtle Beach event and those police engage in significantly more aggressive tactics during Black Bike Week.

88.    In 2017, approximately 800 police officers policed Black Bike Week. These law enforcement officers came from a variety of jurisdictions in the region and most were under the command and control of the Myrtle Beach Police Department for the duration of Black Bike Week.

89.    Not only does the City have the area overwhelmed with police officers, but those officers are instructed to police aggressively and strictly enforce city ordinances. Prior to Black Bike Week 2017, the Myrtle Beach Police Department held a meeting for law enforcement officers at a convention center. There, officers were given a pamphlet cataloging more than 50 various offenses and minor infractions for which they could ticket, and officers were encouraged to strictly enforce any violations. Law enforcement officials harass Black Bike Week visitors based on over-enforcement of local ordinances and aggressively ticket and arrest Black Bike Week participants for minor infractions. Throughout the weekend, Black Bike Week participants are surrounded by law enforcement and scrutinized by slow moving police vans filled with armed officers.

90.     Law enforcement officers use the effects of the traffic plan and its resulting gridlock to be more aggressive in their enforcement efforts along Ocean Boulevard. Officers walk their routes back and forth peering in windows and searching occupants of cars that are at a standstill because of the traffic. This only increases the intimidating law enforcement presence

and allows the officers to identify minor violations that would otherwise go unenforced. At points during Memorial Day weekend, vehicles were stopped by law enforcement every ¼ mile.

91.    Because of the traffic gridlock imposed by Defendants' traffic pattern, motorcyclists have to turn off their vehicles in order to prevent overheating. Frequently, as soon as a motorcyclist does so, police officers appear, yelling at the motorcyclist to keep on moving.

92.    Police insist that spectators continue to keep moving and do not allow them to stop in front of stores. No vendors are permitted during Black Bike Week.

93.    The overwhelming presence of the large number of law enforcement officials engaged in aggressive policing tactics is intended to, and has the effect of, intimidating Black Bike Week participants and discouraging them from travelling to Myrtle Beach, in violation of Plaintiffs' basic constitutional rights.

94.    Chief Brown did not observe any actions or behavior that warranted the increased police presence during the 2017 Black Bike Week.

95.    During Harley Week 2017, it was reported that there were only 60 state and local police officers patrolling the streets (less than one-tenth the number present for Black Bike Week).

96.    With many fewer law enforcement officers present, Harley Week participants were not subjected to the same levels of enforcement and scrutiny as those attending Black Bike Week.

97.    During Harley Week, riders are permitted to stop on the street, chat with spectators and other motorists, show off their bikes, and are allowed free and open interaction with one other without the constant scrutiny of law enforcement officers. Harley Week vendors are also permitted to set up stands along the sidewalks.

98.     Chief Brown observed significant differences in the level and behavior of law enforcement between Harley Week and Black Bike Week. Chief Brown did not observe any difference in the size or behavior of the crowds during the two events that would justify the differences in law enforcement.

99.     The City also does not impose traffic restrictions or maintain increased and aggressive law enforcement practices during other widely attended events throughout the summer in the City of Myrtle Beach, including the Sun Fun Festival, Fourth of July weekend, and Labor Day Weekend. All of these events attract large crowds of visitors to Myrtle Beach and Ocean Boulevard in particular. In contrast to Black Bike Week, however, the visitors to Myrtle Beach during these other events are predominantly white.

100.    The Defendants' efforts to undermine Black Bike Week have been successful. By their own account, attendance at Black Bike Week is down significantly since Defendants instituted the current traffic plan and policing practices.

**VIII.  City Officials Acknowledge that They Implement the Traffic Restrictions and Police Presence During Black Bike Week Because of the Composition of the People Attending the Event**

101.    City officials have clearly stated that the City has imposed restrictive traffic and police policies during the predominantly African-American Black Bike Week and not for the predominantly white Harley Week and other summer events because of the composition of the people attending the events.

102.    Former Chief of Police Warren Gall, who retired immediately before Black Bike Week 2017, claimed that "Bikefest creates the atmosphere that draws the bad element to the Myrtle Beach area," and that "the Bikefest draws crowds that can do anything and everything they want to, or think they can, in an atmosphere of anonymity."

103.     Myrtle Beach City Councilman Randal Wallace stated in reference to Black Bike Week that: "We've got to do something to curtail this feeling that they can come and do whatever they want here. We're going to squash that one next year."

