# UNITED STATES DISTRICT COURT
## DISTRICT OF SOUTH CAROLINA
## FLORENCE DIVISION

| | |
|---|---|
| NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE, INC., *et al.*, | |
| Plaintiffs, | |
| v. | Civil Action No. 4:18-cv-00554-RBH |
| CITY OF MYRTLE BEACH, *et al.*, | |
| Defendants. | |

## <u>MOTION FOR PRELIMINARY INJUNCTION</u>

# **TABLE OF CONTENTS**

FACTUAL BACKGROUND .................................................................................2

    I.    Harley Week ...................................................................................2

    II.    Black Bike Week ...........................................................................3

    III.    History of Hostility Toward Black Bike Week Based on Racist Stereotypes ........3

    IV.    Black Bike Week Litigation Against City of Myrtle Beach ....................................4

    V.    Defendants' Discriminatory Treatment of Black Bike Week From 2015 Through 2017 ..................................................................................................7

    VI.    The Black Bike Week Traffic Plan is Significantly More Restrictive Than the Traffic Plan the Court Found Likely Discriminatory in the 2003 Litigation ......................................................................................................12

    VII.    The City Imposes Minimal Traffic Restrictions During Harley Week ................13

    VIII.    The City of Myrtle Beach Maintains an Unequal and Unjustified Police Presence During Black Bike Week .....................................................................14

    IX.    City Officials Acknowledge that Their Black Bike Week Plan is Implemented Because of the Composition of the People Attending the Event .....16

    X.    Defendants' Assertion that Past Violence Justifies the Current Black Bike Week Traffic Plan and Increased Law Enforcement is Demonstrably False ........17

    XI.    Attendees of Black Bike Week Were Subjected to a Hostile and Discriminatory Environment ..............................................................................18

ARGUMENT .....................................................................................................21

    I.    Plaintiffs Are Likely to Succeed on the Merits of their Discrimination Claims ................................................................................................................21

        A.    Black Bike Week Visitors Are Treated Differently Than Visitors for Other Major Events in Myrtle Beach .........................................................22

        B.    The City's Different Treatment of Black Bike Week Visitors Is Based on Race .........................................................................................................25

        C.    The City Can Cite No Compelling Reason for Its Restrictive and Discriminatory Approach to Black Bike Weekend ...................................28

II.     Plaintiffs Are Likely To Succeed on Their First Amendment Claim ................... 30

III.    Plaintiffs Will Suffer Irreparable Harm If Relief Is Not Granted .........................32

IV.     The Balance of the Equities and the Public Interest Favor the Granting of a
        Preliminary Injunction ............................................................................................34

CONCLUSION .........................................................................................................................35

# TABLE OF AUTHORITIES

**Cases**                                                                                          **Page(s)**

*Abernathy v. Conroy*,
429 F.2d 1170 (4th Cir. 1970) ....................................................................................32

*Am. Mfrs. Mut. Ins. Co. v. Sullivan*,
526 U.S. 40 (1999)......................................................................................................22

*Boy Scouts of America v. Dale*,
530 U.S. 640 (2000).....................................................................................................31

*Callum v. CVS Health Corp.*,
137 F.Supp.3d 817 (D.S.C. 2015)...............................................................................22

*Centro Tepeyac v. Montgomery Cty.*,
722 F.3d 184 (4th Cir. 2013) ....................................................................21, 32, 34, 35

*Chiles v. Crooks*,
708 F. Supp. 127 (D.S.C. 1989)..................................................................................22

*Cox v. City of Charleston, S.C.*,
250 F. Supp. 2d 582 (D.S.C. 2003).............................................................................32

*Elston v. Talladega Cty. Bd. of Educ.*,
997 F.2d 1394 (11th Cir. 1993) ..................................................................................22

*Giovani Carandola, Ltd. v. Bason*,
303 F.3d 507 (4th Cir. 2002) ......................................................................................33

*Gordon v. Holder*, 721 F.3d 638 (D.C. Cir. 2013) ........................................................33

*Jackson v. City of Aiken Hous. Auth.*,
No. 1:16-cv-02831-JMC, 2016 WL 7228242 (D.S.C. Decl. 14, 2016)........................33

*Healy v. James*,
408 U.S. 169 (1972) ........................................................................................................32

*Hurley v. Irish-American Gay, Lesbian and Bisexual Group of Boston*,
515 U.S. 557 (1995) ........................................................................................................31

*Morrison v. Garraghty*,
239 F.3d 648 (4th Cir. 2001) ..........................................................................................21

*Nat'l Assoc. for the Advancement of Colored People, Inc. v. City of Myrtle Beach*, No. 4-03-1732-12 (D.S.C. Aug. 16, 2004) ........................................................................... *passim*

*Perry Educ. Ass'n v. Perry Local Educators' Ass'n*,
460 U.S. 37 (1983) ..........................................................................................................32

*Ratliff v. Wake Forest Baptist Med. Ctr.*,
2014 WL 197809 (M.D.N.C. 2014) ................................................................................22

*Roberts v. U.S. Jaycees*, 468 U.S. 609 (1984) ...............................................................30

*Ross v. Meese*, 818 F.2d 1132, 1135 (4th Cir. 1987) ....................................................33

*Sylvia Dev. Corp. v. Calvert Cty., Md.*,
48 F.3d 810, 820 (4th Cir. 1995) .........................................................................22, 26, 28

*United States v. Nat. Treasury Emp. Union*,
513 U.S. 454 (1995) ........................................................................................................32

*Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*,
429 U.S. 252 (1977) ........................................................................................................26

*Winter v. Nat. Resources Defense Council, Inc.*,
555 U.S. 7 (2008) ............................................................................................................21

**Statutes**                                                                                 **Page(s)**

42 U.S.C. § 1981 .................................................................................................. 21, 22

42 U.S.C. § 1983 .................................................................................................. 22, 33

**Other Authorities**                                                                        **Page(s)**

Myrtle Beach, SC, Code of Ordinances § 19-190 ....................................................7, 8

Myrtle Beach, SC, Code of Ordinances § 19-191 ........................................................8

Myrtle Beach, SC, Code of Ordinances § 19-193 ........................................................8

Plaintiffs hereby move pursuant to Fed. Rule of Civ. P. 65 for an order requiring the City of Myrtle Beach to maintain a substantially similar traffic pattern during both Myrtle Beach Bike Week Spring Rally ("Harley Week") and the Atlantic Beach Bikefest ("Black Bike Week").

For the last several decades, two large motorcycle rallies have been held in the Myrtle Beach area in the month of May:  Harley Week in mid-May and Black Bike Week over Memorial Day Weekend. The vast majority of the Harley Week participants are white and the area welcomes them with minimal special restrictions for the event. One week later, over the Memorial Day weekend, a similar number of motorcyclists gather for Atlantic Beach Bikefest ("Black Bike Week"). The vast majority of Black Bike Week visitors are African-American and the event has historically been met with opposition and resistance from the City of Myrtle Beach. The City implements *no* unique traffic plan for Harley Week and the mostly white participants are able to travel around the Myrtle Beach area much like they can on any other day of the year. During Black Bike Week, however, Ocean Boulevard— a major thoroughfare that runs the length of Myrtle Beach, adjacent to the beach and that is a focal point for both weekends—is reduced to a single lane of one-way traffic. During the late night hours of the event, all motorists entering Ocean Boulevard are forced into a 23-mile loop that has just one exit.

In 2005, Chief United States District Court Judge Terry Wooten found that differences in the traffic plans between Black Bike Week and Harley Week were likely motivated by race and likely unconstitutional. Subsequently, a consent decree was entered requiring the City to maintain substantially similar traffic plans during both Harley Week and Black Bike Week. Nonetheless, fewer than five years after the Consent Order expired in 2010, the City has imposed a traffic plan for Black Bike Week that is even more onerous than the plan Judge Wooten found likely unconstitutional. The City can proffer no legitimate explanation for its different bike week

1

policies. The one-way Ocean Boulevard traffic plan and the 23-mile loop in place during Black Bike Week serve no useful traffic- or safety-related purpose. Instead, they have the opposite effect, resulting in increased frustration and anxiety for motorists and pedestrians attending Black Bike Week and making it nearly impossible to traverse the Boulevard or surrounding area.

As detailed below, the City's Black Bike Week traffic plan is motivated by a discriminatory opposition to the predominantly African-American attendees of the event. The Plan, which Myrtle Beach asserts it will impose for Black Bike Week 2018 is, therefore, unconstitutional and causes irreparable harm to Plaintiffs and other visitors to the City during the weekend. With the traffic plan's discriminatory purpose and lack of justification, it is easily concluded that the balance of equities tips heavily against the Plan and demands the issuance of a preliminary injunction to require equal treatment of Black Bike Week and its participants.

## FACTUAL BACKGROUND

### I.    Harley Week

Harley Week, which began in the 1940s, now draws hundreds of thousands of participants to the Myrtle Beach area. Ex. 1 (MyrtleBeachBikeWeek.com, Welcome to Myrtle Beach Bike Week).[1] Harley Week typically extends over ten days, with the last weekend attracting the largest crowds. Ex. 2 (Decl. of M. James) ¶ 5 ("James Decl."); Ex 3 (May 16, 2016 WMBFNews.com) at 1. Since its inception, the vast majority of Harley Week participants have been white. James Decl. ¶ 5; Ex. 4 (*NAACP. v. City of Myrtle Beach*, (D.S.C. Aug. 16, 2004)) (Doc. No. 19) ("Answer") ¶ 13.

