IN THE UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
FLORENCE DIVISION

| | |
|---|---|
| National Association for the Advancement of Colored People, Inc. by and through its Myrtle Beach Branch, Simuel Jones, Leslie Stevenson, and Cedric Stevenson,<br><br>                Plaintiffs,<br><br>v.<br><br>City of Myrtle Beach, a municipal corporation within the State of South Carolina and City of Myrtle Beach Police Department, a department of the City of Myrtle Beach,<br><br>                Defendants. | C.A. NO. 4:18-CV-00554-DCC<br><br><br>**DEFENDANTS' ANSWER**<br><br>**(Jury Trial Demanded)** |

Defendants City of Myrtle Beach ("City") and the City of Myrtle Beach Police Department hereby answer the Plaintiffs' complaint for declaratory judgment, injunctive relief, and damages:

## AS TO ALL CAUSES OF ACTION

1. Plaintiffs' complaint fails to state proper causes of action against the above named Defendants and should be dismissed pursuant to Rule 12 (b) of the Federal Rules of Civil Procedure (FRCP).

## AS TO PLAINTIFFS ALLEGATION ON THE NATURE OF THE CASE

2. Each and every allegation of the entire complaint not hereinafter expressly admitted is hereby denied.

3. As to ¶ 1, Defendants admit each year, during the month of May, hundreds of thousands of tourists from around the country gather in the Myrtle Beach, South Carolina. Defendants deny that motorcycle enthusiasts gather for the Myrtle Beach Bike

Week Spring Rally ("Harley Week").   Defendants deny that African American tourists

and have been met with opposition and resistance from the City of Myrtle Beach and

many local businesses.

4.      As to ¶ 2, Defendants deny that alleged hostility toward "Black Bike Week" led

to a number of restrictive governmental policies that were first challenged by the

NAACP and individual Black Bike Week attendees in an action filed in this Court in

2003. Defendants admit the NAACP and others filed a suit alleging that the City of

Myrtle Beach imposed an unequal and unjustified traffic plan during Black Bike Week

and that the plan was motivated by racial discrimination, interfered with the rally, and

discouraged participation. The plaintiffs in that case argued that Black Bike Week should

be treated the same as Harley Week. Defendants admit that Chief United States District

Court Judge Terry Wooten entered an order granting the NAACP a preliminary

injunction.  The order speaks for itself and Defendants would refer to that order for a

correct recitation of its contents.  Defendants would further show that Judge Wooten's

preliminary injunction was stayed by the United States Court of Appeals, Fourth Circuit.

*A copy of that order is attached as Exhibit 1.* Shortly after Judge Wooten's order was

stayed, attorneys for the NAACP contacted the City and pursued a settlement.

Defendants admit the parties in that action ultimately settled the case and would refer to

the settlement agreement and order for an accurate recitation of the contents of the

agreement between Defendants and the NAACP.  *A copy is attached as exhibit # 2.*

5.      As to ¶ 3, Defendants deny that after the consent order expired, the City engaged

in differential treatment of motorcycle rallies. Defendants would further show that the

City enacted numerous ordinances that applied equally to all motorcycle uses in the City.

Those ordinances were designed to make riding motorcycles in the City safer for the

visitors, riders and the residents of the City.  Defendants would show that participants of

the alleged Harley Week were offended by the City's ordinances and felt the City was

hostile to them.  Some Harley Week participants brought lawsuits alleging that they had

been discriminated against by the City.  As a result many of those participants publicly

announced that they would boycott the City and avoid conducting future motorcycle

events in the City.  Some sponsors of the Harley Week events moved their center of

operations from the City to New Bern, North Carolina.  In recent years during the times

alleged for Harley Week, participants in Harley Davidson motorcycle events may stay in

hotels located in the City but all of their motorcycle events are staged outside of the

City's jurisdiction because of the boycott and City's efforts to make all motorcycle

events in the City safer.

6.      As to ¶ 4, Defendants deny the City does not implement a formal traffic plan for

the alleged Harley Week.  Different traffic control strategies are always in place and any

special events occurring during the alleged Harley Week would have to comply with the

City's special events ordinances which include approved traffic plans.  Defendants admit

that certain parts of Ocean Boulevard are subject to one way traffic control strategies but

Defendants deny that during the time alleged as Black Bike Week Ocean Boulevard – a

major thoroughfare that runs the length of Myrtle Beach adjacent to the beach is a focal

point for the motorcycle rallies or that all of Ocean Boulevard is reduced to a single lane

of one-way traffic. Defendants deny that during the late night hours of the event, all

motorists entering Ocean Boulevard are forced into a 23-mile loop that has just one exit.

7.      As to ¶ 5, Defendants deny that because of the traffic restrictions, a drive down

Ocean Boulevard on Saturday night of Black Bike Week could take as long as five hours.

