**UNITED STATES DISTRICT COURT**
**DISTRICT OF SOUTH CAROLINA**
**FLORENCE DIVISION**

| | |
|---|---|
| NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE, INC. by and through its MYRTLE BEACH BRANCH, | |
| HARRY BRIGGS, | |
| NOVICE BRIGGS, | |
| KENNETH COLEMAN, | |
| SIMUEL JONES, | **FIRST AMENDED COMPLAINT** |
| TYRONE KINARD, | Demand For Jury Trial |
| WILLIAM LASSITER, | Case. No. 4:18-cv-00554-MGL |
| CEDRIC STEVENSON, | |
| and | |
| LESLIE STEVENSON, | |
| Plaintiffs, | |
| v. | |
| CITY OF MYRTLE BEACH, a municipal corporation within the State of South Carolina, and | |
| CITY OF MYRTLE BEACH POLICE DEPARTMENT, a department of the City of Myrtle Beach, | |
| Defendants. | |

**FIRST AMENDED COMPLAINT FOR DAMAGES, DECLARATORY AND INJUNCTIVE RELIEF AND DEMAND FOR JURY TRIAL**

Plaintiffs National Association for the Advancement of Colored People ("NAACP"), by and through its Myrtle Beach Branch; Harry Briggs; Novice Briggs; Kenneth Coleman; Simuel Jones; Tyrone Kinard; William Lassiter; Cedric Stevenson; and Leslie Stevenson bring this action against Defendants City of Myrtle Beach ("City"); the City of Myrtle Beach Police Department for declaratory judgment, injunctive relief, and damages for discrimination and the deprivation of rights secured by the Constitution of the United States and statutory law in violation of 42 U.S.C. §§ 1981, 1983, 2000d.

## NATURE OF THE ACTION

1.      Each year, during the month of May, hundreds of thousands of motorcycle enthusiasts from around the country gather in the Myrtle Beach, South Carolina area for each of two separate motorcycle rallies. In the middle of the month, motorcycle enthusiasts gather for the Myrtle Beach Bike Week Spring Rally ("Harley Week"). The vast majority of the Harley Week participants are white, and the area welcomes them. Two weeks later, over the Memorial Day weekend, motorcycle enthusiasts gather for Atlantic Beach Bikefest ("Black Bike Week"). The vast majority of Black Bike Week visitors are African American and the event historically has been met with opposition and resistance from the City of Myrtle Beach and many local businesses.

2.      The hostility toward Black Bike Week has led to a number of restrictive governmental policies that were first challenged by the NAACP and individual Black Bike Week attendees in an action filed in this Court in 2003. That suit alleged that the City of Myrtle Beach imposed an unequal and unjustified traffic plan during Black Bike Week and that the plan was motivated by racial discrimination, interfered with the rally, and discouraged participation. The plaintiffs in that case argued that Black Bike Week should be treated the same as Harley Week.

Chief United States District Court Judge Terry Wooten found that the differences in the traffic plans between Black Bike Week and Harley Week were likely motivated by race and therefore likely unconstitutional. Chief Judge Wooten granted the plaintiffs' motion for a preliminary injunction and ordered the City to implement similar traffic plans for the two events. The parties in that action ultimately settled the case with the City agreeing to a consent order that required the City to maintain similar operations plans for Black Bike Week and Harley Week for the following five years.

3.      Just five years after the consent order expired, the City resumed its differential treatment of the motorcycle rallies. The size of the crowds and the behavior of the participants were similar to each other, but the differences in the City's policies for the two events are even greater than the differences that Chief Judge Wooten found as likely motivated by discriminatory intent.

4.      The City does not implement a formal traffic plan for Harley Week and the mostly white participants are essentially able to travel around the Myrtle Beach area just as they would on any other day of the year. During Black Bike Week, however, Ocean Boulevard – a major thoroughfare that runs the length of Myrtle Beach adjacent to the beach which is a focal point for the motorcycle rallies – is reduced to a single lane of one-way traffic. And during the late night hours of the event, all motorists entering Ocean Boulevard are forced into a 23-mile loop that has just one exit.

5.      Because of the traffic restrictions, a drive down Ocean Boulevard on Saturday night of Black Bike Week could take as long as five hours. During Harley Week, a hotel guest who wanted to drive to a restaurant one mile north on Ocean Boulevard could turn out of the hotel's driveway and be there in a few minutes. During Black Bike Week, that same guest going

to the same restaurant would have to turn south on Ocean Boulevard and navigate a 23-mile loop that could take hours.

6.     The City also maintains significantly different levels of law enforcement between the two bike rallies. During the 2017 Black Bike Week as many as 800 law enforcement officers, including many from other jurisdictions, patrolled the City. Less than a tenth of that number were present for 2017 Harley Week.

7.     The City's motivation for the policies is clear: it seeks to make Black Bike Week sufficiently unpleasant for the mostly African-American motorcyclists that they stop attending and the event ceases to exist.

8.     The City can proffer no legitimate explanation for its different policies. The one-way Ocean Boulevard traffic plan and the 23-mile loop in place during Black Bike Week serve no useful traffic- or safety-related purpose. Instead, they have the opposite effect by leading to increased frustration and anxiety for motorists and pedestrians attending Black Bike Week and making it nearly impossible to traverse the Boulevard or surrounding area.

9.     With no legitimate traffic- or safety-related justification for the traffic plan, the City points to violence that occurred during the 2014 Memorial Day weekend as an explanation. However, no link was drawn between the violence and Black Bike Week and that violence was not abnormal for the City, which has seen a general increase in gun violence and shootings in the last several years. The increasing violence has extended to Harley rallies and other events in Myrtle Beach. Even if gun violence were an explanation for different City policies during Black Bike Week, the implementation of an exasperating and frustrating traffic system that traps people in their cars for hours would not be a rational response to such violence.

10.     Defendants' discriminatory policies and conduct in connection with Black Bike Week have deprived Plaintiffs of their rights to equal treatment and full protection under federal and state law. Accordingly, Plaintiffs seek declaratory and injunctive relief as well as compensatory damages stemming from Defendants' violations of 42 U.S.C. § 1981, 42 U.S.C. §1983, and 42 U.S.C. 2000d.

## JURISDICTION AND VENUE

11.     This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331, 1343(a), and 2201 and 42 U.S.C. § 2000d-2.

12.     Venue is proper in the District of South Carolina pursuant to 28 U.S.C. § 1391(b)(2) because a substantial portion of the events or omissions giving rise to the claims occurred in this District.

## PARTIES

I.     **Plaintiffs**

13.     Plaintiff the NAACP is a membership-based, domestic non-profit corporation organized under the laws of the State of New York in 1911. The NAACP has its principal place of business at 4805 Mt. Hope Drive, Baltimore, Maryland. As one of the oldest and largest civil rights organizations in the nation, the purpose of the NAACP is to ensure the elimination of all racial barriers that deprive African-American citizens of the privileges of equal civil and constitutional rights in the United States.

14.     The NAACP brings this case through its Myrtle Beach branch, which has been a leading advocate for equal protection and due process rights of African-American and other minority residents and visitors in the Myrtle Beach area.

15.    The NAACP and its Myrtle Beach branch are membership-based organizations. They have received multiple complaints from NAACP members and other visitors to Myrtle Beach regarding discrimination against African Americans during Black Bike Week.

16.    Plaintiff Harry Briggs is an African-American resident of Orangeburg, South Carolina. Mr. Briggs travelled from Orangeburg to Myrtle Beach to attend the 2015-2018 Black Bike Weeks. Mr. Briggs had attended numerous previous Black Bike Weeks. Mr. Briggs was offended, inconvenienced, and otherwise adversely affected by the traffic restrictions and police presence implemented by Defendants during the 2015-2018 Black Bike Weeks. Mr. Briggs plans to attend Black Bike Week in 2019.

17.    Plaintiff Novice Briggs is an African-American resident of Orangeburg, South Carolina. Mrs. Briggs travelled from Orangeburg to Myrtle Beach to attend the 2015-2018 Black Bike Weeks. Mrs. Briggs had attended numerous previous Black Bike Weeks. Mrs. Briggs was offended, inconvenienced, and otherwise adversely affected by the traffic restrictions and police presence implemented by Defendants during the 2015-2018 Black Bike Weeks. Mrs. Briggs plans to attend Black Bike Week in 2019.

18.    Plaintiff Kenneth Coleman is an African-American resident of Richmond, Virginia. Mr. Coleman travelled from Virginia to South Carolina to attend the 2015-2018 Black Bike Weeks. Mr. Coleman had attended numerous previous Black Bike Weeks. Mr. Coleman was offended, inconvenienced, and otherwise adversely affected by the traffic restrictions and police presence implemented by Defendants during the 2015-2018 Black Bike Weeks. Mr. Coleman plans to attend Black Bike Week in 2019.

19.    Plaintiff Simuel Jones is an African-American resident of Chicago, Illinois. Mr. Jones has been adversely affected by the acts, policies, and practices of Defendants and their

agents. Mr. Jones travelled from Illinois to South Carolina to attend the 2015-2017 Black Bike

Weeks. Mr. Jones had attended numerous previous Black Bike Weeks. Mr. Jones was offended,

inconvenienced, and otherwise adversely affected by the traffic restrictions and police presence

implemented by Defendants during the 2015-2018 Black Bike Weeks. Mr. Jones plans to travel

to Myrtle Beach to attend the 2019 Black Bike Week.

20.    Plaintiff Tyrone Kinard is an African-American resident of Ruffin, South

Carolina. Mr. Kinard travelled from Ruffin to Myrtle Beach to attend the 2015-2018 Black Bike

Weeks. Mr. Kinard had attended numerous previous Black Bike Weeks. Mr. Kinard was

offended, inconvenienced, and otherwise adversely affected by the traffic restrictions and police

presence implemented by Defendants during the 2015-2018 Black Bike Weeks.

