**Initial Expert Report of Robert L. Stewart**

**February 15, 2019**

*National Association for the Advancement of Colored People, Inc., et al. v. City of Myrtle Beach, et al.*, Case No. 4:18-cv-00554-MGL

## I.    Introduction

On, or about May 2, 2018, I was contacted by the defendant's representative, Mike Battle of the Battle Law Firm, LLC of Conway, South Carolina, about serving as an expert witness/police practices expert on the instant case.

The case, as I understand it, is raised by the NAACP in the belief that the traffic management and law enforcement practices of the Myrtle Beach Police Department and the City of Myrtle Beach during "Bikefest" (formerly called Black Bike Weekend), an annual event during Memorial Day weekend for several years are discriminatory and amount to police "harassment."

On May 10, 2018, I was retained by the firm. I received a $5,000.00 non-refundable retainer against which professional fees would be billed.

My standard rate, which was employed for this engagement, is $300.00 per hour for professional services and $350.00 per hour for trial or deposition testimony. Reasonable expenses are borne or reimbursed at their actual rate. My opinions are mine and no fees are dependent on my findings or the outcome of this case.

To date, I have billed $9,313.72 for my professional services and travel related expenses relating to two on-site visits to Myrtle Beach May 23, 2018 to May 27, 2018 and July 6, 2018 to July 8, 2018.

## II.    Scope of This Report

This is my initial Expert Report which will provide the opinions that I have formed up to the date of this report. It is based on my personal observations during my on-site visits to the defendant's city, the conversations that I had with numerous law enforcement officers, event supporters and participants and materials listed in Appendix A.

I approach each expert engagement embracing logic and common sense in evaluating police practices and performance in comparison with other similarly situated police organizations. The evaluation is also based on what are considered to be standard industry practices and I note industry best practices when I observe them.

1

While I may outline opinions about a number of issues relating to this case, my conclusions will address specific issues raised by Plaintiffs' Experts in their respective Expert Reports dated December 17, 2018. I have known Chief Brown and Chief Williams for years and acknowledge and respect their professional opinions. I view any differences in our perspectives in this matter as professional and not based on any animus toward my fellow colleagues.

I do not know Dr. Gallagher other than by reputation but respect his work and am familiar with a number of the works he cites in his report. I will have no specific opinions of Dr. Gallagher's conclusions or opinions and will only make references to his report in a very general way. His discussion does speak to significant social and governmental issues beyond those specifically focused on the public safety considerations of Bikefest.

Some of my discussion is not necessarily given in a conclusionary manner, but in a way that might broaden the discussion. It is my fervent hope, as an NAACP member, that good hearts and minds might find ways to make Bikefest more enjoyable for law abiding participants while also making it minimally intrusive to residents and safe for both and the officers who work the event.

## III.    Qualifications and Professional Background

I am a police practices expert with almost 50 years of experience in sworn, executive, command, and advisory capacities. For the first 22 years of my career, as a member of the Washington, D.C Metropolitan Police Department, I served at every rank from line officer to captain in a variety of both operational and administrative positions. My tenure included two assignments in the Planning and Development Division; posts in three districts as Watch Commander; and appointment to the positions of Promotional Process Officer, Executive Protection Commander, Administrative Lieutenant, and Squad and Platoon Commander. In these positions, and throughout my career, I performed duties typically associated with patrol, tactical and anti-crime units.

Throughout my career in the Metropolitan Police Department, I served in the department's Civil Disturbance Unit in roles commensurate to my ranks from officer to captain. In this capacity, I worked in or commanded major details in most of the marches, rallies, special events and public disorders that took place in the Nation's Capital between 1974 and 1991. I believe that this background is extremely beneficial in providing expert opinions in this case.

My administrative accomplishments included the development of a new performance evaluation system and oversight of the department's promotional processes.

Upon retiring from the Washington, D.C. Metropolitan Police in 1991, I have sought and attained executive level appointments to several law enforcement agencies. I first served as a major with the Tallahassee, Florida Police Department. I then served as Chief of Police in Ormond Beach, Florida for five years. Beginning in 1997, I served in the following executive positions:

Executive Director, National Organization of Black Law Enforcement Executives
Director of Training, Metro Louisville Police Department
Acting Police Director, Rutgers University, Newark Campus
Acting Police Director, Camden New Jersey Police Department

I am a 1974 graduate of Howard University with a B.A. in Political Science. I have attended graduate studies at the American, District of Columbia, George Washington and Florida State Universities.

