IN THE UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
FLORENCE DIVISION

NATIONAL ASSOCIATION FOR THE
ADVANCEMENT OF COLORED PEOPLE,
INC., *et al.*,

        Plaintiffs,

        v.

CITY OF MYRTLE BEACH, *et al.*,

        Defendants.

Civil Action No. 4:18-cv-00554-MGL

**MOTION FOR PRELIMINARY INJUNCTION**

**TABLE OF CONTENTS**

FACTUAL BACKGROUND ..................................................................................................3

I.      Pre-2014 Background ................................................................................................4

II.     The City's Creation of the Traffic Loop .................................................................6

III.    The Traffic Loop and Its Effects ..............................................................................9

IV.     No Evidence Shows the Traffic Loop is Either Necessary or Effective ............13

PROCEDURAL BACKGROUND ....................................................................................16

ARGUMENT .....................................................................................................................17

I.      Plaintiffs Are Likely to Succeed on the Merits of Their Discrimination Claims .............18

        A.      Plaintiffs Satisfy Their Burden of Demonstrating That Race Played Some Role in
                the Enactment and Continuation of the 23-Mile Traffic Loop ...........................19

                1.      Imposing a 23-Mile Traffic Loop Only for Black Bike Week
                        Disproportionately Impacts Black Visitors to Myrtle Beach...................20

                2.      Myrtle Beach's 23-Mile Traffic Loop Is the Latest Iteration of a Long
                        History of Discriminatory Treatment of Black Bike Week .....................22

                3.      The Sequence of Events Leading Up to the Enactment and Continued Use
                        of the 23-Mile Loop Suggests Discriminatory Intent ..............................24

                4.      Statements Made By and To Officials Regarding Black Bike Week
                        Suggest Discriminatory Intent .................................................................25

                5.      The 23-Mile Traffic Loop Significantly Departs From How Myrtle Beach
                        Treats Other Large Gatherings.................................................................27

        B.      The City Cannot Meet Its Burden of Establishing That It Would Have Enacted
                and Continued the 23-Mile Loop Regardless of Race .........................................30

II.     Plaintiffs Will Suffer Irreparable Harm If Relief Is Not Granted .....................................33

III.    The Balance of the Equities and the Public Interest Favor the Granting of a Preliminary
        Injunction ...............................................................................................................35

CONCLUSION..................................................................................................................35

Pursuant to Federal Rule of Civil Procedure 65, Plaintiffs hereby move for an order directing Defendants City of Myrtle Beach and City of Myrtle Beach Police Department to cease implementation of its 23-mile traffic loop during the 2019 Black Bike Week held over Memorial Day weekend. In an explicit effort to minimize participation in Black Bike Week and to ultimately end the event, the City of Myrtle Beach (the "City") has imposed a variety of unique policies and restrictions for the annual motorcycle rally held over that weekend. The traffic loop has proved to be the most onerous and least justifiable of the measures. Between 10 p.m. and 2 a.m., motorists leaving or attempting to enter hotels, restaurants, or other establishments along Ocean Boulevard, the primary road in the City, are forced into one-lane, one-way traffic heading south and may not exit the mandatory traffic loop until they are miles outside of the City. Those seeking to return to a destination in the northern part of the City, particularly along Ocean Boulevard, must travel the entire loop back to the one entrance to the Boulevard at 29th Avenue North. Despite the City's claims that the traffic loop is supposed to facilitate traffic flow, the average time to circumnavigate the 23-mile loop is *over 4 hours*.

Black Bike Week is indistinguishable from other busy summer weekends in the oceanfront city—there are comparable numbers of vehicles on the roads and people staying in hotels. The only difference between Memorial Day weekend and every other weekend is that it is the sole weekend in the predominantly white City when the visitors are mostly African American. It is now different for another reason—it is the sole event where the City imposes a significant traffic plan, let alone requires visitors to drive 23 miles to get to the City's main attractions.

The traffic loop is the latest of a long history of restrictions the City has imposed on the event since it began in the 1980s. A previous Black Bike Week traffic plan was found to be

1

"likely discriminatory" by Judge Wooten in 2005 and the current traffic loop was implemented only a few years after the expiration of the consent order that resolved that earlier challenge. This traffic plan was enacted shortly after the City was bombarded with explicitly discriminatory calls by the predominately-white Myrtle Beach citizenry, tourists, and governing officials to end the event after shootings occurred during Black Bike Week in 2014 (though the shootings were never linked to Black Bike Week participants).

While the City initially acknowledged that the traffic loop was part of an effort to discourage Black Bike Week attendance, it has now developed post hoc rationales in response to this litigation. The City now argues that the loop is justified to minimize traffic congestion and lessen emergency response times. However, the City never established that traffic congestion or emergency response times were worse during Black Bike Week before implementing the traffic plan—and publicly available data shows that they were not. Moreover, the data continues to show that other weekends have more cars, more people, and longer response times than Black Bike Week, and that the traffic loop does nothing to improve response times or facilitate traffic flow. Despite this ample, objective evidence of the traffic loop's failures and the significant distress that it causes participants, City officials have *still* not conducted any analysis or reviewed any data regarding traffic congestion or emergency response times before or after implementation of the loop. Instead, they continue to rely on their gut feelings regarding the purported problem and their preferred solution—despite the sociological research showing how those "gut feelings" can be a product of unconscious and implicit biases which come into play when predominantly white localities are confronted with predominantly African-American crowds.

Very early in this case, Judge Quattlebaum denied Plaintiffs' motion for a preliminary

injunction seeking to force the City to use the same traffic plans for Harley Week (a predominantly white motorcycle rally) and Black Bike Week. The present motion, filed after the benefit of extensive discovery and expert analysis, is narrowly targeted. At this time, Plaintiffs seek only to prevent the institution of the 23-mile Black Bike Week traffic loop in 2019, which has demonstrably discriminatory underpinnings, *no* articulable justification, and causes significant, irreparable harm to attendees. As detailed below, the evidence establishes that Plaintiffs are likely to prevail on the merits of their claim that the 23-mile traffic loop is discriminatory, that Plaintiffs will suffer irreparable harm if the loop is imposed again in 2019, and that the balance of equities tips in favor of Plaintiffs who seek an injunction that is in the public interest. Accordingly, the Court should order the City to cease its use of the 23-mile traffic loop for Black Bike Week 2019.

## FACTUAL BACKGROUND

The traffic loop is just Myrtle Beach's latest effort to eradicate Black Bike Week, the only major event in the predominantly white City primarily attended by African Americans.

A beachfront City with a tourist- economy, Myrtle Beach attracts large, predominantly white crowds throughout the spring and summer, including Spring Break, Graduation Week, Harley Week, Independence Day, and Labor Day.[1] Myrtle Beach developed as a white-only beach town in the Jim Crow era, while neighboring Atlantic Beach developed in parallel as a prominent African-American destination.[2] Atlantic Beach was the only resort town in the Grand Strand where African Americans could vacation.[3]`

---

[1] All exhibits are attached to the declaration of Laura Gaztambide-Arandes (attached as Exhibit A). Ex. 1 (Rhodes Dep.) at 104:22-106:25; Ex. 2 (Prock Dep.) at 84:2-16; Ex. 3 (Leath 2019 Dep.) at 67:15-68:17; Ex. 4 (COC_000012-13) (67.5% of summer visitors in 2017 were white).
[2] Ex. 5 (PL_016572); Ex. 6 (Evans Dep.) at 16:19-18:7.
[3] Ex. 5 (PL_016572); Ex. 7 (PL_016532); Ex. 6 (Evans Dep.) at 16:19-18:7.

3

Myrtle Beach's residential population and political leadership remain predominantly white and the City is highly segregated by race.[4] On Memorial Day weekend, Black Bike Week comes to town and puts white Myrtle Beach residents and tourists in the unfamiliar and (for them) uncomfortable position of being outnumbered by a large number of African-American visitors.[5] Black Bike Week features motorcycles cruising along Ocean Boulevard as well as a variety of related social gatherings.[6] Its attendees, most of whom are African American, enjoy the same beach-town amenities that draw other visitors to Myrtle Beach.[7] By now, long-time Black Bike Week attendees "are mostly middle-aged African Americans" who "barbeque and spend time together" outdoors "like a family reunion."[8]

## I.    Pre-2014 Background

Black Bike Week began in the 1980s in Atlantic Beach, befitting that town's legacy of welcoming African-American vacationers to the area when other cities such as Myrtle Beach refused to do so.[9] But the event quickly outgrew the small Atlantic Beach's infrastructure, and Black Bike Week festivities began taking place along Ocean Boulevard in Myrtle Beach, with attendees staying in Myrtle Beach hotels and dining at Myrtle Beach restaurants.[10]

---

[4] Ex. 9 (Gallagher Rep.) at 4 (Myrtle Beach is 13.6% black; South Carolina is 27% black); Ex. 10 (Pedersen Dep.) at 243:21-244:24 (majority of city leadership is white).

[5] Ex. 1 (Rhodes Dep.) at 146:20-47:7; Ex. 2 (Prock Dep.) at 234:8-16; Ex. 9 (Gallagher Rep.) at 10-15 (discussing sociological research on white efforts to control white spaces and discomfort and paranoia of whites when confronted with large groups of other races).

[6] Ex. 11 (Jones Decl.) ¶¶ 6-7; Ex. 12 (Johnson Decl.) ¶ 4; Ex. 13 (Graham Decl.) ¶ 5.

[7] Ex. 2 (Prock Dep.) at 234:8-11; Ex. 10 (Pedersen Dep.) at 144:6-11; Ex. 14 (Parnell Rep.) at 5 (86% of the crowd in the area during Memorial Day weekend 2017 were African-American, and 12.9% of the crowd was white); Ex. 13 (Graham Decl.) at ¶ 5 (enjoys "going out to the restaurants and bars with my friends and my bike club").

[8] Ex. 15 (Harrison Decl.) ¶¶ 6-7; see also Ex. 16 (McNeill Decl.) ¶¶ 3-5.

[9] Ex. 6 (Evans Dep.) at 14:18-15:1, 16:19-18:7; Ex. 5 (PL_016572).

