IN THE UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
FLORENCE DIVISION

| | |
|---|---|
| NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE, INC., *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> CITY OF MYRTLE BEACH, *et al.*, <br><br> Defendants. | Civil Action No. 4:18-cv-00554-MGL |

**PLAINTIFFS' REPLY BRIEF IN FURTHER SUPPORT OF MOTION FOR
<u>PRELIMINARY INJUNCTION</u>**

# **TABLE OF CONTENTS**

ARGUMENT ................................................................................................................................... 2

I.     Defendants Fail to Meet Their Burden of Demonstrating That the Traffic Loop Actually Furthers Their Purported Justifications, Which Are All Post Hoc ....................................... 2

II.    Defendants Offer No Meaningful Evidence or Argument Regarding Proper Application of the Arlington Heights Factors ............................................................................................ 9

III.   Plaintiffs Will Suffer Irreparable Harm If Relief Is Not Granted ....................................... 14

IV.    The Balance of the Equities and the Public Interest Favor the Granting of a Preliminary Injunction ............................................................................................................................ 14

CONCLUSION ............................................................................................................................. 15

Plaintiffs ask for carefully targeted relief: an injunction barring Defendants from altering the Black Bike Week traffic plan at 10 p.m. to impose a 23-mile traffic loop that accomplishes nothing productive while imposing misery on those unlucky enough to be caught in it.

Defendants argue that the traffic loop alleviates traffic congestion. But no evidence shows unusually heavy congestion beginning at 10 p.m. during Black Bike Week compared to any number of other busy summer weekends in the resort town or, for that matter, prior to 10 p.m. during Black Bike Week. Nor does any evidence show that the loop improves such congestion. And Defendants offer no other evidence that establishes that their purported non-racial motivations for implementing the loop actually justify it, as the law requires.[1]

Defendants offer little argument or evidence responsive to Plaintiffs' Motion for Preliminary Injunction. Instead, they treat the Motion as though it were the one Judge Quattlebaum denied last year, though Plaintiffs now offer very different arguments and evidence.[2] They argue at length that Black Bike Week and Harley Week are not similarly situated, though Plaintiffs' Motion does not depend on a showing that they are. And they offer evidence and argument defending aspects of their traffic plan (such as making Ocean Boulevard one way) not at issue here. In short, rather than opposing Plaintiffs' actual Motion, Defendants focus elsewhere. That is because the evidence is clear: the traffic loop never responded to any legitimate problem, but rather emerged from a decision-making process infused with racially tinged, irrational panic about Black Bike Week as a way to direct Black Bike Week traffic out of the city and make attending the event unpleasant. That is its intent, and that is its effect.

---

[1] *N.C. State Conference of NAACP v. McCrory*, 831 F.3d 204, 221, 234 (4th Cir. 2016).
[2] *See, e.g.*, Defs.' Br. at 1 (asking this Court to deny Plaintiffs' Motion "[f]or the reasons stated in Judge Quattlebaum's order"); *id.* at 2 ("Plaintiffs do not present any evidence or arguments that are substantially different from those presented to Judge Quattlebaum."); *id.* at 15 (pointing to Judge Quattlebaum's application of *Arlington Heights*).

1

As a preliminary matter, Defendants incorrectly contend that Plaintiffs seek a mandatory injunction.[3] The order requested would not require Defendants to do *anything*, much less "assume control of existing traffic control strategies."[4] Rather, Plaintiffs seek targeted injunctive relief that merely would *prevent* Defendants from taking a specific action at 10 p.m. on the first night of Black Bike Week—putting the loop into effect—that would change the status quo that otherwise prevails. The City's traffic plan and other special safety measures that are in place throughout the rest of Black Bike Week would remain, thus *preserving* the status quo.[5]

## ARGUMENT

### I.   Defendants Fail to Meet Their Burden of Demonstrating That the Traffic Loop Actually Furthers Their Purported Justifications, Which Are All Post Hoc

Defendants use most of their opposition trying to show that the traffic loop serves its supposed goals, but they do not come close to making that showing. Instead, their opposition simply reaffirms the poor fit between the traffic loop's actual effects and the story the City now tells about its purposes (based primarily on evidence generated after this litigation began). In ascertaining the intent behind a challenged action, courts look to what defendants said and knew contemporaneously, not whether defendants can conjure up reasonable-seeming post hoc justifications once sued.[6] And here Defendants cannot even do that.

