

`

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
FLORENCE DIVISION**

| | | |
|---|---|---|
| NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE, INC., by and through its Myrtle Beach Branch, SIMUEL JONES, LESLIE STEVENSON, CEDRIC STEVENSON, HARRY BRIGGS, NOVICE BRIGGS, KENNETH COLEMAN, TYRONE KINARD, and WILLIAM LASSITER | § § § § § § § § | |
| Plaintiffs, | § § | |
| vs. | § § | CIVIL ACTION NO. 4:18-00554-MGL |
| CITY OF MYRTLE BEACH, a municipal corporation within the State of South Carolina, and CITY OF MYRTLE BEACH POLICE DEPARTMENT, a department of the City of Myrtle Beach, | § § § § § § | |
| Defendants. | § | |

**MEMORANDUM OPINION AND ORDER
DENYING PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION**

## I.    INTRODUCTION

The plaintiffs in this lawsuit are the National Association for the Advancement of Colored People, Inc. (the NAACP), Simuel Jones, Leslie Stevenson, Cedric Stevenson, Harry Briggs, Novice Briggs, Kenneth Coleman, Tyrone Kinard, and William Lassiter (collectively, Plaintiffs). They filed this lawsuit against Defendants City of Myrtle Beach and the City of Myrtle Beach Police Department (collectively, Defendants) complaining of violations of: (Count 1) 42 U.S.C. § 1981, (Count 2) their First Amendment Rights, 42 U.S.C. § 1983, (Count 3) their Fourteenth Amendment

Rights, 42 U.S.C. § 1983, (Count 4) their rights under the Dormant Commerce Clause, and (Count 5) Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d.

Pending before the Court is Plaintiffs' motion for a preliminary injunction. Having carefully considered the motion, the response and amended response, the replies, the record, and the relevant law, the Court is of the opinion the motion should be denied.

## II.     FACTUAL AND PROCEDURAL HISTORY

### A.     *Factual History*

"Each year, during the month of May, hundreds of thousands of motorcycle enthusiasts from around the country gather in the Myrtle Beach, South Carolina area for each of two separate motorcycle rallies." Amended Complaint ¶ 1. "In the middle of the month, motorcycle enthusiasts gather for the Myrtle Beach Bike Week Spring Rally (Harley Week)." *Id.* (internal quotation marks omitted).

"The vast majority of the Harley Week participants are white . . . . Two weeks later, over the Memorial Day weekend, motorcycle enthusiasts gather for Atlantic Beach Bikefest (Black Bike Week)." *Id.* (internal quotation marks omitted). "The vast majority of Black Bike Week visitors are African American," and according to Plaintiffs, "the event historically has been met with opposition and resistance from the City of Myrtle Beach and many local businesses." *Id.*

Plaintiffs complain "[t]he hostility toward Black Bike Week has led to a number of restrictive governmental policies that were first challenged . . . in an action filed in this Court in 2003." *Id.* ¶ 2. "That suit alleged that the City of Myrtle Beach imposed an unequal and unjustified traffic plan

during Black Bike Week and that the plan was motivated by racial discrimination, interfered with the rally, and discouraged participation." *Id.*

"The plaintiffs in that case argued that Black Bike Week should be treated the same as Harley Week." *Id.* "United States District Court Judge Terry Wooten found that the differences in the traffic plans between Black Bike Week and Harley Week were likely motivated by race and therefore likely unconstitutional." *Id.*

"Judge Wooten granted the plaintiffs' motion for a preliminary injunction and ordered the City to implement similar traffic plans for the two events." *Id.* Thereafter, the Fourth Circuit stayed Judge Wooten's Order. Defendants' Response to Plaintiffs' Motion, Exhibit 4. "The parties in that action ultimately settled the case with the City agreeing to a consent order that required the City to maintain similar operations plans for Black Bike Week and Harley Week for the following five years." Amended Complaint ¶ 2. That agreement ended on July 31, 2010.

"From 1999 until 2010[,] traffic . . . flowed one way south on Ocean Boulevard during Memorial Day Weekend." Amy Prock (Prock) Affidavit ¶ 2. "In 2011, the City chose to allow traffic on Ocean Boulevard to flow in both directions during Memorial Day Weekend." *Id.*

"Public safety issues and traffic issues began to increase with two way traffic along Ocean Boulevard." *Id.* "In 2013, members of the Myrtle Beach Police Department[,] together with other law enforcement agencies[,] approached the City Manager for the City of Myrtle Beach and requested the City return to one way traffic for [M]emorial Day Weekend." *Id.* "Their request was denied." *Id.*

Prock attests *"[i]n 2013, public safety issues and traffic issues continued to increase." Id.* ¶ 3. "In 2014, nine shooting incidents[,] including three homicides[,] occurred during Memorial Day Weekend in the areas where Ocean Boulevard is located." *Id.*