104.     South Carolina's former Governor, Nikki Haley, who was involved in discussions regarding the policing of Black Bike Week, made public statements in 2014 about her goal to end Black Bike Week. Governor Haley conditioned South Carolina's investment in the town of Atlantic Beach on the town's commitment to cease hosting the festival. Despite Governor Haley's efforts, Atlantic Beach Mayor Jake Evans responded that Atlantic Beach would continue the important tradition of Bikefest. Governor Haley claimed that the culture of Black Bike Week had caused problems and that attendees were "coming to have a party."

105.     Former Mayor John Rhodes also called for the end of Black Bike Week. In response to a suggestion from Horry County officials that the 2015 loop be limited to 9 miles, Mayor Rhodes responded that it would defeat the purpose of the loop, as "we're trying to move people outside of the city. We're trying to get them out." Mayor Rhodes has also continued to employ a significantly larger police presence during Black Bike Week than any other events, ensuring that attendees of Black Bike Week are policed more than any other festival-goers in the City.

106.     Just last year, Mr. Rhodes explicitly denied any connection between Memorial Day weekend in Myrtle Beach and its long history as the largest African-American motorcycle gathering in the country. He issued a statement that: "Memorial Day weekend is not about a bike festival. It's about the celebration of those who've served our country to give us the freedom that we have." Mr. Rhodes's statements make clear that the City does not view Black Bike Week as

an integral part of Myrtle Beach's tourism industry, despite the fact that it is one of the four highest grossing weekends in Myrtle Beach.

107.     These statements from government officials precisely echo the comments Judge Wooten found as being clear evidence of racial motivation in the 2003 Litigation. Again, in recent years, no such similar statements have been made about the predominantly white Harley Week attendees.

## IX.     Defendants' Assertion that Past Violence Justifies the Current Black Bike Week Traffic Plan and Increased Law Enforcement is Demonstrably False

108.     Defendants attempt to justify their return to the differential treatment of Black Bike Week and its predominately African-American attendees, which the Court previously found as likely unconstitutional, by pointing to acts of violence that occurred in 2014.

109.     Defendants' reference to violence relates to incidents during Memorial Day weekend 2014, including an incident when police responded to reports of shootings in a hotel located on Ocean Boulevard. The shootings resulted in the deaths of three South Carolina residents. The shootings were never linked to Black Bike Week, and there is no evidence that the individuals were in Myrtle Beach for any purpose related to Black Bike Week.

110.     The 2014 Memorial Day shootings are consistent with a general increase in gun-violence in Myrtle Beach throughout the year. In 2015 there were at least eleven shootings, two of which resulted in murder. None occurred during Black Bike Week. In November 2016, five people were shot in a nightclub due to gang violence. Four of the victims were innocent bystanders. Eight shootings occurred in Horry County over Easter week 2017, and only a few months later, seven people were injured along Ocean Boulevard during a shooting over Father's Day. This past Labor Day weekend, police responded to an incident involving multiple gunshot

wounds along the Grand Strand on Ocean Boulevard. On October 7 of this year, during the last night of the Harley Fall Rally, shots were fired on Ocean Boulevard near the Sea Banks Motel.

111.    Even though the increase in violence is spread throughout the year, only Black Bike Week has been singled out as an event that requires differential treatment because of the violence. Black Bike Week does not produce an anomalous level of crime or violence that would justify a different traffic plan or higher level of law enforcement.

112.    In addition, a traffic plan that creates frustration and anxiety for motorists would not address concerns about an increase in violence. To the contrary, the effect of the traffic plan only heightens emotions that are more likely to lead to violence. Further, the shootings during the fall Harley Rally did not lead the City to institute traffic plans or increase law enforcement presence during Harley Week or other predominantly white motorcycle rallies. Defendants' use of violence as an explanation for the traffic plan and law enforcement during Black Bike Week is simply a pretext for discriminatory conduct against the one predominantly African-American event in Myrtle Beach each year.

## X.    Attendees of Black Bike Week were Subjected to a Hostile and Discriminatory Environment

113.    Plaintiff Simuel Jones is a 58 year-old ex-marine, who has regularly attended Black Bike Weeks since 2002. Mr. Jones, whose father introduced him to riding when he was a teenager, has been riding for over 40 years.

114.    Black Bike Week is a vacation that Mr. Jones plans for every year, looking forward to making the trip from Chicago, Illinois where he is a gas utility worker.  Each year he loads up his truck and makes the sixteen-hour trip to Myrtle Beach in one day. As soon as he arrives in Myrtle Beach and unloads his bike, Mr. Jones rides his bike around the city. He attends the event for the camaraderie of meeting fellow motorcyclist enthusiasts from all over the

country, to get the opportunity to see a variety of bikes and the ways in which people customize their bikes, and to have the chance to rest and relax on the beach.