Harley Week bikers have historically been welcomed by the City of Myrtle Beach and its resorts, hotels, restaurants, and other merchants. James Decl. ¶ 6. Harley Week bikers regularly

---

[1] All numbered exhibits are described in more detail in the Declaration of Tara Ramchandani, attached as Exhibit A.

drive or "cruise" through the City of Myrtle Beach along Ocean Boulevard. *Id.*; Ex. 5 (BikeWeekMB.com, Welcome to Bike Week Myrtle Beach) at 2. Cruising is a central aspect of Harley Week as bikers display their motorcycles to spectators gathered on the sidewalks and at hotels along Ocean Boulevard. James Decl. ¶ 6; Ex. 6 (Decl. of Simuel Jones) ("Jones Decl.") ¶ 7; Ex. 7 (Decl. of Cedric Stevenson) ("C. Stevenson Decl.") ¶¶ 18-19.

For the last several Harley Weeks, Ocean Boulevard has been open to vehicles travelling in both directions, with traffic flow regulated similarly to any other day of the year. James Decl. ¶ 21; Ex. 8 (Decl. of Mitchell W. Brown) ("Brown Decl.") ¶¶ 8-9. The City has not recently implemented any formal traffic plan or any special, temporary traffic controls or restrictions for Harley Week. Ex. 9 (Decl. of David B. Clarke) ("Clarke Decl.")¶ 6; Brown Decl. ¶¶ 8-10.

## II.      Black Bike Week

Black Bike Week, created by the Carolina Knight Riders, a black biker organization, began in the 1980s. James Decl. ¶ 7. The event origianted in Atlantic Beach, a predominately African-American beach town. Ex. 10 (Nov. 3, 2017 Star News Online) at 2. By the late 1990s, Black Bike Week encompassed much of the greater Myrtle Beach area and many attendees now stay in hotels along Ocean Boulevard in Myrtle Beach. Ex. 4 (Answer) ¶ 25; James Decl. ¶ 7.

Black Bike Week, held each year around Memorial Day, like Harley Week, attracts thousands of participants. Ex. 11 (May 24, 2017 Myrtle Beach Sun News ) at 1; Ex. 1 (Welcome to Myrtle Beach Bike Week). The vast majority of individuals participating in Black Bike Week are African American. James Decl. ¶ 8; Brown Decl. ¶ 18. As during Harley Week, it is common for Black Bike Week attendees to drive or "cruise" along Ocean Boulevard, displaying their motorcycles to spectators gathered on the sidewalks and at hotels. James Decl. ¶ 10.

## III.      History of Hostility Toward Black Bike Week Based on Racist Stereotypes

As Black Bike Week expanded from Atlantic Beach to Myrtle Beach in the mid-1990s,

white Myrtle Beach city officials began exhibiting overt hostility towards the event. City officials implemented special rules and policies in an effort to discourage and prevent Black Bike Week activities from continuing in Myrtle Beach. Ex. 4 (Answer) ¶ 33; Ex. 12 (Dep. of M. McBride, *NAACP v. City of Myrtle Beach* (D.S.C. Oct. 13, 2004)) (Doc. 53-1) ("McBride Dep.") at 163-65. Their prejudice against Black Bike Week stood in sharp contrast to the explicit, public welcoming of Harley Week bikers. Ex. X (McBride Dep.) at 107-108; James Decl. ¶ 6.

In 1998, the City introduced a restrictive traffic pattern that was only implemented during Black Bike Week and did not apply during Harley Week or other festivals. Ex. 4 (Answer) ¶ 33; Ex. 13 (First Am. Compl., *NAACP v. City of Myrtle Beach* (D.S.C. July 2, 2004)) (Doc. 16) ("First Am. Compl.") ¶ 45; Ex. 14 (Mar. 23, 1998 Email from P. Dowling) at 1. These restrictions caused significant gridlock, severely limited the ability of Black Bike Week attendees to move freely throughout the area, made participants feel unwelcome, and interfered with their enjoyment of "cruising" along Ocean Boulevard. *See* Ex. 15 (Exp. Rep. of W. Williams and M. Brown, *NAACP v. City of Myrtle Beach* (D.S.C. Feb. 24, 2005)) (Doc. 53-5) at 3-6; Ex. 16 (Exp. Rep. of D. Clarke, *NAACP v. City of Myrtle Beach* (D.S.C. Feb. 24, 2004)) (Doc. 53-4) at 12-14.

## IV. Black Bike Week Litigation Against City of Myrtle Beach

Despite the City's clear intent to drive Black Bike Week from the City, the Black Bike Week community persisted in trying to continue its strong traditions and not bow to the opposition. Their efforts included filing a lawsuit in May 2003 in federal court against the City of Myrtle Beach and then police chief Warren Gall alleging that the differential treatment of the predominantly African-American attendees of Black Bike Week deprived them of their constitutional rights ("the 2003 Litigation"). Ex. 17 (Compl., *NAACP v. City of Myrtle Beach* (D.S.C. May 20, 2003)) (Doc. 1).

On May 9, 2005, Judge Terry Wooten granted the plaintiffs' motion for a preliminary injunction to enjoin the City from using its restrictive traffic pattern. Ex. 18 (Op. & Order, *NAACP v. City of Myrtle Beach* (D.S.C. May 9, 2005)) (Doc. 85) ("Op. & Order") at 15. In doing so, Judge Wooten examined the traffic plans used for the two bike weeks. At that time, the City limited a five-mile stretch of Ocean Boulevard to one-way traffic during Black Bike Week. In contrast, during Harley Week, two-way traffic was permitted for the entire length of Ocean Boulevard. *Id.* at 3.

Judge Wooten determined that the two events were similarly situated. *Id.* at 7-8, 12-13. In his decision, Judge Wooten relied upon expert testimony that there were no significant differences between the visitors for the two bike weeks that would warrant the differences in the traffic plans. *Id.* at 7-8. He further concluded that the City could use the same traffic plan during Black Bike Week that it employed for Harley Week and other large festivals. *Id.* at 5-6.

The Court also found that there was significant evidence to support a conclusion that the City was motivated by discriminatory intent. Op. & Order at 8-10. This included the fact that Black Bike Week was the only weekend of the year in Myrtle Beach when African-American visitors clearly outnumbered white visitors and was the only weekend when the City implemented a one-way traffic plan. As a result, the Court found that the City's Black Bike Week actions would disproportionately affect African Americans. *Id.*

In finding discriminatory intent, the Court also focused on statements made by City officials showing that race was discussed and considered when implementing the traffic plan for Black Bike Week. *Id.* at 9-10. This included comments about Harley Week tourists being "more law abiding" than Black Bike Week tourists, that holding Black Bike Week visitors to certain expectations would result in fewer attendees because all those visitors wanted to do was have a

5

party, and that Black Bike Week tourists "party differently" and "wanted to take over the street." *Id*. The Court found that these statements were made in connection with the traffic plan for Black Bike Week and revealed that race may have been a motivating factor in implementing it. *Id*.

Finally, the Court determined that the City had not established any compelling reasons for a different traffic plan during Black Bike Week. In particular, the Court found that the City had not provided evidence that the one-way traffic plan would reduce congestion or improve safety as compared to the traffic pattern used for Harley Week. Op. & Order at 9-13.

The Court's finding regarding the traffic plan relied on plaintiffs' traffic expert, Dr. David B. Clarke, who explained that the traffic plan for Black Bike Week resulted in congestion and difficulty for drivers and that there was no reason that the traffic plan used for Harley Week would not work during Black Bike Week. *Id*. at 7, 12. The Court also cited to plaintiffs' other experts, retired police chiefs Willie R. Williams and Mitchell W. Brown, who opined that the traffic plan during Black Bike Week exacerbated gridlock, created anxiety and frustration for bikers and motorists, and created an environment that undermined public safety. *Id*.

Judge Wooten concluded that no one could dispute the fact that the Black Bike Week visitors were being treated differently than the Harley Week visitors and that race was likely a motivating factor for the differing treatment. Op. & Order at 9-10, 13-14. Based on his findings that the two bike weeks were similarly situated events and that race was a motivating factor in the different traffic plans, Judge Wooten found that there was a likelihood that the plaintiffs would prevail on their Equal Protection Clause claims and that the public interest would be served by granting a preliminary injunction and requiring the defendants to maintain a substantially similar traffic plan for the two weekends. *Id*. at 14-15.

After the Court's ruling, the parties in the 2003 Litigation reached a settlement agreement

entered by the Court on February 6, 2006, that required the City to use the same traffic

restrictions, patterns, or plan on Ocean Boulevard during both bike weeks. Ex. 19 (Settlement

Agreement & Order, *NAACP v. City of Myrtle Beach*, (D.S.C. Feb. 6, 2006)) (Doc. 85) § III.A.

The Court retained jurisdiction for the purposes of enforcing the Settlement Agreement and

Order through July 31, 2010. *Id.* §§ VI.B, VII.A.

###    V.    Defendants' Discriminatory Treatment of Black Bike Week From 2015 Through 2017

After the 2014 Black Bike Week, fewer than five years after the settlement expired,

Defendants began taking steps to revive their campaign to eliminate Black Bike Week. They did

this through a special task force dedicated solely to Black Bike Week, targeted legislation, and

an even more restrictive traffic plan than the one found by Judge Wooten to likely violate the

constitutional rights of Black Bike Week attendees.

The City spurred the creation of a "BikeFest Task Force" to implement a new operational

plan for the weekend. Ex. 20 (Oct. 12, 2014 Myrtle Beach Sun News) at 1-2 (noting that the

coordinated "task force" was meeting for the first time to discuss how to handle Memorial Day

weekend, naming Black Bike Week specifically). No such task force exists for Harley Week.