Defendants deny that a hotel guest attempting to go north on Ocean Boulevard would

have to turn south on Ocean Boulevard and navigate a 23-mile loop that could take hours.

8.     As to ¶ 6, Defendant denies there are different levels of law enforcement in the City.  The City fully enforces its laws to the best of its ability at all times.

9.     As to ¶ 7, Defendants admit their motivations for their policies are clear. Defendants seek to make the alleged Black Bike Week sufficiently safe for all visitors.

10.     As to ¶ 8, Defendants deny the allegation that they cannot proffer legitimate explanations for their policies.  Public safety, law enforcement and traffic control are universally recognized as traditional local government functions.  Local governments need to have the discretion, flexibility and authority to respond to real time, dynamic, fluid, and rapidly changing circumstances. Memorial Day weekend is not an exception. The traffic control strategies used during Memorial Day are not a rigid plans and the 23-mile loop that may be in place during that time may be changed depending on the needs of safety and traffic control.  In 2017, the traffic plan was changed after two days to better serve the public's needs for safety, law enforcement and traffic control.

11.     As to ¶ 9, Defendants deny there is no legitimate traffic- or safety-related justification for their traffic plan and Defendants point to the needs for public safety, law enforcement and traffic control as its justification.   Defendants deny that no link was drawn between the violence and Black Bike Week.  Defendants deny that violence is normal for the City.  Defendants admit there has been a general increase in gun violence and shootings in the last several years throughout the City and the United States. Defendants admit the increasing violence has extended to other times.  However, Defendants would show that violence has decreased during Memorial Day Weekend as a result of the implementation of traffic control strategies since 2014.

12.     As to ¶ 10, Defendants' deny they have discriminatory policies and conduct in connection with Black Bike Week.  Defendants deny they have deprived Plaintiffs of their rights to equal treatment and full protection under federal and state law. Defendants deny that Plaintiffs are entitled to declaratory and injunctive relief as well as compensatory damages stemming from Defendants' violations of 42 U.S.C. § 1981, 42 U.S.C. §1983, and 42 U.S.C. 2000d.

## JURISDICTION AND VENUE

13.  As to ¶ 11 & ¶12, Defendants admit this court has jurisdiction and the venue is proper in the Florence Division.

## PARTIES

14.  As to ¶ 13 & ¶ 14, Defendants are informed and believe the allegations are true.

15.  As to ¶ 15, ¶ 16, ¶ 17, and ¶ 18, Defendants do not have information sufficient to form a belief as to the truth or falsity thereof and therefore they deny the same.

16. As to ¶ 19, ¶ 20 and ¶21, Defendants admit the City of Myrtle Beach, South Carolina is a municipal corporation duly organized and existing under the laws of South Carolina. The City maintains its principal office at Myrtle Beach City Hall, located at 937 Broadway Street, Myrtle Beach, South Carolina. The City operates under a Council-Manager city government where a City Council sets policy that is carried out by a City Manager hired by the Council. City officials have some discretion in the development and implementation of the Memorial Day weekend traffic control strategies and law enforcement operations plan. Defendants would further show that responsibility for plans and the use of state roads is vested by statute in the State of South Carolina through its departments and agencies. Defendants admit the City is a recipient of federal funds that it provides to its police

department. The police department is located at the Ted C. Collins Law Enforcement Center, 1101 North Oak Street, Myrtle Beach, South Carolina. The Myrtle Beach Police Department is overseen by a Police Chief, who is appointed by the City Manager. The City of Myrtle Beach Police Department has discretion, in conjunction with state, county and multi-jurisdictional task forces, for the development and implementation of public safety traffic strategies and law enforcement operations during Memorial Day Weekend.

## FACTUAL BACKGROUND

### I.    Motorcycle Rallies in Myrtle Beach

17.  As to ¶ 22, Defendants deny that for the last several decades, two large motorcycle rallies have been held in the Myrtle Beach area each spring: "Harley Week" and "Black Bike Week." Defendants would further show that participants in the "Harley Week" have boycotted the City and hold their events outside the City's jurisdiction.  Defendants admit Ocean Boulevard is a major avenue that runs parallel to the beach.  Defendants deny Ocean Boulevard has become a focal point of the two weekends. Defendants admit Ocean Boulevard, primarily the boardwalk, attracts tourists visiting the businesses along the strip and accessing the beach throughout the year.

### A.    Harley Week

18.  As to ¶ 23, Defendants do not have information sufficient to admit or deny and therefore deny that Harley Week began in the 1940s with a small gathering of bikers in the town of North Myrtle Beach.

19.  As to ¶24, Defendants are informed and believe the number of bikers attending the gatherings increased over the years and more events began to occur in the City of Myrtle Beach. Defendants deny that by the late 1980s, Myrtle Beach had become the central

gathering place for the Harley Week bikers.