21.    Plaintiff William Lassiter is an African-American resident of Richmond, Virginia.

Mr. Lassiter travelled from Richmond to Myrtle Beach to attend the 2015-2018 Black Bike

Weeks. Mr. Lassiter had attended numerous previous Black Bike Weeks. Mr. Lassiter was

offended, inconvenienced, and otherwise adversely affected by the traffic restrictions and police

presence implemented by Defendants during the 2015-2018 Black Bike Weeks. Mr. Lassiter

plans to attend Black Bike Week in 2019.

22.    Plaintiff Leslie Stevenson is an African-American resident of Suwanee, GA. Mrs.

Stevenson travelled from Georgia to South Carolina to attend the 2016 and 2017 Black Bike

Weeks. Mrs. Stevenson was offended, inconvenienced, and otherwise adversely affected by the

traffic restrictions and police presence implemented by Defendants during the 2016 and 2017

Black Bike Weeks.

23.    Plaintiff Cedric Stevenson is an African-American resident of Suwanee, GA. Mr.

Stevenson travelled from Georgia to South Carolina to attend the 2016 and 2017 Black Bike

Weeks. Mr. Stevenson was offended, inconvenienced, and otherwise adversely affected by the traffic restrictions and police presence implemented by Defendants during the 2016 and 2017 Black Bike Weeks.

## II. **Defendants**

24.    Defendant City of Myrtle Beach, South Carolina is a municipal corporation duly organized and existing under the laws of South Carolina. The City maintains its principal office at Myrtle Beach City Hall, located at 937 Broadway Street, Myrtle Beach, South Carolina. The City operates under a Council-Manager city government where a City Council sets policy that is carried out by a City Manager hired by the Council. City officials have responsibility for the development and implementation of the Black Bike Week traffic plan and law enforcement operations plan. The City is a recipient of federal funds, from the United States Department of Justice, that it provides to the City of Myrtle Beach Police Department which conducts law enforcement activities in Myrtle Beach, including during Black Bike Week.

25.    Defendant City of Myrtle Beach Police Department is a department of the City of Myrtle Beach, South Carolina. The Department is located at the Ted C. Collins Law Enforcement Center, 1101 North Oak Street, Myrtle Beach, South Carolina. The Myrtle Beach Police Department is overseen by a Police Chief, who is appointed by the City Manager. The City of Myrtle Beach Police Department has responsibility, in conjunction with other City officials, for the development and implementation of the Black Bike Week traffic plan and law enforcement operations plan.

26.    The City of Myrtle Beach Police Department is a program or activity within the meaning of 42 U.S.C. § 2000d-4a and is a recipient of federal funds from the United States Department of Justice. Those funds are used for the Department's law enforcement activities in

Myrtle Beach, which include the planning, implementation, and enforcement of the traffic and operations plan during Black Bike Week.

## FACTUAL BACKGROUND

### I.    Motorcycle Rallies in Myrtle Beach

27.    For the last several decades, two large motorcycle rallies have been held in the Myrtle Beach area each spring: "Harley Week" and "Black Bike Week." Ocean Boulevard, a major avenue that runs parallel to the beach and through the heart of Myrtle Beach, has become a focal point of the two weekends. During the bike weeks, like other weekends during the year, Ocean Boulevard attracts tourists visiting the businesses along the strip and accessing the beach.

### A.    Harley Week

28.    Harley Week began in the 1940s with a small gathering of bikers in the town of North Myrtle Beach. For many years, the gathering consisted of several hundred bikers racing up and down the beach during the day and having a beach bonfire at night.

29.    The number of bikers attending the gathering increased over the years and more events began to occur in the City of Myrtle Beach. By the late 1980s, Myrtle Beach had become the central gathering place for the Harley Week bikers.

30.    In recent years, Harley Week has occurred in mid-May and drawn hundreds of thousands of participants to the Myrtle Beach area. Harley Week typically extends over ten days, with the last weekend attracting the largest crowds. Since its inception, the vast majority of Harley Week participants have been white.

31.    Harley Week has, at times, been marred by violence. In the 1990s there were several armed standoffs between outlaw motorcycle gangs attending the rally and Myrtle Beach police.

32.    Nonetheless, Harley Week bikers have historically been welcomed by Myrtle Beach resorts, hotels, restaurants, and other merchants. Businesses advertise biker week specials and "Welcome Bikers" signs spring up around the City in the days preceding the event.

33.    Harley Week bikers regularly drive or "cruise" through the City of Myrtle Beach along Ocean Boulevard, from 29th Avenue North to 29th Avenue South, a distance of approximately five miles. Cruising is a central aspect of Harley Week as bikers display their motorcycles to spectators gathered on the sidewalks and at hotels along Ocean Boulevard. For decades, cruising Ocean Boulevard has been an attraction to visitors during motorcycle rallies and other weekends throughout the year.

34.    For the last several Harley Weeks, Ocean Boulevard has been open to vehicles traveling in either direction, with traffic flow regulated in the same manner as any other day of the year. The City has not recently implemented a special traffic or operations plan for Harley Week. In 2017, approximately 60 law enforcement officers policed Myrtle Beach during the weekend.

**B.    Black Bike Week**

35.    Black Bike Week, also known as the Atlantic Beach Bike Festival, began in the 1980s. The event is located in Atlantic Beach, a predominately African-American beach town located between Myrtle Beach and North Myrtle Beach. The area was historically segregated and Atlantic Beach was one the few beaches in the South that permitted African Americans. Fences ran across the beach to prevent blacks from walking north or south from the black beach to neighboring white beaches.

36.    Black Bike Week, which was created by a black biker organization called the Carolina Knight Riders, grew throughout the years and by the late 1990s encompassed much of

the greater Myrtle Beach area. Many Black Bike Week attendees now stay in Myrtle Beach and in the hotels along Ocean Boulevard.

37.     Black Bike Week, which is now held each year around Memorial Day, attracts hundreds of thousands of participants. The vast majority of individuals participating in Black Bike Week are African American.

38.     It is common for Black Bike Week attendees to drive or "cruise" through the City of Myrtle Beach along Ocean Boulevard. As during Harley Week, Black Bike Week participants cruise to display their motorcycles to spectators gathered on the sidewalks and at hotels along Ocean Boulevard.

## II.     History of Hostility Toward Black Bike Week Based on Stereotypes and Racism

39.     As Black Bike Week expanded from Atlantic Beach to Myrtle Beach in the mid-1990s, white Myrtle Beach City officials and leaders of Myrtle Beach's hospitality industry began to exhibit overt hostility toward the event. The prejudice against Black Bike Week stood in sharp contrast to the explicit, public welcoming of Harley Week bikers.

40.     City officials implemented special rules and policies in an effort to prevent Black Bike Week activities from occurring in Myrtle Beach and to otherwise discourage African Americans from visiting Myrtle Beach. These efforts, which are based on racial stereotyping, have been ongoing for decades.

41.     Mark McBride, Myrtle Beach Mayor from 1998 to 2005, was a vocal Black Bike Week critic, advocating for the elimination of Black Bike Week events in Myrtle Beach. Mayor McBride lobbied the state of South Carolina to deploy the National Guard to Myrtle Beach in an attempt to intimidate Black Bike Week participants. Mayor McBride also demanded and obtained a greater police presence during Black Bike Week. Mayor McBride never sought the

same police or National Guard presence for Harley Week or any other special events in Myrtle Beach.

42.    Mayor McBride's efforts were successful, as the presence of hundreds of police officers created a hostile and intimidating environment throughout the festival.

43.    Beginning in 1998, the City of Myrtle Beach introduced a restrictive traffic pattern that was only implemented during Black Bike Week and did not apply during Harley Week or other festivals. The traffic pattern included prohibiting two-way traffic along Ocean Boulevard, closing lanes of Ocean Boulevard to vehicular traffic, and barring parking throughout the area. These restrictions caused significant gridlock, severely limited the ability of Black Bike Week attendees to move freely throughout the area, made participants feel unwelcome, and interfered with their enjoyment of "cruising" along Ocean Boulevard.

44.    The City policies in opposition to Black Bike Week were, in part, a response to community and business opposition to the event. In 2002, for example, the Myrtle Beach Chamber of Commerce provided 30-page color brochures for Harley Week participants. The brochure included a "Welcome Letter" from the chief of police urging visitors to attend Harley Week. In contrast, during Black Bike Week that year, the Chamber distributed a two-page flyer listing the City's traffic laws and the locations of local jails.

45.    Businesses also took their own discriminatory actions in opposition to Black Bike Week. Restaurants closed or provided different terms during Black Bike Week. For example, in 1998, business leader and restaurants owner, J. Edward Fleming, explained in a letter to the Chamber of Commerce his intention to close his restaurants over Memorial Day weekend because of the attendees of Black Bike Week. His letter stated that he would rather take the

business loss than have to tolerate serving Black Bike Week visitors, calling the event's

attendees an "illiterate group of people."

46.    In a similar vein, The Yachtsman, a popular hotel on Ocean Boulevard, required

Black Bike Week guests to sign a 34-page guest contract, outlining punitive measures for any

violations of the hotel's policies. This contract was not required on any other nights of the year.

The Yachtsman also charged its highest rates of the year during Black Bike Week, $100 more

per night than during Harley Week.

**III.    Litigation Against the City of Myrtle Beach for Its Black Bike Week Activities**

47.    Despite Myrtle Beach's clear intent to drive Black Bike Week from the City, the

Black Bike Week community persisted in trying to continue its strong traditions and not bow in

the face of public pressure to cease the event.

48.    Their efforts included the filing, on May 20, 2003, of a lawsuit in the United

States District Court for the District of South Carolina against the City of Myrtle Beach and then

Police Chief, Warren Gall, alleging that the differential treatment of the predominantly African-

American attendees of Black Bike Week deprived them of their constitutional rights ("the 2003

Litigation").

49.    On May 9, 2005, Judge Terry Wooten granted the plaintiffs' motion for a

preliminary injunction to enjoin the City from using its restrictive traffic pattern. *See Nat'l Ass'n*

*for the Advancement of Colored People, Inc. v. City of Myrtle Beach*, No. 4-03-1732-12, 2006

WL 2038257 (D.S.C. May 9, 2005) (Doc. No. 85).