I also earned graduate credit from the University of Virginia during the 144th Session of the FBI National Academy.

I have been a member of the following professional police organizations, without interruption, since approximately 1980:
The National Organization of Black Law Enforcement Executives (NOBLE) – Life Member
The International Association of Chiefs of Police – Life Member
The Police Executive Research Forum

In 2001, I incorporated Bobcat Training and Consulting. In that role, I collaborate with many criminal justice organizations, associations and law enforcement consultants. Bobcat Training conducts supervision, management and executive development courses throughout the law enforcement community primarily for newly promoted police managers.  Curricula are largely devoted to core law enforcement administration pillars of "Policy, Training, Supervision and Discipline." For incumbent managers, I offer classes that explore "Policing in a Democratic Society" with special focus on bias-free policing, consent decrees, procedural justice and community engagement. I have conducted Procedural Justice Classes for the University of Illinois and taught several supervisor and management courses for the Penn State Justice and Safety Institute domestically and internationally. I was also among the first Human Diversity Instructor/Trainers certified by the Florida Criminal Justice Standards & Training Commission

I offer career development classes devoted to law enforcement personnel preparing for promotional examinations.

I served as a trainer in the development of "Fair and Impartial Policing." Fair and Impartial Policing, LLC Is the primary provider of implicit bias awareness training for law enforcement in the country. https://fipolicing.com/

3

I have also instructed the "Policing the Teen Brain" for Strategies for Youth. https://strategiesforyouth.org/for-police/training/

For the past four years, I have instructed classes on consent decrees for the Florida Criminal Justice Executive Institute (FCJEI).

Bobcat Training and Consulting provides a wide array of professional services to the law enforcement community. I have led and conducted countless management studies, audits and professional reviews of police agencies. I have reviewed both policy and practices in nearly all operational and administrative areas of police service. While my consulting often involves my individual work under the banner of other organizations, Bobcat Training and Consulting most recently conducted a departmental review of the Fort Lauderdale Florida, Police Department. Other similar engagements are listed in my attached resume.

As a sergeant in the DC Metropolitan Police I was the manager of our Directive Development Section of the Planning and Development Division where the department's general and special orders were written.

While I have been a trainer/instructor throughout my law enforcement career, I was the Director of Training for the Louisville Metro Police Department 2004-2005.

I have an in-depth working knowledge of patrol, special operations and investigative areas of policing and very specific experience with policy, training and administration. In my training and consulting experiences, I often interact with community stakeholders, municipal officials and employees. I also spend countless hours talking to law enforcement officers of all ranks from the newest recruits to tenured executives, other industry professionals and my friends and family members who are, or have been sworn officers, deputies and agents.

I have been engaged as a monitor in *Johnson, et al v. City of Hobbs, et. al.* between 2001-2004. I was also employed as an investigator in a USDOJ investigation into the policies and practices of the Portland, Maine Police Department. (2000-2001)

I am currently serving on the monitoring team in Ferguson, Missouri and have formerly been engaged similarly in consent decrees in Newark, New Jersey and the U.S. Virgin Islands. I have also provided consent decree related technical assistance to the East Haven, Connecticut Police Department in their successful compliance effort. I assisted them in the creation of a performance evaluation system and the establishment of their disciplinary matrix.

Of particular note is my experience as the chief in Ormond Beach, Florida from 1992-1997. Ormond Beach is the municipality directly north of the city of Daytona Beach, Florida. During my tenure in Ormond Beach, I served two terms as the president of the Volusia County Police Chiefs Association. I was, therefore, intimately involved in the planning and operations of all of the major events in and around Volusia County, Florida which were centered in Daytona Beach. These include, but are not limited to:

Speed Weeks and the Daytona 500 at Daytona International Speedway
The Coke Zero at Daytona International Speedway (during the July 4th Holiday Weekend)
Bike Week
Biketoberfest
Black College Reunion
Spring Break

This experience, like my Civil Disturbance Unit assignments in the DC Metropolitan Police Department, is uniquely suited to examine several of the law enforcement and public service issues being argued in this case.