[10] Ex. 17 (Leath 2004 Dep.) at 112:18-16:18; Ex. 18 (PL_017002) ("But as the festival grew in attendance . . . attendees looked south for hotels.").

By the mid-1990s, Myrtle Beach residents and city officials publicly expressed hostility toward Black Bike Week, in contrast to their far more welcoming treatment of Harley Week, an event comparable in size and character but with predominantly white attendees.[11] City officials objected to the "party atmosphere" and asserted that "black crowds party differently" from white crowds by gathering outside on the streets and in parking lots whereas whites, including Harley bikers, gathered indoors at bars and similar places.[12] Myrtle Beach imposed disruptive policies on Black Bike Week that it did not impose on Harley Week, including increased law enforcement, zero tolerance for law breakers, and a one-way traffic plan along Ocean Boulevard with restricted right-hand turns.[13] At one point, former mayor Mark McBride called for the National Guard to help police Black Bike Week.[14]

Eventually the National Association for the Advancement of Colored People (the "NAACP") sued Myrtle Beach for the racially discriminatory treatment.[15] In 2005, Judge Wooten preliminarily enjoined Myrtle Beach from treating Black Bike Week differently from Harley Week, finding the disparate treatment of comparable events likely due to racial discrimination.[16] Judge Wooten found Black Bike Week was the only weekend of the year when

---

[11] Ex. 3 (Leath 2019 Dep.) at 63:12-64:18; Ex. 19 (PL_030048) (Leath letter); Ex. 17 (Leath 2004 Dep.) at 136:14-38:16 (discussing letter); Ex. 20 (Gildea Dep.) at 55:3-24 (City had suggested "bringing in dogs and bring (sic) in National Guard" during Black Bike Week); Ex. 3 (Leath 2019 Dep.) at 237:7-18 (saying of Harley Week, "If they are going to be there, we're going to try our best to -- to accommodate them.").

[12] Ex. 21 (PL_025636) (article); Ex. 17 (Leath 2004 Dep.) at 41:2-17; 199:12-202:18 (discussing article); Ex. 3 (Leath 2019 Dep.) at 274:16-75:24 (affirming 2004 statements).

[13] Ex. 22 (McBride Dep.) at 163:16-65:11; Ex. 23 (DEF01415429-32) (previous expert report of W. Williams and M. Brown at 3-6); Ex. 24 (DEF01415448-52) (previous expert report of D. Clarke at 10-14).

[14] Ex. 17 (Leath 2004 Dep.) at 179:20-80:3, 181:17-20, 185:5-13, 188:25-89:3; Ex. 3 (Leath 2019 Dep.) at 254:23-55:2, 265:12-22.

[15] Ex. 25 (2003 Compl.).

[16] Ex. 26 (2005 Op. & Order) at 9-10, 15.

the plan was implemented and that race was considered when developing the plan, noting the racially coded language used by officials when comparing Black Bike Week to Harley Week.[17] The Fourth Circuit stayed the injunction in a cursory order that expressed no opinion on the merits.[18] The parties settled prior to any any substantive decision by the Fourth Circuit, with Myrtle Beach agreeing to treat Harley Week and Black Bike Week comparably until 2010.[19]

In 2008, a shooting incident occurred during Memorial Day weekend.[20] This incident was unrelated to Black Bike Week or its attendees[21] and reflected a general increase in crime in the City.[22] The City nonetheless cited it in imposing restrictions on Black Bike Week. Required by the consent decree to treat the two events equally, the City publicly called for an end to *both* events.[23] The City instituted a series of restrictive ordinances affecting both, including a helmet requirement and a loitering prohibition.[24]

While City officials believed that there were no longer significant numbers of people attending the Harley Week rally,[25] Black Bike Week continued, to the dismay of white tourists who disliked sharing "their" vacation resort with people they considered to be wholly unlike them. They expressed their displeasure to City officials. For example, one tourist complained in

---

[17] *Id.* at 9-10.

[18] Ex. 27 (2005 4th Cir. Order) (noting that "[t]he panel expresses no view as to the ultimate merits of the case").

[19] Ex. 28 (2006 Settlement Agreement).

[20] Ex. 29 (PL_032708-9) (describing shooting).

[21] *Id.* (noting that police did not confirm a motive in the shooting).

[22] Ex. 2 (Prock Dep.) at 92:2-22, 227:4-10; Ex. 30 (Gall Dep.) at 153:24-54:9; Ex. 31 (DEF00322540) (City's compilation of murders since 2013).

[23] Ex. 32 (DEF00705862-63); Ex. 17 (Leath 2004 Dep.) at 82:23-83:9 ("the attendees were really moving out of the city").

[24] Ex. 32 (DEF00705862); Ex. 33 (PL_027309-28); Ex. 34 (PL_032421) (prohibiting loitering); Ex. 35 (PL_024894) (prohibiting congregation in parking lots).

[25] Ex. 1 (Rhodes Dep.) at 157:1-13; Ex. 10 (Pedersen Dep.) at 146:2-17; Ex. 3 (Leath 2019 Dep.) at 60:19-63:3; Ex. 36 (DEF00764602-3) (2009 radio ad discouraging bikers).

2013 that Black Bike Week attendees "act like barbarians!" . . . "[T]his is an 'ILK' of people who ought not be allowed to steal your tax revenue..and they are."[26] Another tourist complained, "When I arrived I found anything but a family environment. I found 'Bike Week.'"[27]

## II.    The City's Creation of the Traffic Loop

Against the backdrop of a white City's long-standing discomfort with Black Bike Week, three people were killed in a shooting at an Ocean Boulevard hotel during Memorial Day weekend in 2014.[28] As City officials now acknowledge, no evidence links these shootings or any of the people involved to Black Bike Week,[29] but the City nevertheless publicly and repeatedly tied that violent event to Black Bike Week and its attendees.[30] The immediate public backlash had racial overtones that City officials acknowledged.[31] Complaints describe the (predominantly black) crowd as criminals and called the attendees "a bunch of animals [who] shoot the place up," "delinquents," "hoodlums," "heathens," "thugs," "a band of raping and plundering Vikings," and unable to act in a "civilized manner."[32] Complainants expressed concerns about "noise," "profanity music," and even the clothing worn by Black Bike Week attendees, such as "pants hanging down low" and "asses hanging out."[33] Visitors and residents contrasted the weekend's predominantly black environment to a more desirable, and predominantly white, environment: "This beautiful area should not turn into the Chicago or Detroit of the South"; "It's

---

[26] Ex. 37 (DEF00009628-29).
[27] Ex. 38 (DEF00713310).
[28] Ex. 39 (PL_017041).
[29] Ex. 40 (PL_017045); Ex. 3 (Leath 2019 Dep.) at 144:14-17; Ex. 1 (Rhodes Dep.) at 201:11-13.
[30] Ex. 3 (Leath 2019 Dep.) at 144:18-45:1; Ex. 41 (PL_016560-61); Ex. 42 (DEF01418314).
[31] Ex. 3 (Leath 2019 Dep.) at 161:9-25; Ex. 43 (Kruea Dep.) at 145:15-46:1; *see also* Ex. 30 (Gall Dep.) at 68:14-69:21 (acknowledging elements of racist paranoia and racist undertones in the conversations around Black Bike Week).
[32] Ex. 44 (DEF00113180); Ex. 45 (DEF00389876); Ex. 46 (PL_032820); Ex. 47 (DEF00083653); Ex. 48 (DEF01378374).
[33] Ex. 49 (DEF00072290); Ex. 48 (DEF01378374); Ex. 45 (DEF00389876).

the golf capital of the world. Not Compton!!!"[34] Public Information Officer Mark Kruea

forwarded many racially-charged complaints to other City officials and leaders, at times assuring

complainants that the City was addressing the issue.[35]

With such inflammatory sentiments bombarding City officials, then-Assistant City

Manager John Pedersen initiated internal discussions that would culminate in the traffic loop

with an e-mail stating forthrightly that the object was to "suck the fun completely out of the

event" and make it "go away."[36] Mayor Rhodes similarly expressed his objective to make

attendance at Black Bike Week less appealing and more arduous.[37] The City drafted an

"Extraordinary Events Ordinance" that described Bikefest as "causing residents and visitors to

fear for their safety" and "engendering anarchy on the public streets and rights-of-way."[38] In that

ordinance and in other communications, City officials proposed a series of responses consistent

with those views.[39]

Among other policies, City officials quickly coalesced around increased law enforcement

and traffic restrictions, including a more-than-40-mile-long traffic loop that would force Black

---

[34] Ex. 50 (DEF00079983); Ex. 49 (DEF00072290); *see also* Ex. 45 (DEF00389876) (urging the City "to draw a line in the sand and decide whether you want to be known as a family destination or a destination for derelicts").

[35] Ex. 43 (Kruea Dep.) at 145:15-46:1, 152:17-54:1; Ex. 51 (DEF00705357) (Kruea responding that "we saw new heights of violence and crime" and that the City would be addressing "this unlawful street party"); Ex. 45 (DEF00389876) (Kruea forwarding "destination for derelicts" email to City Council); Ex. 44 (DEF00113180) (Kruea forwarding "bunch of animals" email to Leath, Pedersen).

[36] Ex. 10 (Pedersen Dep.) at 189:2-17; Ex. 52 (DEF00015624).

[37] Ex. 53 (PL_017034-35); *see also* Ex. 30 (Gall Dep.) at 198:3-13 (testifying that politicians at the time had made promises that they were going to shut the event down).

[38] Ex. 54 (DEF00077049).

[39] *See, e.g.*, Ex. 52 (DEF00015624) (suggesting "as many drug dogs as possible"); Ex. 55 (DEF00076606) (suggesting curfew).