Defendants argue that the loop is necessary to prevent traffic problems in two ways: first,

---

[3] *See* Defs.' Br. at 8-9.
[4] *Id.* at 8.
[5] *See Pashby v. Delia*, 709 F.3d 307, 320 (4th Cir. 2013) (prohibitory injunction seeks to maintain the "last uncontested status between the parties which preceded the controversy") (citation omitted).
[6] *See, e.g.*, *United States v. Virginia*, 518 U.S. 515, 533 (1996) ("The justification must be genuine, not hypothesized or invented *post hoc* in response to litigation."); *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 647 n.2 (4th Cir. 2002) (jury can find defendant's explanation for employment decision insufficient if it was "a post hoc justification of a decision made on other grounds").

to "keep traffic moving" on Ocean Boulevard, and second, to prevent people leaving Black Bike Week festivities on Ocean Boulevard from driving through residential areas of Myrtle Beach and surrounding jurisdictions—as the Defendants frame it, to "keep traffic on Ocean Boulevard from being dumped back into the City" or "dumped into residential areas located outside of the City."[7] But whereas Plaintiffs introduced objective data demonstrating that the loop *degrades* traffic flow,[8] Defendants introduce no real evidence at all supporting their contrary contention. They rely, instead, on conclusory assertions that loop plans "have been successful" elsewhere and general citations to expert reports that primarily address *other* topics and do not contain *any* analysis that shows that the traffic loop facilitates traffic flow during Black Bike Week evenings.

Drs. Alpert and McClean did not attempt to measure traffic congestion, let alone what effects the loop might have on it, and their report contains no analysis pointing to the need for traffic or safety-related measures specific to the loop hours from 10 p.m. to 2 a.m.[9] They find more motor vehicles in the Myrtle Beach area during Black Bike Week than Harley Week,[10] but that does not mean either that there is intolerable congestion or that the loop will alleviate it. And Alpert and McClean only counted motor vehicles on those two weekends, notwithstanding that other summer weekends get a high volume of visitors.[11] Thus, their report does not even establish that Black Bike Week sees a uniquely high number of motor vehicles. Their report, like

---

[7] Defs.' Br. at 7.
[8] *See* Pls.' Br. at 33 (citing Pls.' Br. Ex. 66 (Clarke Rep.) at 38-41).
[9] Defs.' Br. Ex. 27 (Alpert and McClean Rep.) at 5 (tbls. 1 and 2), 9 (tbl. 3), and 15 (tbls. 6 and 7).
[10] *See id.* (Alpert and McClean Rep.) at 24.
[11] Pls.' Br. Ex. 66 (Clarke Rep.) at 14 (discussing occupancy data throughout the summer); Ex. 1 (Holoman Dep.) at 39:24-41:1 (noting that summer weekends are busy in Myrtle Beach, and when people visit Myrtle during the summer, they stay in hotels on Ocean Boulevard); Ex. 2 (Smith Dep.) at 187:13-189:4 (observing that July 4th is a busy summer weekend where lots of people hang out on Ocean Boulevard); Ex. 3 (Berry Dep.) at 179:23-180:4 (Ocean Boulevard is the hub of the area in terms of hotels and accommodations).

much of Defendants' brief, seems designed to refute an argument that Plaintiffs do not rely on in this Motion—that Black Bike Week is similarly situated to Harley Week—rather than showing that anything beneficial happens when the loop goes into effect at 10 p.m.[12]

Chief Stewart, meanwhile, opines in conclusory fashion that a "'loop' traffic pattern during 'peak' evening and night times . . . is necessary for the safe movement of the motoring public along Ocean Boulevard."[13] However, his report—which otherwise barely mentions the loop—provides no basis for this conclusion and does not explain how he reached it. Most of it is based on his personal observations of Black Bike Week, but he observed the loop route only during the afternoon, not during loop hours.[14]

Mr. Teague's report also barely mentions the 23-mile loop, as opposed to other traffic plan components not at issue. It does not assess the functioning of the loop or any other aspect of the traffic plan in practice, but only the reasonableness of the City's written policy.[15] Mr. Teague's conclusions are not based on observations made at Black Bike Week, or for that matter any other busy summer weekend in Myrtle Beach.[16] Put simply, he *assumes* the very facts that Defendants rely on his report to *prove*—that there is unique congestion to be mitigated, that it occurs in areas that impede access to resources such that the loop might be justified, that the loop actually mitigates that congestion, and that the City actually enacted the loop for that reason.