"After the problems occurred [during] Memorial Day Weekend 2014, an association of city mayors and Horry County leaders[,] known as[] Coastal Alliance, formed a . . . Task Force to address the public safety problems arising during Memorial Day Weekend." *Id.* ¶ 5. "The City of Myrtle Beach, the Myrtle Beach Police Department and the Myrtle Beach Area Chamber of Commerce held a summit of public safety officials to focus on special events and problems and issues similar to the ones that arose in Myrtle Beach on Memorial [Day] Weekend." *Id.*

"The consensus of the summit was that to improve public safety, local governments had to keep pedestrians and vehicular traffic moving at all times." *Id.* "The public safety officers with experience in events such as Memorial Day Weekend in the City recommended using a traffic chute to keep vehicular traffic moving during peak limes of traffic." *Id.*

"During the planning sessions for the . . . Task Force[,] several traffic loops were proposed by different members of the [T]ask [F]orce." *Id.* ¶ 6. "The City of Myrtle Beach proposed a traffic loop that was rejected by the [T]ask [F]orce." *Id.* "Eventually, a traffic loop that was acceptable to all members of the . . . Task Force was chosen by the . . . Task Force and put in operation." *Id.*

"The traffic loop runs in the City of Myrtle Beach on roads controlled by the City and it runs for approximately [seventeen] miles on roads controlled by [the South Carolina Department of Transportation (SCDOT)]." *Id.* ¶ 7. "The traffic loop is put into operation on Friday, Saturday, and Sunday nights of Memorial Day Weekend between the hours of 10:00 [PM] and 2:00 [AM]." *Id.*

"The traffic loop[,] together with limited ingress and egress[,] annually receives written approval from the [SCDOT,] which is ultimately responsible for the use of all state roads." *Id.* "Under the current . . . Task Force plan, the City of Myrtle Beach can close the traffic loop early if it is no longer needed." *Id.* ¶ 8.

### B. *Procedural History*

This is the second motion for a preliminary injunction Plaintiffs have filed in this lawsuit. In their initial motion, "Plaintiffs sought an order requiring [Defendants] to maintain a substantially similar traffic plan during the 2018 Black Bike Week as the one it maintains during Harley Week." Plaintiffs' Motion 18. Judge Marvin Quattlebaum denied their motion. *NAACP v. City of Myrtle Beach*, No. 4:18-CV-00554, 2018 WL 2332018 (D.S.C. May 23, 2018).

This motion for a preliminary injunction is more limited than the first. In the present motion, Plaintiffs seek an Order from this Court directing Defendants suspend operation of the traffic loop during the 2019 Black Bike Week. Here, Plaintiffs do not challenge the other restrictions on Black Bike Week alleged in their amended complaint.

The Court has been fully briefed on all the relevant issues and is thus prepared to rule on the motion in accordance with the standards it details below.

### III. STANDARD OF REVIEW

### A. *Factors to Consider*

"[P]reliminary injunctions are intended to meet exigent circumstances[.]" *Ideal Toy Corp. v. Plawner Toy Mfg. Corp.*, 685 F.2d 78, 84 (3d Cir. 1982). It "is an extraordinary remedy never awarded as of right." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). "[T]he party

seeking the injunction must prove his own case and adduce the requisite proof, by a preponderance of the evidence, of the conditions and circumstances upon which he bases the right to and necessity for injunctive relief." *Citizens Concerned for Separation of Church & State v. City of Denver*, 628 F.2d 1289, 1299 (10th Cir. 1980).

A preliminary injunction should issue only when the plaintiffs can "[1] establish that [they are] likely to succeed on the merits, [2] that [they are] likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in [their] favor, and [4] that an injunction is in the public interest." *Winter*, 555 U.S. at 20. The burden is on the party seeking injunctive relief to show it is entitled to the relief, not the burden of the other party to show the movant is not entitled. *Granny Goose Foods, Inc. v. Bhd. of Teamsters*, 415 U.S. 423, 443 (1974).

"[A]ll four requirements must be satisfied." *Real Truth About Obama, Inc. v. Fed. Election Comm'n*, 575 F.3d 342, 346 (4th Cir. 2009). Thus, even a strong showing of likely success on the merits cannot compensate for failure to show likely injury. *Winter*, 555 U.S. at 21-22. And, irreparable injury alone is insufficient to support equitable relief. *See id.* at 23 (holding irreparable injury was likely to occur, but holding an injunction was improper because of the burden on the government and impact on public interest). In other words, "[a] preliminary injunction shall be granted only if the moving party clearly establishes entitlement." *Di Biase v. SPX Corp.*, 872 F.3d 224, 230 (4th Cir. 2017).