115.    Mr. Jones has observed that the implementation of the current Black Bike Week Traffic Plan has made traffic significantly worse. He has also observed a drop off in the number of attendees of Black Bike Week since the implementation of the current Black Bike Week Traffic Plan. He also believes that harassment of attendees by police has also contributed to the declining participation in the event.

116.    This past year Mr. Jones made a reservation at the Sun & Sand Resort at 2701 South Ocean Boulevard. The hotel is in a central location on Ocean Boulevard, and Mr. Jones booked this hotel so that he could easily access the festivities.

117.    Mr. Jones enjoys dining at the Pizza Hut located at 7601 North Kings Hwy. On Saturday, May 25, 2017, Mr. Jones left his hotel around 9 p.m. to go to the Pizza Hut. Upon exiting his hotel he had no choice but to head south on Ocean Boulevard and ended up caught in the loop. When he reached Highway 17, he was diverted west to 501 South. A trip that would normally have taken no more than twenty minutes took him approximately 3 hours.

118.    Mr. Jones had planned to eat dinner, return to his hotel, and then head out for the evening to enjoy the festival. As a result of his immense frustration and exhaustion from battling the traffic loop, Mr. Jones decided to stay in his room for the night.

119.    The existence of the loop required Mr. Jones to plan his nights around the traffic plan. Unable to go out for just a few hours, Mr. Jones felt he had to plan to be out until 2 a.m. in order to leave his hotel in the evening. Mr. Jones was no longer able to attend the night events at Atlantic Beach or try out new venues because he knew that if he did not like the event or venue he couldn't leave without being stuck in traffic for hours.

120.    Defendants' policing tactics have also negatively affected Mr. Jones's experience of Black Bike Week. Mr. Jones believes that the police presence on Ocean Boulevard is excessive and has observed that it exacerbates traffic in the area. During his recent visits to Myrtle Beach during Black Bike Week he has noticed a strict enforcement of the "no loitering" rule, with law enforcement refusing to allow people to gather, even briefly, on the sidewalks or streets. From Mr. Jones's observations, it appears that attendees get stopped and searched for the simple act of socializing with one another. This, combined with the erection of barriers along Ocean Boulevard, prevents bikers from interacting with spectators. In the past, Mr. Jones was able to meet people on the streets, chat with them, and ride with them. The law enforcement has interfered with the sense of camaraderie that developed from these types of interactions.

121.    Although Mr. Jones plans to continue to attend Black Bike Week, the current traffic plan and policing tactics have made the experience far less enjoyable. The traffic loop restricts his movements, requires him to alter his plans, and severely impedes his experience of the weekend. Having attended Black Bike Week for almost 15 years, the only reason he can identify for the traffic plan and law enforcement presence are stereotypes about the African-American attendees.

122.    Plaintiffs Leslie and Cedric Stevenson are a married couple living outside Atlanta, Georgia. They attended Black Bike Week in 2016 and 2017. In 2017, Mrs. Stevenson brought along her mother, Mary Ann Dunlap, to enjoy the festival.

123.    Leslie Stevenson recently retired from a 23-year career at Allstate Insurance Company. Cedric Stevenson works as a contract long-haul truck driver and previously ran his own construction company. Mr. Stevenson began riding a motorcycle when he was 15 years old.

Mr. Stevenson attends approximately two bike festivals a year, and the couple has traveled together to other bike rallies, including in Atlanta and Daytona Beach.

124.    The Stevensons first traveled to Myrtle Beach for Black Bike Week in 2016. They had decided to attend Black Bike Week because they had heard good things about the event from Mr. Stevenson's Atlanta-based motorcycle club, the Mystic Knights. They had heard that over 100,000 bikers would attend and that the crowd was friendly, respectful and low-key, with plenty of dancing and merriment. While the crowd at Black Bike Week lived up to their expectations, the Stevensons are reluctant to return to Myrtle Beach over Memorial Day because of Defendants' actions.

125.    In 2016, the Stevensons stayed at the Sheraton Convention Center hotel. They had decided to go to Landry's Seafood House for dinner. The drive to Landry's took only 20 minutes, and they finished dinner around 10 p.m., not realizing that the loop would be in place even outside of the downtown area. As they were heading back to their hotel they got stuck in the loop and it took nearly two hours for them to get back to their hotel. Later that weekend the Stevensons were forced to leave a restaurant before getting their food because the service was slow and they were worried about getting caught in the loop. For the remainder of the weekend, the traffic loop was constantly on their minds as they made plans about what to do. In the evenings the Stevensons could only venture out within walking distance of their hotel even though they wanted to explore other restaurants and areas.