This Task Force began discussing the creation of a new traffic plan for the 2015 Black Bike

Week that was far more restrictive, more onerous, and created substantially greater difficulties

for Black Bike Week attendees than any previous plan. Ex. 21 (Mem. Day Weekend Bikefest

Task Force Brief) at 9, 13-14.

On April 28, 2015, the Myrtle Beach City Council passed an "extraordinary events"

ordinance. Myrtle Beach, SC, Code of Ordinances § 19-190 *et seq.*; Ex. 22 (Ordinance 2015-31);

Ex. 23 (City Council Minutes of April 28, 2015) at 7. This ordinance allows the City Council to

declare certain events as extraordinary and triggers special governmental powers. Myrtle Beach,

SC, Code of Ordinances §§ 19-191-19-193. Currently, the ordinance has a general definition for extraordinary events, but specifically identifies only Black Bike Week as an extraordinary event: "[t]he motorcycle event, however named or styled, that occurs immediately preceding Memorial Day by 96 hours, and including Memorial Day and the day after, may be declared to be an extraordinary event." *Id.* §§ 19-190, 19-191(3). When the ordinance was being considered, the Myrtle Beach City Manager candidly stated that "I'm not going to pretend [the ordinance] is not for Memorial Day." Ex. 24 (Apr. 14, 2015 Myrtle Beach Sun News) at 2.

The City then designed and implemented a traffic plan during the 2015 Black Bike Week marked by two primary restrictions: 1) Ocean Boulevard being limited to a single, one-way lane for the entirety of Black Bike Week; and 2) a mandatory 23-mile loop for all traffic entering Ocean Boulevard from approximately 10 p.m. to 2 a.m. during the Friday, Saturday, and Sunday nights of Black Bike Week. Ex. 25 (Mem. Day Weekend Plan) at 21-23; Ex. 26 (Traffic and Safety Plans for 2015) at 1. The City has subsequently used the 2015 traffic plan in 2016 and 2017. Ex. 27 (2016 MDW Operational Plan) at 2; Ex. 28 (2016 MDW Traffic Loop) at 1; Ex. 29 (2017 MDW Operational Plan); Ex. 30 (2017 MDW Traffic Loop) at 1. The City has stated that it will use it again for the 2018 Black Bike Week. Ex. 31 (May 30, 2017 WBTWNews 13) at 1; Ex. 32 (May 30, 2017 WPDE.com) at 1-2; Ex. 33 (Jan. 5, 2018 WBMFNews.com) at 2.

Under the current traffic plan, traffic on Ocean Boulevard is restricted to a single lane of southbound traffic during the entire event. Ex. 34 (April 17, 2017 Email re: Bikefest post) ("April 17, 2017 Email") at 1; Brown Decl. ¶ 11. No northbound traffic is allowed and the remaining three lanes of Ocean Boulevard are closed to public travel. Ex. 34 (April 17, 2017 Email) at 1; Ex. 35 (Mem. Day Weekend 2017 Police Dep't Pamphlet) ("Pamphlet") at 3; Brown Decl. ¶ 11. Vehicles can access Ocean Boulevard from Kings Highway at 29th Avenue North and

only six other streets between that point and the southern terminus of Ocean Boulevard. Ex. 35
(Pamphlet) at 3. All other intersecting streets are barricaded. Ex. 36 (May 22, 2016 Email from J.
Pedersen re: Directive to Police Department) at 2-3; Brown Decl. ¶ 11.

The single-lane traffic plan significantly hampers vehicle movement and increases traffic
congestion. Clarke Decl. ¶ 8. It severely limits access to and from Ocean Boulevard via
intersecting cross streets, forces traffic to stay on Ocean Boulevard for unnecessarily long
distances, and increases the traffic load on the street. *Id*. During the early evening of the Saturday
of Black Bike Week, the one-lane restriction caused the time to drive Ocean Boulevard from 29th
Avenue North to 29th Avenue South to be as long as 5 hours. *Id.* ¶ 14. During Harley Week or
other times when multiple lanes are open and two-way traffic is permitted, cars can drive the
route in approximately 20 to 30 minutes. *Id.* ¶¶ 11, 13, 19, 21.

In addition to limiting Ocean Boulevard to a single southbound lane, the current Black
Bike Week traffic plan creates a mandatory 23-mile traffic loop for any vehicle entering Ocean
Boulevard from the hours of 10 p.m. to 2 a.m. on the Friday, Saturday, and Sunday nights of
Black Bike Week. Ex. 3 (Pamphlet) at 3.



The 23-mile loop begins at the intersection of 29th Avenue North and Ocean Boulevard (Point B) and runs south along the length of Ocean Boulevard until it intersects with Kings Highway. Ex. X (Pamphlet) at 3; Brown Decl. ¶ 13. Motorists are then forced to travel north on Kings Highway until turning left on Harrelson Boulevard. *Id*. The loop follows Harrelson until after it becomes George Bishop Parkway and intersects with South Carolina 501. *Id*. The loop travels west on 501 until the intersection with South Carolina 31 (the Carolina Bays Parkway). *Id*. At that point, drivers can exit the loop and leave the area. *Id*. However, drivers seeking to return to Ocean Boulevard have to travel north on the Carolina Bays Parkway until it turns onto the Robert Grissom Parkway, and they are forced to turn left on 29th Avenue North and travel back to the intersection with Ocean Boulevard. *Id*.

All drivers entering Ocean Boulevard at 29th Avenue North or anywhere south of that point are forced into the loop. Brown Decl. ¶ 14. Any visitors exiting restaurants, hotels, or other businesses along Ocean Boulevard are caught in the loop. *Id*. As a result, a guest at an Ocean

Boulevard hotel during Black Bike Week wishing to, for example, eat at a restaurant a mile north of his hotel from 10 p.m. to 2 a.m. must drive south on Ocean Boulevard and around the 23-mile loop until he ends up north of his hotel. *Id.*; Jones Decl. ¶¶ 13-14; C. Stevenson Decl. ¶¶ 7-8.

In implementing the current Black Bike Week traffic plan, the City asserts that the Plan is intended to keep vehicles moving, ease congestion in the City, and make the weekend safer and more controllable. Ex. 34 (Mem. Day Bikefest Plan Description) at 1-2; Ex. 37 (May 19, 2016 Email from A. Prock) at 1-2; Ex. 38 (June 3, 2016 Email from J. Pedersen) at 1-2. In reality, the plan has precisely the opposite effect.

The current Black Bike Week traffic plan exacerbates traffic problems and undermines public safety by creating anxiety and frustration. Brown Decl. ¶¶ 23-24. Rather than easing traffic, the 23-mile loop is the source of significant congestion, long traffic jams, driver discomfort, and prevents access to restaurants, entertainment venues, and hotels. *Id.* ¶¶ 15, 24; Clarke Decl. ¶ 27; Jones Decl. ¶¶ 8, 10, 14-15; C. Stevenson Decl. ¶¶ 8-9, 13-15. At approximately 6:30 p.m. on the Saturday of Black Bike Week 2017, a test vehicle started driving south on Ocean Boulevard at 29th Avenue North. Clarke Decl. ¶¶ 23, 25. It took that test vehicle 6 hours, 5 minutes, and 58 seconds to drive the Black Bike Week Loop and return to Ocean Boulevard. *Id.* ¶ 25. The Plan simply fails to achieve any of the national norms for traffic management, which include facilitating the free flow of vehicles, minimizing gridlock, and providing for public safety. *Id.* ¶¶ 8, 30, 32; Brown Decl. ¶¶ 15, 23-24.

Myrtle Beach's Black Bike Week traffic plan makes participants feel unwelcome, interferes with their enjoyment of driving and walking along Ocean Boulevard, interferes with their ability to freely access hotels, vacation rentals, restaurants, and other venues and events throughout the Myrtle Beach area, and otherwise impedes the Black Bike Week events. Brown

Decl. ¶¶ 15, 23-24; Jones Decl. ¶¶ 8, 12-17; C. Stevenson Decl. ¶¶ 8-9, 13-15, 20, 21; Ex. 39

(Decl. of Leslie Stevenson) ¶¶ 6, 8-9, 11("L. Stevenson Decl."); James Decl. ¶¶ 19-20, 28-29.

### VI.    The Black Bike Week Traffic Plan is Significantly More Restrictive Than the Traffic Plan the Court Found Likely Discriminatory in the 2003 Litigation

The current Black Bike Week traffic plan is more restrictive that the plan found likely to

be unconstitutional in 2005. *See infra* at 24-25.

Dr. David Clarke, who served as plaintiffs' expert in the 2003 Litigation, observed the

traffic plan during the 2017 Black Bike Week. Clarke Decl. ¶ 5. Dr. Clarke concluded that the

traffic measures imposed by the City of Myrtle Beach had an even more negative effect on traffic

flow than the traffic measures imposed under the previous traffic plan. *Id.* ¶ 31. Dr. Clarke found

that the one-way, one-lane limitation on Ocean Boulevard hinders the flow of traffic, adds travel

time and inconvenience to motorists, and causes the roads in the area to experience substantially

worse performance than they would have without the restriction. *Id.* ¶¶ 7-21.

Dr. Clarke further concluded that, as in the 2003 Litigation, there is no traffic-related

reason that can justify the current Black Bike Week traffic plan. Clarke Decl. ¶¶ 28, 30, 32. In

Dr. Clarke's opinion, the sole purpose of the plan is to discourage travel and visitors to the area.

*Id.* ¶ 32. The traffic pattern imposed by the City is not warranted by the behavior, crowd size, or

any other characteristic of the Black Bike Week festival attendees. *Id.* ¶ 28.