20.  As to ¶ 25, Defendants deny that in recent years, Harley Week has occurred in mid-May and drawn hundreds of thousands of participants to the Myrtle Beach area. Defendants deny Harley Week typically extends over ten days, with the last weekend attracting the largest crowds.

21.  As to ¶ 26, Defendants admit violent events have occurred during the times associated with "Harley Week."

22.  As to ¶ 27, Defendants deny Harley Week bikers have historically been welcomed by Myrtle Beach resorts, hotels, restaurants, and other merchants.  Defendants admit some businesses may advertise biker week specials and "Welcome Bikers" signs.

23.  As to ¶ 28, Defendants deny Harley Week bikers regularly drive or "cruise" through the City of Myrtle Beach along Ocean Boulevard, from 29th Avenue North to 29th Avenue South, a distance of approximately five miles. Defendants deny that cruising is a central aspect of Harley Week or that bikers display their motorcycles to spectators gathered on the sidewalks and at hotels along Ocean Boulevard.

24.  As to ¶ 29, Defendants admit that for the last several years for the times Plaintiffs allege are Harley Weeks, Ocean Boulevard traffic flow has been regulated at times in the same manner as any other day of the year.

**B.    Black Bike Week, Part I**

25.  As to ¶ 30, Defendants do not have information sufficient to admit or deny and therefore deny that Black Bike Week, also known as the Atlantic Beach Bike Festival, began in the 1980s. Defendants are informed and believe a motorcycle event is located in Atlantic Beach, a predominately African-American beach town located between Myrtle Beach and North Myrtle Beach. Atlantic Beach was historically segregated.

26.  As to ¶ 31, Defendants do not have information sufficient to admit or deny and therefore deny that Black Bike Week, which was created by a black biker organization called the Carolina Knight Riders, grew throughout the years and by the late 1990s encompassed much of the greater Myrtle Beach area. Defendants are informed and believe some Black Bike Week attendees now stay in Myrtle Beach and some stay in the hotels along Ocean Boulevard.

27.  As to ¶ 32, Defendants do not have information sufficient to admit or deny and therefore deny that Black Bike Week, which is now held each year around Memorial Day, attracts hundreds of thousands of participants or that the vast majority of individuals participating in Black Bike Week are African American.  Defendants would further show that inside the City of Myrtle Beach, Black Bike Week is not an organized event.   The numbers of participants or the activities for any year are not known to the Defendants until after they arrive for Memorial Day weekend.

28.  As to ¶ 33, Defendants do not have information sufficient to admit or deny and therefore deny that it is common for Black Bike Week attendees to drive or "cruise" through the City of Myrtle Beach along Ocean Boulevard or that Black Bike Week participants cruise to display their motorcycles to spectators gathered on the sidewalks and at hotels along Ocean Boulevard.

II.       **Black Bike Week, part II.**

29.  As to ¶ 34, Defendants deny that white Myrtle Beach City officials and leaders of Myrtle Beach's hospitality industry have exhibited overt hostility toward the event alleged to be Black Bike Week.

30.  As to ¶ 35, Defendants deny that City officials implemented special rules and policies in an effort to prevent Black Bike Week activities from occurring in Myrtle

Beach and to otherwise discourage African Americans from visiting Myrtle Beach. Defendants would further show that all ordinances enacted for traffic control use are related to public safety and apply to all persons equally.  All the City's rules and policies are enacted to fulfill the City's fundamental obligations as a municipal and local government.

31.   As to ¶ 36, Defendants do not have information sufficient to admit or deny and therefore deny that former Mark McBride, Myrtle Beach Mayor from 1998 to 2005, was a vocal Black Bike Week critic, advocating for the elimination of Black Bike Week events in Myrtle Beach; Defendants that former Mayor McBride lobbied the state of South Carolina to deploy the National Guard to Myrtle Beach in an attempt to intimidate Black Bike Week participants; Defendants deny that former Mayor McBride also demanded and obtained a greater police presence during Black Bike Week; or that Mayor McBride never sought the same police or National Guard presence for Harley Week or any other special events in Myrtle Beach.  Defendants would further show that former Mark McBride is not the mayor of the City of Myrtle Beach having been removed from office by the voting public. Defendants would further show that Mark McBride has not been the mayor for the past 13 years.

32.  As to ¶ 37, Defendants deny that former Mayor McBride's efforts were successful or the City created a hostile and intimidating environment.

33.  As to ¶ 38, Defendants deny that beginning in 1998, the City of Myrtle Beach introduced a restrictive traffic pattern that was only implemented during Black Bike Week and did not apply during Harley Week or other festivals. Defendants admit that in 1998, the City began implementing traffic controls along Ocean Boulevard requiring one way traffic at times including the times associated with Memorial Day weekend.

Defendants deny these traffic controls caused significant gridlock; severely limited the ability of attendees to move freely throughout the area; made participants feel unwelcome; and interfered with their enjoyment of "cruising" along Ocean Boulevard.