50.    In granting the preliminary injunction, Judge Wooten examined the traffic plans

used for Harley Week and Black Bike Week. At that time, the City limited a five mile stretch of

13

Ocean Boulevard to one-way traffic during Black Bike Week. In contrast, during Harley Week, two-way traffic was permitted for the entire length of Ocean Boulevard. *Id*. at *2.

51.     Judge Wooten determined that the Black Bike Week and Harley Week events were similarly situated. *Id*. at *3-*5, *7.  In reaching this conclusion, Judge Wooten relied upon expert testimony that there were no significant differences, based on size, age, or crowd behavior, between the visitors for Black Bike Week as compared to Harley Week that would warrant the differences in the traffic plans. *Id*. at *3. He also relied on statements by City officials that the events were similar. *Id*. at *4.

52.     Judge Wooten further concluded that the City could use the same traffic plan during Black Bike Week that it employed for Harley Week and other large festivals. *Id*. at *3.

53.     The Court also analyzed whether there was evidence indicating that the City was motivated by discriminatory intent, and found that there was significant evidence to support such a conclusion. *Id*. at *4-*5.

54.     This evidence included the fact that Black Bike Week was the only weekend of the year in Myrtle Beach where African-American visitors clearly outnumbered white visitors and was the only weekend when the City implemented a one-way traffic plan. As a result, the City's Black Bike Week actions disproportionately affected African Americans. *Id*. at *4.

55.     The Court also focused on statements made by City of Myrtle Beach officials demonstrating that the nature of the attendees of the event was discussed and considered when implementing the traffic plan for Black Bike Week. *Id*. at *5. This included comments about Harley Week tourists being "more law abiding" than Black Bike Week tourists, that holding Black Bike Week visitors to certain expectations would result in fewer attendees because all those visitors wanted to do was have a party, and that Black Bike Week tourists "party

differently" and "wanted to take over the street." *Id*. The Court determined that these statements were made in connection with the plan for Black Bike Week and revealed that race may have been a motivating factor in implementing the traffic plan. *Id*.

56.    Finally, the Court determined that the City had not established any compelling reasons for a different traffic plan during Black Bike Week. In particular, the Court found that the defendants had not provided evidence that the one-way traffic plan would reduce congestion or provide more accessibility for emergency vehicles as compared to the traffic pattern used for Harley Week. *Id*. at *6-*7.

57.    The Court's findings regarding the traffic plan relied on plaintiffs' traffic expert, Dr. David B. Clarke, who explained that the traffic plan for Black Bike Week resulted in congestion and difficulty for drivers and that there was no reason that the traffic plan used for Harley Week would not work during Black Bike Week. *Id*. at *6. The Court also cited to plaintiffs' other experts, retired police chiefs Willie R. Williams and Mitchell W. Brown, who opined that the traffic plan during Black Bike Week exacerbated gridlock, created anxiety and frustration for bikers and motorists, and created an environment that undermined public safety. *Id*. Chief Williams and Chief Brown also opined that the Harley Week traffic plan could be used for Black Bike Week and that there was no reason for the difference in treatment of the two weekends. *Id*.

58.    Judge Wooten concluded that no one could dispute the fact that the Black Bike Week visitors were being treated differently than the Harley Week visitors and that race was likely a motivating factor for the differing treatment. *Id*. at *3.

59.    Based on his findings that Harley Week and Black Bike Week were similarly situated events and that race was likely a motivating factor in the different traffic plans for the

two events, Judge Wooten found that there was a likelihood that the plaintiffs would prevail on

their claims of alleged violations of the Equal Protection Clause and that the public interest

would be served by granting a preliminary injunction and requiring the defendants to maintain a

substantially similar traffic plan for the two weekends. *Id.* at *7-8.

60.     After the Court's ruling, the parties in the 2003 Litigation entered into a

settlement agreement that required the City to use the same traffic restrictions, patterns, or plan

on Ocean Boulevard during both Harley Week and Black Bike Week. The Court retained

jurisdiction for the purposes of enforcing the Settlement Agreement and Order through July 31,

2010.

## IV.    Defendants' Discriminatory Treatment of Black Bike Week From 2015 Through 2017

61.     After the 2014 Black Bike Week and fewer than five years after the 2003

Litigation settlement expired, Defendants began to revive their campaign to eliminate Black Bike

Week. The City spurred the creation of the "BikeFest Task Force" to implement a new

operational plan for the weekend.

62.     On April 28, 2015, the Myrtle Beach City Council passed an "extraordinary

events" ordinance, §19-190, et. seq. This ordinance allows the City Council to declare certain

events as extraordinary, triggering special governmental powers including requesting financial

resources from other governments, hiring private security officers and requiring hotels and

businesses to do the same, establishing pedestrian and vehicular road blocks and diversions, and

establishing and enforcing "no cruising" zones.

63.     Currently, the ordinance has a general definition for extraordinary events, but then

specifically identifies only Black Bike Week as an extraordinary event: "[t]he motorcycle event,

16

however named or styled, that occurs immediately preceding Memorial Day by 96 hours, and including Memorial Day and the day after, may be declared to be an extraordinary event."

64.    A new traffic plan was created for the 2015 Black Bike Week that was far more restrictive and created substantially greater difficulties for Black Bike Week attendees than any previous plan and was significantly more onerous than the plan the Court found likely discriminatory in the 2003 Litigation. The traffic plan implemented for the 2015 Black Bike Week event serves no useful purpose for traffic congestion management. The 2015 Traffic Plan was marked by two primary aspects: (1) Ocean Boulevard being limited to a single, one-way lane for the entirety of Black Bike Week and (2) a mandatory 23-mile loop for all traffic entering Ocean Boulevard from approximately 10 p.m. to 2 a.m. during the Friday, Saturday, and Sunday nights of Black Bike Week.

65.    The City has subsequently used the 2015 Traffic Plan for the 2016,2017 and 2018 Black Bike Weeks and has stated that it will use the 2015 Traffic Plan for the 2019 Black Bike Week ("current Black Bike Week Traffic Plan").

**A.    Traffic Limited to A Single Lane on Ocean Boulevard**

66.    Under the current Black Bike Week Traffic Plan, traffic on Ocean Boulevard is restricted to a single lane of southbound traffic during the entire weekend. No northbound traffic is allowed and the remaining lanes of Ocean Boulevard are closed to public travel. During the day and evening of Black Bike Week the only entrances to and exits from Ocean Boulevard are at the few cross streets with traffic signals on Kings Highway, which runs parallel to Ocean Boulevard. All other entrances are barricaded.

67.    The single lane traffic plan significantly hampers vehicle movement and increases traffic congestion. The plan reduces capacity on the road significantly. This further exacerbates

traffic congestion. Severely limiting access to and from Ocean Boulevard via intersecting cross streets forces traffic to stay on Ocean Boulevard for unnecessarily long distances, increasing the load on the street. During the early evening periods of Black Bike Week, the one lane restriction on Ocean Boulevard caused travel times between 29th Avenue North and 29th Avenue South to increase significantly.

**B.     Traffic Is Forced Onto a 23-Mile Loop On Friday, Saturday, and Sunday Nights**

68.     In addition to having Ocean Boulevard limited to a single southbound lane, the current Black Bike Week Traffic Plan creates a mandatory 23-mile traffic loop for any vehicle entering Ocean Boulevard from the hours of 10 p.m. to 2 a.m. on the Friday, Saturday, and Sunday nights of Black Bike Week.



69.     The 23-mile loop begins at the intersection of 29th Avenue North and Ocean Boulevard (Point B in Figure 1). The loop runs south along the length of Ocean Boulevard until

it intersects with Kings Highway. Motorists are then forced to travel north on Kings Highway until turning left on Harrelson Boulevard. The loop follows Harrelson until after it becomes George Bishop Parkway and intersects with South Carolina 501. The loop travels west on 501 until the intersection of South Carolina 501 and 31 (the Carolina Bays Parkway). At that point, drivers can exit the loop and leave the area. However, drivers seeking to return to Ocean Boulevard have to travel north on the Carolina Bays Parkway until they turn onto the Robert Grissom Parkway, which returns drivers to a point where the loop turns left on 29th Avenue North and back to Ocean Boulevard.

70.     The loop forces any driver entering Ocean Boulevard at 29th Avenue North or anywhere south of that point to drive the entire length of the loop or exit at the intersection of 501 and the Carolina Bays Parkway. While turns onto Ocean Boulevard from intersecting roads are prohibited, Myrtle Beach visitors exiting restaurants, hotels, or other businesses onto Ocean Boulevard are caught in the loop.

71.     As a result, a person staying at an Ocean Boulevard hotel during Black Bike Week and wishing to travel, for example, to a restaurant a mile north of his hotel from 10 p.m. to 2 a.m. must drive south on Ocean Boulevard and around the 23-mile loop until he ends up north of his hotel.

72.     The loop creates unreasonable delays and undue inconvenience, and increases the traffic load on affected streets.

73.     In addition, the City interferes with pedestrian access along Ocean Boulevard during Black Bike Week. The City installs barriers between the sidewalk and the road from 29th Avenue North to 29th Avenue South, preventing participants who attend the festivities as pedestrians from interacting with those cruising the strip.

19

74.    In implementing the current Black Bike Week Traffic Plan, the City asserts that the plan is intended to keep vehicles moving, ease congestion in the City, and make the weekend safer and more controllable. In reality, the plan has precisely the opposite effect.

75.    The current Black Bike Week Traffic Plan exacerbates traffic problems and undermines public safety by creating anxiety and frustration. Rather than easing traffic, the 23-mile loop is the source of significant congestion, long traffic jams, driver discomfort, and prevents access to restaurants, entertainment venues, and hotels. Travel time around the traffic loop on the Saturday night of the 2017 Black Bike Week was measured to be as long as over six hours.

76.    The current Black Bike Week Traffic Plan also fails to achieve any of the national norms for traffic management, which include facilitating the free flow of vehicles, minimizing gridlock, and providing for public safety.

77.    The current Black Bike Week Traffic Plan makes participants feel unwelcome, interferes with their enjoyment of driving and walking along Ocean Boulevard, interferes with their ability to freely access hotels, vacation rentals, restaurants and other venues along Ocean Boulevard and throughout the Myrtle Beach area, and otherwise impedes the Black Bike Week events over Memorial Day weekend.