I have also been retained as a police practices expert in the following cases:

Mora v. Arpaio, CV 09-01719 PHX-DGC
Melendres v. Arpaio, CV 07-2513-PHX-GMS
Thornton v. City of Surprise Az. CV2015-096393
Hall v. City of Chicago. 12 C 6834
Taylor v. Ambrifi, 15-CV-3280-NLH-KMW

I co-authored "Avoiding Profiling by Proxy" with Lisa Thurau published by the Vera Institute, March 14, 2015 https://www.vera.org/blog/police-perspectives/avoiding-profiling-by-proxy

I am the author and founder of "Policing in Our Community"© 2017, a facilitated police-community engagement program.

I am the subject of Chapter Seven in the book, "BEHIND AND BEYOND THE BADGE - Volume II." https://www.facebook.com/BehindAndBeyondTheBadge/

I served honorably in the United States Army.

More detailed information concerning my career, education and most recent engagements are listed in my resume which is attached to this report.[1]

---

[1] Attachment "A"

## IV.    Discussion

While I made two visits to Myrtle Beach during 2018, the first, during Bikefest, was much more relevant to this discussion. Other than mentioning it, I don't believe that my activities during the Fourth of July 2018 weekend, lent any information that would be significant in my review of activities that occurred during the Memorial Day weekend.

I was in the Myrtle Beach area from May 23rd to May 27th, 2018 to observe the actions and activities of the Myrtle Beach Police Department over the Bikefest Weekend. During the weekend I attended police afternoon and evening roll calls and the law enforcement orientation for out of town law enforcement officers conducted by Chief Prock and Captain Crosby. I spoke with several city officials and legal representatives. Friday and Saturday evenings were both spent riding on patrol with a number of police supervisors and walking along the busiest sections of Ocean Boulevard. I attended the "Blessing of the Bikes" event on Friday morning. During the afternoon hours, I drove the "loop" several times and visited the Atlantic Beach and North Myrtle Beach areas where I spoke with the members and officers of several motorcycle clubs that have come to this event for years. I also talked with several South Carolina State Troopers and their supervisors.

I had not previously attended Bikefest (formerly known as "Black Bike Weekend"). I am, however, familiar with the event and its history. My oldest son, a DC Metropolitan Police officer and motorcycle enthusiast, attended this event each year from 1996-2005 with several members of his motorcycle club.

The remainder of my Friday evening and early Saturday morning hours were spent at the Beachfront observing both pedestrian and motorized event goers and law enforcement personnel as they went about their work. The traffic and crowd control measures in place are described in various places connected to the instant case. The vehicle and pedestrian traffic, likewise, has been outlined as has the makeup and tenor of the crowds.

On Saturday, in addition to the legal team meeting and the police roll calls, I repeated the vehicle observations through Myrtle Beach, North Myrtle Beach and Atlantic Beach. I met with North Myrtle Beach and Horry County public safety officials, other state troopers and additional motorcycle club members and bikers. I visited the North Myrtle Beach Drag Strip where motorcycle races and a car show were being held. It was there where I also met and talked to the Horry County Sheriff and visited with the track owner and members of the Carolina Thunder Motorcycle Club.

Saturday evening was split between patrolling in Myrtle Beach away from the Beachfront observing police operations throughout the city with personnel not assigned to Bike Fest. My Beachfront activities were a repeat of the Friday night pattern.

I began closely following news reports about Black Bike week in 1993. During my tenure as Police Chief in Ormond Beach, Florida (1992-1997) law enforcement agencies in Volusia County, Florida realized that our local annual event, Black College Reunion, had similar unique law enforcement and public safety challenges with Freaknik in Atlanta, Greekfest in Philadelphia and Black Bike Weekend in Myrtle Beach.

I gained some familiarity with the history of all of these events and how they started out with relatively small groups. Freaknik started with college students from the Atlanta area. Black College Reunion (BCR) started as a Spring Break beach party for students from Florida A&M and Bethune Cookman Universities. Greekfest began as a spring gathering of black fraternities and sororities. All of these festivals became victims of their own popularity. Each of these events began attracting large groups of young adults and teens who were not attached to the colleges and universities represented by early attendees. The hosting, housing and catering to these new crowds clearly outgrew the planning and accommodations which had heretofore been sufficient for the crowd size. These festivals grew beyond the abilities of their originators to host, entertain and provide security for the throng of event goers.

Similarly, Bikefest started as a relatively small weekend event for motorcycle riders held entirely in Atlantic Beach. As outlined elsewhere, the event attracted a much larger, younger crowd that outgrew its' origins which created new and different challenges than public safety officials had previously encountered.