Bike Week traffic across multiple jurisdictions.[40] Their stated aim was to drive Black Bike Week traffic out of town rather than permit attendees to drive through Myrtle Beach.[41] The City "settled" for the current 23-mile loop after neighboring jurisdictions balked at a longer one.[42]

Before imposing this loop, the City gathered no data about traffic flow, response time, rates of crime, or crowd size;[43] conducted no analysis on traffic demand or supply (nor engaged a licensed traffic engineer to do so);[44] and entirely failed to evaluate whether other, less intrusive alternatives would accomplish the loop's purported purposes.[45] Instead, it relied on (almost all white) City officials' "observations" and "experiences" regarding Black Bike Week.[46]

## III.    The Traffic Loop and Its Effects

Beginning in 2015, and each year since, Myrtle Beach takes a variety of unique actions for Black Bike Week. It brings in hundreds of additional police officers and instructs them to

---

[40] Ex. 10 (Pedersen Dep.) at 369:18-70:11 (City was primary driver behind having a loop, and discussed concept of loop before multi-jurisdictional task force existed); Ex. 56 (Nell Dep. Ex. 2); Ex. 57 (Nell Dep.) at 69:6-14 (confirming map shows 40-mile loop that was being discussed); Ex. 58 (DEF00557653-5).

[41] Ex. 1 (Rhodes Dep.) at 265:10-20; Ex. 59 (Thomas Dep.) at 152:13-53:2; Ex. 60 (Booker Decl.) at ¶¶ 5, 8-11.

[42] Ex. 1 (Rhodes Dep.) at 301:19-02:7.

[43] Ex. 59 (Thomas Dep.) at 48:14-22, 164:10-15, 169:12-16 ("never looked at specific numbers of calls or specific times" and never looked at any data in determining whether and what plan to use); Ex. 10 (Pedersen Dep.) at 230:7-31:11 (no traffic count numbers considered in assessing what plan would be implemented); Ex. 2 (Prock Dep.) at 48:23-49:2 (did not rely on any data regarding emergency response times in formulating the loop); Ex. 3 (Leath 2019 Dep.) at 98:3-16 (never looked at response times); Ex. 30 (Gall Dep.) at 63:14-64:15, 248:20-50:1, 269:3-9 (City had access to Chamber of Commerce crowd estimates and hotel occupancy data but never used them or relied on them).

[44] Ex. 61 (Smith Dep.) at 224:20-25:21.

[45] Ex. 10 (Pedersen Dep.) at 232:19-33:4 ("I can't even imagine what an alternative could be"); Ex. 3 (Leath 2019 Dep.) at 213:7-19; Ex. 30 (Gall Dep.) at 282:19-24; Ex. 1 (Rhodes Dep.) at 333:12-15 (when asked about alternatives to the loop, stated "Sometimes I don't deal in logic.").

[46] Ex. 30 (Gall Dep.) at 255:8-16, 259:10-16 (congestion worse during Memorial Day weekend "measurably in observation and - and that type thing. Not measurably in statistics."); Ex. 10 (Pedersen Dep.) at 179:8-80:6 ("No data. I know what I saw with my eyes."); Ex. 1 (Rhodes Dep.) at 107:19-108:2.

aggressively and strictly enforce City ordinances.[47] It imposes traffic restrictions, which include reserving one of the two lanes on Ocean Boulevard for police and emergency vehicles and making the one remaining lane one-way driving south.[48] It lines about five miles of Ocean Boulevard with pedestrian barriers.[49] Those policies are not at issue on this motion. At issue, instead, is what happens at 10 p.m. each evening, when the City—*in addition* to those policies— imposes the 23-mile, one-way traffic loop and brings traffic to a virtual stand-still just as many Black Bike Week attendees are looking to head to dinner, gatherings with friends, or back to their hotels after an evening out.

At 10 p.m., the City blocks off all entrances and exits to and from Ocean Boulevard.[50] Thus, motorists may only enter Ocean Boulevard (the primary tourist destination in the City and a major location for Black Bike Week festivities) at the north end of town.[51] If they wish to leave Ocean Boulevard, they must continue at a snail's pace down the entire 5.1 mile stretch until they reach King's Highway and are forced to drive another seven miles before reaching the first opportunity to exit the loop.[52] Drivers seeking to return to Ocean Boulevard must continue in the loop for another nine miles.[53] Any motorists on Ocean Boulevard who want to travel north within the City after 10 p.m.—for example, to a hotel or restaurant near the north end of Ocean Boulevard—must remain in the loop for the entire 23.1 miles, going out of town, up to SC-31

---

[47] Ex. 8 (PL_016535) (more than 800 officers total in 2017, around 580 of whom are from state, local, and federal agencies, and 597 officers from 185 agencies in 2016); Ex. 62 (PL_000509); Ex. 63 (PL_017000).
[48] Ex. 64 (PL_000171-73); Ex. 65 (PL_016152).
[49] Ex. 66 (Clarke Rep.) at 39.
[50] Ex. 30 (Gall Dep.) at 73:19-74:10.
[51] Ex. 67 (NATIVE_HORRY_017203).
[52] *Id.*
[53] *Id.*

and then winding back to Ocean Boulevard at the north.[54]



This map shows the traffic loop in red and identifies with solid yellow areas the *only* places and directions a car can exit the loop. The dashed yellow arrows show where people travelling in the vicinity of Myrtle Beach are forced to enter the loop.

Although City officials discussed implementing the traffic loop and other measures during Black Bike Week in an effort to drive participants out of the City, end Black Bike Week, and prevent crime,[55] when this litigation commenced City officials began contending that the loop has two purposes: easing traffic congestion[56] and lowering emergency vehicle response times.[57] However, at no point has any City official identified data or analysis demonstrating that traffic congestion or emergency response times were a more significant problem during Memorial Day weekend than on any other busy summer weekend in the City of Myrtle Beach,

---

[54] *Id.*; Ex. 2 (Prock Dep.) at 162:8-67:1 (possible exits when in loop).
[55] *See supra* nn. 37-38; Ex. 68 (PL_032828).
[56] Ex. 30 (Gall Dep.) at 177:25-78:20, 227:2-14; Ex. 3 (Leath 2019 Dep.) at 131:19-32:14, 133:23-34:10; Ex. 2 (Prock Dep.) at 151:23-52:5.
[57] Ex. 2 (Prock Dep.) at 153:4-16; Ex. 69 (Preliminary Injunction Hrg. Tr.) at 123:5-17.

nor has the City attempted to demonstrate how the loop, specifically, furthers these goals. Indeed, analysis of available data demonstrates that the traffic loop dramatically *increases* traffic congestion and has no significant effect on emergency vehicle response times.

Trapping all of Black Bike Week traffic in the one-way loop, with little opportunity to exit, results in massive gridlock, with traffic barely moving at all.[58] Making matters worse, the City inexplicably has kept some Ocean Boulevard traffic signals operational while the loop is in effect—even though cars have no option other than proceeding in the loop—thus slowing traffic down further as cars wait for pointless red lights to change.[59]

During the 2017 and 2018 Black Bike Weeks, Plaintiffs' traffic management expert David Clarke had probe vehicles drive the entire loop with GPS trackers.[60] He found that the average length of time to travel the entire loop was *more than 4 hours*.[61] Dr. Clarke performed the same test during other busy weekends, including Harley Week, Sun Fun Festival, July 4th, and Labor Day—weekends identified by City witnesses as comparably busy.[62] The average time to travel the loop route during those weekends was one hour and 7 minutes, showing a 282% increase in travel time for motorists when the loop is in place during Black Bike Week.[63] There are not significantly more vehicles or people in the Myrtle Beach area during Black Bike Week as compared to other busy weekends, demanding the conclusion that the increase in time is a

---

[58] Ex. 66 (Clarke Rep.) at 28 ("[i]f the city intends for the loop to alleviate congestion on Ocean Boulevard, it is unclear how this would happen"); *id.* at 27 ("[u]nless travel demand on Ocean Boulevard became demonstrably lower during Bikefest than for other peak periods, congestion and a poorer level of service for those subject to the one-lane restriction are unavoidable."); *id.* at 34 ("[c]losure of cross streets very likely contributed to the degradation of Ocean Boulevard's performance during Bikefest.").
[59] Ex. 66 (Clarke Rep.) at 27.
[60] Ex. 66 (Clarke Rep.) at 34.
[61] *Id.*
[62] *Id.* at 29, 34.
[63] *Id.* at 34.

consequence of the loop (and the absence of exits from it) rather than any increase in vehicles.[64]

Many individual attendees (and residents) report horror stories from their time in the traffic loop. For example, Joyce Frink, who has bladder cancer and diabetes, was stuck in the loop for two-and-a-half hours in 2015 as she attempted to drive a mere half-mile.[65] While in the loop, Ms. Frink's blood sugar levels rose so high that she had to use her OnStar emergency button to call for an ambulance, and by the time it arrived, she had urinated on herself three times.[66] Patrice Johnson spent three hours navigating the loop in 2015, and, after she managed to exit, needed an additional hour and a half to reach her hotel.[67] These, and many other stories, show how the loop greatly disrupts enjoyment of Black Bike Week evenings, as visitors sit in their virtually motionless cars, frustrated, late at night, not knowing when (or if) they will make it to their hotels.[68] Many motorists—including those not even involved with Black Bike Week— are confused and surprised when they get caught in the loop and its unmoving traffic.[69]

Those who have endured the loop distort their plans to avoid it, making plans that do not require being on the road after 10 p.m. or avoiding Black Bike Week altogether. After getting caught in the loop, Plaintiffs Leslie and Cedric Stevenson took care not to travel further than

---

[64] *Id.* at 14-18, 38.

[65] Ex. 70 (Frink Decl.) ¶¶ 6-12.

[66] *Id.* at ¶¶ 9-10; *see also id.* at 11 (reporting that her doctor told her that her "symptoms were so severe that [she] could have died").

[67] Ex. 12 (Johnson Decl.) ¶ 8.

[68] Ex. 71 (Coleman Decl.) ¶¶ 6, 7 (twenty-minute drive took two hours because of the loop); *see also* Ex. 72 (N. Briggs Decl.) ¶ 6 (five minute drive took three hours because of the loop); Ex. 13 (Graham Decl.) ¶¶ 3, 10 (two hours in loop to reach hotel); Ex. 11 (Jones Decl.) ¶¶ 13-14 (took 3 hours, instead of twenty minutes, to get to restaurant because caught in loop); Ex. 73 (C. Stevenson Decl.) ¶¶ 7, 8; Ex. 74 (L. Stevenson Decl.) ¶ 6.