In sum, although Defendants lean on these expert reports to make up for their lack of other evidence, it is not true that they "have demonstrated the effect [t]he implementation of the

---

[12] *See* Defs.' Br. at 3, 11-14.
[13] *See* Defs.' Br. Ex. 30 (Stewart Rep.) at 14.
[14] *Id.* at 6.
[15] Defs.' Br. Ex. 8 (Teague Rep.) at 2-3 ("JMTE was asked to review and evaluate a traffic management plan" and declares City's justifications for loop).
[16] *See id.* at 1 (describing items reviewed to prepare report).

4

traffic loop has had since [it] was implemented in 2015."[17] None of Defendants' experts even purport to analyze the effect of the loop when it is in place between 10 p.m. and 2 a.m. Indeed, Defendants' experts barely even compare overall traffic performance between the pre-2015 years, when no traffic plan whatsoever was in place, and later years.

In lieu of evidence regarding the traffic loop's effects, Defendants allude to several characteristics of Black Bike Week they contend make the weekend "unique." They fail to demonstrate that Black Bike Week is actually different from other busy summer weekends in Myrtle Beach in any way—be it crowd size, traffic volume, or emergency response times—that warrants the extraordinary step of imposing the 23-mile traffic loop.

First, Defendants state that Black Bike Week "draws *one* of the largest crowds of the year to the City."[18] Tellingly, Defendants do not assert that the weekend draws a larger crowd than *all* other weekends, nor could they.[19] Defendants' only direct response to Plaintiffs' evidence that Black Bike Week does *not* draw the year's biggest crowd is Chief Stewart's conclusory observation that "attendance measures" used to compare events "do not transfer in a way that produces objective or valid results."[20] Chief Stewart's "conclusions" are not based on any actual analysis, and they contradict his own comparison of Black Bike Week to other events outside the City.[21] And Defendants do not acknowledge the undisputed fact that Black Bike Week attendance has dwindled (because of policies such as the loop) such that, even if it once was

---

[17] Defs.' Br. at 20.
[18] Defs.' Br. at 3 (emphasis added).
[19] *See* Pls.' Br. at 34 & n.145.
[20] *See* Defs.' Br. at 12; *see also* Defs.' Br. Ex. 30 (Stewart Rep.) at 14.
[21] *See* Defs.' Br. Ex. 30 (Stewart Rep.) at 7 ("[C]omparison of the Daytona Beach and Myrtle Beach events are much more relevant to our discussion here"); *id.* ("The law enforcement and public safety challenges [between Black Bike Week and Black College Reunion] are virtually the same.").

plausible to claim that Black Bike Week crowds are uniquely large, it no longer is.[22]

Nonetheless, Defendants attempt to paint a picture of an enormous event, stating that Black Bike Week "attracts an additional 250,000 to 350,000 young African American [sic]" on top of the usual tourist crowd.[23] These numbers are, to say the least, unreliable. The testimony of Horry County official Mark Lazarus to which Defendants cite is that the event draws approximately 200,000 to 300,000 people. Mr. Lazarus, in turn, offered no basis for this estimate other than preliminary numbers provided by "the Myrtle Beach Police and whatever."[24] But Myrtle Beach Police Department witnesses testified they never had any reliable methodology for estimating crowd sizes,[25] and City officials have a history of exaggerating the number of Black Bike Week attendees (and attendant crime) when relying on subjective impressions.[26]

Defendants similarly fail to show that Black Bike Week draws significantly more traffic than other busy weekends. The only evidence they muster is Alpert and McClean's finding that the Myrtle Beach area has more vehicles during Black Bike Week than Harley Week, which, according to City witnesses, is *not* one of those busy times anymore.[27] They do not provide vehicle numbers in the City for other busy weekends. Alpert and McClean's study additionally