"Given [the] limited purpose [of a preliminary injunction], and given the haste that is often necessary . . . , a preliminary injunction is customarily granted on the basis of procedures that are less formal and evidence that is less complete than in a trial on the merits." *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981). "Because preliminary injunction proceedings are informal

ones designed to prevent irreparable harm before a later trial governed by the full rigor of usual evidentiary standards, district courts may look to, and indeed in appropriate circumstances rely on, hearsay or other inadmissible evidence when deciding whether a preliminary injunction is warranted." *G.G. ex rel. Grimm v. Gloucester Cty. Sch. Bd.*, 822 F.3d 709, 725–26 (4th Cir. 2016), *vacated and remanded on other grounds*, 137 S. Ct. 1239 (2017).

### B.    Prohibitory or Mandatory

"A preliminary injunction may be characterized as being either prohibitory or mandatory." *League of Women Voters of N. C. v. North Carolina*, 769 F.3d 224, 235 (4th Cir. 2014). "Whereas mandatory injunctions alter the status quo [generally by requiring the non-movant to do something], prohibitory injunctions aim to maintain the status quo and prevent irreparable harm while a lawsuit remains pending." *Id.* at 236 (citation omitted) (internal quotation marks omitted). The Fourth Circuit has "defined the status quo for this purpose to be the last uncontested status between the parties which preceded the controversy." *Id.* (citation omitted) (internal quotation marks omitted).

"Mandatory preliminary injunctive relief in any circumstance is disfavored, and warranted only in the most extraordinary circumstances." *Taylor v. Freeman*, 34 F.3d 266, 270 n.2 (4th Cir. 1994) (citation omitted). Or, put differently, "It is fundamental that mandatory injunctive relief should be granted only under compelling circumstances inasmuch as it is a harsh remedial process not favored by the courts." *Citizens Concerned for Separation of Church & State*, 628 F.2d at 1299.

The Fourth Circuit has stated, "Because preliminary injunctions are extraordinary remedies involving the exercise of very far-reaching power, [it] should be particularly exacting in its use of the abuse of discretion standard when it reviews an order granting a preliminary injunction." *Pashby v. Delia*, 709 F.3d 307, 319 (4th Cir. 2013) (citations omitted) (internal quotation marks omitted)

(alteration marks omitted). "Furthermore, when the preliminary injunction is mandatory rather than prohibitory in nature, [the Fourth Circuit's] application of this exacting standard of review is even more searching." *Id.* (citation omitted) (internal quotation marks omitted).

### C. No Hearing Required

"Rule 65 does not require an evidentiary hearing[,]"so long as "the party opposing the preliminary injunction [has] a fair opportunity to oppose the application and to prepare for such opposition." *McDonald's Corp. v. Robertson*, 147 F.3d 1301, 1311 (11th Cir. 1998) (citation omitted) (internal quotation marks omitted). The Court must ensure, however, "relief follows only after consideration of all facts and arguments deemed important by the parties." *Drywall Tapers & Pointers of Greater NYC, Local 1974 v. Operative Plasterers' & Cement Masons' Int'l Ass'n of U.S. & Can.*, 537 F.2d 669, 674 (2d Cir. 1976).

In *Drywall Tapers*, the Second Circuit held "the documentary evidence presented to [the district court] by both sides was sufficient to . . . enable the court to decide whether an injunction should issue." *Id.* As that court noted, the plaintiffs "were obviously content to rest on that evidence, as they never requested a . . . hearing." *Id.*

## IV. DISCUSSION AND ANALYSIS

Plaintiffs' preliminary injunction request concerns the traffic loop instituted by Defendants, in conjunction with other state and local agencies, during Black Bike Week. As the Court noted above, the traffic loop is generally in place on Friday, Saturday and Sunday evenings of Memorial Day Weekend from 10:00 PM to 2:00 AM.

There appears to be no disagreement the traffic loop is substantially similar to the traffic loop used over Memorial Day Weekend since 2015. Plaintiffs seek to have the Court order Defendants to cease implementation of its traffic loop during the 2019 Black Bike Week.

The parties disagree as to whether the preliminary injunction Plaintiffs seek is prohibitory or mandatory in nature. Because the Court concludes Plaintiffs fail to demonstrate they are entitled to a prohibitory preliminary injunction, it follows Plaintiffs are unable to establish they should be allowed a mandatory one. Thus, it is unnecessary for the Court to determine which type of preliminary injunction Plaintiffs are requesting here.

Regarding the need for a hearing, as the Court noted above, "Rule 65 does not require an evidentiary hearing[,]"so long as "the party opposing the preliminary injunction [has] a fair opportunity to oppose the application and to prepare for such opposition." *McDonald's Corp.*, 147 F.3d at 1311 (citation omitted) (internal quotation marks omitted). Here, "the documentary evidence presented to [the district court] by both sides [is] sufficient to . . . enable the [C]ourt to decide whether an injunction should issue." *Drywall Tapers*, 537 F.2d at 674. The record is voluminous, with almost 3,000 pages of evidence along with video exhibits.