126.    In 2017, Mr. and Mrs. Stevenson and Mrs. Stevenson's mother, Ms. Dunlap, arrived in Myrtle Beach on Friday night around midnight. They were driving their car with a trailer attached in order to bring Mr. Stevenson's bike with them. As they approached their hotel, the Holiday Inn Club Vacations at South Beach Resort, there was a roadblock at the intersection

with Ocean Boulevard. The family could see their hotel from the intersection and tried to speak with the officer at the roadblock so that they could get through to their hotel. The officer asked to see their reservation, which they showed him. He then told them that they could not proceed straight on Ocean Boulevard in order to get to their hotel, and would have to enter the 23-mile loop in order to turn into the parking lot. Fortunately, the Stevensons had not entered the loop and were able to find a side street off of King's Highway that was not blocked and made a U-turn there. They wound their way back through a residential neighborhood to get to their hotel. This still took them an additional 30 minutes late at night after a long drive, even though they had been across the street from their hotel when they were stopped at the intersection.

127.    Throughout the weekend the Stevensons planned their activities with the traffic loop in mind and would only travel to places that required a car during the day. Mrs. Stevenson was particularly worried because her 70-year-old mother was there with them, and if they got stuck out after 10 p.m. her mother would not be able to handle being in the car until 2 a.m. in the traffic loop. As a result, the family planned their evening meals only within walking distance of their hotel. Although they would have preferred to explore other parts of the area, the City's implementation and enforcement of the traffic loop prevented them from using their car.

128.    The Stevensons went out for several rides together during the day, with Mrs. Stevenson riding on the back of the bike. They were shocked to see police officers stationed every few feet in the median on Ocean Boulevard, making them feel watched and uncomfortable for doing nothing more than riding a motorcycle during a motorcycle festival.

129.    Mr. Stevenson has also previously attended Harley Week. Mr. Stevenson has observed several differences between the two bike weeks. During Black Bike Week, he felt as though the police were watching the bikers like vultures, ready to swoop down at any given

moment. What particularly stood out to him was that Harley Week bikers are able to ride around freely, riding up and down Ocean Boulevard and stopping to talk to one another and admire each other's bikes. Black Bike Week bikers on the other hand would have to navigate a maze of road closures and traffic restrictions, and the minute a biker slowed down to talk to someone, the police would descend and tell them to keep moving. During Black Bike Week law enforcement officers were constantly shouting at riders, including Mr. Stevenson, to turn their music down, whereas exactly the same behavior by Harley Week bikers did not result in any reaction from law enforcement.

130.    Mrs. Stevenson attends festivals all over the country and even internationally, and has never experienced anything like the police presence she witnessed during her two years at Black Bike Week. She finds the police presence at Black Bike Week intimidating and unnecessary.

131.    As a result of Defendants' actions, Mr. Stevenson was unable to relax and enjoy the weekend as he otherwise would have. He believes the police intentionally prevent Black Bike Week participants from stopping to interact with each other – the entire point of traveling to attend a motorcycle gathering – and instead force participants to keep inching through gridlocked traffic created by the City's traffic plan.

132.    While the Stevensons think the Black Bike Week event has the best attendees, the intimidating police presence and the City's traffic plan prevent them from being able to enjoy the weekend. The Stevensons are unlikely to return to Myrtle Beach unless the City's traffic plan and law enforcement activities change.

## INJURIES TO PLAINTIFFS

133.    As a direct and proximate result of Defendants' discriminatory practices, policies, and conduct described above, the individual Plaintiffs have suffered and will continue to suffer great irreparable loss and injury including but not limited to humiliation, embarrassment, emotional distress, mental anguish, deprivation of the right to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and deprivation of the exercise of their constitutionally protected rights.

134.    Defendants' illegal discrimination has caused Plaintiffs to suffer irreparable and ongoing injury for which there is no adequate remedy at law and which will continue to cause injury to them unless and until injunctive relief is granted.