Retired police chief Mitchell W. Brown also submitted a report in the 2003 Litigation and

observed the current Black Bike Week traffic plan during the 2017 Black Bike Week. Brown

Decl. ¶¶ 4-8, 11-12. He similarly concluded that he would never have designed or approved such

a traffic management plan. *Id.* ¶ 24. Chief Brown concluded that the current Black Bike Week

traffic plan could only have been designed as an effort to frustrate motorists and discourage

potential visitors from travelling to the area. *Id*. He found that the design of the current traffic

plan was worse and more harmful than the plan at issue in the 2003 Litigation. *Id.* ¶ 23.

The additional restrictions in the current Black Bike Week traffic plan make travel around the Myrtle Beach area substantially more difficult than the plan found likely unconstitutional in the 2003 Litigation and have an even greater effect of discouraging potential participants from attending the event. Nonetheless, as in the 2003 Litigation, the City can provide no legitimate justification for the highly restrictive traffic plan during Black Bike Week.

## VII.    The City Imposes Minimal Traffic Restrictions During Harley Week

In contrast to the onerous Black Bike Week traffic plan, Harley Week has no formal traffic plan. Ex. 40 (May 13, 2016 Myrtle Beach Sun News) at 3; Clarke Decl. ¶ 6; Brown Decl. ¶¶ 9-10; James Decl. ¶ 24. During Harley Week, motorists are able to drive Ocean Boulevard freely in both directions just as they can during most other days of the year. Clarke Decl. ¶ 6; Brown Decl. ¶ 9; C. Stevenson Decl. ¶¶ 17-18; James Decl. ¶¶ 17-18, 21-22, 24. Thus, Harley Week participants are able to cruise up and down and turn on and off Ocean Boulevard as well as access their hotels, vacation rentals, restaurants, and other entertainment without restriction.

Without the traffic restrictions, motorists on Ocean Boulevard could travel the length of the road in 19 to 34 minutes during Harley Week, as compared to an hour and a half to five hours during Black Bike Week. Clarke Decl. ¶¶ 10-21. In addition, motorists during Harley Week were never forced into a traffic loop that would require them to travel miles from their destinations. *Id.* ¶ 6. As Judge Wooten found during the 2003 Litigation, the two bike weeks are similarly situated. Ex. 18 (Op. and Order) at 6-8, 13-14; *see also* Ex. 41 (May 22, 2015 NPR Code Switch) at 2. The number of people attending the events is not significantly different. Brown Decl. ¶ 18. Crowd behavior at the events is similar and there are no other differences between the two events that would justify different traffic management plans. *Id.* ¶¶ 18-19; Clarke Decl. ¶¶ 28, 30.

Indeed, for the last three years when the City implemented the different traffic plans,

Harley Week saw a similar or greater number of out-of-town visitors to the Myrtle Beach area as compared to Black Bike Week. The Brittain Center, which collects hotel occupancy data in the Myrtle Beach area, reported that in 2017, 89.50% of hotel rooms were occupied during the second weekend of Harley Week while only 78.80% of hotel rooms were occupied during Black Bike Week. Ex. 42 (Tourism Economy Data) at 21-24. In 2016, the hotel occupancy rate was 6% greater for Harley Week and the occupancy rates were approximately even in 2015. *Id.* at 17-20.

Dr. Clarke confirmed during his review of the 2017 Bike Weeks that there was no evidence that Black Bike Week produced traffic demands that were any different from the traffic demands during Harley Week. Clarke Decl. ¶¶ 28, 30. He concluded that Ocean Boulevard and other area streets experienced better performance during Harley Week, when there were no traffic restrictions, than with the current Black Bike Week traffic plan in place. *Id.* ¶ 9. Chief Brown similarly concluded based on personal observation that the two events were similar and that behaviors of the participants were similar. Brown Decl. ¶ 18. He observed no reason to implement different traffic management for the two events. *Id.* ¶ 19.

As in the 2003 Litigation, the City can provide no explanation for maintaining different traffic plans for Harley Week and Black Bike Week.

### VIII.    The City of Myrtle Beach Maintains an Unequal and Unjustified Police Presence During Black Bike Week

Defendants deploy significantly more police during Black Bike Week than during any other Myrtle Beach event and those police engage in significantly more aggressive tactics during Black Bike Week. During the 2017 Black Bike Week, the City overwhelmed the area with police presence, drawing officers from a variety of jurisdictions to report to the Myrtle Beach Police Department (MBPD) for the duration of Black Bike Week. Ex. 11 (May 24, 2017 Myrtle Beach Sun News) at 1 (more than 800 officers total in 2017, around 580 of whom are from state, local,

and federal agencies, and 597 officers from 185 agencies in 2016); Ex. 43 (May 11, 2017 Email from Neighborhood Watch to M. Kruea) at 2 (500 additional officers coming to town); Ex. 44 (June 7, 2016 email from J. Pedersen) at 1 (noting that City recruits "more than 600 officers").

These officers were instructed to police aggressively and strictly enforce City ordinances. *See, e.g.*, Ex. 45 (2017 MDW Directives) at 1; Ex. 46 (2017 Bikefest Public Safety Guidelines) at 2. Prior to Black Bike Week, the MBPD held a meeting at the convention center where officers were handed a pamphlet cataloguing more than 50 various laws and ordinances that they were encouraged to enforce. Ex. 45 (2017 MDW Directives) ¶ 20; Ex 35 (Pamphlet) at 5-7; Ex. 47 (2017 MDW Ordinances) at 1-11. Officers used the effects of the traffic plan and its resulting gridlock to be more aggressive in their enforcement efforts along Ocean Boulevard. Brown Decl. ¶ 17. Officers walked their routes back and forth, peering into windows, and searching occupants of cars that were at a standstill because of the traffic. *Id.*

In contrast, during Harley Week 2017, there were far fewer state and local police officers patrolling the streets. *See, e.g.*, Ex. 48 (2017 Harley Week Assignments) at 1-5. With many fewer law enforcement officers present, Harley Week participants are not subjected to the same levels of enforcement and scrutiny as those attending Black Bike Week. Brown Decl. ¶¶ 9, 17.

Chief Brown observed significant differences not only in the number of law enforcement, but also in their behavior between Harley Week and Black Bike Week. *Id.* Chief Brown did not, however, observe any difference in the size or behavior of the crowds during the two events that would justify the differences in law enforcement. *Id.* ¶ 18.

The overwhelming presence of law enforcement engaged in aggressive policing tactics is intended to, and has the effect of, intimidating Black Bike Week participants and discouraging them from travelling to Myrtle Beach, in violation of Plaintiffs' basic constitutional rights. Jones

Decl. ¶¶ 9, 17; L. Stevenson Decl. ¶¶ 10-11; C. Stevenson Decl. ¶¶ 16, 21-22; Ex. 49 (June 16, 2016 Myrtle Beach Sun News) at 1-3 (attendees discussing aggressive police presence).

The City's efforts to undermine Black Bike Week have been successful. By their own account, attendance at Black Bike Week is down significantly since Defendants instituted the current traffic plan and policing practices. Ex. 44 (June 7, 2016 Email from J. Pedersen) (stating that Black Bike Week participation had declined by about 40% over the prior two years).

### IX.    City Officials Acknowledge that Their Black Bike Week Plan is Implemented Because of the Composition of the People Attending the Event

City officials have clearly stated that the City has imposed restrictive traffic and police policies during the predominantly African-American Black Bike Week and not for the predominantly white Harley Week and other events because of the composition of the attendees of the event and in order to drive them out of Myrtle Beach

Former Chief of Police Warren Gall, who retired immediately before Black Bike Week 2017, claimed that "Bikefest creates the atmosphere that draws the bad element to the Myrtle Beach area," and that "the Bikefest draws crowds that can do anything and everything they want to, or think they can, in an atmosphere of anonymity." Ex. 50 (June 8, 2014 Myrtle Beach Sun News) at 2. Myrtle Beach City Councilman Randal Wallace stated in reference to Black Bike Week that: "We've got to do something to curtail this feeling that they can come and do whatever they want here. We're going to squash that one next year." *Id.* at 4.

Former Mayor John Rhodes also called for the end of Black Bike Week. In response to a suggestion from Horry County officials that the 2015 loop be limited to 9 miles, Mayor Rhodes responded that it would defeat the purpose of the loop, as "we're trying to move people outside of the city. We're trying to get them out." Ex. 51 (Sept. 30, 2014 Myrtle Beach Sun News) at 2. Mayor Rhodes also continued to employ a significantly larger police presence during Black Bike

16

Week than any other events, ensuring that its attendees were policed more than any other festival-goers in the City. Ex. 43 (May 11, 2017 Email) at 2; Ex. 52 (Apr. 6, 2016 ABC15 News) at 1-2.

These statements from government officials are precisely the same kind of comments Judge Wooten found as being evidence of racial motivation in the 2003 Litigation. *See* Ex. 18 (Op. & Order) at 9-10. Again, in recent years, no such similar statements have been made about the predominantly white Harley Week attendees.

### X.     Defendants' Assertion that Past Violence Justifies the Current Black Bike Week Traffic Plan and Increased Law Enforcement is Demonstrably False

The City of Myrtle Beach has attempted to justify its return to the differential treatment of Black Bike Week and its predominately African-American attendees by pointing to acts of violence that occurred in 2014. Ex. 53 (Dec. 8, 2014 Email from J. Pedersen) at 1-2; Ex. 54 (May 20, 2015 Email from M. Kruea) at 1.