34.  As to ¶ 39, Defendants deny the City enacted policies in opposition to Black Bike Week or that discriminatory policies were enacted in response to community and business opposition to an event.

35.  As to ¶ 40, Defendants do not have information sufficient to admit or deny and therefore deny businesses took discriminatory actions in opposition to Black Bike Week.

36.  As to ¶ 41, Defendants do not have information sufficient to admit or deny and therefore deny The Yachtsman, a popular hotel on Ocean Boulevard, required Black Bike Week guests to sign a 34-page guest contract, outlining punitive measures for any violations of the hotel's policies.

**Former NAACP litigation Against the City of Myrtle Beach.**

37.  As to ¶ 42, Defendants deny the City had a clear intent to drive Black Bike Week from the City.

38.  As to ¶ 43, Defendants admit the NAACP and others filed on May 20, 2003, a lawsuit in the United States District Court for the District of South Carolina against the City of Myrtle Beach and then Police Chief, Warren Gall, alleging that the differential treatment of the predominantly African American attendees of Black Bike Week deprived them of their constitutional rights ("the 2003 Litigation").

39.  As to ¶ 44, Defendants admit Judge Terry Wooten granted the plaintiffs' motion

for a preliminary injunction. *See Nat'l Ass'n for the Advancement of Colored People, Inc. v. City of Myrtle Beach*, No. 4-03-1732-12, 2006 WL 2038257 (D.S.C. May 9, 2005) (Doc. No. 85)**.** The order speaks for itself. Defendants would further show that Judge Wooten's preliminary injunction was stayed by the Fourth Circuit of the U.S. Court of Appeals upon motion by the City. *See attached Exhibit # 1.* Defendants would further show the factors to be considered in determining whether a court should grant a stay are: (1) the likelihood that the party seeking the stay will prevail on the merits of the appeal; (2) the likelihood that the moving party will be irreparably harmed absent a stay; (3) the prospect that others will be harmed if the court grants the stay; and (4) the public interest in granting the stay.

40.  As to ¶ 45, ¶ 46, ¶ 47, ¶48, ¶ 49, ¶ 50, ¶ 51, ¶ 52, ¶ 53, and ¶ 54,  Defendants deny the allegations and would further allege Judge Wooten's order speaks for itself.

41.  As to ¶ 55 Defendants admit that shortly after the Fourth Circuit Court of Appeals issued it order to stay Judge Wooten's preliminary injunction order, an attorney for the NAACP contacted the City's attorney and requested that the parties of 2003 litigation begin settlement negotiations which resulted in a settlement agreement. *A copy of that agreement is attached as Exhibit # 2.* Defendants admit the Court retained jurisdiction for the purposes of enforcing the Settlement Agreement and Order through July 31, 2010.

**Black Bike Week From 2015 Through 2017**

42.  As to ¶ 56, Defendants deny that after the 2014 Black Bike Week and fewer than five years after the 2003 litigation settlement expired, Defendants began to revive their campaign to eliminate Black Bike Week. Defendants further deny the City spurred the

creation of the "Bikefest Task Force" to implement a new operational plan for the
weekend.  Defendants would further show that the idea for the multi-jurisdictional
"Bikefest Task Force" first originated with the Coastal Alliance, an association of mayors
throughout Horry County.  Defendants admit that part of impetus for a multi-
jurisdictional was a response to the nine shooting incidents that occurred during
Memorial Day Weekend and Defendants further admit that part of the impetus came
directly from the former governor of South Carolina, Nikki Haley.

43.  As to ¶ 57 & ¶ 58, Defendants admit that the Myrtle Beach City Council passed an
"extraordinary events" ordinance, §19-190, et. seq. which speaks for itself.

44. As to ¶ 59, Defendants deny that a new traffic plan was created for the 2015 Black
Bike Week that was far more restrictive and created substantially greater difficulties for
Black Bike Week attendees than any previous plan and was significantly more onerous
than the plan at issue in the 2003 Litigation. Defendants deny the traffic control strategies
implemented for the 2015 Black Bike Week event serve no useful purpose for traffic
congestion management. Defendants deny the 2015 traffic control strategies were
marked by two primary aspects: (1) Ocean Boulevard being limited to a single, one-way
lane for the entirety of Black Bike Week and (2) a mandatory 23-mile loop for all traffic
entering Ocean Boulevard from approximately 10 p.m. to 2 a.m. during the Friday,
Saturday, and Sunday nights of Black Bike Week.

45.  As to ¶ 60, Defendants admit the Bikefest Task Force has subsequently used some of
the traffic control strategies and tools used in 2015 during 2016 and 2017 Black Bike
Weeks.