**V.    The Black Bike Week Traffic Plan is Significantly More Restrictive Than the Traffic Plan the Court Found Likely Discriminatory and Unjustified in the 2003 Litigation**

78.    The traffic plan that the Court found likely unconstitutional in 2005 required "that all traffic travel southbound on Ocean Boulevard for approximately five miles. Exit points off Ocean Boulevard during this five mile stretch are restricted." Court Order at 2. The current Black Bike Week Traffic Plan maintains those same requirements but adds several more: (1) the

20

previous plan allowed <u>two</u> lanes of one-way traffic (where Ocean Boulevard is four lanes) while the current Black Bike Week Traffic Plan further reduces traffic to a <u>single</u> lane; (2) the previous plan allowed right hand turns off of Ocean Boulevard at <u>multiple</u> intersections while the current Black Bike Week Traffic Plan allows <u>no</u> turns during Friday, Saturday, and Sunday nights between 10 p.m. and 2 a.m.; and (3) the previous plan had no significant traffic control measures once motorists left the stretch of Ocean Boulevard between 29th Avenue North and 29th Avenue South while the current Black Bike Week Traffic Plan forces all motorists entering Ocean Boulevard to travel a <u>23-mile loop</u> that allows only one point of exit.

79.     The additional restrictions in the current Black Bike Week Traffic Plan make travel around the Myrtle Beach area substantially more difficult than the previous plan that was considered by the Court and have an even greater effect of discouraging potential Black Bike Week participants from travelling to the area for the event than the restrictions under the previous plan.

80.     The plaintiffs' expert from the 2003 Litigation, Dr. David Clarke, whom the Court relied upon when concluding that the previous traffic plan was likely discriminatory observed and assessed the current Black Bike Week Traffic Plan during the 2017 Black Bike Week. Dr. Clarke concluded that the traffic measures imposed by the City of Myrtle Beach in 2017 had an even more negative effect on traffic flow in the Myrtle Beach area than the traffic measures imposed under the previous traffic plan. Dr. Clarke found that the current Black Bike Week Traffic Plan hinders the flow of traffic and that roads in the area experienced substantially worse performance than they would have without the traffic restrictions. Limiting Ocean Boulevard to a single southbound lane guaranteed severe congestion because the single lane was

inadequate to accommodate the traffic. Dr. Clarke concluded that the current Black Bike Week Traffic Plan resulted in added travel time and inconvenience to motorists in the area.

81.    Dr. Clarke further concluded that, as under the previous traffic plan considered by the Court, there is no traffic-related reason that can justify the current Black Bike Week Traffic Plan. It appears to Dr. Clarke that the sole purpose for the current Black Bike Week Traffic Plan is to discourage travel and visitors in the area during Black Bike Week. The traffic pattern imposed by the City is not warranted by the behavior, crowd size, or any other characteristic of the Black Bike Week festival attendees.

82.    Retired police chiefs Willie R. Williams and Mitchell W. Brown, who were also considered by the Court when finding the previous traffic plan likely unconstitutional, also reviewed the current Black Bike Week Traffic Plan during the 2017 Black Bike Week. They similarly concluded that they would never have designed or approved such a traffic management plan. The Chiefs also concluded that the current Black Bike Week Traffic Plan could only have been designed as an effort to frustrate motorists and discourage potential visitors from traveling to the area. The Chiefs found that the design of the current Black Bike Week Traffic Plan was worse and had more harmful effects than the plan at issue in the 2003 Litigation.

83.    Again, as in the 2003 Litigation, the City can provide no legitimate justification for the highly restrictive traffic plan during Black Bike Week.

VI.    **The City Of Myrtle Beach Imposes Minimal Traffic Restrictions During Harley Week**

84.    In contrast to the highly restrictive current Black Bike Week Traffic Plan, Harley Week has no formal traffic plan. During Harley Week, motorists are able to drive the road freely in both directions just as they would be able to during most other days of the year. Harley Week participants are able to cruise up and down and turn on and off Ocean Boulevard as well as

access their hotels, vacation rentals, restaurants, and other entertainment without restriction. Defendants also do not put up police barriers between pedestrians and motorists, except in a limited area around the downtown amusement parks.

85.     Without the traffic restrictions, motorists on Ocean Boulevard could travel the road with minimal impediments and were never forced into a traffic loop that would require them to travel miles from the most direct route to their destinations.

86.     As Judge Wooten found during the 2003 Litigation, Harley Week and Black Bike Week are similarly situated. The number of people attending the events is not significantly different. The behavior of the crowds during the two events is similar and there are no other differences in the characteristics of the two events that would justify different traffic management plans.

87.     No traffic forecasts were done that suggested different traffic management needs for the two events. Dr. Clarke confirmed during his review of the 2017 Bike Weeks that there was no evidence that Black Bike Week produced traffic demands that were any different from the traffic demands during Harley Week.

88.     Dr. Clarke's assessment of traffic during the two weekends led to a conclusion that Ocean Boulevard and other area streets experienced better performance with no traffic restrictions in place during Harley Week than with the traffic restrictions under the current Black Bike Week Traffic Plan.

89.     In comparing the two events and the traffic patterns used during them, Dr. Clarke concluded that the current Black Bike Week Traffic Plan served no useful purpose for traffic management during Black Bike Week.

90.    Chiefs Brown and Williams also concluded based on personal observation that the two events were similar and that behaviors of the participants were similar. The Chiefs observed no reason to implement different traffic management for Black Bike Week and Harley Week.

91.    As in the 2003 Litigation, the City can provide no explanation for maintaining different traffic plans for Harley Week and Black Bike Week.

## VII.    The City of Myrtle Beach Maintains an Unequal and Unjustified Police Presence During Black Bike Week

92.    Defendants deploy significantly more police during Black Bike Week than during any other Myrtle Beach event and those police engage in significantly more aggressive tactics during Black Bike Week.

93.    In 2017, approximately 800 police officers policed Black Bike Week. These law enforcement officers came from a variety of jurisdictions in the region and most were under the command and control of the Myrtle Beach Police Department for the duration of Black Bike Week.

94.    Not only does the City have the area overwhelmed with police officers, but those officers are instructed to police aggressively and strictly enforce city ordinances. Prior to Black Bike Week 2017, the Myrtle Beach Police Department held a meeting for law enforcement officers at a convention center. There, officers were given a pamphlet cataloging more than 50 various offenses and minor infractions for which they could ticket, and officers were encouraged to strictly enforce any violations. Law enforcement officials harass Black Bike Week visitors based on over-enforcement of local ordinances and aggressively ticket and arrest Black Bike Week participants for minor infractions. Throughout the weekend, Black Bike Week participants are surrounded by law enforcement and scrutinized by slow moving police vans filled with armed officers.

95.    Law enforcement officers use the effects of the traffic plan and its resulting gridlock to be more aggressive in their enforcement efforts along Ocean Boulevard. Officers walk their routes back and forth peering in windows and searching occupants of cars that are at a standstill because of the traffic. This only increases the intimidating law enforcement presence and allows the officers to identify minor violations that would otherwise go unenforced. At points during Memorial Day weekend, vehicles were stopped by law enforcement every ¼ mile.

96.    Because of the traffic gridlock imposed by Defendants' traffic pattern, motorcyclists have to turn off their vehicles in order to prevent overheating. Frequently, as soon as a motorcyclist does so, police officers appear, yelling at the motorcyclist to keep on moving.

97.    Police insist that spectators continue to keep moving and do not allow them to stop in front of stores. No vendors are permitted during Black Bike Week.

98.    The overwhelming presence of the large number of law enforcement officials engaged in aggressive policing tactics is intended to, and has the effect of, intimidating Black Bike Week participants and discouraging them from travelling to Myrtle Beach, in violation of Plaintiffs' basic constitutional rights.

99.    Chief Brown did not observe any actions or behavior that warranted the increased police presence during the 2017 Black Bike Week.

100.    During Harley Week 2017, it was reported that there were only 60 state and local police officers patrolling the streets (less than one-tenth the number present for Black Bike Week).

101.    With many fewer law enforcement officers present, Harley Week participants were not subjected to the same levels of enforcement and scrutiny as those attending Black Bike Week.

102.    During Harley Week, riders are permitted to stop on the street, chat with spectators and other motorists, show off their bikes, and are allowed free and open interaction with one other without the constant scrutiny of law enforcement officers. Harley Week vendors are also permitted to set up stands along the sidewalks.

103.    Chief Brown observed significant differences in the level and behavior of law enforcement between Harley Week and Black Bike Week. Chief Brown did not observe any difference in the size or behavior of the crowds during the two events that would justify the differences in law enforcement.

104.    The City also does not impose traffic restrictions or maintain increased and aggressive law enforcement practices during other widely attended events throughout the summer in the City of Myrtle Beach, including the Sun Fun Festival, Fourth of July weekend, and Labor Day Weekend. All of these events attract large crowds of visitors to Myrtle Beach and Ocean Boulevard in particular. In contrast to Black Bike Week, however, the visitors to Myrtle Beach during these other events are predominantly white.

105.    The Defendants' efforts to undermine Black Bike Week have been successful. By their own account, attendance at Black Bike Week is down significantly since Defendants instituted the current traffic plan and policing practices.

VIII.    **City Officials Acknowledge that They Implement the Traffic Restrictions and Police Presence During Black Bike Week Because of the Composition of the People Attending the Event**

106.    City officials have clearly stated that the City has imposed restrictive traffic and police policies during the predominantly African-American Black Bike Week and not for the predominantly white Harley Week and other summer events because of the composition of the people attending the events.

107.    Former Chief of Police Warren Gall, who retired immediately before Black Bike Week 2017, claimed that "Bikefest creates the atmosphere that draws the bad element to the Myrtle Beach area," and that "the Bikefest draws crowds that can do anything and everything they want to, or think they can, in an atmosphere of anonymity."

108.    Myrtle Beach City Councilman Randal Wallace stated in reference to Black Bike Week that: "We've got to do something to curtail this feeling that they can come and do whatever they want here. We're going to squash that one next year."