While I have referred to events surrounding Freaknik and Greekfest, I believe that the comparison of the Daytona Beach and Myrtle Beach events are much more relevant to our discussion here. The general geography and topography, the beachfront and adjoining stretches of hotels and beachside residences are almost identical. The law enforcement and public safety challenges are virtually the same. Chief among the challenges was "cruising[2]."

Bikefest and Black College Reunion became known for cruising as a common activity that lasted late into the night and early morning on Friday and Saturday nights during the event weekend. Plaintiffs' experts have commented on this activity. This practice by event participants was problematic in Daytona Beach as it most certainly has been in Myrtle Beach based on the geographic makeup of the beachfront.

As with every other major event in the Daytona Beach area, all of the law enforcement and first responder agencies and departments in Volusia County had roles to play in conjunction with the event. These are generally organized around the traffic control and crowd management responsibilities of the event. Typically, additional support for the traffic, crowd and public safety responsibilities came from county and state public safety agencies. First responders from other states were also requested to "staff-up" local departments. No event was exactly the same

---

[2] https://en.wikipedia.org/wiki/Cruising_(driving)

as any other and the public safety needs were different for each event. That's not to say that certain elements of our public safety efforts for some events did not have some applicability to others. Host or primary law enforcement departments, over time, had managers and planners who became specialists for specific events gaining expertise in the various kinds of challenges that would develop over time.

It was also clear that other municipalities were also interested in our approaches to special events in the Daytona area. Other law enforcement agencies that hosted NASCAR events were interested in the traffic and crowd plans that we were using for the events at the Daytona International Speedway. Cities that hosted big motorcycle rallies were also interested in the kinds of resources needed for Bike Week and Biketoberfest. Beach destinations were all interested in the Daytona Beach planning for Spring Break as more towns, not just those in Florida, attracted huge crowds of high school and college aged young adults that came to their beach towns during the spring and Easter breaks. These are obviously some of the most challenging for a myriad of public safety concerns. Of all of the special events that took place annually in Daytona Beach, issues connected to Spring Break were probably the most illustrative in facing the public safety concerns attached to Black College Reunion.

The age range of Daytona Beach's Spring Break attendees is roughly the same as Black College Reunion. Similarly, the age and demographic makeup of Bike Week in Daytona are virtually the same as those found at Harley Week in Myrtle Beach.

While most of the attendees of Bikefest are in the same age as those who attended Black College Reunion, the Myrtle Beach event also includes a significant number of older participants who appear to come as members of a motorcycle club as opposed to coming alone or in an unaffiliated group.

In Daytona Beach, the events staged at the Daytona International Speedway are unique because they occur inside of a ticketed, secured venue where the major law enforcement challenge is traffic movement. Traffic patterns and control are designed to move huge numbers of attendees to and away from the area near or adjacent to the track. Over years, the patterns have changed in response to highway and road construction, pedestrian walkways and the never-ending search for a better way. The most significant change has been the addition of "counter-flow" lanes of traffic which typically involves changing the direction of several lanes of traffic into one-way roadways; inbound before the race and outbound after the race. These "race day" traffic changes are often disconcerting to the unindoctrinated who often find themselves headed north when they wanted to go south or east. This is designed to not only facilitate traffic movement away from the Speedway but to also prevent traffic from cutting through major residential areas on or near the major thoroughfares. No matter the plan, residents are often inconvenienced in and around the Speedway and find it more difficult to get to and from their own homes.

8

With "day-trippers" adding to those staying at one of the numerous hotels along the beachfront, the streets are packed, curbside parking doesn't exist and the foot traffic crowds the sidewalks. This too, has added to the number of public safety personnel who also work the beachside. Significant resources are needed from all of the jurisdictions along the coast to assist the Beach Patrol, the law enforcement and public safety agency for the beachfront.

Myrtle Beach has a similar experience when NASCAR events are held at Darlington Raceway. Many fans stay at hotels in Myrtle Beach and travel back and forth to the events at the track. While the highway patrol manages the bulk of the traffic flow, all of jurisdictions along the routes are impacted as well as the beachfront businesses and residences.

Bike Week and Biketoberfest, spring and fall motorcycle special events, are very much like Harley Week in Myrtle Beach. Bike Week, the larger of the two Daytona Beach motorcycle events, is virtually the same as Harley Week. Bike Week draws approximately 500,000 attendees every year. It is an official event with huge corporate sponsorship and funding. This brings structure to the event in much the same way that the events at the Speedway are staged. There are activities and mini-events throughout Volusia County during the entire run of the event. Additionally, many businesses that cater to these motorcycle events stage and host their own events that are advertised widely and often discounted with coupons that are available through a myriad of sources.