[69] Ex. 66 (Clarke Rep.) at 40-41 (discussing motorists caught in the loop); *see also* Ex. 74 (L. Stevenson Decl.) ¶ 6 (inadvertently caught in the loop); Ex. 75 (Knox Dep.) at 50:10-12 (same).

walking distance from their hotel in the evenings.[70] This significantly reduces the appeal of an event built in part around the riding of motorcycles. Plaintiffs Novice and Harry Briggs try not to leave their room on Ocean Boulevard after 10 p.m. because of the loop, passing up many of the social gatherings that they used to attend.[71] Many former attendees now stay away altogether; Black Bike Week attendance has dropped significantly due to the traffic loop.[72]

## IV.    No Evidence Shows the Traffic Loop is Either Necessary or Effective

In the face of this mounting evidence as to the loop's actual effects, the City has produced no contrary evidence of the loop accomplishing anything productive. Its officials maintain that the loop alleviates traffic congestion and facilitates response times, but they acknowledge these views are not based on serious analysis, either prior to the loop's imposition or after.[73] The City has declined to collect the data to support such an analysis, though it could readily do so; for example, it has equipment to count the number and speed of the cars on its roads but has not used it to measure traffic during Black Bike Week.[74] It has had emergency response time information for years, but has not analyzed how Black Bike Week compares to

---

[70] Ex. 74 (L. Stevenson Decl.) ¶ 9; Ex. 73 (C. Stevenson Decl.) ¶ 9; *see also* Ex. 16 (McNeill Decl.) ¶ 7 (walks instead of riding motorcycle).

[71] Ex. 72 (N. Briggs Decl.) ¶¶ 3, 5-7, 10; *see also* Ex. 76 (Anderson Decl.) ¶ 10 ("I did not want to go out or leave my hotel room.").

[72] Ex. 10 (Pedersen Dep.) at 139:5-140:6 (estimating reduction in Black Bike Week attendees since 2014).

[73] *See supra* nn. 44-45 (no data gathered or analysis done prior to implementation of the loop); Ex. 1 (Rhodes Dep.) at 268:5-21, 298:17-99:20, 335:10-13; Ex. 43 (Kruea Dep.) at 170:14-17; Ex. 10 (Pedersen Dep.) at 194:22-95:1; Ex. 30 (Gall Dep.) at 103:7-12.

[74] Ex. 61 (Smith Dep.) at 27:13-16; Ex. 59 (Thomas Dep.) at 68:16-69:2; Ex. 10 (Pedersen Dep.) at 230:18-24, 246:3-19; Ex. 2 (Prock Dep.) at 179:8-180:1.

other weekends.[75] Top City officials have never even driven the loop while it was in place.[76]

Yet City officials have acknowledged that the loop has caused traffic congestion at various times; in its own official debriefing document in 2015, the Public Works Department concluded that the traffic loop had proven "ineffective at times" in achieving its stated goal of "keep[ing] traffic moving at a steady pace," and instead led to "traffic congestion at many locations within the loop."[77] And the City has also received countless complaints about traffic in the loop over the years from participants and non-participant residents alike.[78] Despite all of this evidence of the loop's failures, the City has never sought further study. Put simply, the City does not know the loop's effects on traffic and response times and chooses not to know.

If the City reviewed the data in its own possession, it would see that traffic is not heavier, and emergency response times are not slower, during Memorial Day weekend as compared to other weekends. Publicly available traffic counts at major roads leading to Myrtle Beach show that Memorial Day weekend "generates total vehicle volumes similar to other peak weekends during the year, including Harley Week."[79] And the City's emergency response data shows that

---

[75] Ex. 30 (Gall Dep.) at 143:17-23 (acknowledging that City officials can obtain emergency response time data); Ex. 59 (Thomas Dep.) at 48:14-22 (never looked at specific numbers of calls or specific times).

[76] Ex. 10 (Pedersen Dep.) at 196:10-20; Ex. 2 (Prock Dep.) at 196:20-197:23; Ex. 3 (Leath 2019 Dep.) at 180:10-181:5; Ex. 1 (Rhodes Dep.) at 267:18-268:4; Ex. 30 (Gall Dep.) at 98:22-99:4, 276:24-277:11; Ex. 43 (Kruea Dep.) at 165:22-23.

[77] Ex. 77 (DEF00948657-66); *see also* Ex. 10 (Pedersen Dep.) at 323:19-22 (first year loop was in place a huge amount of traffic congestion was created); *id.* at 247:23-248:19 (recognizing loop could create significant inconvenience to individuals trying to get to Ocean Boulevard); Ex. 30 (Gall Dep.) at 268:2-13 (discussing congestion created by loop).

[78] Ex. 30 (Gall Dep.) at 100:19-101:20; Ex. 10 (Pedersen Dep.) at 322:17-323:18; Ex. 43 (Kruea Dep.) at 200:13-201:2 (no recollection of talking to BBW participants about loop before concluding it worked well and relied on City officials, though City "had feedback that would indicate that some visitors did not think the loop worked well.").

[79] Ex. 66 (Clarke Rep.) at 15-18; *see also* South Carolina Department of Transportation, Historical Data, *available at* http://dbw.scdot.org/Poll5WebAppPublic/wfrm/wfrmViewDataNightly.aspx#.

emergency response times during Memorial Day weekend from 2011-2014 (when no loop was put in place) were either comparable to or lower than emergency response times during loop hours when no loop is in place during Labor Day (another busy holiday weekend) and all other summer weekends from 2011 to 2017.[80]



See also Ex. 78 (chart). These data demonstrate that there are no significant distinctions between Black Bike Week emergency response times before and after implementation of the loop.

Instead, City officials insist—with no empirical basis and with all objective evidence to the contrary—that the detrimental effects about which Plaintiffs complain do not exist. City Manager Pedersen claims it takes only half an hour to drive the loop and that the traffic plan does not slow traffic but instead "speeds it up," based solely on observations made while driving *by* the loop in the emergency lane along Ocean Boulevard that is closed to non-emergency traffic.[81] City officials also maintain that the loop improves emergency vehicle response time, but—once

---

[80] Chart compilation of information contained in DEF00003964-75; DEF00008153-64; DEF00014776-85, DEF00017733-37; DEF00019020; DEF00020843; DEF00025052-63; DEF00045133-44; DEF00056232-43; DEF00061868-79.
[81] Ex. 10 (Pedersen Dep.) at 196:21-197:15, 232:11-16.

again—lack evidence to support the assertion.[82] City officials' statements that the loop solves some problem during Black Bike Week is solely based on "observation" and "experience."[83]

City witnesses similarly opine, based on their "observations," that crowds for Black Bike Week are substantially larger than those for other busy summer weekends, but actual data disagree.[84] The Clay J. Brittain Center for Resort Tourism at Coastal Carolina University calculates hotel occupancy rates for summer weekends in Myrtle Beach.[85] Each year from 2012-2018, Memorial Day weekend's occupancy rate was outpaced by July 4th, the last weekend in July, and the first weekend in August.[86]

The only factual disputes presented by the evidence thus boil down to whether to credit actual data or City officials' unsupported "observations" and "experience." Just as they decline to consider data, so do City officials refuse to engage in any consideration of alternatives that would meet their ostensible goals without causing such frustration for Black Bike Week attendees. For example, Pedersen has considered no alternatives in recent years and says he "can't even imagine what an alternative would be."[87]

---

[82] *See supra* n. 75.

[83] Ex. 2 (Prock Dep.) at 48:23-49:12 ("relied on personal experiences," and "law enforcement partners" but not any data); *id.* at 230:6-15 (knows amount of people and traffic is higher for Memorial Day "because of personal experience."); *id.* at 110:7-111:7 (using "line of sight" method to judge hotel occupancy by observing if there are no vacancy signs outside hotels); Ex. 30 (Gall Dep.) at 139:6-14 (no data analysis); Ex. 1 (Rhodes Dep.) at 109:16-110:14 (any numerical information received would have been "pure speculation"); Ex. 43 (Kruea Dep.) at 165:15-21 (believes traffic is moving in loop based on "observations and experience").

[84] Ex. 3 (Leath 2019 Dep.) at 150:5-11; Ex. 43 (Kruea Dep.) at 74:24-75:3; Ex. 10 (Pedersen Dep.) at 157:3-6.

[85] Coastal Carolina University Clay Brittain Jr. Center for Resort Tourism and E. Graig Wall Sr. College of Business Administration, "The Tourism Economy Study: CCU Lodging Update," *available at* https://www.coastal.edu/business/resort/archives.

[86] Ex. 66 (Clarke Rep.) at 14; *id.*

[87] Ex. 10 (Pedersen Dep.) at 232:23-233:4; *see also supra* n. 46 (other City officials who failed to consider any alternatives).

## PROCEDURAL BACKGROUND

The NAACP and eight individuals who attend Black Bike Week commenced this action challenging the traffic loop and other City policies regarding Black Bike Week. They bring claims under 42 U.S.C. § 1981, Title VI of the Civil Rights Act of 1964, the Equal Protection Clause, and other laws not at issue on this motion.[88]

Around the time of filing the Complaint, Plaintiffs also sought a preliminary injunction that was different from the one they seek here. In the first motion, Plaintiffs sought an order requiring the City to maintain a substantially similar traffic plan during the 2018 Black Bike Week as the one it maintains during Harley Week.[89] This Court (Quattlebaum, J.) denied preliminary relief. Without venturing an opinion as to whether Plaintiffs ultimately could make out the required showing, it found that, "[a]t this early stage of this case," Plaintiffs had not "made a clear showing that the participants at Harley Week and Bikefest are similarly situated due to the differences in the two events."[90] Since that decision, the parties have proceeded through a substantial portion of discovery. The record now is considerably fuller, permitting Plaintiffs to present substantial evidence in support of its motion and the City has had ample notice of Plaintiffs' plan to renew the motion for preliminary injunction. Plaintiffs now seek a more streamlined injunction, which would bar the City only from employing the 23-mile traffic loop beginning at 10 p.m. For the purposes of this motion, Plaintiffs do not challenge the other City restrictions on Black Bike Week that are alleged in the Complaint.