---

[22] Pls.' Br. Ex. 10 (Pedersen Dep.) at 323:19-324:21; *see also* Ex. 4 (DEF00819058) (noting during 2018 Black Bike Week that "attendance levels were way down from years past. Not near as many people on the roads, and not near as many motorcycles."); Pls.' Br. Ex. 16 (McNeill Decl.) ¶¶ 12-13 ("We, as black bikers, are aware that we are not welcome.").
[23] Defs.' Br. at 11.
[24] Pls.' Br. Ex. 79 (Lazarus Dep.) at 113:10-113:18.
[25] Pls.' Br. Ex. 2 (Prock Dep.) at 110:7-111:7 (using "line of sight" to judge hotel occupancy by observing if there are no vacancy signs); Pls.' Br. Ex. 30 (Gall Dep.) at 248:20-249:15 (estimating crowd size by "look[ing] at the traffic," "the way people are moving," and "hotel parking lots").
[26] Pls.' Br. at 28 & n.124.
[27] *See* Defs.' Br. Ex. 27 (Alpert and McClean Rep.) at 24; Ex. 5 (Kruea Dep.) at 72:8-73:8 (Harley Week has not been a large event in the City since 2009 or 2010); Pls.' Br. Ex. 3 (Leath 2019 Dep.) at 60:19-63:3 (same); Ex. 6 (Leath 2019 Dep.) at 238:14-239:10 (same); Pls.' Br. Ex. 10 (Pedersen Dep.) at 146:2-146:17 (same).

6

fails to examine whether traffic intensifies significantly at 10 p.m. during Black Bike Week, and so it cannot justify an extraordinary traffic loop that goes into effect at that hour.

Finally, although Defendants assert that emergency and police response times for Black Bike Week are down since 2014,[28] they neglect to note that Black Bike Week, both before and after implementation of the traffic plans, has seen faster-than-average response times among all busy summer weekends.[29] Alpert and McClean's report actually shows a one-year spike in 2014 response times for Black Bike Week (but still lower than the last July weekend) that returned to the earlier, lower rates the following year.[30] Thus, their data more plausibly suggest that 2014 was an idiosyncratically bad year for emergency response times, with no meaningful difference otherwise between the years before the loop was in place and after—though Black Bike Week has become a smaller event. Furthermore, Alpert and McClean make no effort to identify whether and how response times changed during the hours when the loop is in effect.

Defendants assert that "[v]iolent crimes have gone down and no one has been murdered since 2015,"[31] but once again without connecting that result to the loop. The Alpert and McClean study does not opine on whether any of the studied crime rates used to occur at higher rates *during loop hours*, such that one *could* logically infer the loop affects those numbers. Similarly, the Alpert and McClean study shows that the number of traffic accidents during Black Bike Week has declined since 2014, but does not show any difference between the number of accidents during loop hours and during other hours, which should be the relevant question.[32]

In sum, Defendants offer absolutely no evidence that the loop has any relationship to

---

[28] Defs.' Br. at 7 ("[e]mergency and police vehicle response times are down").
[29] Defs.' Br. Ex. 27 (Alpert and McClean Rep.) at 22.
[30] *Id.* at 22.
[31] Defs.' Br. at 8.
[32] Defs.' Br. Ex. 27 (Alpert and McClean Rep.) at 11.

traffic congestion, emergency response times, or crime. Nor do they offer evidence supporting the notion that Black Bike Week sees unusually large crowds or high traffic.

Meanwhile, the loop may accomplish Defendants' second stated objective—keeping vehicles out of surrounding residential neighborhoods, which are predominantly white—but Defendants make no attempt to prove that legitimate reasons (as opposed to fear of mostly African-American motorists) require the extraordinary step of blocking motorists from the possibility of contact with residential areas. Keeping African-American tourists drawn to Ocean Boulevard during Black Bike Week from entering the rest of the City has been part of the City's motivation for the loop from the start, as City officials announced contemporaneously. For example, in 2014 Mayor Rhodes announced forthrightly: "[W]e're trying to move people outside of the City. We're trying to get them out."[33] But that just raises the question of why Myrtle Beach pushes *these* people out and not the *other*, predominantly white, tourists and their vehicles that fill the City throughout the summer.

Unable to justify the loop, the City tries to evade responsibility for it by repeatedly suggesting that the loop is partly the brainchild of entities such as the Coastal Alliance and the Bikefest Task Force.[34] These assertions are meritless. Defendants rattle off bureaucratic activities such as calling together summits and assembling task forces,[35] but the evidence establishes that Myrtle Beach suggested and drove the loop's creation.[36] Myrtle Beach may have consulted with