And besides, neither party requested a hearing. *See id.* (observing the plaintiffs "were obviously content to rest on [the record] evidence, as they never requested a . . . hearing"); *see also* Local Civil Rule 7.08 ("Hearings on motions may be ordered by the court in its discretion. Unless so ordered, motions may be determined without a hearing."). Accordingly, the Court will decide Plaintiffs' motion without a hearing.

**A.      *Whether Plaintiffs have established they are likely to succeed on the merits***

Plaintiffs claim they are likely to succeed on the merits of their challenge to Defendants' use of the traffic loop.  According to Plaintiffs, the race of Black Bike Week attendees influenced Defendants' enactment and perpetuation of the traffic loop.  They state the evidence supports their argument racial prejudices and fears helped motivate Defendants to enact and continue the loop.  Defendants dispute these contentions.

To show the traffic loop "has been administered or enforced discriminatorily, more must be shown than the fact that a benefit was denied to one person while conferred on another.  A violation is established only if the plaintiff can prove that the state intended to discriminate[.]" *Sylvia Dev. Corp. v. Calvert Cty.*, 48 F.3d 810, 819 (4th Cir. 1995) (citation omitted).

"Thus, even when a facially neutral statute has a racially disproportionate impact, a discriminatory animus must nevertheless be proved to establish an equal protection violation." *Id.* (citation omitted) (internal quotation marks omitted).  Put differently, "even when an administrative action disparately impacts members of a particular racial group, it will not be found to violate the Equal Protection Clause unless the plaintiff demonstrates that the action was motivated, at least in part, by an invidiously discriminatory intent." *Id.*  (citations omitted) (internal quotation marks omitted).

Both parties agree the factors set forth in *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252 (1977), a case dealing with the determination of whether a decisionmaking body was motivated by a discriminatory intent, governs the Court's inquiry into whether Plaintiffs have made out a constitutional claim sufficient to warrant their request for injunctive relief.

The Fourth Circuit has aptly summarized those considerations as follows:

> (1) evidence of a "consistent pattern" of actions by the decisionmaking body disparately impacting members of a particular class of persons; (2) historical background of the decision, which may take into account any history of discrimination by the decisionmaking body or the jurisdiction it represents; (3) the specific sequence of events leading up to the particular decision being challenged, including any significant departures from normal procedures; and (4) contemporary statements by decisionmakers on the record or in minutes of their meetings.

*Sylvia Dev. Corp.*, 48 F.3d at 819 (citing *Arlington Heights*, 429 U.S. at 266-68). "In the end, the plaintiff has the burden of establishing that a classification introduced through administrative action was clear and intentional." *Id.* (citation omitted) (internal quotation marks omitted).

But, "proof that racial discrimination was a motivating factor [does] not end the matter. Such proof merely shifts the burden to the decisionmaking body to demonstrate that the same decision would have resulted even had the impermissible purpose not been considered." *Id.* at 819 n.2 (citation omitted) (internal quotation marks omitted).

1.     **whether Plaintiffs have established there is evidence of a consistent pattern of actions by the decisionmaking body disparately impacting members of a particular class of persons**

Plaintiffs contend Defendants' "[i]mposing a . . . traffic loop only for Black Bike Week disproportionately impacts black visitors to Myrtle Beach[.]" Plaintiffs' Motion 21. According to Plaintiffs, "[t]he traffic loop is tailored to apply only during Black Bike Week, the only major Myrtle Beach event attracting predominantly African-American visitors." *Id.* (emphasis omitted).

They also argue "[i]t creates a profoundly different, far more unpleasant environment for the predominantly African-American attendees of Black Bike Week than the one that Myrtle Beach offers its predominantly white visitors every other weekend of the year." *Id.* Plaintiffs state "City

officials have acknowledged that it is intended to have such an effect, in order to diminish interest in attending Black Bike Week." *Id*.

Plaintiffs urge "[t]he traffic loop thus must be viewed as the latest shot in a long-running war that the City has fought against Black Bike Week." *Id*. at 24. "That larger context reveals that, at every step, the City and its residents have overreacted to any violent crime that happens to occur during Black Bike Week and used it as a reason to curtail an event that they always barely tolerated." *Id*. at 24-25. According to Plaintiffs, "[i]t confirms that race has always lurked just below the surface of the City's Black Bike Week policies." *Id*. at 25.

Countering Plaintiffs' allegations, "Defendants contend that their experts' analysis and reports[,] together with discovery conducted thus far[,] ha[ve] strengthened their contention that Defendants were not motivated by discriminatory intent." Defendants' Response 15. Defendants insist they "were motivated by the public safety concerns expressed by professionally trained police officers who had experienced first hand the public safety problems arising during past Memorial Day weekends." *Id*.