135.    Defendants' implementation of the current Black Bike Week Traffic Plan and deployment of excessive law enforcement personnel caused significant mental and emotional distress to the individual Plaintiffs and members of the NAACP and its Myrtle Beach branch. The knowledge that Myrtle Beach implemented different traffic plans and deployed different levels of law enforcement between Black Bike Week and Harley Week and that those different policies and practices were motivated by discrimination caused additional mental and emotional distress, humiliation, and embarrassment to the individual Plaintiffs and members of the NAACP and its Myrtle Beach branch. Defendants' actions as described herein also caused the deprivation of the civil rights of the individual Plaintiffs and members of the NAACP and its Myrtle Beach branch.

136.    Members of the NAACP regularly attend Black Bike Week in Myrtle Beach, including the Black Bike Weeks held between 2015 and 2017. Members of the NAACP who

34

attended Black Bike Week between 2015 and 2017 were injured by Defendants' conduct as described herein.

137.    For the reasons stated herein, members of the NAACP and its Myrtle Beach branch would otherwise have standing to sue as individuals. The issues and claims raised herein are germane to the purpose and missions of the NAACP and its Myrtle Beach branch. The relief requested by the NAACP and its Myrtle Beach branch in their capacities as representatives of their members does not require the participation of those members in this action.

138.    Members of the NAACP who attended Black Bike Week between 2015 and 2017 were injured by Defendants' conduct as described herein.

139.    In response to complaints from members and other Myrtle Beach visitors, the NAACP and its Myrtle Beach branch have been monitoring and investigating the treatment of African Americans during Black Bike Week, including in comparison to other festivals held in Myrtle Beach. These efforts to identify and counteract the City's discrimination has forced the NAACP and its Myrtle Beach branch to divert their resources from other activities and efforts they would otherwise have pursued in furtherance of their missions. Defendants' actions have frustrated the mission, purpose and interests of the NAACP and its Myrtle Beach branch and their memberships.

## CAUSES OF ACTION

### Count I
### 42 U.S.C. § 1981

140.    Plaintiffs reallege and incorporate by reference all of the allegations set forth in Paragraphs 1 through 139 above.

141.    Section 1981 provides in pertinent part that:

> All persons within the jurisdiction of the United States shall have
> the same right in every State…to the full and equal benefit of all
> laws and proceedings for the security of persons and property as is
> enjoyed by white citizens, and shall be subject to like punishment,
> pains, penalties, taxes, licenses, and exactions of every kind, and to
> no other…The rights protected by this section are protected
> against…impairment under color of State law.

142.    Individual Plaintiffs and the members of the NAACP and its Myrtle Beach branch are "persons" within the meaning of that term as it is used in 42 U.S.C. §1981 and are within the jurisdiction of the United States.

143.    Defendants' actions as described above constitute a deprivation of the rights of the Plaintiffs to the full and equal benefit of all laws and proceedings for the security of persons and property on the same terms as are enjoyed by white persons and have subjected the Individual Plaintiffs and the members of the NAACP and its Myrtle Beach branch to disparate punishment, pain, and penalties, in violation of 42 U.S.C. § 1981.

**Count II**
**42 U.S.C. §1983 for Deprivation of First Amendment Rights**

144.    Plaintiffs reallege and incorporate by reference all of the allegations set forth in paragraphs 1 through 139 above.

145.    Defendants are "persons" within the meaning of that term as it is used in 42 U.S.C. §1983.

146.    Individual Plaintiffs and the members of the NAACP and NAACP Myrtle Beach are "citizens" of the United States and are within the jurisdiction thereof.

147.    The United States Constitution, as amended, grants the Individual Plaintiffs and the members of the NAACP and its Myrtle Beach branch certain rights, privileges, and immunities, including the rights of expression, assembly, and association guaranteed under the First Amendment.

148.    Defendants' actions and omissions under color of local law, custom, policy, and usage as described above have deprived and continue to deprive the Individual Plaintiffs and the members of the NAACP and its Myrtle Beach branch of these Constitutional rights, which rights are enforceable under 42 U.S.C. § 1983.

## Count III
### 42 U.S.C. § 1983 for Deprivation of Fourteenth Amendment Rights

149.    Plaintiffs reallege and incorporate by reference all of the allegations set forth in paragraphs 1 through 139 above.

150.    Defendants are "persons" within the meaning of that term as it is used in 42 U.S.C. § 1983.

151.    Individual Plaintiffs and the members of the NAACP and its Myrtle Beach branch are "citizens" of the United States and are within the jurisdiction thereof.

152.    The United States Constitution, as amended, grants the Individual Plaintiffs and the members of the NAACP and its Myrtle Beach branch certain rights, privileges, and immunities, including the rights of equal protection of laws guaranteed under the Fourteenth Amendment.