Defendants' reference to violence relates to incidents during Memorial Day weekend 2014, including a shooting at a hotel located on Ocean Boulevard where three people were killed. Ex 55 (May 25, 2014 USA Today) at 1. The shootings were not linked to Black Bike Week and there is no evidence that the individuals were in Myrtle Beach for any purpose related to Black Bike Week. Ex. 56 (May 26, 2014 USA Today) at 2.

The shootings are consistent with a general increase in gun violence in Myrtle Beach throughout the years. In 2015 there were at least eleven shootings, two of which resulted in murder. Ex. 57 (compilation of news coverage re: shootings in 2015).  In November 2016, five people were shot in a nightclub. Ex. 58 (Nov. 5, 2016 Myrtle Beach Sun News) at 1-2. Six shootings occurred in Horry County over Easter week 2017, and only a few months later six people were injured along Ocean Boulevard during a shooting in June. Ex. 59 (Apr. 19, 2017

Myrtle Beach Sun News) at 1-3; Ex. 60 (June 19, 2017 Fox News) at 1-2. This past Labor Day weekend, police responded to an incident involving multiple gunshot wounds along the Grand Strand on Ocean Boulevard. Ex. 61 (Sept. 4, 2014 WMBFNews.com) at 1-2. During the last night of the 2017 Harley Fall Rally in October, shots were fired on Ocean Boulevard near the Sea Banks Motel. Ex. 62 (Oct. 7, 2017 WMBFNews.com) at 1.

Even though the increase in violence is spread throughout the year, Black Bike Week is the only event that has been singled out as requiring differential treatment because of the violence. There is no evidence that Black Bike Week produces an anomalous level of crime or violence that would justify a different traffic plan or higher level of law enforcement. And the shootings during the fall Harley Rally did not lead the City to institute traffic plans or increase law enforcement presence during Harley Week or other predominantly white motorcycle rallies. The same is true for the Easter week and Labor Day weekend shootings.

Regardless, a traffic plan that creates frustration and anxiety for motorists does not address concerns about an increase in violence. Brown Decl. ¶¶ 23-24; Clarke Decl. ¶ 30. Defendants' use of violence as an explanation for the traffic plan and excessive law enforcement during Black Bike Week is simply a pretext for discriminatory conduct against the one predominantly African American event in Myrtle Beach each year.

**XI.**    **Attendees of Black Bike Week Were Subjected to a Hostile and Discriminatory Environment**

Plaintiff Simuel Jones is a 58-year-old ex-marine, who has regularly attended Black Bike Weeks since 2002. Jones Decl. ¶¶ 2-3, 5. Mr. Jones has observed that the current Black Bike Week traffic plan has made traffic significantly worse. *Id.* ¶¶ 8, 10. On Saturday, May 25, 2017, Mr. Jones left his hotel on Ocean Boulevard around 9 p.m. to go to his favorite Pizza Hut at 7601 North Kings Hwy. *Id.* ¶¶ 12-13. This trip typically takes him between 15-20 minutes. *Id.* ¶ 12.

18

Forced to head south on Ocean Boulevard upon exiting his hotel, Mr. Jones ended up being caught in the loop. *Id.* ¶¶ 13-14. A trip that would have normally taken no more than twenty minutes took him hours. *Id.* ¶ 14. Mr. Jones had planned to eat dinner, return to his hotel, and then head out for the evening to enjoy the festival. *Id.* ¶ 15. As a result of his immense frustration and exhaustion from battling the traffic loop, Mr. Jones stayed in his room for the night. *Id.*

The loop required Mr. Jones to plan his evenings around the traffic plan. *Id.* ¶ 16. Unable to go out for just a few hours, Mr. Jones felt he had to plan to be out until 2 a.m. in order to leave his hotel in the evening. *Id.* Mr. Jones is no longer able to attend the night events in Atlantic Beach or try out new venues because he knows that if he does not like the event or venue, he cannot leave without being stuck in traffic for hours. *Id.* Mr. Jones plans to attend the 2018 Black Bike Week, however, the current traffic plan has made the experience far less enjoyable. *Id.* ¶ 17.

Plaintiffs Leslie and Cedric Stevenson are a married couple living outside Atlanta, GA. C. Stevenson Decl. ¶ 2; L. Stevenson Decl. ¶ 2. They attended Black Bike Week in 2016 and 2017. C. Stevenson Decl. ¶ 5; L. Stevenson Decl. ¶¶ 5, 7. In 2016, the Stevensons stayed at the Sheraton Convention Center hotel. C. Stevenson Decl. ¶ 7; L. Stevenson Decl. ¶ 6. They had decided to go to Landry's Seafood House for dinner. *Id.* The drive to Landry's took only 20 minutes, and they finished dinner around 10 p.m. *Id.* As they were heading back to their hotel they got stuck in the loop and it took hours for them to get back to their hotel. C. Stevenson Decl. ¶ 8; L. Stevenson Decl. ¶ 6. Later that weekend the Stevensons were forced to leave a restaurant before getting their food because the service was slow and they were worried about getting caught in the loop. C. Stevenson Decl. ¶ 9; L. Stevenson Decl. ¶ 6. For the remainder of the weekend, the traffic loop was constantly on their minds as they made plans about what to do. *Id.* In the evenings the Stevensons could only venture out within walking distance from their hotel

19

even though they wanted to explore other restaurants and areas. *Id.*

In 2017, Mr. and Mrs. Stevenson and Mrs. Stevenson's mother, Ms. Dunlap, arrived in Myrtle Beach on Friday night around midnight. C. Stevenson Decl. ¶¶ 11-12; L. Stevenson Decl. ¶¶ 7-8. As they approached their hotel, the Holiday Inn Club Vacations at South Beach Resort, there was a roadblock at the intersection with Ocean Boulevard. C. Stevenson Decl. ¶¶ 11, 13; L. Stevenson Decl. ¶ 8. The family could see their hotel from the intersection and tried to speak with the officer at the roadblock so that they could get through. C. Stevenson Decl. ¶ 13; L. Stevenson Decl. ¶ 8. The officer asked to see their reservation, which they showed him. *Id.* He then told them that they could not proceed straight on Ocean Boulevard in order to get to their hotel and would have to enter the 23-mile loop in order to turn into the parking lot. *Id.* Fortunately, the Stevensons were able to find a side street off of King's Highway that was not blocked and made a U-turn there, winding their way back through a residential neighborhood to get to their hotel on Ocean Boulevard. C. Stevenson Decl. ¶ 14; L. Stevenson Decl. ¶ 8. This still took them an additional 30 minutes late at night after a long drive. *Id.*

Throughout the weekend the Stevensons planned their activities with the traffic loop in mind. C. Stevenson Decl. ¶ 15; L. Stevenson Decl. ¶ 9. Ms. Stevenson was particularly worried because her 70-year-old mother was there with them, and if they got stuck after 10 p.m. her mother would not be able to handle being out until 2 a.m. in the traffic loop. L. Stevenson Decl. ¶ 9. As a result, the family planned their evening meals only within walking distance of their hotel. C. Stevenson Decl. ¶ 15; L. Stevenson Decl. ¶ 9. Although they would have preferred to explore other parts of the area, the City's implementation and enforcement of the traffic loop prevented them from using their car. *Id.*

Mr. Stevenson has also previously attended Harley Week. C. Stevenson Decl. ¶ 17. He

observed that Harley Week is attended primarily by whites while Black Bike Week is attended primarily by African Americans. *Id.* During Harley Week, Mr. Stevenson saw that motorists rode around freely up and down Ocean Boulevard, stopping to talk to one another and admire each other's bikes. *Id.* ¶ 18. Black Bike Week bikers, on the other hand, navigated a maze of road closures and traffic restrictions, and the minute a biker slowed down to talk to someone, the police descended and told them to keep moving. *Id.* ¶ 19.

The Stevensons would like to return to Myrtle Beach for Black Bike Week if the traffic plan is changed to allow for freer travel. C. Stevenson Decl. ¶ 22; L. Stevenson Decl. ¶ 11.

## ARGUMENT

To obtain a preliminary injunction, a movant "must establish [1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest." *Centro Tepeyac v. Montgomery Cty.*, 722 F.3d 184, 188 (4th Cir. 2013) (quoting *Winter v. Nat. Resources Defense Council, Inc.*, 555 U.S. 7 (2008)). Because Plaintiffs' evidence satisfies each of these four elements as to each of its claims, this Court should grant the injunction.

### I.    Plaintiffs Are Likely to Succeed on the Merits of their Discrimination Claims

Plaintiffs are likely to succeed on the merits of their Fourteenth Amendment Equal Protection claims, which require a showing that: (1) they were treated differently from others who were similarly situated and (2) the treatment was intentionally based on impermissible considerations such as race. Ex. 18 (Op. & Order) at 6; *see also Morrison v. Garraghty*, 239 F.3d 648, 654 (4th Cir. 2001) ("[A] plaintiff must first demonstrate that he has been treated differently from others with whom he is similarly situated and that the unequal treatment was the result of intentional or purposeful discrimination."). If a plaintiff can establish those two elements, a

21

government defendant can prevail only if its race-based action or classification withstands "strict scrutiny" because it is "suitably tailored to serve a compelling state interest." *Sylvia Dev. Corp. v. Calvert Cty., Md.*, 48 F.3d 810, 820 (4th Cir. 1995). Plaintiffs' claims under 42 U.S.C. § 1981 and Title VI similarly require Plaintiffs to demonstrate that they are members of a protected class who suffered adverse action while "similarly situated individuals did not suffer the same adverse actions in the same or similar situations."[2] *Ratliff v. Wake Forest Baptist Medical Center*, 2014 WL 197809, at *2 (M.D.N.C. 2014); *see also Elston v. Talladega Cty. Bd. of Educ.*, 997 F.2d 1394, 1406 n.11 (11th Cir. 1993) (Title VI analysis duplicates that of equal protection); *Chiles v. Crooks*, 708 F. Supp. 127, 132 (D.S.C. 1989) (§ 1981 complaint had to allege facts that would support "reasonable inference" of race-based discrimination).[3]

Here, the evidence shows that Plaintiffs are subject to differential treatment, that this differential treatment is race-based, and that the City's actions do not serve any legitimate interest, let alone a "compelling" one.