**B.**       **Traffic on Ocean Boulevard**

46. As to ¶ 61, Defendants admit traffic controls on parts of Ocean Boulevard may be restricted to a single lane of southbound traffic during the entire weekend and northbound traffic may be restricted. Parts of Ocean Boulevard may be closed to public travel. During the day and evening of Memorial Day Weekend entrances to and exits from Ocean Boulevard may be limited.

47. As to ¶ 62, Defendants deny the traffic controls which the City may use during Memorial Day Weekend will significantly hamper vehicle movement and increase traffic congestion. Defendants would further show that such traffic controls are intended to keep traffic moving efficiently.

C.      23-Mile Loop On Friday, Saturday, and Sunday Nights

48. As to ¶ 63, the Bikefest Task Force may use a mandatory 23-mile traffic loop for vehicles as a traffic control strategy. Former strategies have called for a 23-mile traffic loop to be used as needed from the hours of 10 p.m. to 2 a.m. on the Friday, Saturday and Sunday nights of Memorial Day weekend. The maximum time the 23-mile loop has been used during the weekend in the past is 12 hours. Defendants would further show that use of the 23-mile traffic control strategy has been adjusted in the past to accommodate real time circumstances including reducing or shortening the use of the traffic control strategy.

49. As to ¶ 64, ¶65, & ¶66, Defendants admit traffic loops used in the past have begun at the intersection of 29th Avenue North and Ocean Boulevard; run south along the length of Ocean Boulevard until it intersected with Kings Highway; followed Harrelson Blvd. until after it became George Bishop Parkway and intersected with South Carolina 501; then west on 501 until the intersection of South Carolina 501 and 31 (the Carolina

Bays Parkway).  Defendants would further show that approximately 6 miles of the loop is located in the City and approximately 17 miles of the loop is outside the City's jurisdiction.

50.  As to ¶ 67, Defendants deny the traffic control strategy creates unreasonable delays and undue inconvenience, and increases the traffic load on affected streets.

51.  As to ¶ 68, Defendants deny the City interferes with pedestrian access along Ocean Boulevard during Black Bike Week. Defendants admit the City installs barriers between the sidewalk and the road from 29th Avenue North to 29th Avenue South, preventing participants from blocking traffic on Ocean Boulevard.

52.  As to ¶ 69, Defendants admit that the traffic control strategies are intended to keep vehicles moving, ease congestion in the City, and make the weekend safer and more controllable. Defendants deny the strategies have precisely the opposite effect.

53.  As to ¶ 70, Defendants deny the traffic control strategies exacerbate traffic problems and undermine public safety by creating anxiety and frustration or that the 23- mile loop is the source of significant congestion, long traffic jams, driver discomfort, and prevents access to restaurants, entertainment venues, and hotels. Defendants deny travel time around the traffic loop on the Saturday night of the 2017 Black Bike Week was measured to be as long as over six hours.

54.  As to ¶ 71, Defendants deny the traffic strategies used in the past fail to achieve any of the national norms for traffic management, which include facilitating the free flow of vehicles, minimizing gridlock, and providing for public safety.

55.  As to ¶ 72, Defendants deny the traffic control strategies used in the past made participants feel unwelcome, interfered with their enjoyment of driving and walking along Ocean Boulevard, interfered with their ability to freely access hotels, vacation

rentals, restaurants and other venues along Ocean Boulevard and throughout the Myrtle Beach area.  Defendants would further show that traffic control strategies used in the past have moved traffic through the City more efficiently and made the visitors safer during Memorial Day weekend.

**III.**    **Black Bike Week Traffic Plan, part III**

56.  As to ¶ 73, ¶ 74, ¶ 75, ¶76, ¶ 77 & ¶ 78  Defendants deny those allegations.

**Harley Week.**

57.  As to ¶ 79, Defendants deny that the City does not have formal traffic control strategies during the time alleged to be Harley. Defendants admit that in the past motorists have been allowed to drive in two directions on Ocean Boulevard during Harley Week.  Defendants would further show that subject to the approval of the South Department of Transportation, the City has the authority, flexibility and discretion at any time to use the same traffic control strategies used during Memorial Day weekend inside the City should the need arise.

58.  As to ¶ 80, Defendants deny that without the traffic restrictions, motorists on Ocean Boulevard could travel the road with minimal impediments during Memorial Day Weekend.  Defendants deny Harley Davidson bike owners were never forced into a traffic loop that would require them to travel miles from the most direct route to their destinations.  Defendants would further show that only a few miles of the traffic loop are under the control and jurisdiction of the City of Myrtle Beach.  The majority of the traffic loop is located outside  the City's jurisdiction in Horry County.

59.  As to ¶ 81, Defendants deny that Judge Wooten made any final findings of fact during the 2003 litigation; Judge Wooten's preliminary findings are contained in his

preliminary injunction order and speak for themselves.  Defendants would further show

that Judge Wooten's order was stayed by the Fourth Circuit U.S. Court of Appeals.