109.    South Carolina's former Governor, Nikki Haley, who was involved in discussions regarding the policing of Black Bike Week, made public statements in 2014 about her goal to end Black Bike Week. Governor Haley conditioned South Carolina's investment in the town of Atlantic Beach on the town's commitment to cease hosting the festival. Despite Governor Haley's efforts, Atlantic Beach Mayor Jake Evans responded that Atlantic Beach would continue the important tradition of Bikefest. Governor Haley claimed that the culture of Black Bike Week had caused problems and that attendees were "coming to have a party."

110.    Former Mayor John Rhodes also called for the end of Black Bike Week. In response to a suggestion from Horry County officials that the 2015 loop be limited to 9 miles, Mayor Rhodes responded that it would defeat the purpose of the loop, as "we're trying to move people outside of the city. We're trying to get them out." Mayor Rhodes has also continued to employ a significantly larger police presence during Black Bike Week than any other events, ensuring that attendees of Black Bike Week are policed more than any other festival-goers in the City.

111.    Just last year, Mr. Rhodes explicitly denied any connection between Memorial Day weekend in Myrtle Beach and its long history as the largest African-American motorcycle

gathering in the country. He issued a statement that: "Memorial Day weekend is not about a bike

festival. It's about the celebration of those who've served our country to give us the freedom that

we have." Mr. Rhodes's statements make clear that the City does not view Black Bike Week as

an integral part of Myrtle Beach's tourism industry, despite the fact that it is one of the four

highest grossing weekends in Myrtle Beach.

112.    These statements from government officials precisely echo the comments Judge

Wooten found as being clear evidence of racial motivation in the 2003 Litigation. Again, in

recent years, no such similar statements have been made about the predominantly white Harley

Week attendees.

## IX.    Defendants' Assertion that Past Violence Justifies the Current Black Bike Week Traffic Plan and Increased Law Enforcement is Demonstrably False

113.    Defendants attempt to justify their return to the differential treatment of Black

Bike Week and its predominately African-American attendees, which the Court previously found

as likely unconstitutional, by pointing to acts of violence that occurred in 2014.

114.    Defendants' reference to violence relates to incidents during Memorial Day

weekend 2014, including an incident when police responded to reports of shootings in a hotel

located on Ocean Boulevard. The shootings resulted in the deaths of three South Carolina

residents. The shootings were never linked to Black Bike Week, and there is no evidence that the

individuals were in Myrtle Beach for any purpose related to Black Bike Week.

115.    The 2014 Memorial Day shootings are consistent with a general increase in gun-

violence in Myrtle Beach throughout the year. In 2015 there were at least eleven shootings, two

of which resulted in murder. None occurred during Black Bike Week. In November 2016, five

people were shot in a nightclub due to gang violence. Four of the victims were innocent

bystanders. Eight shootings occurred in Horry County over Easter week 2017, and only a few

months later, seven people were injured along Ocean Boulevard during a shooting over Father's

Day. During Labor Day weekend 2017, police responded to an incident involving multiple

gunshot wounds along the Grand Strand on Ocean Boulevard. On October 7, 2017, during the

last night of the Harley Fall Rally, shots were fired on Ocean Boulevard near the Sea Banks

Motel.

116.    Even though the increase in violence is spread throughout the year, only Black

Bike Week has been singled out as an event that requires differential treatment because of the

violence. Black Bike Week does not produce an anomalous level of crime or violence that would

justify a different traffic plan or higher level of law enforcement.

117.    In addition, a traffic plan that creates frustration and anxiety for motorists would

not address concerns about an increase in violence. To the contrary, the effect of the traffic plan

only heightens emotions that are more likely to lead to violence. Further, the shootings during

the fall Harley Rally did not lead the City to institute traffic plans or increase law enforcement

presence during Harley Week or other predominantly white motorcycle rallies. Defendants' use

of violence as an explanation for the traffic plan and law enforcement during Black Bike Week is

simply a pretext for discriminatory conduct against the one predominantly African-American

event in Myrtle Beach each year.

**X.    Attendees of Black Bike Week were Subjected to a Hostile and Discriminatory Environment**

**A.    Plaintiff Simuel Jones**

118.    Plaintiff Simuel Jones is a 58 year-old ex-marine, who has regularly attended

Black Bike Weeks since 2002. Mr. Jones, whose father introduced him to riding when he was a

teenager, has been riding for over 40 years.

119.    Black Bike Week is a vacation that Mr. Jones plans for every year, looking forward to making the trip from Chicago, Illinois where he is a gas utility worker.  Each year he loads up his truck and makes the sixteen-hour trip to Myrtle Beach in one day. As soon as he arrives in Myrtle Beach and unloads his bike, Mr. Jones rides his bike around the city. He attends the event for the camaraderie of meeting fellow motorcyclist enthusiasts from all over the country, to get the opportunity to see a variety of bikes and the ways in which people customize their bikes, and to have the chance to rest and relax on the beach.

120.    Mr. Jones has observed that the implementation of the current Black Bike Week Traffic Plan has made traffic significantly worse. He has also observed a drop off in the number of attendees of Black Bike Week since the implementation of the current Black Bike Week Traffic Plan. He also believes that harassment of attendees by police has also contributed to the declining participation in the event.

121.    In 2017 Mr. Jones made a reservation at the Sun & Sand Resort at 2701 South Ocean Boulevard. The hotel is in a central location on Ocean Boulevard, and Mr. Jones booked this hotel so that he could easily access the festivities.

122.    Mr. Jones enjoys dining at the Pizza Hut located at 7601 North Kings Hwy. On Saturday, May 25, 2017, Mr. Jones left his hotel around 9 p.m. to go to the Pizza Hut. Upon exiting his hotel he had no choice but to head south on Ocean Boulevard and ended up caught in the loop. When he reached Highway 17, he was diverted west to 501 South. A trip that would normally have taken no more than twenty minutes took him approximately 3 hours.

123.    Mr. Jones had planned to eat dinner, return to his hotel, and then head out for the evening to enjoy the festival. As a result of his immense frustration and exhaustion from battling the traffic loop, Mr. Jones decided to stay in his room for the night.

124.    The existence of the loop required Mr. Jones to plan his nights around the traffic plan. Unable to go out for just a few hours, Mr. Jones felt he had to plan to be out until 2 a.m. in order to leave his hotel in the evening. Mr. Jones was no longer able to attend the night events at Atlantic Beach or try out new venues because he knew that if he did not like the event or venue he couldn't leave without being stuck in traffic for hours.

125.    Defendants' policing tactics have also negatively affected Mr. Jones's experience of Black Bike Week. Mr. Jones believes that the police presence on Ocean Boulevard is excessive and has observed that it exacerbates traffic in the area. During his recent visits to Myrtle Beach during Black Bike Week he has noticed a strict enforcement of the "no loitering" rule, with law enforcement refusing to allow people to gather, even briefly, on the sidewalks or streets. From Mr. Jones's observations, it appears that attendees get stopped and searched for the simple act of socializing with one another. This, combined with the erection of barriers along Ocean Boulevard, prevents bikers from interacting with spectators. In the past, Mr. Jones was able to meet people on the streets, chat with them, and ride with them. The law enforcement has interfered with the sense of camaraderie that developed from these types of interactions.

126.    Although Mr. Jones plans to continue to attend Black Bike Week, the current traffic plan and policing tactics have made the experience far less enjoyable. The traffic loop restricts his movements, requires him to alter his plans, and severely impedes his experience of the weekend. Having attended Black Bike Week for almost 15 years, the only reason he can identify for the traffic plan and law enforcement presence are stereotypes about the African-American attendees.

    **B.**    **Plaintiffs Leslie and Cedric Stevenson**

127.    Plaintiffs Leslie and Cedric Stevenson are a married couple living outside Atlanta, Georgia. They attended Black Bike Week in 2016 and 2017. In 2017, Mrs. Stevenson brought along her mother, Mary Ann Dunlap, to enjoy the festival.

128.    Leslie Stevenson recently retired from a 23-year career at Allstate Insurance Company. Cedric Stevenson works as a contract long-haul truck driver and previously ran his own construction company. Mr. Stevenson began riding a motorcycle when he was 15 years old. Mr. Stevenson attends approximately two bike festivals a year, and the couple has traveled together to other bike rallies, including in Atlanta and Daytona Beach.

129.    The Stevensons first traveled to Myrtle Beach for Black Bike Week in 2016. They had decided to attend Black Bike Week because they had heard good things about the event from Mr. Stevenson's Atlanta-based motorcycle club, the Mystic Knights. They had heard that over 100,000 bikers would attend and that the crowd was friendly, respectful and low-key, with plenty of dancing and merriment. While the crowd at Black Bike Week lived up to their expectations, the Stevensons are reluctant to return to Myrtle Beach over Memorial Day because of Defendants' actions.

130.    In 2016, the Stevensons stayed at the Sheraton Convention Center hotel. They had decided to go to Landry's Seafood House for dinner. The drive to Landry's took only 20 minutes, and they finished dinner around 10 p.m., not realizing that the loop would be in place even outside of the downtown area. As they were heading back to their hotel they got stuck in the loop and it took nearly two hours for them to get back to their hotel. Later that weekend the Stevensons were forced to leave a restaurant before getting their food because the service was slow and they were worried about getting caught in the loop. For the remainder of the weekend,

the traffic loop was constantly on their minds as they made plans about what to do. In the evenings the Stevensons could only venture out within walking distance of their hotel even though they wanted to explore other restaurants and areas.

131.    In 2017, Mr. and Mrs. Stevenson and Mrs. Stevenson's mother, Ms. Dunlap, arrived in Myrtle Beach on Friday night around midnight. They were driving their car with a trailer attached in order to bring Mr. Stevenson's bike with them. As they approached their hotel, the Holiday Inn Club Vacations at South Beach Resort, there was a roadblock at the intersection with Ocean Boulevard. The family could see their hotel from the intersection and tried to speak with the officer at the roadblock so that they could get through to their hotel. The officer asked to see their reservation, which they showed him. He then told them that they could not proceed straight on Ocean Boulevard in order to get to their hotel, and would have to enter the 23-mile loop in order to turn into the parking lot. Fortunately, the Stevensons had not entered the loop and were able to find a side street off of King's Highway that was not blocked and made a U-turn there. They wound their way back through a residential neighborhood to get to their hotel. This still took them an additional 30 minutes late at night after a long drive, even though they had been across the street from their hotel when they were stopped at the intersection.