While the event has become more diverse every year, becoming a better representation of Harley-Davidson enthusiasts, there has been a group of predominately African-American bikers who camp in an area not far from Bethune-Cookman University.

The National Bikers Roundup is the largest camping motorcycle rally in the USA and is organized by a group of African American motorcycle clubs. Its location changes every year but every decade it returns to its founding city of Kansas City, Missouri. More than 1,000 motorcycle clubs attend the event and black women make up close to half of the participants.[3] Despite visiting major urban cities every year, this event has no reputation for associated crime and/or violence.

Bike Week requires the Daytona Beach Police to develop specific traffic and crowd control that include venues along its beachfront and throughout the city and Volusia County. Some of these measures incorporate plans that are also used during Speed Weeks while others are drawn from plans specific to Spring Break. Some cruising is an element of every major event in Daytona and they all require some monitoring by police and traffic direction and/or re-direction for relatively short periods of time. During Bike Week, there is an annual parade that disrupts normal traffic and regular periods when certain streets will be closed both on the beachside and downtown. Streets are barricaded so that pedestrian sidewalk traffic does not

---

[3] Samuels, Adrienne P (Ebony, October 2007), "Black Biker; the rides and the history"

spill over into the roadway with motorized vehicle traffic. This is at the top of the list of public safety conditions to be avoided.

All major and special events attract a criminal element as well as those who look for opportunities to create or participate in disorder. As generally peaceful and crime free as Bike Week now appears, its history is marked with periods of violence, crime and disorder to the point that Daytona officials restricted the wearing of "colors" within city limits. These colors, leather jackets emblazoned with outlaw gang names and symbols, were the source of violent and criminal behavior.[4]Despite years of relative crime free Bike Week events, a recent resurgence in outlaw gang behavior produced intelligence that put the law enforcement agencies in Daytona and Volusia on alert to potential violence.[5]

Over the history of all of these special events, most who are arrested for felonies during the event have extensive criminal histories. A core responsibility to ensure public safety is to gain intelligence about organized groups or individuals known to commit violent criminal acts and are likely to attend this event placing event attendees, law enforcement and public safety personnel and the public at large at significant risk.

Prior to the huge growth of Black College Reunion, the most difficult event for the police in Daytona had been Spring Break. In addition to the characteristics and public safety challenges listed elsewhere in this discussion, Spring Break has often been marred by disorderly raucous behavior, open alcohol and drug use, fights, accidental deaths, property damage and general disorderly conduct.

This behavior, the ensuing costs and backlash from residents have resulted in a 3-4 year cycle where Spring Break will be designated as a Special Event by Daytona Beach followed by a 3-4 year period where it will not receive an official sanction by the city. The event will get picked up by Fort Lauderdale or Panama City for a period of years before returning as an official event in Daytona Beach.

In the late 1980's and early 1990's, in the area both on the beach and along SRA1A large throngs of youth would gather. Periodically, the crowd would respond to a loud popular song, a scantily clad partier, a fight and often, unfortunately, police action in a mad rush to the location of the "attraction." Most often, this mass movement would result in a "flash mob."[6]This spontaneous activity would cause blocked sidewalks, injuries to participants, traffic stoppages

---

[4] *At Biker Bars, better check your colors at the door,* Orlando Sentinel, March 6, 2001, Attachment "D"
Bikers rally in Daytona Beach for end to ban on club patches, Daytona Beach News-Journal, Mar 2, 2014, Attachment "D"

[5] *Police watching motorcycle gangs in Daytona for Bike Week,* Daytona News-Journal, Mar 15, 2018, "Attachment "D"

[6] *A* flash mob *(or flashmob) is a group of people who assemble suddenly in a public place, perform an unusual and seemingly pointless act for a brief time, then quickly disperse, often for the purposes of entertainment, satire, and artistic expression,* Wikipedia. (Attachment "D"

on the part of motor vehicles passing in close proximity and extremely dangerous conditions when pedestrians would spill out onto roadways. Often, vehicle traffic would attempt to U-Turn from the opposite side of the street or come to a complete stop in both directions causing complete gridlock. I wish that Plaintiff's experts would have addressed this issue and provided some specific commentary on it. It sits at the heart of the public safety challenges of this and similar special events.