## ARGUMENT

To obtain a preliminary injunction, a movant "must establish [1] that he is likely to

---

[88] *See* First Am Compl. at 47-51 (Doc. 84).
[89] *See* 2018 Op. & Order, at 1 ("Opinion") (Doc. 50).
[90] *Id.* at 8.

succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of

preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in

the public interest."[91] Plaintiffs satisfy each of these elements.

While Plaintiffs could succeed under either standard, they submit that the injunction they

seek would do no more than maintain the status quo and thus should be considered prohibitory

rather than mandatory in nature.[92] By this motion, Plaintiffs only seek to enjoy the City from

implementing—at considerable manpower and other expense—the 23-mile, one-way loop that

has proven to be purposely discriminatory, to have severely discriminatory effect, and to serve

no legitimate purpose. Plaintiffs will establish that the City continues imposing the loop at least

in part because of consideration of race; that they will suffer irreparable harm if it is not

enjoined; and that the City will not suffer any harm if the loop is enjoined.

## I.    Plaintiffs Are Likely to Succeed on the Merits of Their Discrimination Claims

Plaintiffs are likely to succeed on the merits of their challenge to Defendants' continued

use of the 23-mile traffic loop. The gravamen of Plaintiffs' claims, as relevant to this motion, is

that the race of Black Bike Week attendees influenced Defendants' enactment and perpetuation

of the traffic loop. The evidence overwhelmingly supports Plaintiffs' prima facie case that racial

prejudices and fears have played *some* role in motivating the City to enact and continue the loop,

even as the City's supposed justifications for the loop—that it serves to combat crime and

improve traffic flow—have become increasingly untenable. The disconnect between the stated

purposes of the loop and its actual effects further prevents Defendants from satisfying their

burden of showing that they would have enacted and maintained the loop without regard to race.

---

[91] *Centro Tepeyac v. Montgomery Cty.*, 722 F.3d 184, 188 (4th Cir. 2013) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7 (2008)).
[92] *See Pashby v. Delia*, 709 F.3d 307, 320 (4th Cir. 2013).

Under the framework for evaluating intentional discrimination claims set forth in *Arlington Heights* and its progeny,[93] Plaintiffs' initial burden is to establish that race was "a factor" that motivated enactment of the challenged policy—here, the traffic loop.[94] They need not show that race was the only factor or even the predominant factor.[95] Nor must they show that Myrtle Beach, or its officials, "harbored racial hatred or animosity toward" African Americans, only that racial considerations infected their decision-making.[96]

Once a plaintiff establishes that race played *some* part in the policy's enactment, the burden shifts to the defendant to show the policy would have been enacted without regard to race.[97] Plaintiffs easily meet their burden; Defendants cannot come close to meeting theirs.

## A.     Plaintiffs Satisfy Their Burden of Demonstrating That Race Played Some Role in the Enactment and Continuation of the 23-Mile Traffic Loop

Because government officials rarely admit to intentional discrimination, courts conduct a "sensitive inquiry" into their motivation, closely examining the available evidence for a variety of established indicia of intentional discrimination.[98] *Arlington Heights* sets out "a nonexhaustive list of factors to consider" including: the "impact of the official action—whether it bears more

---

[93] The same intent analysis applies to all Plaintiffs' intentional discrimination claims. *See Elston v. Talladega Cty. Bd. of Educ.*, 997 F.2d 1394, 1406 n.11 (11th Cir. 1993) (Title VI analysis duplicates that of equal protection); *Chiles v. Crooks*, 708 F. Supp. 127, 132 (D.S.C. 1989) (section 1981 claim requires proof of race-based discrimination). Title VI requires proof "that the defendant received federal financial assistance" in addition to proof "that the defendant engaged in intentional discrimination based on race, color, or national origin." *Callum v. CVS Health Corp.*, 137 F.Supp.3d 817, 844 (D.S.C. 2015). Plaintiffs do not understand there to be any dispute that this federal-funding element is met.

[94] *N.C. State Conference of NAACP v. McCrory*, 831 F.3d 204, 220, 233 (4th Cir. 2016); *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265 n.11.

[95] *Id.*

[96] *McCrory*, 831 F.3d at 233; *accord Garza v. Cty. of L.A.*, 918 F.2d 763, 778 (9th Cir. 1990) (Kozinski, J., concurring in part and dissenting in part) (intentional discrimination by officials does not require that they personally harbor "dislike, mistrust, hatred or bigotry" based on race.).

[97] *Id.* at 233; *Hunter v. Underwood*, 471 U.S. 222, 228 (1985).

[98] *McCrory*, 831 F.3d at 220.

heavily on one race than another"; the "historical background" of the decision; the "specific sequence of events leading up to the challenged decision"; statements made by and to officials regarding the event, including "contemporary statements by members of the decisionmaking body"; and departures and deviations "from normal procedural sequence" or how the same policymakers usually act, "particularly if the factors usually considered important by the decisionmaker strongly favor a decision contrary to the one reached."[99]

Here, the *Arlington Heights* factors demonstrate that racial considerations infected the City's decision to impose the traffic loop for Black Bike Week. While discussed separately below, they must be considered collectively.[100] Here, the full context shows that race factored into, and continues to factor into, the City's decision-making surrounding the loop.

### 1. Imposing a 23-Mile Traffic Loop Only for Black Bike Week Disproportionately Impacts Black Visitors to Myrtle Beach

The first *Arlington Heights* factor, the policy's disproportionate racial impact, powerfully suggests a racial motivation. The traffic loop is tailored to apply *only* during Black Bike Week, the *only* major Myrtle Beach event attracting predominantly African-American visitors. It creates a profoundly different, far more unpleasant environment for the predominantly African-American attendees of Black Bike Week than the one that Myrtle Beach offers its predominantly white visitors every other weekend of the year. Indeed, City officials have acknowledged that it is intended to have such an effect, in order to diminish interest in attending Black Bike Week.

Such a disproportionate impact based on race, "provide[s] an important starting point."[101]

---

[99] *Arlington Heights*, 429 U.S. at 266-68; *see Sylvia Dev. Corp. v. Calvert Cty., Md.*, 48 F.3d 810, 819 (4th Cir. 1995).
[100] *McCrory*, 831 F.3d at 233 ("Any individual piece of evidence can seem innocuous when viewed alone, but gains an entirely different meaning when considered in context.").
[101] *Arlington Heights*, 429 U.S. at 266.

"[T]he impact of an official action is often probative of why the action was taken in the first place since people usually intend the natural consequences of their actions."[102] Here, the "natural consequence[]" of imposing a highly disruptive traffic loop for the one weekend each year that sees predominantly African-American visitors is to discourage African-American tourism.

The loop dramatically degrades the Black Bike Week experience. Anyone headed to Ocean Boulevard, the hub of Black Bike Week festivities and where the majority of hotels in the area are located—and anyone seeking to leave—during loop hours must literally drive in a circle, in traffic moving extremely slowly, unable to get off except at a few select points. *On average*, it takes more than four hours for any driver forced into the loop to make it to the other end. Those unaware of the loop in advance, or who fail to adequately plan for it, suffer a nightmarish end to their evening, trapped in their cars or on their motorcycles for hours. Those with advance warning alter their plans to avoid it. Some turn in early, avoiding Ocean Boulevard (and much of Black Bike Week festivities) and confining themselves to their hotel rooms. Others stop attending Black Bike Week altogether. All of the mostly African-American participants are denied the typical Myrtle Beach evening experience available other weekends, including ready access to the City's restaurants, entertainment venues, and hotels.

There is no evidence to suggest that, other than their skin color, there is anything different about the visitors in town for Black Bike Week than those in town throughout the rest of the summer. The data shows that other summer weekends have the same or more people in town, and cars on the road.[103] Yet Myrtle Beach only employs the traffic loop only during the one weekend when predominantly white Myrtle Beach hosts predominantly African-American

---

[102] *Reno v. Bossier Par. Sch. Bd.*, 520 U.S. 471, 487 (1997).
[103] *See* Ex. 66 (Clarke Rep.) at 14-15 (discussing hotel occupancy rates); *id.* at 15-26 (discussing traffic counts); Ex. 4 (COC_000003-11) (estimating amounts of tourists in town).

attendees.[104] That creates the obvious inference that the City intends to offer that weekend's attendees a very different, inferior experience based at least in part on race.[105] City officials know they attract predominantly African-American attendees for Black Bike Week; that they are imposing a traffic plan for that weekend and no other; and that the loop makes the City dramatically less welcoming for that weekend's attendees. Where a public entity intentionally treats differently (and more harshly) a group that it knows is predominantly of one race, one can readily infer that race played some part in that decision.[106]

**2.  Myrtle Beach's 23-Mile Traffic Loop Is Just the Latest Iteration of a Long History of Discriminatory Treatment of Black Bike Week**

The City's 23-mile traffic loop is just the latest in a long series of official policies aimed (often explicitly) at disrupting Black Bike Week. "A historical pattern of laws producing discriminatory results provides important context for determining whether the same decisionmaking body has also enacted a law with discriminatory purpose."[107] Here, City officials have expressed hostility toward the event, and acted accordingly, since at least 1998, when officials imposed the first restrictive traffic plan. This Court found an earlier version of that plan to be likely based on intentional race discrimination.[108] Subsequent events have only confirmed that racial considerations have long influenced the City's hostile treatment of Black Bike Week.

The City's discriminatory treatment of Black Bike Week is as old as the event's presence

---

[104] Ex. 66 (Clarke Rep.) at 1; Ex. 10 (Pedersen Dep.) at 296:2-10 ("this is the only application of a loop").

[105] *See McCrory*, 831 F.3d at 230 (finding it probative that legislature "enacted legislation restricting all—and only—practices disproportionately used by African Americans").

[106] *See id.* at 225-26 (finding it relevant that North Carolina legislature, when taking actions it claimed were aimed at achieving partisan rather than racial results, "certainly knew" that race and party were highly correlated).

[107] *McCrory*, 831 F.3d at 223-24.

[108] Ex. 26 (2005 Op. & Order) at 13-15.

in Myrtle Beach. As the event expanded beyond Atlantic Beach and into Myrtle Beach in the

mid-1990s, the City's white leadership demonstrated animosity toward the event and openly

stated a desire to end it. The City's hostility toward Black Bike Week has been consistent in the

years since, expressed in a series of actions designed to disrupt the event. Indeed, even as they

defend their *current* policy, today's City officials acknowledge that their *past*, yet related,

policies for the event have been problematic.