---

[33] *See* Pls.' Br. Ex. 53 (PL_017036) (Sun News Article); *see also* Pls.' Br. Ex. 1 (Rhodes Dep.) at 265:10-266:11 (agreeing that the goal of the loop is to move bikers out of the City during late night hours and prevent congestion within the City).
[34] *See* Defs.' Br. at 1-2, 6, 17.
[35] *See* Defs.' Br. at 6-7.
[36] Ex. 6 (Leath 2019 Dep.) at 230:3-21; *see also* Ex. 7 (Lazarus Dep.) at 86:14-88:13, 159:13-161:19 (Horry County Council Chairman testifying that "the loop came because that's what the City of Myrtle Beach wanted to do"); Ex. 8 (Webster Dep.) at 162:3-6 (Task Force Chairman identifying that City proposed the loop originally); Ex. 3 (Berry Dep.) at 114:16-115:15 (traffic

8

other jurisdictions and interested parties to avoid regional friction, but it retained full ownership of the loop. If Defendants decide not to implement the loop this year, or this Court enters an injunction to that effect, no one else—not the Coastal Alliance, not the Bikefest Task Force, not Horry County, not the State—would stand in the way.[37] Tellingly, Defendants acknowledge they have the discretion not to implement the loop or to end it early.[38] That some of the loop's roads are technically controlled by other entities[39] is irrelevant; the question is whether Defendants control whether the entirety of the loop goes into effect, and they indisputably do.

## II.  Defendants Offer No Meaningful Evidence or Argument Regarding Proper Application of the *Arlington Heights* Factors

Defendants make little attempt to rebut Plaintiffs' comprehensive demonstration that careful weighing of all *Arlington Heights* factors shows that racial prejudices and fears have played *some* role in motivating the City to enact and continue the loop.[40] Instead, Defendants simply ignore much of the most significant, contemporaneously generated evidence pointing to

---

plan "is not a plan that [SCDOT] wished to implement. It's a plan that -- that -- that the city came to us, wanted to implement"); Ex. 9 (Causey Dep.) at 29:17-31:2 (SCHP was there "just as a support unit").

[37] Ex. 10 (Eldridge Dep.) at 85:19-86:14 (Horry County Administrator noting that if Myrtle Beach wanted to stop the loop, there would not be a loop); Ex. 11 (Nell Dep.) at 208:5-19 (Highway Patrol "can't make the decision to say, we're going to stop it right now" because "[i]t's Myrtle Beach's decision."); Ex. 7 (Lazarus Dep.) at 43:20-22, 216:24-217:21 (Coastal Alliance cannot force any jurisdictions to act or to implement the loop); Ex. 8 (Webster Dep.) at 186:6-16 (Chairman of the Task Force testifying it could not enact the loop on its own).

[38] Defs.' Br. at 18 ("[T]he Police Chief in consultation with the other stakeholders has the authority to end the operation of the traffic loop before 2 am . . . ."); Ex. 12 (Gall Dep.) at 97:4-8 (Chief Prock would not need approval from anyone else before issuing the order to take down the loop); Ex. 13 (Pedersen Dep.) at 304:22-311:8 (noting that plan "gives the chief the . . . authority to put the . . . loop into effect or not put the loop into effect. And it will be the entire loop because it's based on the traffic conditions in the City of Myrtle Beach."); *id.* at 333:10-335:15 (noting that, if Prock "decides that we don't need to impose that in the City of Myrtle Beach, then the rest of the group will stand down and the loop would not go into effect.").

[39] *See* Defs.' Br. at 1-2.

[40] *McCrory*, 831 F.3d at 220, 233; *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265 n.11.

9

improper racial motivations infecting their decision-making. They make no effort to square their post hoc justification of the loop as a good-faith attempt to lessen traffic congestion with the evidentiary record of how they actually made this policy decision—including the reality that, with the City already having been sued for racial discrimination for its treatment of the same event, everyone involved was fully aware of the racial implications of their choices.

Defendants have little to say about the pages of evidence that white City officials, residents, and tourists alike for years have made crude, racially-charged statements regarding Black Bike Week—statements of the type routinely found probative of official intent.[41] Even as they formulated the loop policy, City officials received e-mails calling Black Bike Week attendees "a bunch of animals" and "hoodlums," complaining about their "profanity music" and "asses hanging out," and urging City officials not to let Myrtle Beach "turn into the Chicago or Detroit of the South."[42] City officials were deluged with panicked and derogatory statements about Black Bike Week attendees that were barely coded (if at all) racial epithets.