Defendants state "[i]n 2014[,] the need for a dedicated emergency access lane became obvious when [nine] shootings[,] including three homicides[,] occurred in the City[ ]" over the Memorial Day Weekend. *Id*. at 16. According to Defendants, "[p]olice cars and emergency vehicles were unable to reach the scenes of the incidents in time." *Id*.

Thus, in short, Plaintiffs claim Defendants' implementation of the traffic loop is racially motivated. Defendants respond it is, instead, for public safety concerns.

African Americans do appear to be disparately impacted by the traffic loop. Nevertheless, as the Court explains below, it is unconvinced Defendants' use of the traffic loop is the result of any

discriminatory intent.  *See Arlington Heights*, 429 U.S. at 269 (concluding "[t]he impact of the Village's decision does arguably bear more heavily on racial minorities" but finding no evidence of racial discrimination); *see also Sylvia Dev. Corp.*, 48 F.3d at 823 (stating "discriminatory impact, if shown, may be probative (though not dispositive) on the issue of intent" (citation omitted)).

2. **whether Plaintiffs have established there is a historical background of the decision, which may take into account any history of discrimination by the decisionmaking body or the jurisdiction it represents**

Plaintiffs contend the "traffic loop is just the latest in a long series of official policies aimed (often explicitly) at disrupting Black Bike Week." Plaintiffs' Motion 23.  Plaintiffs also argue "City officials have expressed hostility toward the event, and acted accordingly, since at least 1998, when officials imposed the first restrictive traffic plan." *Id.*  Plaintiffs point to Judge Wooten's 2005 order in their favor and state "[s]ubsequent events have only confirmed that racial considerations have long influenced the City's hostile treatment of Black Bike Week." *Id.*  They also contend, "[s]oon after the settlement [from Judge Wooten's case] ended, the City imposed the Black Bike Week-only restrictions at issue in this lawsuit." *Id.* at 24.

In response, Defendants argue they "were not the sole decision makers on the traffic loop" and "SCDOT made the final decision on the traffic loop." Defendants' Response 18.  They also claim "for three years immediately before the creation of the traffic loop (2011–2014)[,] two way traffic was allowed [on] Ocean Boulevard and side streets were open." *Id.* at 18-19.

According to Defendants, "That traffic pattern is the same pattern that Plaintiffs have requested in the present lawsuit." *Id.* at 19.  They further state "that traffic pattern was a tragic failure which caused the traffic loop adopted by the . . . Task Force and [] approved by the Coastal Alliance." *Id.* (Mark Lazarus Deposition 214).

In addition, Defendants maintain "Judge Wooten's order only directed that traffic patterns should be equal for both [Memorial Day Weekend] and Harley Week in the month May." *Id.* They also insist "the facts were substantially different and the elements for obtaining a preliminary injunction were different in 2005." *Id.* (citing *NAACP v. Myrtle Beach*, 2018 WL 2332018, at *3 n.6).

According to Defendants, "[m]any of the same claims of discrimination made by the Plaintiffs in the present lawsuit were made by the white bikers who attended Harley Week." *Id.* (citing Thomas E. Ellenburg (Ellenburg) Declaration). Defendants claim "White Harley Week visitors were so offended by the acts of the City that they declared a boycott of the City." *Id.* Defendants state "[t]hat boycott continues to the present." *Id.*

Plaintiffs have failed to clearly establish their claim of a historical background of discrimination here. The decision to enact the traffic loop was made by a host of decisionmakers. Defendants were two of many. And, the Court must defer to Defendants' value judgments on matters of public safety. *See Sylvia Dev. Corp.*, 48 F.3d at 820 ("In determining whether a statutory purpose is legitimate, substantial judicial deference is required so that the court does not substitute its value judgments for those established by the democratically chosen branch." (citation omitted)).

Plaintiffs' argument concerning Judge Wooten's 2005 Order granting the plaintiffs' motion for a preliminary injunction is also unpersuasive. The issues, evidence, and record in that case are different than the ones here. In addition, the preliminary injunction standard in effect in 2005, the *Blackwelder* test, was less rigorous than the *Winter* test applicable here. And, the Fourth Circuit stayed the 2005 Order, keeping it from going into effect.

Further, Plaintiffs are unable to establish the traffic loop being used during Black Bike Week and not Harley Week is evidence of a history of Defendants racial animosity against Plaintiffs. As Ellenburg attested, "[a]s a result of the boycott, the traffic problems associated with Harley Week have vanished." Ellenburg Declaration 2. Thus, there is no reason for a traffic loop during Harley Week. For these reasons, the Court concludes Plaintiffs have failed to satisfy the second *Arlington* factor.