153.    Defendants' actions and omissions under color of local law, custom, policy, and usage as described above have deprived and continue to deprive the Individual Plaintiffs and the members of the NAACP and its Myrtle Beach branch of these Constitutional rights, which rights are enforceable under 42 U.S.C. §1983.

## Count IV
### 42 U.S.C. § 1983 for Deprivation of Rights Under the Dormant Commerce Clause

154.    Plaintiffs reallege and incorporate by reference all of the allegations set forth in paragraphs 1 through 139 above.

155.    Defendants are "persons" within the meaning of that term as it is used in 42 U.S.C. § 1983.

156.    Individual Plaintiffs and the members of the NAACP and NAACP Myrtle Beach are "citizens" of the United States and are within the jurisdiction thereof.

157.    The United States Constitution, as amended, grants the Individual Plaintiffs and the members of the NAACP and its Myrtle Beach branch certain rights, privileges, and immunities, including the rights under the Dormant Commerce Clause of Article I, Section 8 of the Constitution.

158.    For these and other reasons, the actions and omissions of Defendants under color of local law, custom, policy and usage have deprived and continue to deprive the Individual Plaintiffs and the members of the NAACP and its Myrtle Beach branch of these Constitutional rights, which rights are enforceable under 42 U.S.C §1983.

**Count V**
**Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d**

159.    Plaintiffs reallege and incorporate by reference all of the allegations set forth in paragraphs 1 through 139 above.

160.    Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d, et seq., provides that "[n]o person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance."

161.    At times relevant to this action, Defendant City of Myrtle Beach has received federal financial assistance from the United States Department of Justice for law enforcement purposes.

162.     As set forth in more detail above, Defendants have violated and are violating 42 U.S.C. § 2000d by providing services, which are partially funded by federal financial assistance, in a discriminatory manner.

163.     As described herein, the City of Myrtle Beach's differential treatment of African Americans and whites is motivated by discriminatory intent based on race and/or color.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully pray that the Court grant the following relief:

164.     enter a declaratory judgment finding that the actions of Defendants, as alleged in this Complaint, violate 42 U.S.C. § 1981, 1983, and 2000d;

165.     enter a preliminary and permanent injunction barring Defendants from continuing to engage in the forms of illegal discriminatory conduct alleged in this Complaint;

166.     enter a preliminary and permanent injunction directing that Defendants take all affirmative steps necessary to remedy the effects of the illegal discriminatory conduct alleged in this Complaint and to prevent repeated occurrences in the future;

167.     award compensatory damages to each individual Plaintiff in an amount that would fully compensate Plaintiffs for the humiliation, embarrassment, emotional distress, mental anguish, and out-of-pocket costs caused by Defendants' conduct as alleged herein;

168.     award compensatory damages to the NAACP through its Myrtle Beach branch in an amount that would fully compensate them for the diversion of resources and frustration of mission caused by Defendants' conduct as alleged herein;

169.     award Plaintiffs their reasonable attorneys' fees and costs; and

170.     order all other relief deemed just and equitable by this Court.

## DEMAND FOR JURY TRIAL

Pursuant to Fed. R. Civ. P. 38(b), Plaintiffs demand a jury trial on all claims so triable as of right.

Dated: February 27, 2018                    Respectfully submitted,

/s/ Peter Wilborn
D. Peter Wilborn, Jr. (ID #7609)
Law Office of Peter Wilborn
57 Cannon Street
Charleston, SC 29403
(843) 416-9060
peter@bikelaw.com

Reed N. Colfax*
Tara K. Ramchandani*
Ryan C. Downer*
Laura Gaztambide-Arandes*
Relman, Dane & Colfax, PLLC
1225 19th Street, N.W., Suite 600
Washington, D.C. 20036
(202) 728-1888
rcolfax@relmanlaw.com
tramchandani@relmanlaw.com
rdowner@relmanlaw.com
larandes@relmanlaw.com

Anson Asaka*
Associate General Counsel
National Association for the Advancement of
Colored People, Inc.
4805 Mt. Hope Drive
Baltimore, MD 21215
(410) 580-5777
aasaka@naacpnet.org

Joseph Rich*
Dorian L. Spence*
Lawyers' Committee for Civil Rights Under Law
1401 New York Avenue, NW, Suite 400
Washington, DC 20005
(202) 662-8600
jrich@lawyerscommittee.org

dspence@lawyerscommittee.org

*Attorneys for Plaintiffs*

*\*Pro Hac Vice Application to be Submitted*