### A. Black Bike Week Visitors Are Treated Differently Than Visitors for Other Major Events in Myrtle Beach

Just as in the 2003 Litigation, "it cannot be seriously disputed that the Black Bike Week visitors are being treated differently than the Harley Week visitors" and that the two weekends are "similarly situated." Ex. 18 (Op. & Order) at 5-9, 13. Black Bike attendees are "similarly

---

[2] Title VI additionally requires proof "that the defendant received federal financial assistance and that the defendant engaged in intentional discrimination based on race, color, or national origin." *Callum v. CVS Health Corp.*, 137 F.Supp.3d 817, 844 (D.S.C. 2015). Plaintiffs have proffered such evidence. Ex. 63 (City of Myrtle Beach, South Carolina Comprehensive Annual Financial Report (Nov. 26, 2015) (demonstrating receipt of federal grants totaling $1,212,841, of which $444,683 were from the Department of Justice for law enforcement activities).

[3] Plaintiffs' claims under the Equal Protection Clause, the First Amendment, and 42 U.S.C. § 1981 are brought pursuant to 42 U.S.C. § 1983, which requires that Plaintiffs show that (1) the City deprived them of a right secured by the United States Constitution or federal law and (2) the City acted under color of state law. *Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 49 (1999). It is self-evident that the City's traffic plan is imposed under color of law. Accordingly, the principal question is whether Plaintiffs are likely to show that the City's conduct deprives them of their rights under federal law.

situated" to those attending Harley Week and other major events in the City.

As shown in the hotel occupancy data, there are larger numbers of out-of-town visitors during Harley Week than Black Bike Week. Ex. 42 (Brittain Center data). Both events involve large crowds gathering along Ocean Boulevard and an increase in vehicle traffic on the road. Clarke Decl. ¶ 29; Brown Decl. ¶ 18. The South Carolina Highway Patrol describes the two events with similar language and identifies similar safety considerations for both. Ex 64 (2017 SCHP Harley & Memorial Op. Plans). Former police Chief Brown observed both events and concluded that there were no significant distinctions between the behavior of attendees or the traffic demands. Brown Decl. ¶¶ 18-19. Just as the Court found in the 2003 Litigation, there are no "significant differences that warrant[] the differences in traffic plans" between Harley Week and Black Bike Week. Ex. 18 (Op. & Order) at 7. There are also other major weekends when similarly-sized crowds gather in the Myrtle Beach area. *See* James Decl. ¶ 4.

However, attendees at Black Bike Week are treated differently than attendees at other events, including Harley Week. Almost five years after the 2003 Litigation consent order expired, the Myrtle Beach City Council officially designated Black Bike Week as an "extraordinary event," warranting increased security, road blocks, "no cruising zones," and its own "task force." *See supra* at 7-8. The City has never imposed such onerous restrictions on any other event. Plaintiffs' evidence shows that Black Bike Week, the only weekend of the year in Myrtle Beach where African-American visitors clearly outnumbered white visitors, is also the only weekend when the City implemented a one-way traffic plan. Under that plan, traffic on Ocean Boulevard is restricted to a single lane of southbound traffic during the entire weekend. No northbound traffic is allowed, and the remaining lanes of Ocean Boulevard are closed to public travel. *See supra* at 8-11. This creates an unparalleled level of traffic congestion,

unnecessarily cutting road capacity by 50% and significantly increasing drive times. Clarke Decl. ¶ 8.

In addition, the City's Black Bike Week traffic plan creates a mandatory 23-mile traffic loop for any vehicle entering Ocean Boulevard from the hours of 10 p.m. to 2 a.m. on the Friday, Saturday, and Sunday nights of Black Bike Week. The loop is a source of significant congestion, long traffic jams, driver discomfort, and prevents access to restaurants, entertainment venues, and hotels. Travel time around the traffic loop during the 2017 Black Bike Week took over six hours for one driver. *See supra* at 8-11.

Despite the facts that similar numbers of people attend the two bike weeks and that there are no significant observable differences in crowd behavior or traffic management needs between the two weekends, the traffic and police measures put in place for Black Bike Week were not put in place for Harley Week or any other events where attendance is predominantly white in the last three years. In contrast to the heavily-restricted routes at Black Bike Week, Harley Week has no formal traffic plan. Motorists can drive the roads freely in both directions and can take the most direct route to their late-night destinations rather than get trapped in a needless loop. There is no 23-mile traffic loop to contend with in the evenings. And, a mere 60 police officers are on patrol in contrast to more than ten times that number during Black Bike Week. Accordingly, a drive along Ocean Boulevard that can take up to *five hours* during Black Bike Week takes only one-tenth that amount of time during Harley Week. *See supra* at 13-15.

In its 2005 ruling, this Court held that the differences in the traffic plans for Black Bike Week and Harley Week amounted to likely unconstitutional discrimination. *See* Ex. 18 (Op. & Order) at 5-9, 13. The differences are even starker today: (1) the previous Plan allowed two lanes of one-way traffic while the current Black Bike Week traffic plan further reduces traffic to a

24

single lane; (2) the previous plan allowed right hand turns off of Ocean Boulevard at three

intersections while the current traffic plan allows no turns during Friday, Saturday, and Sunday

nights; and (3) the previous plan had no significant traffic control measures once motorists left

the stretch of Ocean Boulevard between 29th Avenue North to 29th Avenue South while the

current Black Bike Week traffic plan forces all motorists entering Ocean Boulevard to travel a

23-mile loop that allows only one point of exit. *Compare* Ex. 4 (Answer) ¶¶ 34, 36; Ex. 13 (First

Am. Compl.) ¶¶ 46, 48; Ex. 14 (Mar. 23, 1998 Email from P. Dowling); Ex. 16 (Clarke Rep.) at

4-5 (1999-2004 plan) *with* Ex. 29 (2017 MDW Operational Plan); Ex. 35 (Pamphlet); Ex. 30

(2017 MDW Traffic Loop)(current traffic plan).

These added restrictions make travel around the Myrtle Beach area substantially more

difficult than the previous Plan and have an even greater effect of discouraging potential Black

Bike Week participants from attending the event. Brown Decl. ¶ 23; Clarke Decl. ¶¶ 31, 32. The

City has offered no valid justification for these glaring differences in treatment and, even in the

face of expert analyses, has repeatedly refused to reconsider its approach. James Decl. ¶¶ 14-15.

Indeed, Chief Brown concluded that the City's current Black Bike Week plan "could only have

been designed as an effort to frustrate motorists and discourage potential visitors from traveling

to the area" and that it "has a more harmful impact . . . and further restricts the freedom of

movement . . . than the 2002-2004 traffic plans I observed." Brown Decl. ¶¶ 23-24.

Accordingly, the Court's conclusion in 2005 that the predominantly African-American

Black Bike Week visitors "are being treated differently" than the predominantly white Harley

Week visitors is even clearer today.

      **B.**     **The City's Different Treatment of Black Bike Week Visitors Is Based on Race**

This Court's prior ruling observed that "[s]everal factors have been recognized as

probative of whether a decisionmaking body was motivated by a discriminatory intent." Ex. 18 (Op. & Order) at 8. These include:

> (1) evidence of a consistent pattern of actions by the decisionmaking body disparately impacting members of a particular class of persons; (2) historical background of the decision, which may take into account any history of discrimination by the decisionmaking body or the jurisdiction it represents; (3) the specific sequence of events leading up to the particular decision being challenged, including any significant departures from normal procedures; and (4) contemporary statements by decisionmakers on the record or in minutes of their meetings.

*Id.*; *Sylvia Dev. Corp. v. Calvert Cty., Md.*, 48 F.3d 810, 819 (4th Cir. 1995). These factors are almost identical to those set forth by the Supreme Court in *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 267 (1977) for determining whether invidious discriminatory purpose was a motivating factor behind the challenged action. In this case, each factor strongly indicates that the City's actions are intentionally discriminatory.

First, there is overwhelming evidence of a pattern of City actions demonstrating differential treatment of Black Bike Week and Harley Week, actions which have had a harmful and disparate impact on African Americans at Black Bike Week. The City's singular hostility toward the event, which is the sole predominantly African-American event in the city, dates back to at least 1998, when officials imposed the first restrictive traffic plan. *See supra* 3-4. The City repeatedly implemented that plan until this Court enjoined it as likely violative of the Fourteenth Amendment and reinstated it shortly after the consent order expired. Ex. 18 (Op. & Order) at 13-15; Ex. 19 (Settlement Agreement & Order) §§ VI.B, VII.A.

The City's current plan, which it used from 2015 through 2017 and intends to use again this year, is even more restrictive than the original. *See supra* at 7-9; Brown Decl. ¶ 23; Clarke Decl. ¶ 31. No other major, predominantly white event—including Harley Week—has ever been subject to such restrictions. Brown Decl. ¶¶ 9-10; Clarke Decl. ¶ 6; James Decl. ¶¶ 8, 17-18, 21-

22, 24. That is precisely why this Court found just over a decade ago that the City's Black Bike Week Plan was likely discriminatory. Ex. 18 (Op. & Order) at 7-11.