Defendants would further show that the conditions and traffic control strategies that

existed in 2003 through 2005 are quite different from those that exist in 2018.

60.  As to ¶ 82, Defendants deny that no traffic forecasts were done that suggested

different traffic management needs for the two events. Defendants would further show

that if Dr. Clarke found during his review of the 2017 Bike Weeks that there was no

evidence that Black Bike Week produced traffic demands that were any different from

the traffic demands during Harley Week, he was incorrect.

61.  As to ¶ 83, ¶84, 85 Defendants do not have information sufficient to make a

determination and therefore deny Dr. Clarke's, Chiefs Brown and Williams conclusions

or his assessment of traffic during the two weekends.

62.  As to ¶ 86 Defendants deny the City can provide no explanation for maintaining

different traffic plans for Harley Week and Black Bike Week.

## IV.     Police Presence During Black Bike Week

63.  As to ¶ 87, Defendants admit significantly more police are deployed during

Memorial Day weekend than during any other time.  Defendants deny those police

engage in significantly more aggressive tactics during the time alleged as "Black Bike

Week."

64.  As to ¶ 88, Defendants admit that in 2017, approximately 800 police officers

policed Black Bike Week throughout Horry County and Georgetown County. These

law enforcement officers come from a variety of state and local jurisdictions in the

region.

65.  As to ¶ 89, Defendants deny the City has the area overwhelmed with police

officers, or that those officers are instructed to police or enforce city ordinances any differently against African Americans than other races. Defendants deny that prior to Black Bike Week 2017; the Myrtle Beach Police Department held a meeting for law enforcement officers at a convention center. Pre-planning meetings were conducted by the Bikefest Task Force for the years 2015 - 2017. Defendants deny that law enforcement officials harass Black Bike Week visitors based on over-enforcement of local ordinances and aggressively ticket and arrest Black Bike Week participants for minor infractions. Defendants deny Black Bike Week participants are surrounded by law enforcement and scrutinized by slow moving police vans filled with armed officers.

66. As to ¶ 90, Defendants deny law enforcement officers use the effects of the traffic plan and its resulting gridlock to be more aggressive in their enforcement efforts along Ocean Boulevard. Defendants deny officers walk their routes back and forth peering in windows and searching occupants of cars that are at a standstill because of the traffic and this only increases the intimidating law enforcement presence allowing the officers to identify minor violations that would otherwise go unenforced. Defendants deny that at points during Memorial Day weekend, vehicles were stopped by law enforcement every ¼ mile.

67. As to ¶ 91, Defendants deny that because of the traffic gridlock imposed by Defendants' traffic pattern, motorcyclists have to turn off their vehicles in order to prevent overheating. Defendants deny that as soon as a motorcyclist does so, police officers appear, yelling at the motorcyclist to keep on moving.

68. As to ¶ 92, Defendants deny that Police insist that spectators continue to keep moving and do not allow them to stop in front of stores. Defendants deny that special event vendors are prohibited during Memorial Day Weekend.

69. As to ¶ 93, Defendants deny an overwhelming presence of a large number of law enforcement officials engaged in aggressive policing tactics is intended to, and has the effect of, intimidating Black Bike Week participants and discouraging them from travelling to Myrtle Beach, in violation of Plaintiffs' basic constitutional rights.

70. As to ¶ 94, Defendants do not have information sufficient to form a belief as to what Chief Brown observed or did not observe and therefore deny the same.

71. As to ¶ 95, Defendants deny that during Harley Week 2017, there were only 60 state and local police officers patrolling the streets.

72. As to ¶ 96, Defendants deny Harley Week participants were not subjected to the same levels of enforcement and scrutiny as those attending Black Bike Week.

73. As to ¶ 97, Defendants deny that during Harley Week, riders are permitted to stop on the street, chat with spectators and other motorists, show off their bikes, and are allowed free and open interaction with one another without the constant scrutiny of law enforcement officers in the City of Myrtle Beach. Defendants deny Harley Week vendors are also permitted to set up stands along the sidewalks of the City of Myrtle Beach.

74. As to ¶ 98, Defendants do not have information sufficient to form a belief as to what Chief Brown's observed or did not observe and therefore deny the same.

75. As to ¶ 99, Defendants deny the City also does not impose traffic restrictions or maintain increased and aggressive law enforcement practices during other widely attended events throughout the summer in the City of Myrtle Beach, including the Sun Fun Festival, Fourth of July weekend, and Labor Day Weekend. Defendants admit that events attract large crowds of visitors to Myrtle Beach and Ocean Boulevard in particular. Defendants deny that the visitors to Myrtle Beach during these other events

are predominantly white.

76.  As to ¶ 100, Defendants deny the existence of efforts to undermine Black Bike Week. Defendants would further show that because the events occurring in the City of Myrtle Beach during Memorial Day weekend are unsupervised and not organized by any group or promoters, Defendants do not know from year to year what the number of people who come to Myrtle Beach during Memorial Day weekend will be.