132.    Throughout the weekend the Stevensons planned their activities with the traffic loop in mind and would only travel to places that required a car during the day. Mrs. Stevenson was particularly worried because her 70-year-old mother was there with them, and if they got stuck out after 10 p.m. her mother would not be able to handle being in the car until 2 a.m. in the traffic loop. As a result, the family planned their evening meals only within walking distance of their hotel. Although they would have preferred to explore other parts of the area, the City's implementation and enforcement of the traffic loop prevented them from using their car.

133.     The Stevensons went out for several rides together during the day, with Mrs. Stevenson riding on the back of the bike. They were shocked to see police officers stationed every few feet in the median on Ocean Boulevard, making them feel watched and uncomfortable for doing nothing more than riding a motorcycle during a motorcycle festival.

134.     Mr. Stevenson has also previously attended Harley Week. Mr. Stevenson has observed several differences between the two bike weeks. During Black Bike Week, he felt as though the police were watching the bikers like vultures, ready to swoop down at any given moment. What particularly stood out to him was that Harley Week bikers are able to ride around freely, riding up and down Ocean Boulevard and stopping to talk to one another and admire each other's bikes. Black Bike Week bikers on the other hand would have to navigate a maze of road closures and traffic restrictions, and the minute a biker slowed down to talk to someone, the police would descend and tell them to keep moving. During Black Bike Week law enforcement officers were constantly shouting at riders, including Mr. Stevenson, to turn their music down, whereas exactly the same behavior by Harley Week bikers did not result in any reaction from law enforcement.

135.     Mrs. Stevenson attends festivals all over the country and even internationally, and has never experienced anything like the police presence she witnessed during her two years at Black Bike Week. She finds the police presence at Black Bike Week intimidating and unnecessary.

136.     As a result of Defendants' actions, Mr. Stevenson was unable to relax and enjoy the weekend as he otherwise would have. He believes the police intentionally prevent Black Bike Week participants from stopping to interact with each other – the entire point of traveling to

attend a motorcycle gathering – and instead force participants to keep inching through gridlocked traffic created by the City's traffic plan.

137.    While the Stevensons think the Black Bike Week event has the best attendees, the intimidating police presence and the City's traffic plan prevent them from being able to enjoy the weekend. The Stevensons are unlikely to return to Myrtle Beach unless the City's traffic plan and law enforcement activities change.

### C.    Plaintiffs Novice and Harry Briggs

138.    Plaintiffs Novice and Harry Briggs are a married couple living in Orangeburg, South Carolina. Mrs. Briggs, who is 63-years-old, is a retired Army Officer and retired postmaster. Mr. Briggs is a 62-year-old who has been a paramedic since 1986. When riding together, Mr. Briggs drives the motorcycle, while Mrs. Briggs rides as a passenger. Mrs. Briggs particularly enjoys the freedom she experiences when riding a motorcycle.

139.    Mrs. Briggs has attended Black Bike Weeks regularly since the early 1980s. Mrs. Briggs was initially drawn to Black Bike Week because of the opportunity to admire the various styles of customized motorcycles and to meet new people. She has found Black Bike Week to be a joyous occasion. Since 2006, attending Black Bike Week together has become a yearly tradition for Mr. and Mrs. Briggs. Mr. Briggs attends Black Bike Week because he enjoys being surrounded by other individuals who share his interest in motorcycles. The Briggs' drive their car from Orangeburg to Myrtle Beach with Mr. Briggs' motorcycle attached in a trailer.

140.    Black Bike Week is the only time of the year that the Briggs are able to convene with fellow African-American bikers. During the rest of the year, the Briggs rarely encounter African-American bikers. Black Bike Week is particularly special to the Briggs because they are able to share both a love of motorcycles with their fellow attendees as well as a common cultural

history and experience. As a result, the Briggs feel a strong sense of cultural and historical pride in Black Bike Week.

141.    Mr. and Mrs. Briggs usually stay at the Yachtsman Resort on Ocean Boulevard when they visit Myrtle Beach for Black Bike Week. The Briggs were attracted to the Yachtsman Resort because of its central location and proximity to many of the social gatherings that take place during Black Bike Week. Since the 23-mile loop was implemented in 2015, Mr. and Mrs. Briggs' experience of Black Bike Week has been transformed for the worse.  With the loop in place, Mr. and Mrs. Briggs do all that they can to avoid leaving their hotel room after 10 p.m. Based on their past experience, they know that once the loop goes into place, they will be stuck in traffic if they leave the hotel by vehicle. Because the experience of being trapped in the loop is so uncomfortable, they remain indoors. As a result, the Briggs are prevented from engaging with the very community that they travel to Myrtle Beach to see. The Briggs do not venture anywhere beyond a short walk from the hotel to get food or meet any other needs that may arise. The significant inconvenience and confinement created by the loop has made the environment during Black Bike Week unwelcoming to Mr. and Mrs. Briggs.

142.    After attending Black Bike Week in 2015 and experiencing the negative effects of the City's traffic management plan during the weekend, Mr. and Mrs. Briggs contacted the NAACP to make a complaint about Defendants' treatment of African-American bikers during Black Bike Week. Mrs. Briggs is a lifetime member of the NAACP.

143.    Despite their negative experience in 2015 due to Defendants' traffic plan, Mr. and Mrs. Briggs resolved not to allow Defendants to drive them away from the tradition they cherish. They returned to Black Bike Week in 2016.

144.    In 2016, Mr. Briggs was driving on Ocean Boulevard while the 23-mile loop went into effect. The drive from his location at that time to the Briggs' hotel usually would take five minutes. However, with the loop in place, Mr. Briggs was prevented from making a U-turn on Ocean Boulevard to return to the hotel. As a result, he was stuck in the loop for three hours before finally reaching the hotel.

145.    In 2018, Mrs. Briggs was trapped in the loop when driving into town. Because of the loop, what is usually a five-minute drive took her one-and-a-half hours. While stuck in the loop, Mrs. Briggs felt an overwhelming sense of entrapment.

146.    Mr. and Mrs. Briggs pride themselves on being law-abiding citizens, particularly given their long careers in service to the country and to others. Nonetheless, they feel that African-American visitors are treated by the City of Myrtle Beach during Black Bike Week as if they were all inherently criminal and inferior. The Briggs have seen the presumption of criminality exhibited in the dramatic increase in police presence in recent years, including the addition of armed security guards on the roads.

147.    Mr. and Mrs. Briggs believe that Defendants are attempting to drive African-American visitors out of Myrtle Beach through the traffic plan and the militaristic police presence. Thus, the Briggs were unsurprised to observe that the number of Black Bike Week attendees has decreased since 2015. Even though the number of attendees has decreased, Mr. and Mrs. Briggs have continued to observe an unyielding police presence and traffic plan.

148.    Mr. and Mrs. Briggs travel to Myrtle Beach about two to three times a year on weekends other than Black Bike Week. During those weekends, the visitors are predominately white. In sharp contrast to Black Bike Week, the police presence is barely noticeable to the Briggs during those weekends. There are no barricades and the traffic is far easier to navigate.

149.    Defendants' actions have diminished Mr. and Mrs. Briggs' ability to enjoy Black Bike Week. While the Briggs are dismayed and hurt by the discriminatory treatment of African-American visitors during Black Bike Week, they plan to continue attending Black Bike Week because of the rare community of African-American bikers they have found and the historical significance that the event embodies for them as African-American bikers.

### D.    Plaintiff Kenneth Coleman

150.    Plaintiff Kenneth Coleman is a 55-year-old Master Patrol Officer for the City of Richmond, Virginia Police Department. He has been a police officer for 22 years. Mr. Coleman began riding motorcycles when he was 16 years old. He enjoys the fresh air he is able to experience when riding.

151.    Mr. Coleman has attended Black Bike Week every year since 2005, when he was initially invited to attend by friends. Since then, Black Bike Week has been like a family vacation for Mr. Coleman. He attends with his friends, who are also police officers.

152.    Mr. Coleman appreciates the sense of security that comes from being surrounded by other bikers at Black Bike Week. Mr. Coleman feels that Black Bike Week provides African-American bikers of all ages a unique opportunity to come together.

153.    Mr. Coleman usually arrives in Myrtle Beach on the Monday prior to Memorial Day and stays for a week. He rents a condominium in Myrtle Beach. Between the Monday prior to Memorial Day and the start of the weekend, there is no traffic plan in place. As a result, Mr. Coleman is able to ride his motorcycle freely on Ocean Boulevard.

154.    Since Defendants implemented the traffic plan, Mr. Coleman has observed significant additional traffic congestion at night during Black Bike Week. He has been trapped in

the 23-mile traffic loop for several hours in 2015, 2016, 2017, and 2018 while simply trying to navigate the City.

155.    During 2015 Black Bike Week, Mr. Coleman left Atlantic Beach well before 10:00 p.m. to return to his condominium, hoping to avoid the loop. Mr. Coleman's condominium is located near the intersection of Highway 501 and River Oaks Drive. However by the time he dropped off his motorcycle at a storage facility nearby, the intersection of Highway 501 and River Oaks Drive was barricaded. Although he informed officers of his condominium location, the officers refused to allow him to enter the street. As a result, Mr. Coleman drove back to Atlantic Beach, spending about two hours in traffic, and was unable to return to his condominium until after the barricades were taken down at 2 a.m.

156.    Mr. Coleman has observed an excessive police presence during Black Bike Week. He has witnessed police officers stationed at nearly every intersection in some areas of Myrtle Beach. Mr. Coleman has seen officers tell vacationers during Black Bike Week that they are not allowed to sit in the McDonald's parking lot after purchasing food there.