Unrestricted interaction between motor vehicles and pedestrians is dangerous under any condition, let alone one where a push, scream, punch or other impetus launches a stampede. This became our deepest fear during both Spring Break and Black College Reunion. We've become all too familiar with scenes of vehicles careening into crowds of people in London and in Charlottesville. If the animus toward African – Americans in South Carolina, generally and in Horry County and Myrtle Beach described by Dr. Graham, it makes the case for extra-ordinary precautions for an event like Bikefest. I suggest that the public safety concerns at the Boston Marathon changed substantially after April 15, 2013.

When the size of BCR mushroomed, we encountered a dangerous gridlock condition along Florida SR A1A. In addition to the geography of the beachfront, Daytona Beach has several major east-west roadways that traverse the Halifax River, creating the threat of gridlock on any of the bridges. These are all evacuation routes away from the beachfront. Chief among our concerns was the ability to get emergency medical attention into gridlocked streets and sidewalks. The EMS first responders began equipping motorcycles and bicycles with medical supplies which were capable of working their way through crowds to get to those in need of medical attention.

The circular traffic pattern or "loop" was employed by the Daytona Beach Police Department to keep the parade of vehicles moving along the southbound curb lane from the Band Shell to US 92, International Speedway Boulevard where the bulk of the pedestrian traffic assembled. This loop is approximately twelve (12) miles long. When the traffic flow on SRA1A backed up to US 40 in Ormond Beach, The Daytona Beach Police Department would extend traffic on SRA1A southbound to SR421 in Port Orange. This larger loop doubled the distance of the loop to almost twenty-four (24) miles.

My observations during the 2018 Memorial Day Weekend were virtually identical to those that we encountered with BCR. The Myrtle Beach Police employed almost all of the very same safeguards that were utilized in Daytona during Black College Reunion and, to a lesser degree, during Spring Break.

The Myrtle Beach Police Department, when faced with the cruising traffic stalling, halt or slowdown southbound traffic at the north end to "flush" the stalled traffic south and west on the major thoroughfares to US 501 and SR31.

11

All of the official events mentioned here all have corporate branding, official government sanctioning and schedules of events. Simply, there were planners from all of the major interests at the countless meetings that made public safety decisions. This also included representatives of the various neighborhood associations from areas that were going to be impacted by any or all of these special events. There was also an enormous amount of historic data with which to predict attendance, by day and event. This level of inclusive participation was never available for the planning of Black College Reunion and, I suspect, Bike Fest.

Because of this, law enforcement and other first responders in both jurisdictions were left to bring safety to an event without much structure. While vendors and small time promoters have been able to hold some ticketed events and several events, specifically hosted for participants, no activity has been large enough to draw people away from the parade of vehicles and roaming block party. The vast majority of the attendees, just as we find during Spring Break, are fun loving, respectful and law-abiding. Some are not.

The order maintenance challenges are always a balance of enforcement and tolerance. I've found that the pressure for more strict law enforcement is typically led by homeowners who live on or near the beachfront. For the 2018 Memorial Day weekend, I found that the officers were generally fairly "hands off" except in the cases of those that ignored officer's warnings or refused to comply with officer's directions to move their vehicles along, turn their music down or cover up what clearly constituted indecent exposure. The later Friday and Saturday became, the younger the crowd seemed to be. I thought that the police department did a very good job of opening regular bi-directional traffic earlier than expected when it appeared that traffic volume was dying down.

In the Daytona Beach area this is where the controversies associated with these events began. Much of Dr. Graham's Expert Report outlines many of the very same social, political and governmental issues in Myrtle Beach and Horry County that also arose in the Daytona Beach and Volusia County areas around Black College Reunion. A sampling of news articles, written throughout the life of the Black College Reunion, is attached at Appendix "B." They reflect the observations of news journalists reporting on the event.

I would offer just a couple of observations about the weekend that might be helpful in future planning since it's clear that this event will continue to take place for the foreseeable future no matter the decisions that may be made in the instant case.

The motorcycle club members that I spoke with throughout the weekend all echoed very similar views about Bike Fest. Chief among these was the desire for more organized "rides." The second was a wish for more participation from the motorcycle manufacturers. They view themselves as some of their best customers and would like to see their more visible presence throughout the weekend.