For example, former Mayor Mark McBride set the tone for racially charged and

unnecessarily aggressive policing of Black Bike Week, lobbying the state of South Carolina to

deploy the National Guard to Myrtle Beach for Memorial Day weekend. Thomas Leath, who

later would become city manager, testified that he opposed that request precisely because he was

concerned about its obvious racial overtones.[109] That plan was abandoned, but the City instead

introduced a restrictive traffic plan that was only implemented during Black Bike Week.

After that plan was found likely unconstitutional, the City entered a settlement agreement

precluding it from imposing different traffic patterns for Black Bike Week and the comparable

Harley Week. While that settlement was in place, the City was unable to target Black Bike

Week, so instead it passed a series of ordinances heavily regulating both Harley Week and Black

Bike Week. Soon after the settlement ended, the City imposed the Black Bike Week-only

restrictions at issue in this lawsuit. And they tried to go further: Once again seeking to call in the

National Guard, the same step that Leath earlier opposed because of its racial connotations.[110]

The traffic loop thus must be viewed as the latest shot in a long-running war that the City

has fought against Black Bike Week. That larger context reveals that, at every step, the City and

---

[109] Ex. 3 (Leath 2019 Dep.) at 254:23-55:8, 265:12-22.
[110] Ex. 10 (Pedersen Dep.) at 342:17-44:19 (noting that Pedersen never considered asking the National Guard to be present for any other event or weekend in the City of Myrtle Beach).

its residents have overreacted to any violent crime that happens to occur during Black Bike Week and used it as a reason to curtail an event that they always barely tolerated.[111] It confirms that race has always lurked just below the surface of the City's Black Bike Week policies.

As former Police Chief Warren Gall acknowledged, Black Bike Week has always engendered an "unexplained fear" among many of Myrtle Beach's citizens, who "assign[] certain types of behaviors to the event and based upon race that had no basis of fact."[112] That history frames the consideration of whether race plays some part in the imposition of the present loop.

### 3. The Sequence of Events Leading Up to the Enactment and Continued Use of the 23-Mile Loop Suggests Discriminatory Intent

Against that historical background, City officials imposed the 23-mile loop on Black Bike Week beginning in 2015. The "process" by which they made this decision—and have continued to impose it—confirms that the loop's purpose has never been, as City officials now contend, about traffic and emergency response issues. Rather, the loop has always been intended to diminish or shut down the event, and to prevent attendees from having full access to the City.

During Memorial Day weekend 2014, three people were killed in a shooting at a hotel on Ocean Boulevard. No evidence links these shootings to Black Bike Week, nor is it unusual for such crime to occur in Myrtle Beach. Nonetheless, many blamed the event on Black Bike Week, and called on the City to end Black Bike Week using barely veiled racial language.[113] City officials responded by looking for ways to shut Black Bike Week down or greatly reduce its attendance. As Pedersen stated, the goal was to "suck the fun completely out of the event."[114]

---

[111] *See* Ex. 9 (Gallagher Rep.) at 14-15, 19-20 (discussing the overestimation of "danger" and the impact of racial stereotyping in the City's focus on crime during Black Bike Week).
[112] Ex. 30 (Gall Dep.) at 68:14-70:6; *see also* Ex. 43 (Kruea Dep.) at 150:15-151:8, 152:12-21, 153:9-154:1 (recognizes racial undertones in emails).
[113] *See infra* Factual Background Sec. II.
[114] Ex. 10 (Pedersen Dep.) at 188:19-89:8; Ex. 52 (DEF00015624).

Thus, the traffic loop was formulated as part of an effort to discourage people from attending and enjoying Black Bike Week; unsurprisingly, it has had exactly those effects. Further illuminating the City's intentions is its failure to seriously study whether the loop reasonably accomplishes legitimate ends. Before enacting the loop, the City conducted no meaningful analysis of traffic demand, how the loop would affect traffic flow, emergency response times, or whether other, less intrusive means would accomplish legitimate purposes. Since then, the City has made no serious attempts to measure the loop's effects, notwithstanding public complaints (and this lawsuit). The first use of the data it had in its possession was in response to Plaintiffs' first motion for preliminary injunction—and their analysis, on its face, did not show the loop was effective at forwarding their recently identified goals.

Rather than acknowledging the loop's actual, severely detrimental effects on Black Bike Week visitors, City officials insist—despite overwhelming evidence to the contrary—that such effects do not exist. Nor are they willing to consider alternatives that would meet their ostensible goals or otherwise reconsider their decision to institute a 23-mile loop based on new evidence.

The obvious inference is that the City is content with the traffic loop's actual, discriminatory results and unconcerned about whether it accomplishes its purported purposes, strongly suggesting that those stated reasons are pretextual.[115] Moreover, City officials' reliance on their own subjective "observations" rather than readily available, objective data that could better inform their own purported reasoning is itself suggestive of discriminatory intent.[116]

---

[115] *See Smith v. Town of Clarkton, N.C.*, 682 F.2d 1055, 1065 (4th Cir. 1982) (that town's "alleged interests" were "almost wholly pretextual" suggested discriminatory intent).

[116] *See supra* Factual Background Sec. IV; *cf. Garrett v. Hewlett-Packard Co.*, 305 F.3d 1210, 1217 (10th Cir. 2002) (in employment, excessive use of subjective criteria is indicia of pretext); *Bell v. Bolger*, 708 F.2d 1312, 1319-20 (8th Cir. 1983) ("subjective promotion procedures are to be closely scrutinized because of their susceptibility to discriminatory abuse.").

### 4.     Statements Made By and To Officials Regarding Black Bike Week Suggest Discriminatory Intent

Statements made by and to City officials regarding the purported need for the traffic loop further demonstrate that racial considerations infected their decision-making. Myrtle Beach residents and tourists put heavy pressure on City officials to find a way to shut down Black Bike Week because of their virulent distaste for the people attending the event. Many of their statements used language that has clear racial overtones. For example, both before and after the 2014 shootings that purportedly justify the traffic loop, complaints were made to City officials describing the predominantly black crowd as criminals and criticizing the influx of black music, culture, and bodies entering their predominantly white space.[117]

As courts have recognized and the expert report of Professor Charles Gallagher has explained, references to "crime" and "loud music" and "values" are clear code words for race.[118] Such comments do not have to "use[] explicitly racial language" for their racial connotations to be apparent.[119] That these statements were made by residents to City officials, rather than by City officials themselves, makes them no less relevant. Myrtle Beach officials stay "well plugged into [their] citizens" in formulating policy and "hear from them oftentimes about what the citizens are concerned about."[120] The loop was, at least in part, a "response to the vocal and

---

[117] *See supra* Factual Background Secs. I, II.

[118] *See, e.g.*, *Greater New Orleans Fair Hous. Action Ctr. v. St. Bernard Par.*, 648 F. Supp. 2d 805, 812 (E.D. La. 2009); Ex. 9 (Gallagher Rep.) at 7-8 (noting that 50% of whites rate blacks as more prone to violence than whites, and describing how the "stereotypes of blacks as criminals is widely known and is deeply embedded in the collective consciousness of Americans, irrespective of level of prejudice or personal beliefs") (internal quotation marks omitted).

[119] *Mhany Mgmt., Inc. v. Cty. of Nassau*, 819 F.3d 581, 608-09 (2d Cir. 2016) (stated concern that zoning change would alter city's "flavor" and "character" were "code words for racial animus"); *Smith*, 682 F.2d at 1066 (pointing to "camouflaged racial expressions") (internal quotation marks omitted).

[120] Ex. 10 (Pedersen Dep.) at 30:14-31:7; *see id.* at 32:11-34:4 (describing City's processes for ensuring city council is informed of public opinion).

27

racially influenced opposition" to Black Bike Week by constituents.[121] "Private biases may be outside the reach of the law, but the law cannot, directly or indirectly, give them effect."[122]

Moreover, as described above, City officials have made similar statements throughout Black Bike Week's history, confirming that (like their constituents) they understand the traffic loop's purpose to be opposing the event and trying to diminish it or eliminate it altogether. Asked whether his goal was to discourage people from attending Black Bike Week, Pedersen answered that Black Bike Week "would be a more safe event if there were fewer participants involved" and acknowledged the City would prefer not to host it.[123] City officials regularly exaggerate the number of Black Bike Week attendees and the attendant crime,[124] further confirming that their perceptions and actions are colored by race.[125]

Not only do these statements make clear the extent to which racially-tinged views of the event's attendees influenced official decision-making, they also confirm that city officials

---

[121] *Mhany*, 819 F.3d at 606.

[122] *Id.* (quoting *Palmore v. Sidoti*, 466 U.S. 429, 433 (1984)); *Innovative Health Sys., Inc. v. City of White Plains*, 117 F.3d 37, 49 (2d Cir. 1997) ("[A] decision made in the context of strong, discriminatory opposition becomes tainted with discriminatory intent even if the decisionmakers personally have no strong views on the matter."); *Marks v. City of Chesapeake, Va.*, 883 F.2d 308, 312 (4th Cir. 1989) (zoning denied application in part because of religious prejudice expressed by members of the public); *Smith*, 682 F.2d at 1065 (evidence indicated that town officials' action "resulted directly from the community's deeply-felt, intentional, invidious racial animus").

[123] Ex. 10 (Pedersen Dep.) at 182:2-21.

[124] *Id.* at 138:17-40:15; Ex. 30 (Gall Dep.) at 144:24-47:2 (discussing the "sheer numbers and the sheer numbers of [criminal] violations" during Memorial Day weekend); *see also* Ex. 79 (Lazarus Dep.) at 113:1-9 (Horry County official claiming that there are 500 people in town during Black Bike Week for each person in town during other summer weekends).

[125] *See Doe v. Vill. of Mamaroneck*, 462 F. Supp. 2d 520, 549 (S.D.N.Y. 2006) (finding it relevant to discriminatory intent that town officials "stigmatized the day laborers in repeated public pronouncements, grossly exaggerating their numbers, asserting—without any basis in fact—that they were not residents of the Village and accusing them—again without any basis in fact—of engaging in criminal and disorderly conduct"); *see also* Ex. 9 (Gallagher Rep.) at 12-15 (explaining the tendency of whites to over-count the size of African-American populations and to feel threatened by increasing African-American group size).