Indeed, Defendants' own narrative confirms that the loop was developed in a politically-charged environment where unsubstantiated fear of Black Bike Week-related criminality, not reason, drove decision-making.[43] For example, Gov. Nikki Haley did not say "something had to be done to stop the violence and make Memorial Day weekend safer";[44] she publicly called for

---

[41] *Mhany Mgmt., Inc. v. Cty. of Nassau*, 819 F.3d 581, 608-09 (2d Cir. 2016); *Smith v. Town of Clarkton*, 682 F.2d 1055, 1065-66 (4th Cir. 1982) ("There can be no doubt that the defendants knew that a significant portion of the public opposition was racially inspired, and their public acts were a direct response to that opposition."); *see also United States v. Yonkers Bd. of Educ.*, 837 F.2d 1181, 1224 (2d Cir. 1987) ("[A] governmental body may not escape liability under the Equal Protection Clause merely because its discriminatory action was undertaken in response to the desires of a majority of its citizens.").
[42] *See* Pls.' Br. at 5-8, 27-29.
[43] *See* Defs.' Br. at 5-6.
[44] *Id.* at 6.

10

Black Bike Week to end, as did the president of Myrtle Beach's Chamber of Commerce.[45] If the Governor's statement was relevant to Defendants' thinking—as its inclusion in Defendants' narrative suggests—the natural inference is that the loop the City then adopted was meant to further the Governor's stated goal, not the post hoc rationales that Defendants offer now.

Defendants assure this Court that City officials whose "sole responsibility is to keep the public safe" ignored a public environment infected with racially discriminatory sentiment and demands for them to shut down Black Bike Week.[46] Defendants cite no caselaw in support of this wishful thinking. Courts applying *Arlington Heights* regularly find that, when the public calls for discriminatory policies, public officials—acting on the same incentive to keep their jobs that the City claims leads invariably to lawful results—routinely succumb to such pressure.[47]

Defendants attempt to rebut this evidence by pointing to deposition testimony in which they repeatedly asked the President of the Myrtle Beach NAACP if individual City officials were "racist" and he declined to opine.[48] The following is a representative example:

> Q: I'll ask you the same questions about Amy Proctor [sic]. Do you think she's a racist?
>
> A: I can't answer that question either.[49]

This is irrelevant. As Plaintiffs explained earlier, it is settled law that public officials can make decisions that are influenced by improper racial considerations regardless of whether they personally harbor racial animus.[50] That is particularly true where, as here, the evidence suggests

---

[45] *See* Defs.' Br. Ex. 17 (Sun News Gov. Haley Article) at 1.
[46] Defs.' Br. at 21-22.
[47] *See, e.g.*, *Innovative Health Sys., Inc. v. City of White Plains*, 117 F.3d 37, 49 (2d Cir. 1997) ("[A] decision made in the context of strong, discriminatory opposition becomes tainted with discriminatory intent even if the decisionmakers personally have no strong view on the matter"); *see also* Pls.' Br. at 28 & n.122 (providing more caselaw).
[48] Defs.' Br. at 14.
[49] Defs.' Br. Ex. 41 (James Dep.) at 14:11-13.
[50] Pls.' Br. at 20 & n. 96; *McCrory*, 831 F.3d at 233.

11

that public officials reacted to discriminatory public sentiment. The relevant question is whether racial considerations infected the official action taken, not whether public officials are racist (or, even more specifically, whether the head of the NAACP branch thinks they are racist).[51]

Nor can Defendants refute that the loop policy is just the latest act in a long-running story, in which officials consistently exaggerate Black Bike Week's impact, overreact to Black Bike Week events, and seriously consider (use of the National Guard) or actually take (the previous, enjoined traffic plan) discriminatory action.[52] Defendants dismiss this history with conclusory statements that "[d]ifferent standards and different facts existed" earlier and some officials involved in past decisions have left,[53] but nothing significant has changed. They point to the three years from 2011 to 2014 when the City did *not* impose discriminatory rules on Black Bike Week,[54] but this just shows that the City, having been sued for its last discriminatory action and under close watch, declined to act again without a pretext, which the 2014 shootings provided. Indeed, Defendants acknowledge that their police chief *wanted* to impose a traffic plan on Black Bike Week *prior* to 2014, but City Manager Leath vetoed the idea.[55]

Not only do Defendants' recently commissioned expert reports fail to justify the loop policy *now*,[56] they also cannot overcome the evidence suggesting that improving traffic flow had little or nothing to do with Defendants' contemporaneous reasons for the loop. Defendants