### 3. whether Plaintiffs have established there is a specific sequence of events leading up to the particular decision being challenged, including any significant departures from normal procedures

Plaintiffs state "[t]he sequence of events leading up to the enactment and continued use of the [twenty-three]-mile loop suggests discriminatory intent[.]" Plaintiffs' Motion 25. Plaintiffs claim "[t]he process by which [Defendants] made th[e] decision [to implement the traffic loop]—and have continued to impose it—confirms that the loop's purpose has never been, as City officials now contend, about traffic and emergency response issues." *Id.* (internal quotation marks omitted). "Rather," Plaintiffs allege, "the loop has always been intended to diminish or shut down the event, and to prevent attendees from having full access to the City." *Id.*

In response, Defendants insist they "have filed expert reports from experts in three different fields who have analyzed Defendants' planning and the experts have demonstrated the effect [t]he implementation of the traffic loop has had since was implemented in 2015." Defendants Response 20. According to Defendants, "[t]hose experts considered films of traffic conditions before the loop was implemented and they have observed either in person or investigated the effect of the traffic loop on [Memorial Day Weekend]." *Id.* Defendants contend their "experts have all concluded that planning that led to the traffic loop was proper." *Id.* (first citing Mark Teague Expert Report; then

citing Geoffrey Alpert and Kyle McClean Expert Report; and then citing Robert L. Stewart Expert Report).

Again, "substantial judicial deference is required" here to Defendants' implementation of the traffic loop, "so that the court does not substitute its value judgments for those established by the democratically chosen branch." *Sylvia Dev. Corp.*, 48 F.3d at 820 (citation omitted). Having reviewed these expert materials, the Court is unable to say there is anything racially suspect in the procedures Defendants employed in implementing the traffic loop. Hence, Plaintiffs have also failed to satisfy the third *Arlington* requirement.

### 4. whether Plaintiffs have established there were contemporary statements by decisionmakers on the record or in minutes of their meetings

Plaintiffs charge "[s]tatements made by and to City officials regarding the purported need for the traffic loop further demonstrate that racial considerations infected their decision-making." Plaintiffs' Motion 27. Plaintiffs stress "Myrtle Beach residents and tourists put heavy pressure on City officials to find a way to shut down Black Bike Week because of their virulent distaste for the people attending the event." *Id.*

Plaintiffs also complain "[m]any of their statements used language that has clear racial overtones." *Id.* "For example," Plaintiffs charge, "both before and after the 2014 shootings that purportedly justify the traffic loop, complaints were made to City officials describing the predominantly black crowd as criminals and criticizing the influx of black music, culture, and bodies entering their predominantly white space." *Id.* (citation omitted).

"Defendants contend there is no legislative history and there are no contemporary statements by legislators showing a discriminatory intent because there were no legislative acts." Defendants' Response 21. According to Defendants, the "Task Force public safety officials who created the

traffic loop were trained public safety professionals and not popularly elected government officials." *Id*.

The record before the Court demonstrates the Task Force is the entity that ultimately concluded there was a necessity for the traffic loop. Plaintiffs have neglected to establish there are any contemporary statements by them on the record or in minutes of their meetings indicating any racial animosity. Accordingly, Plaintiffs have failed to satisfy the fourth *Arlington* factor, as well.

     **5.**     **whether the factors usually considered important by the decisionmaker strongly favor a decision contrary to the one reached**

Although the *Arlington* court discussed this issue under the second factor, the historical factor, Plaintiffs have made it a separate one.

According to Plaintiffs, "Black Bike Week is just one of many large gatherings that come to Myrtle Beach each year, yet it is the only one for which the City feels the need to impose a . . . traffic loop." Plaintiffs' Motion 29. Plaintiffs state "[n]o other major, predominantly white event has ever been subject to such restrictions." *Id.* Plaintiffs contend "[t]he City has declared Black Bike Week an extraordinary event to justify its extraordinary treatment, but has offered no rationale as to why Black Bike Week alone warrants this designation, even as Harley Week and other events have drawn comparable numbers of people to the area." *Id.* at 29-30 (citing David B. Clarke Report 14-18) (internal quotation marks omitted).

As provided above, Defendants say the reason for the traffic loop is for public safety concerns. The evidence supports their claim. Plaintiffs have provided nothing to convince the Court otherwise.

**\*\*\*\*\***

To summarize the Court's discussion of the *Arlington* factors, Plaintiffs have failed to show a clear discriminatory intent by Defendants in relation to their decision to enact the traffic loop. Consequently, the burden does not shift to Defendants "to demonstrate that the same decision would have resulted even had the impermissible purpose not been considered." Sylvia Dev. Corp., 48 F.3d at 819 n.2 (citation omitted) (internal quotation marks omitted). As such, the Court need not address Plaintiffs' arguments in that regard.

The Court, having concluded Plaintiffs have failed to establish a constitutional violation, also necessarily concludes Plaintiffs have failed to clearly establish they will likely succeed on the merits of their underlying discrimination claim.

The Court will now consider the three remaining preliminary injunction requirements.