Second, the historical background reveals the City's long history of hostility to Black Bike Week. As Black Bike Week expanded from Atlantic Beach to Myrtle Beach in the mid-1990s, the City's white leadership demonstrated animosity towards the event and openly expressed a desire to end it. Mark McBride, former Myrtle Beach Mayor, was a vocal and consistent critic. *See, e.g.*, Ex. 12 (McBride Dep.) at 163-65, 190-91. Mayor McBride lobbied the state of South Carolina to deploy the National Guard to Myrtle Beach in an attempt to intimidate Black Bike Week participants. Ex. 4 (Answer) ¶ 27. Mayor McBride also demanded and obtained a greater police presence. *Id.* ¶ 29; Ex. 65 (Feb. 11, 1999 Herald). McBride's efforts culminated in the adoption of the traffic plan ruled likely unconstitutional in the 2003 Litigation. Ex. 4 (Answer) ¶¶ 33-35; Ex. 13(First Am. Compl.) ¶¶ 45-47; Ex. 14 (Mar. 23, 1998 Email).

Third, the adoption and implementation of the current Black Bike Week traffic plan is a sharp departure from the City's typical approach to other major events. While Black Bike Week has repeatedly been the target of a restrictive traffic plan and an overwhelming police presence, events attended by majority-white crowds have not received such treatment. James Decl. ¶¶ 25-27; Brown Decl. ¶¶ 9-10; Clarke Decl. ¶¶ 4, 6-9. Nor is it the City's typical practice to mete out such treatment. The City's relatively lax approach to Harley Week, July 4th weekend, Labor Day weekend, and other events drawing crowds roughly the same size as Black Bike Week's, indicates that Black Bike Week has been singled out unfairly. Indeed, the City has declared Black Bike Week an "extraordinary event" in an attempt to justify the unique and arbitrary restrictions it has put in place. Yet, the City has offered no rationale as to why Black Bike Week alone warrants this designation, even as Harley Week and other events draw comparable

numbers of people to the area. Plaintiffs' experts all concluded that there is simply no legitimate justification for this difference in treatment. Clarke Decl. ¶¶28-32; Brown Decl. ¶¶ 23-24.

Fourth, just as in the 2003 Litigation, high-ranking City officials have made clear through their public comments and use of racial code words that the renewed Black Bike Week restrictions are race-based. *See supra* at 16-17. None of these officials similarly expressed an interest in eliminating Harley Week, despite the fact that there are no meaningful differences between the two weekends other than race. These comments, and others like them, echo the comments this Court held to be evidence of racial motivation in the 2003 Litigation. *See* Ex. 18 (Op. & Order) at 9. They evidence City officials' determination to use a discriminatory traffic plan as a means of suppressing attendance at, and ultimately eliminating altogether, the one major event each year that attracts a predominantly black crowd.

Accordingly, there is ample evidence that each of the *Arlington Heights* factors is satisfied in this case and that the City's plan violates the Constitution.

### C.    The City Can Cite No Compelling Reason for Its Restrictive and Discriminatory Approach to Black Bike Weekend

The City's Black Bike Week Plan treats African-American visitors differently and adversely on the basis of race. This policy violates the United States Constitution because the City cannot point to any legitimate rationale, let alone a compelling one, that could justify its intentional discrimination. *Sylvia Dev. Corp.*, 48 F.3d at 820.

The primary justification that the City has proffered for its return to aggressive policing and obstructionist traffic planning during Black Bike Week is a shooting that occurred during the 2014 Memorial Day weekend. Ex. 53 (Dec. 8, 2014 Email); Ex. 54 (May 20, 2015 Email) at 1. However, there are several reasons why that incident fails to support the City's subsequent actions. Importantly, the City has not identified any established connection between that shooting

28

and either motorcyclists or spectators in town for Black Bike Week. The City's law enforcement believes the shootings were gang-related. Ex. 50 (June 8, 2014 Myrtle Beach Sun News) at 1. As Chief Brown describes, traffic patterns are not deterrents to gang and gun violence, and if they were every police chief in the United States would use such a strategy to curb this type of violence which happens throughout the country. Brown Decl. ¶ 20. Unfortunately, the 2014 shooting was part of a general increase in gun violence that the City of Myrtle Beach has experienced over the last several years. *See supra* at 16-17 (discussing multiple shootings over the last few years, including a shooting during the Harley Fall Rally). Although the City can and should be concerned about addressing this legitimate concern—it is not doing so in an even-handed or rational manner.

The City has not implemented any elements of the Black Bike Week traffic plan (or brought in hundreds of additional law enforcement) on any weekend other the only weekend of the year where African-American tourists outnumber non-African-American tourists. The inconsistency of the City's behavior belies any attempt they may make to insist that the gun violence in 2014 justifies their actions.

The City has also suggested that emergency personnel could have responded to the 2014 shooting more quickly if a lane for emergency vehicles had been available. Ex. 50 (June 8, 2014 Myrtle Beach Sun News) at 3. This is clearly contradicted by the facts. Police were on scene outside the hotel when the shootings occurred inside the hotel. *Id*. at 5. Further, any need for a dedicated lane for emergency vehicles does not justify the closing of all but one lane of Ocean Boulevard and does not justify the 23-mile loop. Brown Decl. ¶ 21.

To the extent that the City attempts to argue that it must put a different, unique traffic plan in place for Black Bike Week based on the characteristics of those who attend the Black

Bike Week festival, Chief Brown concluded that, based on his personal observations, Black Bike Week and Harley Week are not substantially different in terms of crowd behavior. *Id.* ¶ 18. Thus, the City's drastically different traffic plans for the two events cannot be justified by a claim that a more restrictive plan is needed because the Black Bike Week crowd is larger or rowdier.

Even if gun violence were an explanation for implementing special policies during Black Bike Week, the implementation of an exasperating traffic system that traps people in their cars for hours does nothing to enhance safety. Plaintiffs' experts observed the crowds, traffic, and behavior of the participants at Black Bike Week 2017 and found that the one-lane, one-way traffic plan implemented along Ocean Boulevard throughout the weekend (and the 23-mile loop imposed at night) created frustrating, unnecessary gridlock and hours-long delays for motorists. *Id.* ¶¶ 15, 24; Clarke Decl. ¶¶ 7-27. In the opinion of both Chief Brown and traffic expert Dr. Clarke, the traffic plan serves no useful purpose, does not enhance safety or traffic control, and instead has the opposite effect. Brown Decl. ¶¶ 23-24; Clarke Decl. ¶¶ 30-32.

The statements of City officials throughout the history of Black Bike Week make clear they have long been opposed to the event and have been trying to eliminate it. The purpose of the current traffic plan is, as openly admitted to by Mayor Rhodes, to make attendance at Black Bike Week less appealing and more arduous. Ex. 51 (Sept. 30, 2014 Myrtle Beach Sun News) at 1-2. That purpose is not a legitimate government interest and cannot survive strict scrutiny.

## II.    Plaintiffs Are Likely To Succeed on Their First Amendment Claim

There is "implicit in the right to engage in activities protected by the First Amendment a corresponding right to associate with others in pursuit of a wide variety of political, social, economic, educational, religious, and cultural ends." *Roberts v. U.S. Jaycees*, 468 U.S. 609, 622 (1984). To make out a right to associate claim, Plaintiffs must demonstrate that they were (1) engaged in expressive association; (2) that the association was infringed upon by the state; and

30

(3) that the state's infringement was not justified by a compelling interest. *See id*. at 622-623. Plaintiffs meet each of these elements.

First, many aspects of Black Bike Week demonstrate expressive association. It is an opportunity for African-American motorcycle enthusiasts to express appreciation for motorcycles through social interaction and public display. As the largest gathering of African-American motorcycle enthusiasts nationwide, it is a unique and time-honored celebration of identity, unity, and love of ridership. Ex. 66 (BlackBikeWeek.us, Black Bike Week History Details); James Decl. ¶ 9. It is also an opportunity for participants to show—despite common, pernicious stereotypes about both bikers and contemporary African-American males—that a vibrant community of black bikers exists and can gather peacefully each year. *See Hurley v. Irish-American Gay, Lesbian and Bisexual Group of Boston*, 515 U.S. 557, 570 (1995) (Group's "celebrat[ion]" of "members' identity as openly gay, lesbian, and bisexual descendants of Irish immigrants, to show that there are such individuals in the community, and to support the like men and women who sought to march in the New York parade" was "expressive" conduct).

A major part of the weekend involves "cruising"—that is, riding slowly down the street while showing off unique, customized bike designs and riding ability to spectators and fellow riders alike. James Decl. ¶ 10; C. Stevenson Decl. ¶¶ 18-19; Jones Decl. ¶¶ 6-7; *see Hurley*, 515 U.S. at 568 ("[W]e use the word 'parade' to indicate marchers who are making some sort of collective point, not just to each other but to bystanders along the way."). Attendees express the values of pride and fellowship with each other and the riding community as a whole. *Boy Scouts of America v. Dale*, 530 U.S. 640, 650 (2000) ("It seems indisputable that an association that seeks to transmit such a system of values engages in expressive activity."). This expressive conduct is sufficient to warrant First Amendment protection. *Hurley*, 515 U.S. at 569 ("[A]

31

narrow, succinctly articulable message is not a condition of constitutional protection.").