**V.    City Officials**

77.  As to ¶ 101, Defendants deny City officials have clearly stated that the City has imposed restrictive traffic and police policies during the predominantly African-American Black Bike Week and not for the predominantly white Harley Week and other summer events because of the composition of the people attending the events.

78.  As to ¶ 102, Defendants deny that former Chief of Police Warren Gall, who retired immediately before Black Bike Week 2017, claimed that "Bikefest creates the atmosphere that draws the bad element to the Myrtle Beach area," and that "the Bikefest draws crowds that can do anything and everything they want to, or think they can, in an atmosphere of anonymity."

79.  As to ¶ 103, Defendants deny that Randal Wallace is now a Myrtle Beach City Councilman and that he stated in reference to Black Bike Week that: "We've got to do something to curtail this feeling that they can come and do whatever they want here. We're going to squash that one next year."

80.  As to ¶ 104, Defendants admit South Carolina's former Governor, Nikki Haley, who was involved in discussions regarding the policing of Black Bike Week, made public statements in 2014 about her goals. Defendants would further show that the former governor was not representing the City of Myrtle Beach when she became involved in

discussions on Black Bike Week.  Defendants do not have information sufficient to form a belief on whether Governor Haley conditioned South Carolina's investment in the town of Atlantic Beach on the town's commitment to cease hosting the festival and therefore deny the same. Defendants do not have information sufficient to form a belief as to how Atlantic Beach Mayor Jake Evans responded.  , Defendants do not have information sufficient to form a belief as to what Governor Haley claimed about the culture of Black Bike Week and therefore deny the same.

81.  As to ¶ 105, Defendants deny that former Mayor John Rhodes called for the end of Black Bike Week or that in response to a suggestion from Horry County officials that the 2015 loop be limited to 9 miles; that Mayor Rhodes responded that it would defeat the purpose of the loop, as "we're trying to move people outside of the city. We're trying to get them out." Defendants deny that former Mayor Rhodes has also continued to employ a significantly larger police presence during Black Bike Week than any other events, ensuring that attendees of Black Bike Week are policed more than any other festival-goers in the City.

82.  As to ¶ 106, Defendants do not have information sufficient to form a belief as to what former Mayor Rhodes denied on the connection between Memorial Day Weekend in Myrtle Beach and the motorcycle gathering. Defendants deny that the City does not view Black Bike Week as an integral part of Myrtle Beach's tourism industry. Defendants would further show that the City expends substantial amounts of money to keep visitors and participants in Black Bike Week safe while they are in the City.

83.  As to ¶ 107, Defendants deny the same  and Defendants would further show Judge Wooten's order and the Fourth Circuit U.S. Court of Appeals staying Judge Wooten's order speak for themselves.

## VI.    Defendants' Assertions About Past Violence

84.  As to ¶ 108, Defendants admit that the acts of violence that occurred in 2014 together with traffic conditions that impaired the ability of the City to perform its public safety functions as a local government and that caused the former governor and the State of South Carolina to take actions.  Those actions included the formation of a multijurisdictional task "BikeFest Task Force" to study and find solutions for the problems that occurred in 2014.

85.  As to ¶ 109, Defendants admit references to violence relate to incidents during Memorial Day weekend 2014, including but not limited to incidents when police responded to reports of shootings in a hotel located on Ocean Boulevard. Defendants deny the shootings were not linked to Black Bike Week.  Defendants deny there is no evidence that the individuals were in Myrtle Beach for any purpose related to Black Bike Week.

86.  As to ¶ 110, Defendants deny the 2014 Memorial Day shootings are consistent with a general increase in gun- violence in Myrtle Beach throughout the year.

87.  As to ¶ 111, Defendants deny that only Black Bike Week has been singled out as an event that requires differential treatment because of the violence.  Defendants would further show that public safety requires many different police strategies and that rigid plans which take away the discretion of reasonable police officers have been universally disfavored.

88.  As to ¶ 112, Defendants admit a traffic plan that creates additional frustration and anxiety for motorists would not address concerns about an increase in violence. Defendants deny that their traffic control strategies heighten emotions that are more likely to lead to violence. Defendants deny that violence as an explanation for traffic

control strategies and law enforcement during Black Bike Week is simply a pretext for discriminatory conduct.

**Attendees of Black Bike Week**

89.  As to ¶ 113 through ¶ 132, Defendants do not have information sufficient to form a belief as to the truth or falsity of the allegations contained therein and therefore Defendants deny the same.