157.    Mr. Coleman believes in taking necessary precautions to ensure public safety. However, he sees no valid justification for the traffic plan or intimidating police presence at nearly every intersection. Mr. Coleman believes that Defendants' actions do not increase public safety and only serve to frustrate Black Bike Week visitors.

158.    Mr. Coleman has visited Myrtle Beach several times during the month of August. Although Myrtle Beach was very busy when Mr. Coleman visited in August, no traffic restrictions were in place. During those visits, people were free to drive down Ocean Boulevard and enjoy all that the City has to offer vacationers.

159.    Based on his experience, Mr. Coleman believes that Defendants implement the restrictive traffic plan during Black Bike Week to discourage African Americans from visiting the City. After observing this discriminatory treatment of African Americans and learning about this lawsuit, Mr. Coleman filed a complaint with the NAACP.

E.    **Plaintiff Tyrone Kinard**

160.    Plaintiff Tyrone Kinard is the owner and operator of the trucking company Tyrone Kinard Trucking, LLC. He is a 45-year-old former Marine. Spending time riding his Harley is a hobby for Mr. Kinard. He works longs days and enjoys the chance to take a break to ride his motorcycle.

161.    Mr. Kinard has regularly attended Black Bike Week with his brothers since the early 2000s. He attends Black Bike Week because it allows him to admire the extravagant alterations that fellow attendees have made to their motorcycles. While Mr. Kinard has attended some predominately-white motorcycle rallies, he prefers Black Bike Week because it provides the unique opportunity to pursue his interest in motorcycles within the context of his own culture. He feels a heightened sense of comfort and familiarity when surrounded by African-American bikers because of the background they share. He also feels connected to the history of Black Bike Week and its roots out of the exclusion of African-American bikers from predominately-white biking networks

162.    Mr. Kinard spends time in both Atlantic Beach and Myrtle Beach during Black Bike Week. Atlantic Beach provides a safe haven for Mr. Kinard and other bikers during the event. Mr. Kinard has had positive interactions with police officers in Atlantic Beach and does not find their presence overbearing. In sharp contrast, Mr. Kinard feels very unwelcomed in Myrtle Beach due to Defendants' policing and traffic restriction practices. Based on his

experiences at Black Bike Weeks since 2015, Mr. Kinard believes that Defendants use the traffic plan to antagonize African-American visitors who are simply not wanted by the City.

163.    In 2015, Mr. Kinard attempted to return to his hotel for the night while the loop was in effect. His hotel was located less than two short blocks away from Highway 501. When he reached the exit for his hotel on Highway 501, Mr. Kinard showed officers proof of his hotel reservation and his identification. Nonetheless, the officers refused to allow Mr. Kinard to exit the loop. Mr. Kinard was forced to remain in the loop until he could make a U-turn, eventually reaching his hotel forty minutes later.

164.    While trapped in the loop or traffic congestion due to one-way traffic, Mr. Kinard's Harley has overheated. Under usual circumstances, Mr. Kinard—and most bikers— would pull over to the side of the road, a parking lot, or a side street to allow his motorcycle to cool down. However, when the traffic plan is in place, Mr. Kinard and other bikers are told by officers that they must keep moving. They are not permitted to pull into parking lots, onto the shoulder of the street, or a side street to cool down their bikes. As a result, Mr. Kinard and other bikers are essentially prevented from cooling down their vehicles.

165.    Mr. Kinard has observed a spike in the police presence during Black Bike Week since 2015. The police presence is so all-encompassing that Mr. Kinard compares it to the police response one would expect for a terrorist threat.

166.    Mr. Kinard has also observed a decrease in the number of Black Bike Week attendees since 2015. He believes that this decrease is the result of Defendants' treatment of Black Bike Week visitors.

167.    Mr. Kinard attended Harley Week in 2014. He observed that individuals were riding motorcycles on Ocean Boulevard and generally acting similarly to Black Bike Week attendees.

168.    Mr. Kinard has also visited Myrtle Beach with his wife during other times of the year when there is no bike rally. He has not observed anything close to the policing and traffic restrictions he experiences during Black Bike Week.

169.    Based on his experiences at Black Bike Weeks and other weekends in Myrtle Beach, Mr. Kinard believes that the difference in treatment of Black Bike Week visitors can only be explained by race. Due to the poor treatment of African Americans during recent Black Bike Weeks, Mr. Kinard is unsure of whether he will return to Black Bike Week in 2019. However, if Defendants' discriminatory actions ceased, he would attend.

**F.    Plaintiff William Lassiter**

170.    Plaintiff William Lassiter is a retired Army Sergeant First Class with 32 years of military service who has regularly attended Black Bike Week since 1995. Mr. Lassiter first began riding a motorcycle when a friend sold him a bike in the mid-1990s.  He continues to ride not only because he enjoys the act of riding his Harley, but because of the friendships, camaraderie, and community that biking has brought to his life.

171.    Black Bike Week is an event that Mr. Lassiter enjoys planning to attend each year. He spends time preparing and customizing his bike for each year's rally. He looks forward to seeing what other riders have done to customize and embellish their bikes, reuniting with fellow bikers who share his love of ridership, and gathering in Myrtle Beach to build community and friendship.

172.    Mr. Lassiter was stationed in Fort Jackson for a number of years during his military career, and began visiting Myrtle Beach for vacations and holidays in addition to his trips for Black Bike Week. He owns a time share in North Myrtle Beach, and during Black Bike Week often uses the time share to stay at Bluegreen Vacations Harbour Lights, located at 2690 Harbour Lights Drive.  He likes this location during Black Bike Week because it is close to gatherings he attends, the beach, and Ocean Boulevard.

173.    Mr. Lassiter has observed that the implementation of the current Black Bike Week Traffic Plan has negatively impacted his experience of Black Bike Week.  Since 2015, traffic on and around Ocean Boulevard has been significantly worse, and in order to avoid being stuck in traffic for hours he is forced to avoid frequenting commercial venues on Ocean Boulevard and cannot interact with friends staying at hotels on Ocean Boulevard. Mr. Lassiter has also observed that the number and behavior of law enforcement officials policing the weekend leads to harassment and unnecessary intimidation of attendees. As a result of the City's actions, Mr. Lassiter has observed a significant decline in the number of bikers attending Black Bike Week.

174.    During 2015 Black Bike Week, Mr. Lassiter was staying at Bluegreen Vacations Harbour Lights.  On Friday, May 22, Mr. Lassiter needed to make a quick trip to Walmart, located at 541 Seaboard Street in Myrtle Beach.  The Walmart is an approximately seven-minute drive from his timeshare.  Mr. Lassiter specifically chose to leave at 9 p.m. because he knew the loop was going into effect at 10 p.m., and he wanted to avoid getting stuck in traffic.  He started back to his timeshare around 9:30 p.m., but when he approached his timeshare he encountered a traffic barrier at the intersection of Highway 501 and George Bishop Parkway and was told he could not continue forward to make the two turns to access his hotel.  Mr. Lassiter was forced to

continue straight on Highway 501 for more than ten miles before he could turn around to return to his hotel. What should have been a drive of no more than three to four minutes took him more than 45 minutes.

175.    Since that experience Mr. Lassiter actively avoids the areas near the loop and spends his time in Atlantic Beach or Broadway at the Beach. Mr. Lassiter is unable to visit with friends and family staying on Ocean Boulevard, where many of the hotels are located, during the evening hours of Memorial Day Weekend for fear of getting stuck in the loop and being unable to get home. He is also unable to frequent the restaurants and clubs on Ocean Boulevard, businesses where he often goes at other times of the year in Myrtle Beach. This has severely impacted his experience of Black Bike Week and leaves him feeling that the City of Myrtle Beach is hostile and does not want him there.

176.    During Black Bike Week 2018, Mr. Lassiter was hoping to meet some friends at the Beach House Restaurant on Ocean Boulevard during non-loop hours. As he approached Ocean Boulevard, however, Mr. Lassiter was blocked from making a turn to get to the restaurant. Due to the one-way traffic restriction and street closures on Ocean Boulevard, Mr. Lassiter and his friends determined that it would take too long to navigate the road closures and traffic and felt they had to leave the area and go elsewhere.

177.    Prior to the Black Bike Week Traffic Plan that began in 2015, Mr. Lassiter would often head down to Ocean Boulevard to show off his bike, see the customization and work other bikers had put into their bikes, cruise and ride with other attendees on Ocean Boulevard, and gather with friends and family at restaurants and businesses on Ocean Boulevard. He now avoids the area entirely during loop hours.

178.    Previously, if there were bad traffic congestion or Mr. Lassiter wanted to be in the area for only a short while, it was easy to be on Ocean Boulevard for a couple of blocks and then turn down a side street and head elsewhere.  Since 2015, visitors have not been able to ride on Ocean Boulevard without getting stuck for hours and risking overheating their bikes. Mr. Lassiter believes that visitors are made to feel as though they are in prison due to the pedestrian barricades and heavy law enforcement presence. He believes that this has significantly impeded the community-building that initially drew him to Black Bike Week.  Bikers have a much more difficult time interacting with one another, showing off their bikes to attendees, and enjoying all that Myrtle Beach has to offer visitors at other times of the year.

179.    Mr. Lassiter has also attended Harley Week several times and has been in Myrtle Beach during other busy summer weekends, including over July 4th and Labor Day. He is struck and upset by the difference in the way the City treats these busy weekends and events as compared to what he has experienced during Black Bike Week.  Mr. Lassiter has observed that these weekends and events draw large crowds and traffic congestion to Myrtle Beach (especially July 4th) but the City does not put in place any traffic restrictions or pedestrian barriers.  Visitors are free to move about the City and deal with congestion on Ocean Boulevard by turning off the main street whenever they decide they have had enough of the traffic.  Likewise, the response of law enforcement is completely different, with police ignoring behavior for which they would ticket and arrest Black Bike Week attendees.  Black Bike Week is the only one of these weekends that attracts a majority African-American crowd, and Mr. Lassiter believes the differential treatment can only be explained by the race of Black Bike Week attendees.