They did acknowledge that they cruise the Boulevard during the early evenings on both nights but noted that once or twice around the loop was usually enough for them. Their younger members often stayed out much later into the night and early morning hours.

I did not see that many local residents had issues getting into or out of side streets into their neighborhoods nor did I see problems for those attempting to get into our out of the parking lots along the ocean front hotels. Most, if not all of the motels, had security staff present and, in addition to maintaining order, helped police officers navigate registered guests and visitors into and out of the parking lots without disrupting the traffic flow.

I thought that the fewer officers on posts in the safety zone could have allowed for a few pairs of officers waking on the sidewalks along Ocean Boulevard interacting in a more personal manner with event goers thereby sending a stronger message of protection rather than enforcement.

Their presence in the safety zone might be augmented by bicycle officers who seemed to operate primarily in a ready-response mode. They responded to several stops and arrests that occurred in the safety zone that were successfully handled by the cops who were already on the scene. Each time, it created a hub bub in the crowd that always has the potential for people rushing to see what's going on or running away for fear of disorder.

Ironically, Myrtle Beach had a scare on Beachside during the 4th of July weekend when it was falsely reported that gun shots had been heard. MBPD did a very good job of diffusing the potential for panic as quickly as the situation had been assessed and stabilized over TV, news and social media.

While not included as parties to this complaint, all of the county and applicable state first responders and public safety professionals are all engaged in, and have a vested interest in, the traffic and crowd control and management plans and decision making since those decisions will have a direct effect on them and their governments. Beachfront residents typically ensure that they are engaged in the official planning process for the events that are likely to impact their neighborhoods. The challenge is to get those interests that are typically overlooked into that planning process. By meeting with bikers' groups, The Bikefest Coalition of county and state stakeholders has found improved relationships with event goers.

That planning process is so critical that it must start immediately following the current event. Our outlook must include a sincere belief that we're always trying to make the event safer and more enjoyable for the guests of our city.

I.    **Conclusions**

    A.    The employment of a "loop" traffic pattern during "peak" evening and night times during the Bikefest event is necessary for the safe movement of the motoring public along Ocean Boulevard and the protection of pedestrians and event goers on the adjacent sidewalks and intersections. Preventing motor vehicle gridlock is one of the biggest public safety goals for the event.

    B.    Other municipalities are, and will continue to be, impacted by this event for the foreseeable future and should have a voice in the matters of this case.

    C.    The police must have control of a complete traffic lane along the beachfront so that safety and emergency vehicles have access to both the roadways and the beachfront properties.

    D.    The "safety zone" in the center roadways is necessary to stage both safety vehicles and public safety personnel on foot and bicycles.

    E.    The crowd control and management challenges require that sidewalks are barricaded from the roadway where large crowds are likely to gather. Traffic and pedestrian crosswalks and control points must also be attended by police officers capable of responding to potential trouble or changing conditions.

    F.    Comparison to Harley Week or other special events
This is a unique event and demographic, activity and attendance measures used to compare one against another do not transfer in a way that produces objective or valid results.

Robert L. Stewart
2-15-2019

14

I.     **Conclusions**

A.     The employment of a "loop" traffic pattern during "peak" evening and night times during the Bikefest event is necessary for the safe movement of the motoring public along Ocean Boulevard and the protection of pedestrians and event goers on the adjacent sidewalks and intersections. Preventing motor vehicle gridlock is one of the biggest public safety goals for the event.

B.     Other municipalities are, and will continue to be, impacted by this event for the foreseeable future and should have a voice in the matters of this case.

C.     The police must have control of a complete traffic lane along the beachfront so that safety and emergency vehicles have access to both the roadways and the beachfront properties.

D.     The "safety zone" in the center roadways is necessary to stage both safety vehicles and public safety personnel on foot and bicycles.

E.     The crowd control and management challenges require that sidewalks are barricaded from the roadway where large crowds are likely to gather. Traffic and pedestrian crosswalks and control points must also be attended by police officers capable of responding to potential trouble or changing conditions.

F.     Comparison to Harley Week or other special events
        This is a unique event and demographic, activity and attendance measures used to compare one against another do not transfer in a way that produces objective or valid results.

# Initial Expert Report of Robert L. Stewart

## February 15, 2019

*National Association for the Advancement of Colored People, Inc., et al. v. City of Myrtle Beach, et al.*, Case No. 4:18-cv-00554-MGL

### Attachment A

### Robert L. Stewart
### Resume