28

intended the 23-mile loop to have exactly the result it has had: not to improve traffic flow, not to combat crime, but to drive Black Bike Week visitors out. As the leader of the Downtown Redevelopment Commission wrote (in a message that was circulated to all city council members), after walking through options that included closing streets and increasing police presence: "The bottom line is that we MUST make it very UNCOMFORTABLE for them to be here."[126] Myrtle Beach's residents and officials thus understood quite well what the City now tries to deny: the 23-mile traffic loop is designed to suppress attendance at, and ultimately eliminate altogether, the one major event each year that attracts a predominantly black crowd.[127]

### 5.    The 23-Mile Traffic Loop Significantly Departs From How Myrtle Beach Treats Other Large Gatherings

Another *Arlington Heights* factor that suggests discriminatory intent here is deviation from how the same policymakers usually act in comparable situations, "particularly if the factors usually considered important by the decisionmaker strongly favor a decision contrary to the one reached." That describes the situation here.

Black Bike Week is just one of many large gatherings that come to Myrtle Beach each year, yet it is the only one for which the City feels the need to impose a 23-mile traffic loop. No other major, predominantly white event has ever been subject to such restrictions. The City has declared Black Bike Week an "extraordinary event" to justify its extraordinary treatment, but has offered no rationale as to why Black Bike Week alone warrants this designation, even as Harley

---

[126] Ex. 51 (DEF00705357).

[127] The City's primary source of outside information were the opinions of other law enforcement officers from jurisdictions where large African-American events took place, with a focus on what techniques had been used to discourage attendance at those events. Ex. 30 (Gall Dep.) at 164:5-20, 229:10-31:16; Ex. 3 (Leath 2019 Dep.) at 239:11-42:24.

Week and other events have drawn comparable numbers of people to the area.[128]

While Black Bike Week has repeatedly been subjected to a restrictive traffic plan and an overwhelming police presence, events attended by majority-white crowds have not received such treatment. Other events, instead, receive traffic plans more precisely targeted to the actual traffic concerns they raise, not seriously hindering attendees' enjoyment of the events. For example, the City closes a portion of Ocean Boulevard for the Carolina Country Music Festival (the audience actually stands on Ocean Boulevard) and posts officers to keep traffic on a designated through street.[129] It does not institute a traffic loop to keep attendees and other drivers from passing through the City altogether, even though average response times are higher during other busy weekends than those for Memorial Day weekend.[130]

Plaintiffs' experts all concluded that there is no legitimate justification for this difference in treatment.[131] The City, meanwhile, has offered no valid justification for the glaring differences in treatment and has repeatedly refused to reconsider its approach.[132] Indeed, Mitchell Brown and Willie Williams, Plaintiffs' experts and retired police chiefs, concluded that the City's imposition of the 23-mile loop "could only have been designed to frustrate motorists and discourage potential visitors from traveling to the area."[133]

Put simply, the City's loop demonstrates (to put it charitably) utter indifference to whether attendees of Black Bike Week have a pleasant experience. This attitude is at odds with

---

[128] *See supra* Factual Background Sec. IV; Ex. 66 (Clarke Rep.) at 14-15 (occupancy rates not higher for Memorial Day weekend); *id.* at 15-18 (traffic counts not higher for Memorial Day weekend).

[129] *See* Ex. 10 (Pedersen Dep.) at 148:22-51:16.

[130] *See supra* Factual Background Sec. IV.

[131] Ex. 66 (Clarke Rep.) at 38-41; Ex. 80 (Brown & Williams Rep.) at 8-9; Ex. 9 (Gallagher Rep.) at 19-21.

[132] *See supra* Factual Background Sec. IV.

[133] Ex. 80 (Brown & Williams Rep.) at 13.

the City's normal, hospitable approach to visitors (as befits a tourist town). A governmental

entity's departure "from values it would normally prioritize," without reasoned explanation,

contributes to the inference that the race of the affected people played a role in the policy.[134]

*     *     *     *     *

Plaintiffs are likely to establish by a preponderance of the evidence that race played *some*

role in the City's inexplicable imposition of a traffic loop that frustrates the attendees of Black

Bike Week and serves no obvious purpose. The decision to impose this otherwise irrational loop

on Black Bike Week, and no other event, speaks for itself, while comments by residents, tourists,

and City officials confirm that the traffic loop is meant to have discriminatory results.

As Professor Gallagher explains, the City's conduct suggests Myrtle Beach—a

traditionally "white" community—does not want to be racially "branded" as "a black

destination" for Memorial Day weekend.[135] Uncomfortable with sharing space with a large

number of African-American visitors, City officials and residents overestimate the number of

Black Bike Week visitors, exaggerate their criminality, and otherwise act irrationally and

fearfully towards them. Their insistence that Black Bike Week draws the biggest crowd of the

year and causes unusual traffic problems when the data show otherwise is consistent with

sociological research establishing that African Americans can become hypervisible to whites

living in racially segregated areas, making groups of African Americans "seem larger and more

---

[134] *See Cent. Ala. Fair Hous. Ctr. v. Magee*, 835 F. Supp. 2d 1165, 1188-89 (M.D. Ala. 2011), *vacated as moot*, 2013 WL 2372302 (11th Cir. May 17, 2013); *Arlington Heights*, 429 U.S. at 267 (finding it relevant if "the factors usually considered important by the decisionmaker strongly favor a decision contrary to the one reached").
[135] Ex. 9 (Gallagher Rep.) at 18-19.

menacing."[136] Given these common unconscious biases, the City's refusal to review and rely on objective data amounts to a surrender to racial prejudice. The *evidence* establishes that racial considerations underpin the decision to implement and maintain the 23-mile loop.

### B.    The City Cannot Meet Its Burden of Establishing That It Would Have Enacted and Continued the 23-Mile Loop Regardless of Race

Because Plaintiffs have established that race played some part in the City's decision to enact a 23-mile traffic loop applicable only to Black Bike Week, the burden shifts to the City to show that it would follow the same policy regardless of consideration of race. It cannot come close to making that showing, given the extreme disconnect between its stated reasons and the actual evidence regarding the traffic loop's effects.

Once plaintiffs establish that race played some role in the challenged action, this Court "must scrutinize the [defendant's] *actual* non-racial motivations to determine whether they *alone* can justify the [defendant's] choices."[137] As part of this inquiry, the court must "consider[] the substantiality of the state's proffered non-racial interest and how well the law furthers that interest."[138] It is insufficient that the reasons proffered are "plausible" or "not unreasonable"; the defendant must establish that they actually justify the action taken, without regard to race.[139]

Here, there is no evidence that the 23-mile traffic loop furthers the City's proffered interests in public safety and improved traffic flow *at all*, much less to a degree that warrants such disruption to the experience of attending the one major African-American event that comes to the City each year. Rather, the loop is a "solution[] in search of a problem" to solve, leaving

---

[136] *Id.* at 12-13 (internal quotation marks omitted). For example, Professor Gallagher discusses how the average American estimated that the percentage of the black population in the United States is three times larger than it actually is. *Id.*
[137] *McCrory*, 831 F.3d at 221 (emphasis added).
[138] *Id.* at 233-34.
[139] *Id.* at 234 (internal citation and quotation marks omitted).

the obvious inference that the true "problem" it solves is having a large number of African-American attendees mixing with a predominantly white city.[140]

There was no basis for the City's original justification for the imposition of the 23-mile loop—to stop people from coming to Myrtle Beach for this event. And there is similarly no basis now for the City's post hoc, conclusory assertions that the loop somehow improves traffic congestion and emergency vehicle response times; to the contrary, the evidence overwhelmingly establishes that the loop only *increases* traffic congestion and has no significant impact on response times. In the opinion of both Chiefs Brown and Williams and traffic expert Dr. Clarke, the traffic plan serves no useful purpose, does not enhance safety or traffic control, and instead degrades traffic flow.[141]

As Dr. Clarke explains, Myrtle Beach did not design the traffic loop by reference to established best practices for managing traffic flow during large public events that rely on open roads, such as motorcycle rallies.[142] Instead, the City designed the traffic loop by reference to practices for very different, more closed events such as presidential inaugurations or major sports events, *i.e.*, where traffic logically is funneled to one place and "security tends to outweigh inconvenience to the non-attendee public."[143] Thus, by its very design, the traffic loop *degrades* the experience of being on the road rather than *enhancing* it.

The only purpose served by such a long loop around the city (rather than one cutting through the city) is to "discourag[e] travel to the City of Myrtle Beach and along Ocean Boulevard,"[144]—a motive that Myrtle Beach has denied but is apparent from its actions,

---

[140] *See id.* at 238.
[141] Ex. 66 (Clarke Rep.) at 38-41; Ex. 80 (Brown & Williams Rep.) at 13.
[142] *See* Ex. 66 (Clarke Rep.) at 9, 11-12.
[143] *Id.* at 12.
[144] *Id.* at 28.

including the original attempt to impose an even longer, 40-mile loop. The only explanation City officials have provided—that they do not want Black Bike Week traffic directed to city streets other than Ocean Boulevard—simply restates their discriminatory intent to prevent the predominantly African-American attendees from mixing closely with white residents rather than justifying it. No other event's attendees cause the City to shunt traffic out of town in this manner.

Not only is the traffic loop ill-suited to solve the supposed "problem," but there is no evidence any unique traffic "problem" exists. Black Bike Week draws crowds and traffic to Myrtle Beach, but no more so than other events, such as July 4th, when such a traffic plan is not used.[145] Indeed, even if the City could justify its 2015 decision to *institute* the traffic loop by virtue of large crowds, it acknowledges Black Bike Week's size has declined since then, leaving no basis for the City to *continue* imposing the traffic loop on a diminished event.[146] And to the extent the City's ability to defend the need for the loop suffers from the lack of hard data, that is the consequence of the City's own refusal to gather and analyze such data about Black Bike Week traffic, before and after it instituted the loop.