---

[51] *See Innovative Health*, 117 F.3d at 49; Pls.' Br. at 27-28 & n.122.
[52] Pls.' Br. at 23-25.
[53] Defs.' Br. at 19.
[54] Defs.' Br. at 18-19.
[55] *See* Defs.' Br. at 5. Defendants assert, without backing from the record or explanation as to the relevance, that Leath rejected the request because of pedestrian safety islands on Ocean Boulevard. *See id*. Leath's actual testimony was that he rejected the proposal to make Ocean Boulevard one-way prior to 2014 because: "I wasn't convinced that we needed it. There's a huge expense, person, you know, in manpower and equipment to—to do a one lane." Ex. 6 (Leath 2019 Dep.) at 210:7-12.
[56] *See supra* at pp. 3-5.

ignore, rather than rebutting, Plaintiffs' showing that, until this litigation, they never seriously analyzed the traffic loop's necessity and likely effects. Indeed, Defendants *still* refuse to engage with Plaintiffs' extensive evidence of the loop's severely discriminatory effects, apart from a conclusory statement that they "dispute Plaintiffs' claims on the amount of time it takes to navigate the loop."[57] They offer no *evidence* disputing the fact that the loop requires more than four hours to get around and subjects drivers to horrific evening road conditions.[58]

Defendants contend they have discretion "to lift barriers on streets in certain circumstances to allow visitors to get to their hotels" and to end the loop early (or not implement it at all) on certain nights.[59] That is, they argue that "[o]ne of the key reasons the traffic loop works" is that Defendants might not use it.[60] Defendants offer no evidence that this discretion exists (none of the Operations Plans mentions it),[61] nor how often they exercise such discretion (or for whose benefit). To the contrary, multiple witnesses have testified that they asked police officers to be let through the loop, for example to get to their hotels, but the officers refused.[62]

---

[57] Defs.' Br. at 21.
[58] *See* Pls.' Br. at 12-14, 21-23.
[59] Defs.' Br. at 17-18.
[60] Defs.' Br. at 17.
[61] *See, e.g.*, Ex. 14 (PL_016137-48) (non-publicly-released patrol guide for officers does not mention anywhere, including in the "Traffic Plan" section, any leeway in allowing event visitors to cross barriers to access their destination); Ex. 15 (PL_016149-50) (public pamphlet where only discretion noted is that "[e]xits from Ocean Boulevard *during non-loop hours* will be permitted at those cross streets with traffic signals on Kings Highway, depending on traffic conditions") (emphasis added); see also Ex. 16 (Clarke Dec. II) ¶ 34 (observing that turns off Ocean Boulevard were prohibited, either onto or off of the loop, at most intersections, so motorists wishing to leave the loop were unable to do so).
[62] *See* Pls.' Br. Ex. 70 (Frink Decl.) at ¶¶ 6, 8 (not allowed to pass through barriers despite medical emergency); Pls.' Br. Ex. 13 (Graham Decl.) at ¶ 10 (when pulled to side of the road to ask an officer if he could get through a barricade to his hotel, officer shined flashlight at him and yelled, "keep moving"); Ex. 16 (Clarke Decl. II) at ¶ 58 (prevented from entering hotel parking lot, and officer told him only way to reach hotel was to reenter the loop on Ocean).

### III. Plaintiffs Will Suffer Irreparable Harm If Relief Is Not Granted

Plaintiffs will suffer harm if the loop policy is not enjoined.[63] Defendants do not contend otherwise. They argue, instead, that Plaintiffs should be made to suffer harm now and then seek damages at the end of the case.[64] That is not the law. That Plaintiffs allege constitutional violations should be the end of the matter.[65] Defendants argue it is "not clearly established" that constitutional harms are irreparable,[66] but the cases they cite do not say that.

In any event, the real but difficult-to-quantify harms Plaintiffs will suffer are the sort routinely found not fully reparable by money.[67] Money can compensate them to *some* extent, but it cannot undo the humiliation and stress of driving the loop; purchase a year of attending and enjoying Black Bike Week, once lost; or fully make up for suffering discrimination.[68]

### IV. The Balance of the Equities and the Public Interest Favor the Granting of a Preliminary Injunction

Defendants try to have it both ways in arguing that the balance of the equities tips in their favor. On the one hand, they minimize the loop's impact, arguing it would only be in effect for