**B.**     ***Whether Plaintiffs have established they are likely to suffer irreparable harm in the absence of preliminary relief***

Plaintiffs argue Defendants "use [of] the traffic loop again this year . . . will inflict hardship on Plaintiffs and other Black Bike Week attendees, reducing enjoyment of the event for those who attend and discouraging others from attending altogether." Plaintiffs' Motion 35. Plaintiffs contend "[t]he traffic loop effectively traps attendees in or near their hotels in the evening, because getting back to the hotel by car will be so arduous." *Id*. "Thus, if not enjoined," Plaintiffs say, "the loop will seriously disrupt Plaintiffs' enjoyment of Black Bike Week." *Id*.

According to Plaintiffs, "Black Bike Week has suffered diminishing attendance, as the City's loop makes it far less enjoyable, and some Plaintiffs are among those reconsidering attendance." *Id*. at 35-36 (citing John G. Pedersen, Jr. Deposition 139:5-140:6). "This," Plaintiffs state, "constitutes serious, irreparable harm for the many Black Bike Week attendees, including some Plaintiffs, who have regularly attended the event for decades." *Id.* at 36 (first citing Novice Briggs

Declaration ¶ 3; then citing Patrice Johnson Declaration ¶ 6; then citing Kenneth Coleman Declaration ¶ 3; and then citing Simuel Jones Declaration ¶ 5). Plaintiffs claim, for them "and others who are deeply invested in the Black Bike Week community, this threatened deprivation risks real, irreparable, and difficult-to-quantify harm." *Id.*

Plaintiffs further state "the constitutional violations the loop is likely to inflict are deemed irreparable injury as a matter of law." *Id.* at 37. They also argue Defendants' "decision to treat Black Bike Week differently because it brings large groups of African-American individuals to Myrtle Beach violates [their] constitutional right to equal protection, which unquestionably constitutes irreparable injury." *Id.* (citations omitted) (internal quotation marks omitted).

Defendants respond they "agree that any deprivation of constitutional rights is harmful." Defendants' Response 22. But, they state "whether such harms are irreparable is not clearly established." *Id.*

Defendants also argue Plaintiffs' allegations of such things as inconvenience resulting from the traffic loop "are not the kinds of harm that warrant a preliminary injunction. A preliminary injunction is not normally available where the harm at issue can be remedied by money damages." *Id.* at 23. Defendants also question the timeliness of Plaintiffs' motion. *Id.*

If established, "a prospective violation of a constitutional right constitutes irreparable injury." *Davis v. D.C.*, 158 F.3d 1342, 1346 (D.C. Cir. 1998). But, Plaintiffs have failed to establish such a violation. As to Plaintiffs' claims of inconvenience, such claims, without a showing of racial animus, are not properly before the Court.

In addition, the Court notes Defendants utilized the traffic loop for three years—2015, 2016 and 2017—before Plaintiffs filed this lawsuit in 2018 challenging its use. As a general rule, exigent

circumstances must be present for the issuance of a preliminary injunction. *See Republic of Philippines v. Marcos*, 818 F.2d 1473, 1501 (9th Cir. 1987) (referring to the "exigent circumstances attending application for a preliminary injunction"); *see also Ideal Toy Corp.*, 685 F.2d at 84 ("[P]reliminary injunctions are intended to meet exigent circumstances[.]").

The fact Plaintiffs waited three years to file this lawsuit after Defendants instituted the traffic loop runs sideways into any claim the relief Plaintiffs request amounts to exigent circumstances. Or, as Judge Quattlebaum stated when denying Plaintiffs' initial motion for a preliminary injunction, "this delay cuts against the Plaintiffs' claim of irreparable harm." *NAACP v. Myrtle Beach*, 2018 WL 2332018, at *7. For these reasons, the Court holds Plaintiffs have failed to clearly establish they are likely to suffer irreparable harm in the absence of preliminary relief.

### C.     *Whether Plaintiffs have established the balance of equities tips in their favor*

Plaintiffs maintain "the equities clearly tip in favor of Plaintiffs, who will suffer discrimination, humiliation, inconvenience, and constitutional injury if the City is permitted to put its discriminatory traffic loop in place for another year." Plaintiffs' Motion 37. According to Plaintiffs, "[t]he City, by contrast, will not be harmed by such an injunction, because there is no evidence that the traffic loop actually serves any legitimate interest." *Id*. "Indeed, to the extent it ever becomes necessary, the City could also use the . . . plan it formulated last spring in the event that the Court granted Plaintiffs' initial preliminary injunction motion." *Id*. at 37-38 (citing Benjamin Thomas E-Mail from to South Carolina Department of Natural Resources Command Staff).

Defendants state "[t]he balance of equities tip strongly in favor of the Defendants." Defendants' Response 23. "Defendants contend the favorable balance [is supported] by the exhibits,

the testimony of Myrtle Beach Police Chief Amy Prock and the testimony of Captain Joey Crosby that traffic gridlock, disorderly crowds, and violence has occurred over past Memorial Day Weekends in the area of Ocean Boulevard governed by the traffic plan that the Plaintiffs seek to enjoin." *Id.* (citing Transcript of First Preliminary Injunction Hearing 94-132).