Second, the City's current traffic plan severely circumscribes Plaintiffs' "associational interests," *Healy v. James*, 408 U.S. 169, 181 (1972), by making it nearly impossible—through restrictive traffic routes, physical barriers, and over-policing—for riders to display their bikes and for riders to engage with each other and spectators and thus enjoy the free-flowing exchange of ideas inherent in such an event. Jones Decl. ¶¶ 6-9; C. Stevenson Decl. ¶¶ 10, 16, 18-20; L. Stevenson Decl. ¶ 11; James Decl. ¶¶ 19-20, 26, 28-29. The City's plan therefore "imposes a significant burden on expressive activity." *United States v. Nat'l Treasury Empl. Union*, 513 U.S. 454, 468 (1995).

Finally, as discussed *supra*, there is no reason—let alone a compelling one—for the City's infringement on this expressive conduct. It is unjustified and purposefully discriminatory. Because the City's plan specifically targets Black Bike Week—and only Black Bike Week—it constitutes a content-based restriction on free expression. Moreover, the City cannot articulate a legitimate rationale for the traffic plan. As such, it cannot withstand constitutional scrutiny. *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 45 (1983) ("Content-based exclusion" must be justified by a compelling state interest and be "narrowly drawn"); *see also Abernathy v. Conroy*, 429 F.2d 1170, 1174 (4th Cir. 1970) (holding time restriction for parades constitutional because there were "legitimate reasons for limiting parades to daylight hours"); *Cox v. City of Charleston, S.C.*, 250 F. Supp. 2d 582, 592 (D.S.C. 2003) (Sunday morning parade ban on  not shown to serve stated purposes of safety and preserving order).

## III.    Plaintiffs Will Suffer Irreparable Harm If Relief Is Not Granted

In addition to establishing that they are likely to succeed on the merits, Plaintiffs must also show that they are "likely to suffer irreparable harm in the absence of preliminary relief." *Centro Tepeyac*, 722 F. 3d at 188. Plaintiffs have demonstrated how the City's discriminatory

conduct during the past several Black Bike Weeks has violated their rights. And the City representatives have proclaimed that the traffic loop will be used again this year. *See supra* at 8.

As the court recognized in the 2003 Litigation, violation of one's constitutional rights requires irreparable injury to be inferred as a matter of law. Ex. 18 (Op. & Order) at 3-4 (citation omitted); *see also Ross v. Meese*, 818 F.2d 1132, 1135 (4th Cir. 1987); *Jackson v. City of Aiken Hous. Auth.*, No. 1:16-cv-02831-JMC, 2016 WL 7228242, at *5 (D.S.C. Dec. 14, 2016) (granting preliminary injunction where plaintiff had raised claims under the due process clause and section 1983). Here, the City's unconstitutional decision to treat Black Bike Week differently than any other gathering that brings large groups of non-African-American individuals to Myrtle Beach violates Plaintiffs' constitutional right to equal protection, as well as their constitutional right to associate with others and express their appreciation for motorcycles, and black motorcycle culture specifically, through social interaction and public display. These constitutional injuries "unquestionably" constitute irreparable injury. *Giovani Carandola, Ltd. v. Bason*, 303 F.3d 507, 520-21 (4th Cir. 2002); *see also Gordon v. Holder*, 721 F.3d 638, 653 (D.C. Cir. 2013) ( "prospective violation of constitutional right constitutes irreparable injury").

Moreover, the individual Plaintiffs can specifically articulate how the City's actions cause harm by impeding their ability to enjoy the weekend and engage with other like-minded individuals. Simuel Jones, who has been attending Black Bike Week for almost 15 years, related the exhaustion and frustration he felt when he was trapped in the traffic loop for three hours one evening trying to get back from a restaurant twenty minutes away from his hotel in normal traffic. Jones Decl. ¶¶ 12-15. He then spent the rest of the weekend limiting what he would do and where he would go in the evenings so that he would not similarly be trapped for hours in the loop. *Id.* ¶ 16. Similarly, Cedric and Leslie Stevenson refused to go out in the evenings beyond

walking distance from their hotel last year because they were concerned with getting caught out for hours with Leslie's 70-year-old mother. C. Stevenson Decl. ¶ 15; L. Stevenson Decl. ¶ 9.

Plaintiffs also related how they felt humiliated and frustrated as a direct result of the City's traffic plan and law enforcement activities during recent Black Bike Weeks. The Stevensons are reticent to return after engaging with a police officer who refused to let them enter their hotel after the trip to Myrtle Beach even though the hotel was within eye sight, and instead told them they should drive the full 23-mile loop after an already long drive. C. Stevenson Decl. ¶ 22; L. Stevenson Decl. ¶ 11; *see also* James Decl. ¶¶ 28-29 (discussing frustration of NAACP members at getting caught in loop).

The City's efforts are having the exact effect they are intended to have: making African-American bikers feel harassed, humiliated, and unwelcome. Plaintiffs and others will continue to experience these injuries if the City is allowed to use its discriminatory traffic plan.

### IV.    The Balance of the Equities and the Public Interest Favor the Granting of a Preliminary Injunction

Plaintiffs must also demonstrate that the balance of equities "tips" in their favor and that the granting of a preliminary injunction is in the public interest. *Centro Tepeyac*, 722 F. 3d at 188, 191-92. Here, as was the case in the 2003 Litigation, the equities clearly tip in favor of Plaintiffs, who will suffer discrimination, humiliation, inconvenience, and be unconstitutionally prevented from associating with like-minded individuals if the City is permitted to put its discriminatory traffic and law enforcement plans in place for another year.

The City cannot argue that it will be harmed if it is not allowed to impermissibly continue its discriminatory treatment. There is no evidence that its assertions of safety concerns, crowd size, or participant behavior justify the traffic plan. Brown Decl. ¶¶ 18-19; Clarke Decl. ¶ 28. Indeed, because the evidence shows there are no safety or traffic issues during Black Bike Week

that differ from those needed during Harley Week and other weekends when large crowds descend on the Myrtle Beach, Brown Decl. ¶ 18, the City can simply use the same mechanisms it uses during those weekends during Black Bike Week 2018. *See* Ex. 18 (Op. & Order) at 5-6 (finding that defendants could comply with court's order enjoining discriminatory traffic patterns without significant hardship); *cf. Centro Tepeyac*, 722 F. 3d at 191-92 (noting that "a state is in no way harmed by issuance of a preliminary injunction which prevents the state from enforcing restrictions likely to be found unconstitutional. If anything, the system is improved by such an injunction.") (internal quotation marks omitted).

At its core, understanding the equities requires understanding that the City's primary interest should be furthering the public interest—and the public interest includes ensuring that the City's citizens and visitors are treated fairly. *See Centro Tepeyac*, 722 F.3d at 191-92 (upholding district court granting of preliminary injunction based in part on finding that "upholding constitutional rights surely serves the public interest") (quotation and citation omitted).

Because Plaintiffs would suffer constitutional and tangible injuries if the City is permitted to implement a discriminatory traffic plan again this year, and the City can simply implement the same measures it does during Harley Week and any other weekend that draws large crowds to Myrtle Beach instead, the balance of the equities tips in favor of Plaintiffs and the public interest will be served by enjoining the City's blatantly unconstitutional and unjust conduct.

## <u>CONCLUSION</u>

For the reasons set forth above, Plaintiffs' Motion for Preliminary Injunction should be granted.

Dated: February 27, 2018                    Respectfully submitted,

                                            /s/ Peter Wilborn
                                            D. Peters Wilborn, Jr. (ID #7609)
                                            Law Office of Peter Wilborn
                                            57 Cannon Street
                                            Charleston, SC 29403
                                            (843) 416-9060
                                            Email: peter@bikelaw.com


                                            Reed N. Colfax*
                                            Tara K. Ramchandani*
                                            Ryan C. Downer*
                                            Laura Gaztambide-Arandes*
                                            Relman, Dane & Colfax, PLLC
                                            1225 19th Street, N.W., Suite 600
                                            Washington, D.C. 20036
                                            (202) 728-1888
                                            rcolfax@relmanlaw.com
                                            tramchandani@relmanlaw.com
                                            rdowner@relmanlaw.com
                                            larandes@relmanlaw.com

                                            Anson Asaka*
                                            Associate General Counsel
                                            National Association for the Advancement of
                                            Colored People, Inc.
                                            4805 Mt. Hope Drive
                                            Baltimore, MD 21215
                                            (410) 580-5777
                                            aasaka@naacpnet.org

                                            Joseph Rich*
                                            Dorian L. Spence*
                                            Lawyers' Committee for Civil Rights Under Law
                                            1401 New York Avenue, NW, Suite 400
                                            Washington, DC 20005
                                            (202) 662-8600
                                            jrich@lawyerscommittee.org
                                            dspence@lawyerscommittee.org


                                            *Pro Hac Vice Applications to Be Submitted

                                            Attorneys for Plaintiffs

36

## CERTIFICATE OF SERVICE

I hereby certify that on this 27th day of February, 2018, a true and correct copy of the foregoing Plaintiffs' Motion for Preliminary Injunction was mailed via First Class Mail to the following Defendants:

City of Myrtle Beach, *a municipal corporation within the State of South Carolina*, c/o
Myrtle Beach City Manager John Pedersen
City Hall, 937 Broadway Street
Myrtle Beach, SC 29577

City of Myrtle Beach Police Department, *a department of the City of Myrtle Beach*, c/o
Myrtle Beach City Manager John Pedersen
City Hall, 937 Broadway Street
Myrtle Beach, SC 29577

Myrtle Beach City Attorney
Thomas E. Ellenburg
City Hall, 937 Broadway Street
Myrtle Beach, SC 29577

City Attorney Thomas E. Ellenburg was also served via electronic mail. In addition, this document will be served by personal delivery with the Complaint and the Court-provided Summons.

/s/ Peter Wilborn
Peter Wilborn