## INJURIES TO PLAINTIFFS

90.  As to ¶ 133 through ¶ 139, Defendants deny the same.

## CAUSES OF ACTION

**Count I – 42 USC § 1981**

91.  As to ¶ 140,  Defendants deny the same.

92.  As to ¶ 141, Defendants would refer to the full text and show the statute speaks for itself.

93.  As to ¶ 142, Defendants are informed and believe the Individual Plaintiffs and the individual members of the NAACP are "persons" within the meaning of the term as used in 42 USC § 1981and are within the jurisdiction of the United States.

94.  As to ¶ 143, Defendants deny the same.

**Count II – 42 USC § 1983 First Amendment Rights**

95.  As to ¶ 144, Defendants deny the same.

96.  As to ¶ 145, Defendants admit the City of Myrtle Beach is a  "person" within the meaning of that term as it is used in 42 U.S.C. §1983.  Defendants would further show the Myrtle Beach Police Department is the same entity as the City of Myrtle Beach and should be removed as a party defendant to avoid confusion.

97. As to ¶ 146, Defendants are informed and believe the allegations are true.

98. As to ¶ 147, Defendants would show the United States Constitution is a document that speaks for itself and  is interpreted by the courts.

99. As to ¶ 148, Defendants deny the same.

**Count III – 42 USC § 1983 Fourteenth Amendment Rights**

100. As to ¶ 149 Defendants deny the same.

101. As to ¶ 150, Defendants admit the City of Myrtle Beach is a  "person" within the meaning of that term as it is used in 42 U.S.C. §1983.  Defendants would further show the Myrtle Beach Police Department is the same entity as the City of Myrtle Beach and should be removed as a party defendant to avoid confusion.

102. As to ¶ 151, Defendants are informed and believe the allegations are true.

103. As to ¶ 152, Defendants would show the United States Constitution is a document that speaks for itself and is interpreted by the courts.

104. As to ¶ 153, Defendants deny the same.

**Count IV - 42 U.S.C. § 1983 Dormant Commerce Clause**

100. As to ¶ 154 Defendants deny the same.

101. As to ¶ 155, Defendants admit the City of Myrtle Beach is a  "person" within the meaning of that term as it is used in 42 U.S.C. §1983.  Defendants would further show the Myrtle Beach Police Department is the same entity as the City of Myrtle Beach and should be removed as a party defendant to avoid confusion.

102. As to ¶ 156, Defendants are informed and believe the allegations are true

103. As to ¶ 157, Defendants would show the United States Constitution is a document that speaks for itself and is interpreted by the courts.

104. As to ¶ 158, Defendants deny the same.

**Count V Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d**

105. As to ¶ 159, Defendants deny the same.

106.  As to ¶ 160 would show that Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d, et seq., speaks for itself.

107.  As to ¶ 161, Defendants admit Defendant City of Myrtle Beach has received federal financial assistance from the United States Department of Justice for law enforcement purposes.

108.  As to ¶ 162 and ¶163, Defendants deny the same.

## PRAYER FOR RELIEF

109.  As to ¶ 164 through ¶ 170, Defendants deny the same.

## AFFIRMATIVE DEFENSES

### Equitable Defenses

110.  Plaintiffs' claims for equitable relief are barred by the doctrines laches, equitable estoppel, judicial estoppel, unclean hands, waiver and the existence of adequate remedies at law.

111.   Plaintiffs' claim for temporary or permanent injunctive relief is barred by the principles of equity, comity and federalism.

### Standing

112.   Plaintiffs do not have standing to bring their claims for temporary or permanent injunctive relief.

### Statute of Limitations

113.  Plaintiffs' claims are barred by the applicable statutes of limitations.

### Case or Controversy

114.   Plaintiffs are seeking equitable relief and damages for events that have not yet occurred.  Defendants are informed and believe that Plaintiffs can show the existence of a

justiciable case or controversy.

## Ripeness

115.  Plaintiffs are seeking equitable relief and damages for events that have not yet

occurred.  Plaintiffs' claims are not ripe for adjudication.

## Prayer for Relief

Defendants City of Myrtle Beach ("City") and the City of Myrtle Beach Police

Department hereby pray for the following relief:

a.      That Plaintiffs claims for declaratory and equitable relief be denied;

b.      That Plaintiffs claims for damages be denied;

c.      That Plaintiffs' claims for costs and attorneys' fees be denied;

d.      That Defendants costs and attorneys' fees be awarded; and

e.      For such other and further relief as to the Court is just and proper.

Respectfully submitted,

By: s/Michael W. Battle
Michael W. Battle, Fed. ID # 1243   (mbattle@battlelawsc.com)
James R. Battle, Fed. ID # 10221      (jbattle@battlelawsc.com)
ATTORNEYS FOR DEFENDANTS
CITY OF MYRTLE BEACH AND
THE CITY OF MYRTLE BEACH
POLICE DEPARTMENT
BATTLE LAW FIRM, LLC
PO Box 530
1200 Main Street
Conway, SC 29528
(843) 248-4321 (tel)
(843) 248-4512 (fax)

March 16, 2018