180.    Despite his enthusiasm for the community and love of ridership that is fostered by Black Bike Week, Mr. Lassiter is unsure as to whether he will continue to attend.  He is likely to

attend in 2019 because his wife is having a family reunion in Myrtle Beach over Memorial Day

Weekend, but is not inclined to return after that due to the City's treatment of the weekend.  Mr.

Lassiter believes that the City of Myrtle Beach wants to deter bikers from coming to Myrtle

Beach for Black Bike Week and that he is unwelcome in the City as an African-American biker.

## INJURIES TO PLAINTIFFS

181.    As a direct and proximate result of Defendants' discriminatory practices, policies,

and conduct described above, the individual Plaintiffs have suffered and will continue to suffer

great irreparable loss and injury including but not limited to humiliation, embarrassment,

emotional distress, mental anguish, deprivation of the right to the full and equal benefit of all

laws and proceedings for the security of persons and property as is enjoyed by white citizens,

and deprivation of the exercise of their constitutionally protected rights.

182.    Defendants' illegal discrimination has caused Plaintiffs to suffer irreparable and

ongoing injury for which there is no adequate remedy at law and which will continue to cause

injury to them unless and until injunctive relief is granted.

183.    Defendants' implementation of the current Black Bike Week Traffic Plan and

deployment of excessive law enforcement personnel caused significant mental and emotional

distress to the individual Plaintiffs and members of the NAACP and its Myrtle Beach branch.

The knowledge that Myrtle Beach implemented different traffic plans and deployed different

levels of law enforcement between Black Bike Week and Harley Week and that those different

policies and practices were motivated by discrimination caused additional mental and emotional

distress, humiliation, and embarrassment to the individual Plaintiffs and members of the NAACP

and its Myrtle Beach branch. Defendants' actions as described herein also caused the deprivation

of the civil rights of the individual Plaintiffs and members of the NAACP and its Myrtle Beach branch.

184.    Members of the NAACP regularly attend Black Bike Week in Myrtle Beach, including the Black Bike Weeks held between 2015 and 2018. Members of the NAACP who attended Black Bike Week between 2015 and 2018 were injured by Defendants' conduct as described herein.

185.    For the reasons stated herein, members of the NAACP and its Myrtle Beach branch would otherwise have standing to sue as individuals. The issues and claims raised herein are germane to the purpose and missions of the NAACP and its Myrtle Beach branch. The relief requested by the NAACP and its Myrtle Beach branch in their capacities as representatives of their members does not require the participation of those members in this action.

186.    Members of the NAACP who attended Black Bike Week between 2015 and 2018 were injured by Defendants' conduct as described herein.

187.    In response to complaints from members and other Myrtle Beach visitors, the NAACP and its Myrtle Beach branch have been monitoring and investigating the treatment of African Americans during Black Bike Week, including in comparison to other festivals held in Myrtle Beach. These efforts to identify and counteract the City's discrimination has forced the NAACP and its Myrtle Beach branch to divert their resources from other activities and efforts they would otherwise have pursued in furtherance of their missions. Defendants' actions have frustrated the mission, purpose and interests of the NAACP and its Myrtle Beach branch and their memberships.

## CAUSES OF ACTION

### Count I
### 42 U.S.C. § 1981

188.    Plaintiffs reallege and incorporate by reference all of the allegations set forth in Paragraphs 1 through 187 above.

189.    Section 1981 provides in pertinent part that:

> All persons within the jurisdiction of the United States shall have the same right in every State…to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other…The rights protected by this section are protected against…impairment under color of State law.

190.    Individual Plaintiffs and the members of the NAACP and its Myrtle Beach branch are "persons" within the meaning of that term as it is used in 42 U.S.C. §1981 and are within the jurisdiction of the United States.

191.    Defendants' actions as described above constitute a deprivation of the rights of the Plaintiffs to the full and equal benefit of all laws and proceedings for the security of persons and property on the same terms as are enjoyed by white persons and have subjected the Individual Plaintiffs and the members of the NAACP and its Myrtle Beach branch to disparate punishment, pain, and penalties, in violation of 42 U.S.C. § 1981.

**Count II**
**42 U.S.C. §1983 for Deprivation of First Amendment Rights**

192.    Plaintiffs reallege and incorporate by reference all of the allegations set forth in paragraphs 1 through 187 above.

193.    Defendants are "persons" within the meaning of that term as it is used in 42 U.S.C. §1983.

194.    Individual Plaintiffs and the members of the NAACP and NAACP Myrtle Beach are "citizens" of the United States and are within the jurisdiction thereof.

195.    The United States Constitution, as amended, grants the Individual Plaintiffs and the members of the NAACP and its Myrtle Beach branch certain rights, privileges, and immunities, including the rights of expression, assembly, and association guaranteed under the First Amendment.

196.    Defendants' actions and omissions under color of local law, custom, policy, and usage as described above have deprived and continue to deprive the Individual Plaintiffs and the members of the NAACP and its Myrtle Beach branch of these Constitutional rights, which rights are enforceable under 42 U.S.C. § 1983.

**Count III**
**42 U.S.C. § 1983 for Deprivation of Fourteenth Amendment Rights**

197.    Plaintiffs reallege and incorporate by reference all of the allegations set forth in paragraphs 1 through 187 above.

198.    Defendants are "persons" within the meaning of that term as it is used in 42 U.S.C. § 1983.

199.    Individual Plaintiffs and the members of the NAACP and its Myrtle Beach branch are "citizens" of the United States and are within the jurisdiction thereof.

200.    The United States Constitution, as amended, grants the Individual Plaintiffs and the members of the NAACP and its Myrtle Beach branch certain rights, privileges, and immunities, including the rights of equal protection of laws guaranteed under the Fourteenth Amendment.

201.    Defendants' actions and omissions under color of local law, custom, policy, and usage as described above have deprived and continue to deprive the Individual Plaintiffs and the members of the NAACP and its Myrtle Beach branch of these Constitutional rights, which rights are enforceable under 42 U.S.C. § 1983.

49

**Count IV**
**42 U.S.C. § 1983 for Deprivation of Rights Under the Dormant Commerce Clause**

202.    Plaintiffs reallege and incorporate by reference all of the allegations set forth in paragraphs 1 through 187 above.

203.    Defendants are "persons" within the meaning of that term as it is used in 42 U.S.C. § 1983.

204.    Individual Plaintiffs and the members of the NAACP and NAACP Myrtle Beach are "citizens" of the United States and are within the jurisdiction thereof.

205.    The United States Constitution, as amended, grants the Individual Plaintiffs and the members of the NAACP and its Myrtle Beach branch certain rights, privileges, and immunities, including the rights under the Dormant Commerce Clause of Article I, Section 8 of the Constitution.

206.    For these and other reasons, the actions and omissions of Defendants under color of local law, custom, policy and usage have deprived and continue to deprive the Individual Plaintiffs and the members of the NAACP and its Myrtle Beach branch of these Constitutional rights, which rights are enforceable under 42 U.S.C § 1983.

**Count V**
**Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d**

207.    Plaintiffs reallege and incorporate by reference all of the allegations set forth in paragraphs 1 through 187 above.

208.    Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d, et seq., provides that "[n]o person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance."

209.     At times relevant to this action, Defendant City of Myrtle Beach has received federal financial assistance from the United States Department of Justice for law enforcement purposes.

210.     As set forth in more detail above, Defendants have violated and are violating 42 U.S.C. § 2000d by providing services, which are partially funded by federal financial assistance, in a discriminatory manner.

211.     As described herein, the City of Myrtle Beach's differential treatment of African Americans and whites is motivated by discriminatory intent based on race and/or color.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully pray that the Court grant the following relief:

212.     enter a declaratory judgment finding that the actions of Defendants, as alleged in this Amended Complaint, violate 42 U.S.C. § 1981, 1983, and 2000d;

213.     enter a preliminary and permanent injunction barring Defendants from continuing to engage in the forms of illegal discriminatory conduct alleged in this Amended Complaint;

214.     enter a preliminary and permanent injunction directing that Defendants take all affirmative steps necessary to remedy the effects of the illegal discriminatory conduct alleged in this Amended Complaint and to prevent repeated occurrences in the future;

215.     award compensatory damages to each individual Plaintiff in an amount that would fully compensate Plaintiffs for the humiliation, embarrassment, emotional distress, mental anguish, and out-of-pocket costs caused by Defendants' conduct as alleged herein;

216.     award compensatory damages to the NAACP through its Myrtle Beach branch in an amount that would fully compensate them for the diversion of resources and frustration of mission caused by Defendants' conduct as alleged herein;

217.     award Plaintiffs their reasonable attorneys' fees and costs; and

218.     order all other relief deemed just and equitable by this Court.

## DEMAND FOR JURY TRIAL

Pursuant to Fed. R. Civ. P. 38(b), Plaintiffs demand a jury trial on all claims so triable as of right.

Dated: February 12, 2019                    Respectfully submitted,

                                            /s/ Peter Wilborn
                                            D. Peter Wilborn, Jr. (ID #7609)
                                            Law Office of Peter Wilborn
                                            57 Cannon Street
                                            Charleston, SC 29403
                                            (843) 416-9060
                                            peter@bikelaw.com

                                            Reed N. Colfax
                                            Tara K. Ramchandani
                                            Laura Gaztambide-Arandes
                                            Angela Groves
                                            Relman, Dane & Colfax, PLLC
                                            1225 19th Street, N.W., Suite 600
                                            Washington, D.C. 20036
                                            (202) 728-1888
                                            rcolfax@relmanlaw.com
                                            tramchandani@relmanlaw.com
                                            larandes@relmanlaw.com
                                            agroves@relmanlaw.com

                                            Khyla D. Craine
                                            National Association for the Advancement
                                            of Colored People, Inc.
                                            4805 Mt. Hope Drive
                                            Baltimore, MD 21215
                                            (410) 580-5777
                                            kcraine@naacpnet.org

                                            Dorian L. Spence
                                            Maryum Jordan
                                            Lawyers' Committee for Civil Rights Under Law

1401 New York Avenue, NW, Suite 400
Washington, DC 20005
(202) 662-8600
dspence@lawyerscommittee.org
mjordan@lawyerscommittee.org

*Attorneys for Plaintiffs*