Nebulous concerns about "traffic" are often cited to justify actions with discriminatory racial effect, and courts regularly find them insufficient where, as here, no evidence indicates that the challenged action actually serves that interest.[147] Indeed, in previous litigation regarding

---

[145] *See id.* at 14 (occupancy rates are lower on Memorial Day weekend than at least one summer weekend every year from 2012-2018); *id.* at 16-17 (at every traffic counter in the area, other weekends have higher traffic counts than Memorial Day weekend); *id.* at 18 (attendance and traffic little different from "other peak weekends").

[146] *See* Ex. 10 (Pedersen Dep.) at 139:5-40:6 (acknowledging "significant reduction in the number of individuals attending").

[147] *See, e.g.*, *Mhany*, 819 F.3d at 613-14 (finding that purported concern about traffic could not justify zoning decision where the defendant could not establish that its action actually would reduce traffic by any significant amount); *Fla. State Conference of NAACP Branches v. City of Daytona Beach, Fla.*, 54 F. Supp. 2d 1283, 1289 (M.D. Fla. 1999) (finding purported concern

a similar traffic plan, the City was found not to have made a showing that its plan for Black Bike

Week "clearly reduces congestion or is more accessible to emergency vehicles."[148]

## II.    Plaintiffs Will Suffer Irreparable Harm If Relief Is Not Granted

In order to obtain preliminary injunctive relief, Plaintiffs must show that they are "likely

to suffer irreparable harm in the absence of preliminary relief."[149] The City intends to use the

traffic loop again this year, which will inflict hardship on Plaintiffs and other Black Bike Week

attendees, reducing enjoyment of the event for those who attend and discouraging others from

attending altogether.

The traffic loop effectively traps attendees in or near their hotels in the evening, because

getting back to the hotel by car will be so arduous. For example, Simuel Jones plans his entire

weekend around avoiding being caught in the loop, after being trapped for three hours trying to

get from a restaurant to his hotel.[150] Similarly, Cedric and Leslie Stevenson declined to venture

beyond walking distance from their hotel in the evening to avoid being trapped in the loop for

hours with Leslie's 70-year-old mother.[151] Thus, if not enjoined, the loop will seriously disrupt

Plaintiffs' enjoyment of Black Bike Week.

Indeed, long-time Black Bike Week attendees like William McNeill intend to stop

attending the event altogether because the loop makes it so unpleasant.[152] Black Bike Week has

suffered diminishing attendance, as the City's loop makes it far less enjoyable, and some

---

about "congestion that jeopardize[d] public safety" too "vague") (internal quotation marks
omitted).
[148] Ex. 26 (2005 Op. & Order) at 12.
[149] *Centro Tepeyac*, 722 F.3d at 188 (internal citation and quotation marks omitted).
[150] Ex. 11 (Jones Decl.) ¶¶ 12-16.
[151] Ex. 73 (C. Stevenson Decl.) ¶ 15; Ex. 74 (L. Stevenson Decl.) ¶ 9.
[152] Ex. 16 (McNeill Decl.) ¶ 13 (no longer plans to attend Black Bike Week after roughly twenty
years).

Plaintiffs are among those reconsidering attendance.[153] This constitutes serious, irreparable harm

for the many Black Bike Week attendees, including some Plaintiffs, who have regularly attended

the event for decades.[154] Attendance at Black Bike Week for them is not a one-time event, but a

treasured, unique, and long-standing cultural tradition; that they would seriously consider not

attending illustrates just how much the City's traffic plan has degraded that cherished experience.

For Plaintiffs and others who are deeply invested in the Black Bike Week community,

this threatened deprivation risks real, irreparable, and difficult-to-quantify harm. Irreparable

harm "is suffered when monetary damages are difficult to ascertain or are inadequate."[155] While

the harm to Plaintiffs may ultimately merit damages relief as well, quantifying their losses is not

"'a matter of simple mathematic calculation,'" making preliminary injunctive relief

appropriate.[156] Moreover, the nature of the harm here "creates the possibility of permanent loss,"

*i.e.*, harm that is truly irreparable.[157] Applying these principles, companies regularly obtain

injunctive relief to block actions that would cost them customers or good-will, irreparable

---

[153] Ex. 10 (Pedersen Dep.) at 139:5-140:6; *see, e.g.*, Ex. 81 (Kinard Decl.) ¶¶ 3-4; Ex. 82 (Lassiter Decl.) ¶¶ 4-5.

[154] Ex. 72 (N. Briggs Decl.) ¶ 3 (attended every year since the early 1980s); Ex. 12 (Johnson Decl.) ¶ 6 (attended every year since 1996); Ex. 71 (Coleman Decl.) ¶ 3 (attended every year for over a decade); Ex. 11 (Jones Decl.) ¶ 5 (attended every year since 2002).

[155] *Multi-Channel TV Cable Co. v. Charlottesville Quality Cable Operating Co.*, 22 F.3d 546, 551 (4th Cir. 1994) (internal citation omitted), *abrogated on other grounds by Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7 (2008); *see also Superior Performers, Inc. v. Meaike*, No. 1:13CV1149, 2014 WL 1412434, at *14 (M.D.N.C. Apr. 11, 2014).

[156] *Multi-Channel TV Cable Co.*, 22 F.3d at 552 (internal citation omitted); *see also Basicomputer Corp. v. Scott*, 973 F.2d 507, 511 (6th Cir. 1992) ("an injury is not *fully* compensable by money damages if the nature of the plaintiff's loss would make damages difficult to calculate") (emphasis added) (internal citation omitted); *NAACP-Greensboro Branch v. Guilford Cty. Bd. of Elections*, 858 F. Supp. 2d 516, 526 (M.D.N.C. 2012).

[157] *Multi-Channel TV Cable Co.*, 22 F.3d at 552 (internal citation omitted).

injuries that could be compensated by damages in *some* part but not fully.[158] Comparable harm is threatened here.

Moreover, the constitutional violations the loop is likely to inflict are deemed irreparable injury as a matter of law.[159] The City's decision to treat Black Bike Week differently because it brings large groups of African-American individuals to Myrtle Beach violates Plaintiffs' constitutional right to equal protection, which "unquestionably" constitutes irreparable injury.[160]

## III.   The Balance of the Equities and the Public Interest Favor the Granting of a Preliminary Injunction

Plaintiffs must also demonstrate that the balance of equities "tips" in their favor and that the granting of a preliminary injunction is in the public interest.[161] Here, the equities clearly tip in favor of Plaintiffs, who will suffer discrimination, humiliation, inconvenience, and constitutional injury if the City is permitted to put its discriminatory traffic loop in place for another year.

The City, by contrast, will not be harmed by such an injunction, because there is no evidence that the traffic loop actually serves any legitimate interest. Indeed, to the extent it ever becomes necessary, the City could also use the flush plan it formulated last spring in the event

---

[158] *See, e.g.*, *id.* at 552; *BellSouth Telecomms., Inc. v. MCIMetro Access Transmission Servs., LLC*, 425 F.3d 964, 970 (11th Cir. 2005); *Basicomputer Corp.*, 973 F.2d at 511-12; *Superior Performers, Inc.*, 2014 WL 1412434, at *14.

[159] *See Ross v. Meese*, 818 F.2d 1132, 1135 (4th Cir. 1987); *Jackson v. City of Aiken Hous. Auth.*, No. 1:16-cv-02831-JMC, 2016 WL 7228242, at *5 (D.S.C. Dec. 14, 2016) (granting preliminary injunction where plaintiff had raised claims under the due process clause and section 1983); *Poindexter v. Strach*, 324 F. Supp. 3d 625, 634 (E.D.N.C. 2018).

[160] *Giovani Carandola, Ltd. v. Bason*, 303 F.3d 507, 520-21 (4th Cir. 2002) (internal citation and quotation marks omitted); *see also Gordon v. Holder*, 721 F.3d 638, 653 (D.C. Cir. 2013) ("prospective violation of a constitutional right constitutes irreparable injury") (internal citation and quotation marks omitted).

[161] *Centro Tepeyac*, 722 F. 3d at 188, 191-92.

that the Court granted Plaintiffs' initial preliminary injunction motion.[162] Moreover, there is no

public interest in continuing a likely unconstitutional practice.[163]

## CONCLUSION

For the reasons set forth above, Plaintiffs' Motion for Preliminary Injunction should be

granted.


DATED: February 22, 2019                    /s/ Peter Wilborn
                                            D. Peters Wilborn, Jr. (ID #7609)
                                            Law Office of Peter Wilborn
                                            57 Cannon Street
                                            Charleston, SC 29403
                                            (843) 416-9060
                                            peter@bikelaw.com

                                            Reed N. Colfax
                                            Tara K. Ramchandani
                                            Laura Gaztambide-Arandes
                                            Angela A. Groves
                                            Relman, Dane & Colfax, PLLC
                                            1225 19th Street, N.W., Suite 600
                                            Washington, D.C. 20036
                                            (202) 728-1888
                                            rcolfax@relmanlaw.com
                                            tramchandani@relmanlaw.com
                                            larandes@relmanlaw.com
                                            agroves@relmanlaw.com

                                            Khyla D. Craine
                                            National Association for the Advancement of
                                            Colored People, Inc.
                                            4805 Mt. Hope Drive
                                            Baltimore, MD 21215

---

[162] Ex. 83 (SCDNR_001588) ("MBPD has a backup plan if the 'loop' is over thrown by the court decision. Plan B is to 'flush' the boulevard as they have in the past. Additional officers should not be needed").

[163] *See Centro Tepeyac*, 722 F. 3d at 191-92 ("a state is in no way harmed by issuance of a preliminary injunction which prevents the state from enforcing restrictions likely to be found unconstitutional. If anything, the system is improved by such an injunction.") (internal quotation marks omitted).

(410) 580-5777
kcraine@naacpnet.org

Dorian L. Spence
Maryum Jordan
Lawyers' Committee for Civil Rights Under Law
1401 New York Avenue, NW, Suite 400
Washington, DC 20005
(202) 662-8600
dspence@lawyerscommittee.org
mjordan@lawyerscommittee.org

*Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that on February 22, 2019, a copy of the foregoing Motion for Preliminary Injunction was filed and served on all counsel of record using the Court's CM/ECF system.

/s/ Peter Wilborn
Peter Wilborn