---

[63] Pls.' Br. at 35-37.
[64] Defs.' Br. at 22-23.
[65] *See, e.g.*, *Ross v. Meese*, 818 F.2d 1132, 1135 (4th Cir. 1987) (constitutional violations considered irreparable harm as a matter of law); *Wilson v. Thomas*, No. 5:14-CV-85-BO, 2014 WL 7405462, at *3 (E.D.N.C. Dec. 23, 2014) ("The deprivation of a constitutional right, even if only briefly, constitutes irreparable harm."); *accord Jackson v. City of Aiken Hous. Auth.*, No. 1:16-cv-02831-JMC, 2016 WL 7228242, at *5 (D.S.C. Dec. 14, 2016); *Poindexter v. Strach*, 324 F. Supp. 3d 625, 634 (E.D.N.C. 2018); *De Leon v. Perry*, 975 F. Supp. 2d 632, 663-64 (W.D. Tex. 2014), *aff'd sub nom. De Leon v. Abbott*, 791 F.3d 619 (5th Cir. 2015).
[66] Defs.' Br. at 22.
[67] *See* Pls.' Br. at 35-37.
[68] *See, e.g.*, *Chalk v. U.S. Dist. Ct. of Cent. Dist. of Cal.*, 840 F.2d 701, 709-10 (9th Cir. 1988) (employee reassigned due to discrimination entitled to injunction reinstating him; while money could compensate for lost wages, it could not compensate for having to work unfulfilling and "distasteful" job and for the "emotional and psychological" harm of discrimination); *Johnson v. City of Memphis*, 444 F. App'x 856, 860 (6th Cir. 2011) (similar analysis in granting injunction to person denied promotion due to race discrimination).

14

12 hours of Black Bike Week. On the other, they exaggerate the loop's importance—in completely conclusory and hyperbolic fashion—claiming that enjoining it would "forc[e] Defendants to police a potentially unsafe extraordinary event with an inadequate public safety plan," thus "jeopardiz[ing] the safety of the MDW visitors, City residents and the police."[69]

Defendants are wrong on both counts. The loop does not just disrupt the experience of attending Black Bike Week when in effect. It forces attendees to alter their plans to avoid any risk of being trapped in it.[70] Meanwhile, Defendants have failed to produce *any* evidence that the loop (as opposed to other Black Bike Week policies not at issue in this Motion) furthers public safety. Defendants barely argue now that the loop has public safety (as opposed to traffic flow) purposes, making their reliance on such grounds especially unconvincing.

Defendants repeatedly point to Judge Quattlebaum's reasoning that it would be inequitable to grant hurried injunctive relief when Plaintiffs sued three years into the policy and soon before that year's Black Bike Week.[71] But Defendants now have had more than a year to prepare for this Motion and make contingency plans. There is no longer concern that an injunction would require rushed planning. *Id.* at 9.

## CONCLUSION

For the reasons set forth above, as well as those set out in Plaintiffs' initial brief, Plaintiffs' Motion for Preliminary Injunction should be granted.

DATED: March 15, 2019                 /s/ Peter Wilborn
                                      D. Peters Wilborn, Jr. (ID #7609)
                                      Law Office of Peter Wilborn
                                      57 Cannon Street

---

[69] Defs.' Br. at 23.
[70] *See* Pls.' Br. at 35.
[71] Defs.' Br. at 8-9, 23.

Charleston, SC 29403
(843) 416-9060
peter@bikelaw.com

Reed N. Colfax
Tara K. Ramchandani
Laura Gaztambide-Arandes
Angela A. Groves
Relman, Dane & Colfax, PLLC
1225 19th Street, N.W., Suite 600
Washington, D.C. 20036
(202) 728-1888
rcolfax@relmanlaw.com
tramchandani@relmanlaw.com
larandes@relmanlaw.com
agroves@relmanlaw.com

Khyla D. Craine
National Association for the Advancement of
Colored People, Inc.
4805 Mt. Hope Drive
Baltimore, MD 21215
(410) 580-5777
kcraine@naacpnet.org

Dorian L. Spence
Maryum Jordan
Lawyers' Committee for Civil Rights Under Law
1401 New York Avenue, NW, Suite 400
Washington, DC 20005
(202) 662-8600
dspence@lawyerscommittee.org
mjordan@lawyerscommittee.org

*Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

  I hereby certify that on March 15, 2019, a copy of the foregoing Reply in Further Support of Motion for Preliminary Injunction was filed and served on all counsel of record using the Court's CM/ECF system.

            /s/ Peter Wilborn
            Peter Wilborn

17