Defendants also argue "[f]or . . . Plaintiffs, the most serious actual injury would be inconvenience, exhaustion, and frustration resulting from the traffic loop for a possible total of twelve hours during [Memorial Day Weekend]." *Id.* (citing Plaintiffs' Motion for Leave to File First Amended Complaint). Defendants maintain "[t]hat inconvenience would only occur between the hours of 10 [PM] and 2 [AM]. *Id.*

"In contrast," according to Defendants, "forcing Defendants to police a potentially unsafe extraordinary event with an inadequate public safety plan and deny Defendants the use of techniques used by other jurisdictions under similar conditions, jeopardizes the safety of the [Memorial Day Weekend] visitors, City residents and the police." *Id.*

The Court first considers Plaintiffs' statement they "will suffer discrimination, humiliation, inconvenience, and constitutional injury if the City is permitted to put its discriminatory traffic loop in place for another year." Plaintiffs' Motion 37. The only claims of Plaintiffs the Court is concerned about, however, are whether Plaintiffs have established a constitutional violation, or, to adopt Plaintiffs' terms, "discrimination" and "constitutional injury." They have not. As the Court already noted, a determination on complaints such as humiliation and inconvenience, without more, is well beyond the scope of their motion for injunctive relief.

In balancing the equities of the parties, the Court is of the opinion Defendants would be prejudiced if the Court enjoined the traffic loop, one of their public safety measures. Of course,

there are also the harms and injuries Plaintiffs allege in their motion to consider. And, there is no question the balance of equities would tip in Plaintiffs' favor if they had shown a constitutional violation. But, they did not. Thus, the Court is unable to agree Plaintiffs have clearly established the balance of equities tips in their favor.

### D.       Whether Plaintiffs have established an injunction is in the public interest

Plaintiffs state "[t]here is no public interest in continuing a likely unconstitutional practice." *Id.* at 38. They then cite to *Centro Tepeyac v. Montgomery Cty.*, 722 F.3d 184 (4th Cir. 2013), which, when discussing the irreparable harm factor, the Fourth Circuit opined "a state is in no way harmed by issuance of a preliminary injunction which prevents the state from enforcing restrictions likely to be found unconstitutional. If anything, the system is improved by such an injunction." *Id.* at 191 (citation omitted).

Defendants respond, "[a]lthough . . . Plaintiffs have raised issues about the effectiveness of the [Black Bike Week] traffic plan, the evidence and expert reports provided by . . . Defendants . . . indicate that the traffic plan in place for Memorial Day Weekend attempts to serve a legitimate public interest in decreasing traffic congestion from Ocean Boulevard throughout the City, providing a clear path for emergency response vehicles and providing for the public safety in general." Defendants' Response 25.

"When considering the alleged injuries to the Plaintiffs with the demonstrated public interest in preventing problems with traffic gridlock, disorderly crowds and violence that might occur on Ocean Boulevard and surrounding areas if the City's plan is enjoined, Defendants contend that the public interest will be best served if the Defendants are allowed to proceed with the [Black Bike Week] traffic plan for Memorial Day Weekend 2019." *Id.*

As to Plaintiffs' argument it is in the public interest to prevent a constitutional violation, in light of the Court's conclusion Plaintiffs neglected to demonstrate a constitutional violation, that argument is of no consequence here.

Even though Plaintiffs submit claims and evidence as to the ineffectiveness of the traffic loop, Defendants respond with claims and evidence as to its effectiveness as a public safety measure. Weighing Plaintiffs' alleged injuries up against Defendants' public safety concerns, the Court concludes Defendants have the better argument. The public interest is best served if Defendants are allowed to go forward with the traffic loop for the upcoming Memorial Day Weekend.

*****

None of this is meant to say Plaintiffs' claims are wholly without merit. Instead, it is to say they have failed to clearly establish the extraordinary circumstances required to entitle them to the extraordinary remedy of a preliminary injunction at this juncture. They still have an opportunity to prove their case. "[A]nd the findings of fact and conclusions of law made by a court [deciding] a preliminary injunction are not binding at trial on the merits," *Univ. of Texas*, 451 U.S. at 395.

## V. CONCLUSION

In light of the foregoing discussion and analysis, Plaintiffs' motion for a preliminary injunction is **DENIED**.

Going forward, the Court requires citations appear in the body of the parties' submissions, not in footnotes. And, it requests brevity in those same submissions.

**IT IS SO ORDERED**.

Signed this 22nd day of May, 2019, in Columbia, South Carolina.

s/ Mary Geiger Lewis
MARY GEIGER LEWIS
UNITED STATES DISTRICT JUDGE