IN THE UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
FLORENCE DIVISION

NATIONAL ASSOCIATION FOR THE
ADVANCEMENT OF COLORED PEOPLE,
INC., *et al.*,

        Plaintiffs,

        v.

CITY OF MYRTLE BEACH, *et al.*,

        Defendants.

Civil Action No. 4:18-cv-00554-MGL

**BRIEF IN OPPOSITION TO DEFENDANTS'**

**MOTION FOR SUMMARY JUDGMENT**

### <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES ............................................................................................ ii

I. INTRODUCTION ...................................................................................................1

II. PLAINTIFFS' STATEMENT OF MATERIAL FACTS ........................................2

III. LEGAL STANDARD ...........................................................................................10

IV. ARGUMENT .........................................................................................................10

    A. The Jury Could Find for Plaintiffs on Their Civil Rights Claims.........................10

        1. The Evidence Supports a Jury Finding of Intentional Discrimination ......12

            a) The City Has Consistently Taken Actions that Disparately Affect African-Americans ............................................................12

            b) The City has a History of Race Discrimination .............................15

            c) The Sequence of Events Leading to the Operations Plan Supports an Inference of Improper Purpose .................................17

            d) Statements Made By and To City Officials Demonstrate Discriminatory Intent .....................................................................21

            e) Other Evidence of Discriminatory Intent.......................................24

        2. The City Cannot Establish as a Matter of Law that it Would Have Adopted the Operations Plan Absent Consideration of Race ...................28

        3. The City is the Decisionmaker..................................................................28

        4. Plaintiffs Satisfy the Remaining Requirements of Section 1981..............30

    B. Plaintiffs Can Establish Their First Amendment Claim .......................................31

        1. Participation in Black Bike week is Protected Expressive Association ....32

        2. The City Impermissibly Curtails Plaintiffs' Expressive Association ........33

    C. Plaintiffs' Can Establish Their Dormant Commerce Clause Claim ....................34

CONCLUSION.....................................................................................................................35

**TABLE OF AUTHORITIES**

**Cases**                                                                                                      **Page(s)**

*Alex v. Rayne Concrete Serv.*, 951 So. 2d 138 (La. 2007)............................................................20

*Alexander v. City of Greensboro*, 762 F. Supp. 2d 764 (M.D.N.C. 2011) ....................................30

*Alexander v. Sandoval*, 532 U.S. 275 (2001)...............................................................................11

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986)...............................................................10

*Baker v. McDonald's Corp.*, 686 F. Supp. 1474 (S.D. Fla. 1987) .................................................31

*Boy Scouts of America v. Dale*, 530 U.S. 640 (2000).................................................................33

*Callum v. CVS Health Corp.*, 137 F. Supp. 3d 817 (D.S.C. 2015)................................................11

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) ..........................................................................10

*City of Dallas v. Stanglin*, 490 U.S. 19 (1989) ..........................................................................33

*Clark v. Community for Creative Non–Violence,* 468 U.S. 288 (1984) ........................................34

*Columbus Bd. of Educ. v. Penick*, 443 U.S. 449 (1979) .............................................................12

*Dennis v. Cty. of Fairfax. See* 55 F.3d 151 (4th Cir. 1995) ..........................................................30

*E.E.O.C. v. Sears Roebuck & Co.*, 243 F.3d 846 (4th Cir. 2001)................................................25

*Edwards v. California*, 314 U.S. 160 (1941) ..............................................................................34

*Fed'n of African Am. Contractors v. City of Oakland*, 96 F.3d 1204 (9th Cir. 1996) ..................30

*Fla. State Conference of NAACP Branches v. City of Daytona Beach*, 54 F. Supp. 2d 1283,
    (M.D. Fla. 1999) ......................................................................................................................35

*Gallagher Doe v. Vill. of Mamaroneck*, 462 F. Supp. 2d 520 (S.D.N.Y. 2006)...........................22

*Gen. Bldg. Contractors Ass'n, Inc. v. Pennsylvania*, 458 U.S. 375 (1982)...................................11

*Ham v. Washington Suburban Sanitary Comm'n*, 158 F. App'x 457 (4th Cir. 2005)...................20

*Harper v. Albert*, 400 F.3d 1052 (7th Cir. 2005)........................................................................30

*Hunter v. Underwood*, 471 U.S. 222 (1985)...............................................................................12

*Hurley v. Irish-American Gay, Lesbian and Bisexual Group of Boston*,
515 U.S. 557 (1995)..................................................................................32

*Jennings v. Patterson*, 488 F.2d 436 (5th Cir. 1974)....................................31

*Jesus Christ Is the Answer Ministries, Inc. v. Baltimore Cnty., Md.*, 915 F.3d 256
(4th Cir. 2019)........................................................................................18

*Maine v. Taylor*, 477 U.S. 131 (1986) .........................................................34

*Mbacke v. Federated Dep't Stores, Inc.*, No. 2:07-CV-01118-RLH-LRL, 2008 WL 11449290
(D. Nev. Dec. 15, 2008)............................................................................31

*Mhany Mgmt., Inc. v. Cty. of Nassau*, 819 F.3d 581 (2d Cir. 2016)..........................21, 23

*Mhany Mgmt. Inc. v. Inc. Vill. of Garden City*, 985 F. Supp. 2d 390 (E.D.N.Y. 2013) ...............30

*Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658 (1978)....................................11

*Nat'l Ass'n for Advancement of Colored People v. Ala. ex rel. Patterson*, 357 U.S. 449 (1958) ..33

*N.C. State Conference of NAACP v. McCrory*, 831 F.3d 204 (4th Cir. 2016) ..............................11

*Pac. Shores Props., LLC v. City of Newport Beach*, 730 F.3d 1142 (9th Cir. 2013) ...................12

*Perini Corp. v. Perini Constr., Inc.*, 915 F.2d 121 (4th Cir. 1990) ................................................10

*Pike v. Bruce Church, Inc.*, 397 U.S. 137 (1970). ..........................................................................34

*Reeves v. Sanderson Plumbing Products, Inc.,* 530 U.S. 133 (2000).............................................24

*Roberts v. U.S. Jaycees*, 468 U.S. 609 (1984) ..................................................... 31, 33-34

*Saleh v. Univ. of Virginia,* No. Civ. A. 3:97-CV-460 R, 1999 WL 34798179
(E.D. Va. Feb. 25, 1999)..........................................................................29

*Smith v. Town of Clarkton, N. C.*, 682 F.2d 1055 (4th Cir. 1982)...........................................21, 23

*Spence v. Washington*, 418 U.S. 405 (1974)..........................................................................31, 33

*Sylvia Dev. Corp. v. Calvert Cty., Md.*, 48 F.3d 810 (4th Cir. 1995) ..........................11, 12, 17, 21

*Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.* 429 U.S. 252 (1977) ..............11, 12, 15, 28

*Ward v. Rock Against Racism*, 491 U.S. 781 (1989) ......................................................................34

*Washington v. Davis*, 426 U.S. 229 (1976)................................................................................ 10-11

*Yamaha Motor Corp., U.S.A. v. Jim's Motorcycle, Inc.*, 401 F.3d 560 (4th Cir. 2005) ...............34

**Rules**                                                                                            **Page(s)**

Fed. R. Civ. P. 56(a) ....................................................................................................................10

Plaintiffs hereby submit this response in opposition to Defendants' Motion for Summary Judgment ("Motion") (Doc. No. 129). Pursuant to L.R. 7.08, Plaintiffs hereby request oral argument on the Motion as Plaintiffs believe that oral argument would be particularly helpful to illuminate the legal arguments and the multitude of disputed material facts in the record.

## I.     INTRODUCTION

Defendants City of Myrtle Beach and City of Myrtle Beach Police Department's ("the City") Motion is premised on two essential, yet erroneous, assertions: that Plaintiffs have adduced no evidence of discrimination and that the City cannot be liable because the Bikefest Taskforce ("Taskforce") designed the challenged Black Bike Week Operations Plan. The record directly contradicts both of these assertions. The City has long-opposed Black Bike Week since it began to expand beyond the borders of the predominately African-American town of Atlantic Beach in the mid-90s. That hostility has manifested itself in a twenty-five-year campaign to end the event. The evidence demonstrates that those efforts have been grounded in race. The City experiences many other summer weekends that have the same elements that the City asserts mar Black Bike Week: large crowds, traffic, partying, and occasional serious violence. Black Bike Week has just one unique quality: the attendees are 80 or more percent African American while the residents and visitors on a typical day in Myrtle Beach are at least two-thirds white. The City has assailed Black Bike Week with extraordinarily restrictive policies, but the City has taken virtually no actions against the other events. The architect of the Operations Plan, former City Manager Thomas Leath, explained the difference in the starkest of racial terms: "[T]here is a different party behavior between the black crowds and white crowds, generally."

The City asserts that its actions against Black Bike Week are necessary for emergency responses and to keep traffic moving on Ocean Boulevard. But Black Bike Week emergency

response times have always been faster than virtually every other weekend in Myrtle Beach and Ocean Boulevard drive times only get slower when the Operations Plan is in place.

In the shadow of substantial evidence of racial motivation, the City tries to shield itself from liability with the false narrative that the Taskforce is actually responsible for the Operations Plan. That is simply incorrect. The Taskforce did not design the Operations Plan, but instead was merely a forum for governmental coordination because the City's loop plans extended outside of City limits. The Taskforce has no actual authority over any aspect of the Operations Plan, and all agree that the City alone could end its use during Black Bike Week.

The Operations Plan is the City's latest foray in its crusade to drive African Americans away from the City over Memorial Day weekend. That action violates the civil rights laws, the right of free expression, and discriminates against out-of-state visitors.

The evidence supports a finding that the City's Black Bike Week Operations Plan discriminates on the basis of race, violates Plaintiffs' First Amendment rights, and discriminates between locals and visitors in violation of the Dormant Commerce Clause.  At the very least, material facts are in dispute on each claim, precluding the entry of summary judgment.

## II.    PLAINTIFFS' STATEMENT OF MATERIAL FACTS[1]

1.    A beachfront City with a tourist economy, Myrtle Beach attracts large, predominantly white crowds throughout the spring and summer, and its year-round residential population is around 67% white. Ex. 18 (Rhodes Dep.) at 104:22-106:25; Ex. 17 (Prock Dep.) at 84:2-16; Ex. 13 (Leath 2019 Dep.) at 67:15-68:17; Ex. 47 (COC_000012-13) (67.5% of summer visitors in

---

[1] Plaintiffs' Statement of Material Facts sets forth the facts that pertain to the matter as well as the material facts in dispute. *See* L.R. 7.05(A)(2), (4). Citations to Plaintiffs' Material Facts in Dispute appear as follows: "PMF #", with # being the fact's paragraph number.

2017 were white); Ex. 8 (Gall Dep.) at 67:2-13; Ex. 48 (Parnell Rep.) at 5 (estimating Ocean

Boulevard crowd was 71.3% white during 2017 Harley Week); Ex. 49 (Gallagher Report) at 4.

2.      Once a year, Black Bike Week comes to Myrtle Beach, changing the racial demographics

from around two-thirds white to around three-fourths African-American. *Id.*; Ex. 8 (Gall Dep.) at

67:2-13; Ex. 48 (Parnell Rep.) at 5 (finding that approximately 86% of the crowd on Ocean

Boulevard during Black Bike 2017 was African American); Ex. 13 (Leath 2019 Dep.) at 14:12-

15:23, 67:15-68:11 (Memorial Day weekend only time during Leath's tenure as City Manager

from 1987 through 2014 that tourists to Myrtle Beach are not predominately white); Ex. 50

(RFA) at ¶ 46; Ex. 17 (Prock Dep.) at 234:8-17.

3.      The City of Atlantic Beach and two motorcycle clubs, the Carolina Knight Riders and

Buffalo Riders, started Black Bike Week to celebrate African American motorcycle culture.  Ex.

25 (Armstrong Decl.) at ¶¶ 6-7, 16. Since then, African American motorcycle riders attend Black

Bike Week each year with their motorcycle clubs to continue this tradition. Ex. 25 (Armstrong

Decl.) at ¶¶ 16, 20; Ex. 44 (C. Stevenson 2019 Decl.) at ¶ 5-8 (also discussing club-organized

events); Ex. 39 (Kinard Sep. Decl.) ¶¶ 5-6.

4.      As Black Bike Week grew, Myrtle Beach residents and city officials publicly expressed

hostility toward it. Ex. 13 (Leath 2019 Dep.) at 63:12-64:18; Ex. 51 (PL_030048) (letter stating

"We do not encourage [Black Bike Week]"); Ex. 12 (Leath 2004 Dep.) at 136:14-138:16

(discussing letter); Ex. 14 (McBride 2004 Dep.) at 163:16-164:3 (same); Ex. 9 (Gildea Dep.) at

55:3-24 (City suggested bringing in dogs only during Black Bike Week).

5.      In contrast, the City took a more welcoming attitude towards Harley Week. *Compare id*.

*to* Ex. 13 (Leath 2019 Dep.) at 237:7-18 ( "we're going to try our best to -- to accommodate

[Harley Week]"); Ex. 14 (McBride 2004 Dep.) at 107:22-108:7.

6.     Myrtle Beach imposed policies on Black Bike Week that it did not impose on Harley Week or other events and busy weekends in the City, including increased law enforcement, zero tolerance for law breakers, and a one-way traffic plan along Ocean Boulevard with restricted right-hand turns. Ex. 14 (McBride 2004 Dep.) at 164:8-165:13; Ex. 52 (PL_070764) (referencing more than 700 law enforcement officers at 1999 Bike Week); Ex. 53 (DEF01415448-52) (previous expert report of D. Clarke at 10-14); Ex. 54 (DEF01415429-32) (previous expert report of Williams and Brown at 3-6); Ex. 55 (PL_030159-60) (guides referencing "zero tolerance").

7.     In 2005, Judge Wooten granted the NAACP's motion seeking to preliminarily enjoin Myrtle Beach from treating Black Bike Week differently from Harley Week, finding that race was a motivating factor in the disparate treatment of the comparable events. Ex. 56 (2005 Op. & Order) at 9-10, 15; Ex. 57 (2003 Compl.).

8.     The parties settled the case, with Myrtle Beach agreeing to treat Harley Week and Black Bike Week comparably until 2010. Ex. 58 (2006 Settlement Agreement).

9.     In 2008, a shooting incident occurred during Memorial Day weekend, which was not related to Black Bike Week. Ex. 59 (PL_032708-9); Ex. 14 (PL_041296-7) (suspects in shooting were locals and weren't riding motorcycles). Ex. 36 (James 2019 Decl.) at ¶8-9.

10.     The City reacted to the shooting by passing ordinances directed at Black Bike Week, including a helmet requirement, a prohibition on loitering and congregating, new fines for businesses that did not provide sufficient security to police their premises, and changes to zoning laws so that no motorcycle events could take place at the Myrtle Beach Convention Center. Ex. 61 (DEF00705862); Ex. 62 (PL_027309-28); Ex. 63 (PL_032421); Ex. 64 (PL_024894); Ex. 65 (PL_047956-58); Ex. 66 (PL_047945-46); Ex. 67 (PL_041312); Ex. 33 (Harrell Decl.) at ¶¶ 7-12.

11.    The consent decree required the City to treat Harley Week and Black Bike Week equally; therefore the ordinances also applied to Harley Week, but they were more aggressively enforced during Black Bike Week. Ex. 1 (Asaka 30(b)(6) Dep.) at 28:15-29:16; Ex. 68 (PL_019458-460); Ex. 69 (PL_019472-74); Ex. 33 (Harrell Decl.) at ¶ 7 ) ("Harley Week was merely collateral damage"); Ex. 25 (Armstrong Decl.) at ¶ 22; Ex. 36 (James 2019 Decl.) at ¶¶12-13.

12.    During Memorial Day weekend in 2014, three people were killed in a shooting at an Ocean Boulevard hotel. Ex. 70 (PL_017041).

13.    This type of violence occurs in Myrtle Beach periodically, year-round, and is not limited to Black Bike Week.  Ex. 71 (DEF00322540); Ex. 72 (PL_016798); Ex. 73 (PL_017048-119); Ex. 74 (PL_017121-23) (five people shot in a nightclub); Ex. 75 (PL_017125-27); Ex. 76 (PL_017141-42) (describing Easter and Father's Day shootings in 2017); Ex. 77 (PL_017148-51) (shooting resulting in multiple gunshot wounds on Ocean Boulevard during Labor Day); Ex. 17 (Prock Dep.) at 227:4-10; Ex. 8 (Gall Dep.) at 153:24-154:9; Ex. 24 (Webster Dep.) at 120:12-121:2 (Black Bike Week not more violent than other events).

14.    City officials acknowledge that no evidence links the 2014 Memorial Day shootings or any of the people involved to Black Bike Week or its attendees. Ex. 78 (PL_017045); Ex. 13 (Leath 2019 Dep.) at 144:14-17; Ex. 18 (Rhodes Dep.) at 201:11-13. Yet, the City publicly and repeatedly tied that violent event to Black Bike Week. Ex. 13 (Leath 2019 Dep.) at 144:18-145:1; Ex. 79 (PL_016560-61); Ex. 80 (DEF01418314).

15.    The immediate public backlash had racial motivations that City officials acknowledged. Ex. 13 (Leath 2019 Dep.) at 161:9-25; Ex. 10 (Kruea Dep.) at 145:15-146:1; Ex. 8 (Gall Dep.) at 68:14-69:21. Instead of repudiating racial complaints, the City circulated them and assured

constituents that the Council would address the Black Bike Week issues. *See* Ex. 81 (DEF00705357).

16.     One former City leader, David Stradinger, sent a letter shortly after Black Bike Week 2014 describing the predominately Black attendees as "bands of groupies and thugs and gang members," and called for the City to make Memorial Day Weekend "very UNCOMFORTABLE for them." Ex. 81 (DEF00705357-59) (emphasis in original). There were also calls for the National Guard to be brought in, Ex. 18 (Rhodes Dep.) at 324:2-325:14, echoing sentiments from 1990s and early 2000s, *see* Ex. 14 (McBride 2004 Dep.) at 209:15-211:19 (discussing desire to bring in 2,000 officers, including the national guard); Ex. 12 (Leath 2004 Dep.) at 179:20-180:3, 181:17-20, 185:5-13, 188:25-189:3; Ex. 13 (Leath 2019 Dep.) at 254:23-255:2, 265:12-22.

17.     It was clear at that time, that the City wanted to end Black Bike Week. Ex. 82 (DEF00015624); Ex. 83 (DEF00015576); Ex. 8 (Gall Dep.) at 198:3-13 ("there were politicians . . . that made promises . . . to shut this event down."); Ex. 84 (PL_017034-35); Ex. 26 (Booker Decl.) at ¶¶ 5, 8-11. This sentiment was also present among influential members of the business community. *See* Ex. 85 (DEF00754282) (email from Chamber CEO suggesting increased law enforcement, re-routed traffic, and canceling Atlantic Beach Bikefest); Ex. 86 (COC_039390) (petition titled "City of Myrtle Beach: End Atlantic Beach Bikefest" signed and forwarded by Chamber employees); Ex. 19 (Richardson Dep.) 89:23-91:14.

18.     Just days after the shooting, the City proposed an emergency lane and pedestrian barricades on Ocean Boulevard during Black Bike Week, Ex. 82 (DEF00015624), and soon after developed a plan for increased law enforcement and a 40-mile traffic loop that would force Black Bike Week traffic across multiple jurisdictions, Ex. 87 (PL_002500-501); Ex 13 (Leath 2019 Dep.) at 3:13, 229:6-230:2; Ex. 15 (Nell Dep.) at 60:3-18 (City pushed 40-mile loop), 69:6-

14; Ex. 88 (Nell Dep. Ex. 2) (map of 40 mile loop); Ex. 89 (DEF00557653-5); Ex. 90 (excerpt

from PL_016124 at 34:30) (J. Pedersen Video) (Pedersen announces the plan for 40-mile loop).

19.     The City's plans were solidified well before the Special Events Summit took place on

September 21-23, 2014, Ex. 91 (DEF00015902); Ex. 8 (Gall Dep.) at 231:3-16, and before the

Taskforce was created on Sept. 24, 2014, Ex. 92 (Horry_000068-69). The Taskforce was a

response to the City's desire to use a traffic pattern extending into other jurisdictions, was made

for coordination and comment, and has no independent authority. See Ex. 92 (Horry_000069);

Ex. 6 (Eldridge Dep.) at 165:3-167:19.

20.     The City "settled" for the current 23-mile loop after neighboring jurisdictions resisted a

longer one. Ex. 18 (Rhodes Dep.) at 301:19-302:7; Ex. 24 (Webster Dep.) at 165:23-166:7; Ex.

84 (PL_017034-36) (article on proposal for 9-mile loop); Ex. 11 (Lazarus Dep.) at 193:18-23.

21.     The City ultimately finalized the following set of restrictions for Black Bike Week—

referred to collectively (with the traffic loop) as the Operations Plan: 1) hundreds of additional

police officers, instructed to strictly enforce the law, Ex. 93 (PL_000509); Ex. 94 (PL_017000);

Ex. 95 (DEF00072090-91) (587, 597, 643, and 488 law enforcement officers from other agencies

brought in between 2015-2018, respectively); 2) a one-way traffic pattern, with one lane reserved

solely for police and emergency vehicles, Ex. 96 (PL_016152); and 3) pedestrian barriers lining

over five miles of Ocean Boulevard, *id.*; Ex. 97 (Clarke Rep.) at 39.

22.     The City justifies the one-way traffic pattern and traffic loop as being necessary to keep

traffic moving on Ocean Boulevard and respond to calls for service. Ex. 5 (Crosby 30(b)(6)

Dep.) at 46:16-47:23 (primary reason for one-way is responding to calls for service), 48:10-15

(objective to keep traffic moving on Ocean Boulevard); Ex. 8 (Gall Dep.) at 177:25-178:20; Ex.

13 (Leath 2019 Dep.) at 131:19-132:14, 133:23-134:10; Ex. 17 (Prock Dep.) at 153:4-16.

23.     However, before implementing the Plan, the City gathered no data about traffic flow, response time, rates of crime, or crowd size; conducted no analysis on traffic demand or supply (nor engaged a licensed traffic engineer to do so); and did not evaluate whether other, less intrusive alternatives would accomplish the City's articulated purposes. Ex. 16 (Pedersen Dep.) at 194:22-195:1, 230:7-231:11, 232:19-233:4; Ex. 17 (Prock Dep.) at 48:23-49:2; Ex. 13 (Leath 2019 Dep.) at 98:3-16, 213:7-19; Ex. 8 (Gall Dep.) at 63:14-64:15, 248:20-250:1, 269:3-9, 282:19-24; Ex. 20 (Smith Dep.) at 224:20-225:21; Ex. 4 (Crosby Dep.) at 180:24-181:8. The City relied on City officials' observations and "gut" feelings regarding Black Bike Week in putting together the Plan. Ex. 8 (Gall Dep.) at 255:8-16, 259:10-16; Ex. 16 (Pedersen Dep.) at 179:8-180:6; Ex. 8 (Gall Dep.) at 145:23-147:2 (explaining that as Police Chief he had to rely on the gut feelings of officers rather than statistics); Ex. 17 (Prock Dep.) at 240:10-19 (Chief of Police evaluates effectiveness of Plan based on personal observation rather than data)

24.     Moreover, contrary to their assertions (Defs. Mot. X), the City has not properly analyzed and assessed the impact of the Plan since it was implemented over five years ago, including whether it accomplishes its purported goals. Ex. 98 (Brown and Williams Rep.) at 12; Ex. 5 (Crosby 30(b)(6) Dep.) at 41:14-46:15 (other than real time observations, no data analysis done related to traffic management); Ex. 99 (DEF00072100-04) (2018 After Action Report at 9-13) (containing no quantitative or qualitative analysis).

25.     An analysis of available data demonstrates that the Plan's traffic loop *increases* traffic congestion and has no significant effect on emergency vehicle response times. Ex. 97 (Clarke Rep.) at 28, 34, 38 (plan fails to alleviate congestion, unnecessary for emergency access).

26.     The City's Plan has severe consequences for those who come to Myrtle Beach over Memorial Day Weekend, as compared to any other time of year. *See* Ex. 1 (Asaka 30(b)(6) Dep.)

at 48:1-52:12; 112:8-113:15; 188:23-189:13. However, other busy weekends in Myrtle Beach attract similar numbers of visitors. Ex. 30 (Clarke Decl.) at ¶¶ 5-8.

27.    During Memorial Day Weekend, trips that normally take minutes, take hours due to the one-way traffic pattern and imposition of traffic loop. Ex. 27 (Briggs Decl.) at ¶ 6 (five minute drive took three hours because of the loop); Ex. 32 (Frink Decl.) at ¶¶ 6-12; Ex. 36 (Johnson Decl.) at ¶ 8; Ex. 31 (Coleman Decl.) at ¶¶ 6-7; Ex. 37 (S. Jones Decl.) at ¶¶ 13-14; Ex. 43 (C. Stevenson 2018 Decl.) at ¶¶ 7-8; Ex. 45 (L. Stevenson Decl.) at ¶ 6.

28.    The traffic plan limits Black Bike Week participants' ability to cruise and display their unique bikes, Ex. 34 (James 2018 Decl.) at ¶ 10; Ex. 43 (C. Stevenson 2018 Decl.) at ¶¶ 18-19; Ex. 37 (S. Jones Decl.) at ¶¶ 6-7, and the pedestrian barriers hinder engagement with each other and spectators, Ex. 37 (S. Jones Decl.) ¶¶ 8-9; Ex. 43 (C. Stevenson 2018 Decl.) at ¶ 20. Participants are also subject to invasive policing. Ex. 36 (Johnson Decl.) at ¶¶ 10-11; Ex. 43 (C. Stevenson 2018 Decl.) at ¶ 16.

29.    The Operations Plan also provides preferential treatment to local residents and businesses, and the City acknowledges that non-locals are disproportionately affected by the plan. Ex. 4 (Crosby Dep.) at 92:18-22 (Crosby asked to come up with a traffic plan that assisted local residents); Ex. 100 (DEF00981931-34) (guide sent to city employees telling them how to navigate Memorial Day weekend traffic controls); Ex. 23 (Thomas Dep.) at 236:14-238:24;  Ex. 38 (W. Jones Decl.) ¶¶ 4-6 (side-street access for locals only and preferential treatment for local businesses); Ex. 101 (COC_014055) at 53 (identifying Ocean Boulevard as for visitors with a tourist focus); Ex. 16 (Pedersen Dep. At 87:24-88:12); Ex. 22 (Teague Dep. 88:18-22); Ex. 24 (Webster Dep. At 107:12-20); Ex. 3 (Brown Dep.) at 48:4-49:5; Ex. 2 (Bethune Dep.) at 74:5-16 (Myrtle Beach residents know how to get around Memorial Day Weekend traffic controls); Ex.

29 (Clark Decl.) ¶¶ 2-3, 5-6, 9 (out-of-state business forced to keep operations outside of Myrtle

Beach during Black Bike Week because of traffic controls).

30.    The City's actions have led to a drop in Black Bike Week attendance. Ex. 16 (Pedersen

Dep.) at 139:5-140:6; *see, e.g.*, Ex. 40 (Kinard Feb. Decl.) ¶¶ 3-4; Ex. 41 (Lassiter Decl.) ¶¶ 4-5;

Ex. 42 (McNeill Decl.) at ¶ 13 (will not attend Black Bike Week after roughly twenty years).

## III.    LEGAL STANDARD

Summary judgment is appropriate only if the movant shows that "there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed.

R. Civ. P. 56(a). The movant bears the burden of demonstrating that there is no material fact in

dispute.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). A genuine issue of material fact

exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving

party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). On a motion for summary

judgment, all evidence must be viewed in the light most favorable to the nonmoving party.

*Perini Corp. v. Perini Constr., Inc.*, 915 F.2d 121, 123-24 (4th Cir. 1990).

## IV.    ARGUMENT

### A.    The Jury Could Find for Plaintiffs on Their Civil Rights Claims.

The City's decision to enact the Operations Plan discriminates on the basis of race in

violation of the Equal Protection Clause of the Fourteenth Amendment, Title VI of the Civil

Rights Act of 1964, and 42 U.S.C. § 1981.[2] A plaintiff can prevail under each of these provisions

by establishing that the defendant engaged in intentional discrimination.[3] *See e.g., Washington v.*

---

[2] Contrary to the City's argument (Defs' Mot X), Plaintiffs do not have a separate constitutional
claim based on over-policing. Rather, Plaintiffs contend that the over-policing present at Black
Bike Week is evidence of the City's discriminatory intent.

[3] Plaintiffs' Section 1983 and Title VI counts have additional elements that are easily met here.
As to Section 1983, there appears to be no dispute that the threshold requirements are satisfied,
namely that the City is a governmental body whose official policy, the Operations Plan, is

*Davis*, 426 U.S. 229, 239 (1976); *Gen. Bldg. Contractors Ass'n, Inc. v. Pennsylvania*, 458 U.S. 375, 391 (1982); *Alexander v. Sandoval*, 532 U.S. 275, 280-81 (2001). The most appropriate method for establishing intentional discrimination in this context is through the framework set forth in *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.* 429 U.S. 252 (directing courts to engage in "a sensitive inquiry into such circumstantial and direct evidence of intent as may be available."). *Arlington Heights* sets out "a nonexhaustive list of factors to consider" as part of a court's inquiry, including the following:

> (1) evidence of a "consistent pattern" of actions by the decisionmaking body disparately impacting members of a particular class of persons; (2) historical background of the decision, which may take into account any history of discrimination by the decisionmaking body or the jurisdiction it represents; (3) the specific sequence of events leading up to the particular decision being challenged, including any significant departures from normal procedures; and (4) contemporary statements by decisionmakers on the record or in minutes of their meetings.

*Sylvia Dev. Corp. v. Calvert Cty., Md.*, 48 F.3d 810, 819 (4th Cir. 1995) (citing *Arlington Heights*, 429 U.S. at 266-68). These factors must be considered collectively. *N.C. State Conference of NAACP v. McCrory*, 831 F.3d 204, 233 (4th Cir. 2016).

Under the *Arlington Heights* framework, Plaintiffs' initial burden is to establish that race was "<u>a</u> factor" that motivated the challenged policy—here, the Operations Plan. *McCrory*, 831 F.3d at 233. *See also Arlington Heights,* 429 U.S.at 265 n.11. Plaintiffs need not show that race was the <u>only</u> factor or even the predominant factor. *Id.* Nor must Plaintiffs show that Myrtle Beach, or its officials, "harbored racial hatred or animosity toward" African Americans.

---

challenged by Plaintiffs as unconstitutional. *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658 (1978) ("[T]he touchstone of the § 1983 action against a government body is an allegation that official policy is responsible for a deprivation of rights protected by the Constitution"). Title VI also requires a plaintiff to prove "that the defendant received federal financial assistance," which is undisputed here. *See Callum v. CVS Health Corp.*, 137 F.Supp.3d 817, 844 (D.S.C. 2015); Ex. 50 (RFA) at ¶ 1. The remaining requirements of Plaintiffs' Section 1981 claim are addressed further in Section IV.A.4.

*McCrory*, 831 F.3d at 233. At the summary judgment stage, "any indication of discriminatory motive . . . may suffice to raise a question that can only be resolved by a fact-finder." *Pac. Shores Props., LLC v. City of Newport Beach*, 730 F.3d 1142, 1158 (9th Cir. 2013) (quoting *Schnidrig v. Columbia Mach., Inc.*, 80 F.3d 1406, 1409 (9th Cir. 1996).

Once a plaintiff establishes that a jury could find that race played *some* role, the burden shifts to the defendant to show it would have taken the same action without regard to race. *McCrory*, 831 F.3d at 233; *Hunter v. Underwood*, 471 U.S. 222, 228 (1985). Here, there is ample evidence that race played a role in the creation of the Operations Plan.

### 1.     The Evidence Supports A Jury Finding of Intentional Discrimination

#### a)     *The City Has Consistently Taken Actions that Disparately Affect African Americans*

The first *Arlington Heights* factor examines whether there is evidence of a consistent pattern of actions by the decisionmaking body that disproportionately affects a protected class. *Sylvia Dev. Corp.*, 48 F.3d at 819; *McCrory*, 831 F.3d at 231.[4] Impact is probative of intent because "people usually intend the natural consequences of their actions." *Reno v. Bossier Parish Sch. Bd.*, 520 U.S. 471, 487 (1997). Moreover, disproportionate effect is forceful and independent evidence of discriminatory intent where the effect is foreseeable. *See, e.g.*, *Columbus Bd. of Educ. v. Penick*, 443 U.S. 449, 464-65 (1979) (quoting *Penick v. Columbus Bd. of Ed.*, 429 F. Supp. 229, 255 (S.D. Ohio 1977)) ("Adherence to a particular policy or practice, 'with full knowledge of the predictable effects of such adherence . . . may be considered by a court in determining whether an inference of [discriminatory] intent should be drawn.").

---

[4] While a "consistent pattern" is relevant, it is not a "necessary predicate to a violation of the Equal Protection Clause. A single invidiously discriminatory governmental act . . . would not necessarily be immunized by the absence of such discrimination in the making of other comparable decisions." *Arlington Heights,* 429 U.S. at 266 n.14.

Black Bike Week is the only time during the year that visitors to Myrtle Beach are predominantly African-American. The City of Myrtle Beach is largely white, with approximately two-thirds of its residents identifying as white/non-Hispanic and approximately 13.5% identifying as African American. Ex. 49 (Gallagher Rep.) at 4. Visitors to Myrtle Beach during the year, and particularly over busy summer weekends, are also predominantly white. PMF 1. However, the racial demographics in Myrtle Beach dramatically shift once a year during Black Bike Week when visitors to the City are approximately 85% African American. PMF 2. This demographic swing has happened since the 1990s, when Black Bike Week began to grow. *Id.*

Myrtle Beach's pattern of adverse actions against Black Bike Week began in 1998 when the City of Myrtle Beach implemented a number of restrictions, including: shutting down portions of Ocean Boulevard; imposing a one-way traffic plan; deploying 500-700 police officers; and aggressively enforcing the law. PMF 6. Those restrictions were imposed during Black Bike Weeks from 1998 to 2010, and not imposed on other weekends,[5] with one notable exception: from 2005 to 2010, the City imposed a traffic plan on Harley Week pursuant to a court-entered settlement agreement requiring the City to treat the two events the same. PMF 8.

The City's attacks on Black Bike Week escalated in the wake of a 2008 shooting incident, when the City passed a series of anti-nuisance ordinances prohibiting conduct such as loitering and congregating, and an ordinance requiring the use of motorcycle helmets. PMF 10. The ordinances were intended to discourage participation in Black Bike Week, but also applied to Harley Week because the consent order required equal treatment. PMF 11. *See Pac. Shores*, 730 F.3d at 1158-64 ("[A] defendant does not immunize itself from suit by being so "thorough in

---

[5] In 2001, there was a short-lived one-way traffic pattern during Harley Week. *See infra* p.16.

its discrimination that all similarly situated [entities] are victimized."). While they applied to both rallies, the ordinances were also enforced unequally during Black Bike Week. PMF 11.[6] During the 2009 bike weeks, virtually all of the citations issued under those ordinances occurred during Black Bike Week. Ex. 68 (PL_019458-460); Ex. 69 (PL_019472-74).

After Memorial Day Weekend 2014, the City's adverse treatment of Black Bike Week reached its most severe stage when it designed the Operations Plan. The City was aware of the racial impact of the Plan. One County council member suggested that the City's original plan was "blatantly racist in design." Ex. 102 (NATIVE_HORRY 002051); *see also* Ex. 34 (James 2018 Decl.) at ¶¶ 14-15; Ex. 1 (Asaka 30(b)(6) Dep.) at 48:1-53:6 (describing City's awareness of the NAACP's concerns that traffic plan would have disparate impact). Yet, despite these warning signs and a prior finding of likely discrimination by Judge Wooten, the City adopted the plan. *See Columbus Bd. of Ed.*, 443 U.S. at 464–65.

The City's Operations Plan profoundly worsens the experience of Black Bike Week attendees. Ex. 32 (Frink Decl.) at ¶¶ 6-12 (describing being stuck in traffic loop for 2.5 hours and having to call an ambulance because her blood sugar levels had dropped and faced real possibility of dying); Ex. 36 (Johnson Decl.) at ¶ 8. (4.5 hours to navigate loop and get to hotel); PMF 26-28. Importantly, the entire Operations Plan—not just the loop—degrades the weekend experience, whether it be the one-way traffic pattern, the pedestrian barriers, or the constant presence of hundreds of police officers. *See e.g.*, Ex. 36 (Johnson Decl.) at ¶¶ 10-11 (one-way traffic pattern slows vehicles to standstill, which police officers use to peer inside stopped vehicles); Ex. 37 (S. Jones Decl.) ¶¶ 8-9 (pedestrian barriers prevent spectators from engaging

---

[6] Contrary to the City's suggestion in its Motion at 7, the NAACP did challenge the ordinances directed at the motorcyclists through the mediation vehicle created by the settlement agreement. Ex. 1(Asaka Dep.) at 30:3-18.

14

with motorcyclists, one of the most pleasant and important parts of a bike rally experience); PMF 26-28. The experiences of these Black Bike Week attendees should come as no surprise, as the City has long-acknowledged that the specific purpose of its actions has been to make Black Bike Week unpleasant and to discourage attendance. PMF 4-5; 16-17. The policies have had their intended effect, as Black Bike Week participation has diminished. PMF 30.

The evidence demonstrating Myrtle Beach's consistent, twenty-year pattern of adverse actions against Black Bike Week, the sole time when the City goes from predominantly white to overwhelmingly African American, supports a finding under the first *Arlington Heights* factor that the Operations Plan is motivated at least in part on race.

b) *The City Has a History of Race Discrimination*

The second *Arlington Heights* factor is "[t]he historical background of the decision" being challenged. *Arlington Heights*, 429 U.S. at 267. A history of race discrimination, patterns of discrimination, and racial polarization are "particularly relevant" to the question of illegal purpose. *McCrory*, 831 F.3d at 223.

Myrtle Beach has a history of racial discrimination, having been developed as a white-only beach town during the Jim Crow era. Ex. 36 (James 2019 Decl.) at ¶5; Ex. 7 (Evans Dep.) at 16:19-18:7. The adjacent Atlantic Beach developed in the 1940s, as the only beach area along the South Carolina coast where African Americans were allowed. Fences were erected on both sides of Atlantic Beach, stretching from the west side of the town into the ocean, to keep African-American swimmers from "polluting" the waters used by whites on neighboring beaches. Ex. 103 (PL_016532); Ex. 104 PL_016586; Ex. 25 (Armstrong Decl.) at ¶4.

The City's specific history of discrimination against Black Bike Week began when Black Bike Week began to bourgeon in the late nineties. The City was highly opposed to the event and

15

as described by former Mayor and City Council Member Mark McBride, Myrtle Beach needed

to band together "in defense of our standards, our neighborhoods, and our laws." Ex. 105

(PL_064847). McBride led a charge for the National Guard to be deployed, PMF **Error!**

**Reference source not found.**. The City took a different approach to Harley Week and readily

admitted that it "welcome[d]" Harley riders, but that it "discouraged" Black Bike Week. Ex. 14

(McBride 2004 Dep.) at 107:22-108:7; 163:16-165:13; PMF 5.

The City's actions reflected those sentiments. The City formed a Memorial Day

Taskforce, which recommended increased law enforcement, zero tolerance for law breakers, and

altered traffic plans on Ocean Boulevard. PMF 6.6. In 2001, in response to calls of unfair

treatment, the City implemented a one-way traffic plan for Harley Week. However, after one

day, Mayor McBride sought to lift the restriction. Ex 14 (McBride 2004 Dep.) at 238:24-241:10;

Ex. 13 (Leath 2019 Dep.) at 276:10-16 (recalling Mayor McBride objected to one-way plan

during Harley Week and tried to overturn it at an emergency city council meeting). The next

year, two-way traffic returned for Harley Week "after business owners and Harley

representatives pressed city officials" to make the change. Ex. 130 (PL_026928). The one-way

remained for Black Bike Week.

The City's actions were recognized as racially motivated by many. Most importantly,

Judge Wooten concluded that race was a motivating factor in the City's decision to use the traffic

plan. Wooten Order at 10.  North Myrtle Beach City Manager, Bill Moss stated that "racism,

overt and insidious, is prevalent [during Black Bike Week]." Ex. 106 (PL_021268). Thomas

Leath opposed deployment of the National Guard because he was concerned about its obvious

racial overtones. Ex. 13 (Leath 2019 Dep.) at 255:3-8; Ex. 63 (PL_032421-22). The NAACP

regularly told the City about differential treatment. Ex. 68 (PL_019458-460); Ex. 69 (PL_019472-74).

The hostility toward Black Bike Week continued even while the consent order was in place. During the 2008 Memorial Day Weekend, a white Coastal Carolina student was shot and killed by a local African-American teenager during a parking dispute. PMF 9. The incident was not connected to Black Bike Week. *Id.* Nonetheless, the City used the incident to start a new campaign to end the event. With the consent order requiring it to treat both events in the same manner, the City passed a series of ordinances targeted at the bike weeks. *See supra* p. 13-14; PMF 10-11. History repeated itself in 2014, when there was a shooting during Memorial Day Weekend (again with no evidence of any link between the shooters or victims and Black Bike Week) and the City tried once more to try to end Black Bike Week. *See* PMF 12, 14, 17. The consent order was no longer in place giving the City the opportunity to target Black Bike Week, leading to the most restrictive and punitive plan ever used in Myrtle Beach.

Importantly, the people who drove the City's implementation of the 2015 Operations Plan include those who created and drove the City's response to Black Bike Week from 1998-2005. Those officials, Leath and Gall, even acknowledge, as detailed below, that race played a role in decisions related to the earlier plan. The evidence of historical race discrimination supports an inference of racial discrimination. *See, e.g., McCrory*, 831 F.3d at 226–27.

      c)     *The Sequence of Events Leading to the Operations Plan Supports an Inference of Improper Purpose*

The third *Arlington Heights* factor is "the specific sequence of events leading up to the particular decision being challenged, including any significant departures from normal procedures." *Sylvia Dev. Corp.*, 48 F.3d at 819. Under this factor, discriminatory intent can be inferred where there is a deviation from how the same decisionmakers have acted in comparable

situations. *McCrory*, 831 F.3d at 227. Here, there are several forms of evidence indicating departures from normal procedures.

The speed with which the City designed the most restrictive traffic management plan the City has ever employed is evidence from which a reasonable jury could infer discrimination. *McCrory*, 831 F.3d at 227 (district court erred by refusing to draw inference of discriminatory intent based on the rushed passage of restrictive voting legislation). Just two days after Memorial Day 2014, then-Assistant City Manager John Pedersen proposed several components of the Plan, including the emergency lane and pedestrian barricades. PMF 18. City Manager Leath stated that the decision to reinstate the emergency lane during 2015 Black Bike Week was "pretty close to final" by June 8, 2014. Ex. 13 (Leath 2019 Dep.) at 156:8-25; 208:21-209:8. A plan was formally presented to the City Council on September 9, 2014 and included all of the elements of the eventual plan: a one-way traffic pattern on Ocean Boulevard, a traffic loop, pedestrian barricades, and increased law enforcement. PMF 18. These actions were taken amid a racially charged backlash, described in detail below, that infected the City. *See infra* p. 15-16; PMF 15-16; *see also Jesus Christ Is the Answer Ministries, Inc. v. Baltimore Cnty., Md.*, 915 F.3d 256, 263 (4th Cir. 2019), *as amended* (Feb. 25, 2019), (citing *Smith v. Town of Clarkton, N. C.*, 682 F.2d 1055, 1066 (4th Cir. 1982)) (jury could infer discrimination where "expressions of community bias are followed by irregularities in government decision-making").

The law enforcement summit, which the City claims influenced the Operations Plan (Motion at 12), did not occur until September 21, 2014, *after* the presentation to the City Council. PMF 19. The Taskforce never discussed the summit and Chief Gall, who planned the summit, testified that the City did not implement anything specific into the Operations Plan as a result of the summit. Ex. 24 (Webster Dep.) at 217:23-25; Ex. 8 (Gall Dep.) at 231:3-16.

In addition to a rushed and racially reactionary process, the City ensured that their decisionmaking process was cloaked in secrecy. Rather than publicly discussing the Operations Plan, the City Council went into executive session to discuss Black Bike Week and the Operations Plan three times in August and September of 2014 and a fourth time in January 2015.[7] Ex. 18 (Rhodes Dep.) at 255:22-257:3; Ex. 108 (PL_002684); Ex. 109 (DEF01503577); Ex. 110 (DEF01503725-29); Ex. 111 (DEF01503327) and Ex. 112 (DEF01503333). This secrecy was part of a pattern, as no minutes were kept from the Taskforce meetings. Ex. 4 (Crosby Dep.) at 219:16-220:4; Ex. 113 (Defs.' Resp. to Pl. 3rd Set of RFPs) No. 70; Ex. 24 (Webster Dep.) at 237:3-5. By the City's own design, there is no contemporaneous formal record of the City's decision-making process and now the City simply points to after-the-fact recollections.

The City has justified the creation of the Operation Plan by pointing to the 2014 shootings. *See, e.g.* Ex. 5 (Crosby 30(b)(6) Dep.) at 92:14-22; Defs.' Mot. 3-4; Ex. 114 (DEF00960667-68); Ex. 115 (COC_032359-61). No evidence has linked the shooting to any Black Bike Week participants. PMF 14. And, violence, including deadly gun violence, occurs with increasing regularity in Myrtle Beach. PMF 13. However, only when that violence has occurred in the context of Black Bike Week has the City responded in any way. *See* Ex. 8 (Gall Dep.) at 153:18-23 (could not recall any new procedures being put in place in response to other shootings); Ex. 5 (Crosby 30(b)(6) Dep.) at 93:20-94:13 (no similar response to shootings during Easter Weekend or Father's Day). Given that Black Bike Week is the only majority African-American event that takes place in the City and that there was a significant departure from the

---

[7] Ironically, the City attempts to use this as proof that no discriminatory statements were made, *see* Defs. Mot. 15, but of course no such statements can exist where the City decides to hide behind a veil of secrecy in executive session.

normal procedure for responding to incidents of violence, a jury could infer that improper

purposes were playing role. *See also* Ex. 49 (Gallagher Rep.) at 14-15, 19-20 (discussing

overestimation of "danger" and impact of racial stereotyping in the City's focus on crime during

Black Bike Week); Ex. 5 (Crosby 30(b)(6) Dep.) at 93:11-19 (City has conducted no analysis

that would lead to conclusion that crime is worse during Memorial Day Weekend).

Further, the City did not rely on professionally accepted procedures for the

implementation or evaluation of a traffic plan. The City's own expert, Robert Stewart,

acknowledges that in planning for large special events, jurisdictions should gather as much data

as they can and that traffic engineers are "absolutely" important to developing traffic plans. Ex.

21 (Stewart Dep.) at 65:17-70:7; Ex. 97 (Clarke Rep.) at 9-11.

The City, however, did not analyze any data related to traffic or transportation capacity

and did not involve traffic engineers. *See, e.g.* PMF 23; Ex. 8 (Gall Dep.) at 46:4-18; Ex. 17

(Prock Dep.) 180:21-181:17. City officials merely relied on their own subjective personal

observations and the "gut" feelings of police officers to develop and evaluate the Operations

Plan. *See* PMF 23. Reliance on subjective criteria is relevant to claims of racial discrimination,

and "gut feelings" is not a race neutral explanation for a decision as it is "ambiguous and

inclusive of discriminatory feelings." *Ham v. Washington Suburban Sanitary Comm'n*, 158 F.

App'x 457, 469 (4th Cir. 2005) (reversing grant of summary judgment where there was evidence

of subjective criteria from which a jury could find pretext); *Alex v. Rayne Concrete Serv.*, 2005-

1457 (La. 1/26/07), 951 So. 2d 138, 151-153 (citing *Batson v. Kentucky*, 476 U.S. 79, 105-06

(1986)).

The City's failure to analyze the effect of the Operations Plan also supports a finding that

the decision-making process was not legitimate. If the City had examined whether the Plan

worked, it would have seen that the Plan is ineffective and results in unacceptable levels of service on Ocean Boulevard and other areas. Ex. 97 (Clarke Rep.) at 39; PMF 24-25. The cursory "After Action Reports" contain no quantitative or qualitative analysis, and consist almost entirely of a description of the Plan. Ex. 99 (DEF00072100-04) (2018 After Action Report 9-13).

The City also dismissed the advice and expertise of its own law enforcement in designing the Plan. The plan that Chief of Police Warren Gall repeatedly proposed after Memorial Day Weekend 2014 was explicitly rejected by City Manager Leath because of political pressures. Ex. 8 (Gall Dep.) at 189:15-191:18. Chief Gall believed traffic could be managed without a loop. *Id.* at 189:15-190:3; Ex. 5 (Crosby 30(b)(6) Dep.) at 151:1-152:5.

The sequence of events and departures form normal procedures surrounding the development of the Operations Plan support an inference of discrimination.

> d)     *Statements Made By and To City Officials Demonstrate Discriminatory Intent*

The final *Arlington Heights* factor examines "contemporary statements" made in the context of the decision-making process. *Sylvia Dev. Corp.*, 48 F.3d at 819. Under this factor, courts look to statements made by officials and whether decision-makers acted in response to discriminatory comments. *Smith*, 682 F.2d at 1066; *Mhany Mgmt., Inc. v. Cty. of Nassau*, 819 F.3d 581, 606-612 (2d Cir. 2016) (examining citizen statements and upholding finding of discriminatory intent where City assented to citizens whose statements showed racial animus). Here, a jury could infer discriminatory intent from evidence of racially motivated statements made by City officials and the City's acquiescence to the racially charged opposition to Black Bike Week.

City officials make clear that they intended to end Black Bike Week. In his email two days after 2014 Memorial Day laying the foundation for the eventual Operations Plan, Pedersen

21

stated: "I think the key for making [Black Bike Week] go away is to suck the fun completely out of the event" and to "[m]ake a concentrated repeated and consistent effort of getting the word out that the event has been 'cancelled'…." Ex. 82 (DEF00015624). Chief Gall also referenced a "promise to shut down this event" in his notes regarding the agenda for the City's 2014 MDW after-action meeting. PMF 17; Ex. 83 (DEF00015576).

The meaning behind these sentiments is confirmed by City officials' earlier statements, before the 2003 Litigation heightened their restraint. *See, e.g,* Ex. 116 (DEF01142707) (indicating hyper-sensitivity to the possibility of another race discrimination lawsuit regarding Black Bike Week). For example, Leath, an originator of the Operations Plan, relied on notions of inherent racial difference to defend the City's treatment of Black Bike Week, proclaiming: "[T]here is a different party behavior between the black crowds and white crowds, generally." Ex. 12 (Leath 2004 Dep.) at 199:12-201:13. *See also* Ex. 13 (Leath 2019 Dep.) at 274:16-275:24 (affirming 2004 statements). Similarly, Chief Gall warned City employees to "be careful about being accused of double standards" when policing Black Bike Week. Ex. 56 (2005 Op. & Order) at 9. Judge Wooten concluded that the City officials' statements made in the context of the previous operations plan revealed discriminatory intent. *Id.* at 9-10.

Statements made by City officials exaggerating Black Bike Week crowd size and crime also reveal that common racial biases tainted their approach to Black Bike Week, as sociological research has shown the tendency of whites to over-count the size of African-American populations and to feel threatened by increasing African-American group size. *See* Ex. 16 (Pedersen Dep.) at 138:17-140:15; Ex. 8 (Gall Dep.) at 144:24-147:2 (discussing the "sheer numbers and the sheer numbers of [criminal] violations" during Memorial Day weekend); Ex. 49 (Gallagher Rep.) at 12-15. *See also Gallagher Doe v. Vill. of Mamaroneck*, 462 F. Supp. 2d 520,

22

549 (S.D.N.Y. 2006) (finding it relevant to discriminatory intent that town officials grossly exaggerated laborers' group size and accused them of criminal behavior).

The record also demonstrates that the City acquiesced to racially motivated complaints from residents, tourists, and prominent local business leaders opposed to Black Bike Week. City officials received and circulated written complaints from residents and tourists describing Black Bike Week visitors with language historically used to suggest the racial inferiority of African-Americans, calling attendees "a bunch of animals," "hoodlums," "heathens," "thugs," "delinquents," "trash", "anti-American", "very intimidating", accusing them of "raping and plundering" and being unable to act in a "civilized manner." Ex. 117 (DEF00113180); Ex. 118 (DEF00389876); Ex. 119 (PL_032820); Ex. 120 (DEF00083653); Ex. 121 (DEF01378374); Ex. 122 (DEF00015655); Ex. 123 (DEF01100187); Ex. 124 (DEF01162516) (also stating, "let us not be frightened by the NAACP, we need to fight back"); *see also* Ex. 13 (Leath 2019 Dep.) at 161:1-25 confirming complaints racial in nature).  Tourists and residents warned City officials that their predominately white town would degenerate into an inferior, predominately African-American one if they did not shut down Black Bike Week: "This beautiful area should not turn into the Chicago or Detroit of the South". Ex. 125 (DEF00079983); *see also* Ex. 126 (DEF00072290) (suggesting the City could change from the "golf capital of the world" to "Compton"); Ex. 118 (DEF00389876) (urging the City "to draw a line in the sand and decide whether you want to be known as a family destination or a destination for derelicts"); Ex. 122 (DEF00015655) ("our beach" should not become a "run down slum that only thugs would support"). *See Smith*, 682 F.2d at 1066 (statements that occupants were "undesirable" and would "dilute" the community were "camouflaged racial expressions") (internal quotation marks omitted); *Mhany Mgmt.*, 819 F.3d at 608-09 (stated concern that zoning change would alter

23

city's "flavor" and "character" were "code words for racial animus"). City officials recognized the racist nature of the comments but nonetheless acted on them. Ex. 8 (Gall Dep.) at 68:9-69-21 (describing public comments on Black Bike Week had a racial component to them, expressed an unexplained fear and assigned types of behaviors that had no basis in fact); PMF 15.

City officials also received racialized complaints about Black Bike Week from influential local business leaders and organizations. David Stradinger, an influential real estate developer and former City Manager described the predominately African-American attendees to City officials as "bands of groupies and thugs and gang members." PMF 16; Ex. 81 (DEF00705357). Racially biased complaints were sent to the Myrtle Beach Area Chamber of Commerce (the "Chamber"). *See, e.g.,* Ex. 127 (COC_031063-70) (complaints stating "I don't care whether the NAACP thinks it's racism or not" and suggesting bikers be forced to stay in Atlantic Beach); Ex. 19 (Richardson Dep.) at 131:20-136:2. The Chamber then actively lobbied City leaders to take an aggressive approach to Black Bike Week. PMF 17.

The evidence contradicts the City's claim that this barrage of racialized complaints were "stray remarks." Despite knowing that the complaints were racially biased, City officials responded with assurances that concerns would be addressed and did not repudiate the racial animus in the complaints. *See e.g.*, Ex. 8 (Gall Dep.) at 68:14-69:21; Ex. 81 (DEF00705357) (assuring complainant and explaining City's past attempts to end Black Bike Week).

The evidence of race-based statements made in the context of planning the Operations Plan supports a jury finding of discrimination.

          e)      *Other Evidence of Discriminatory Intent*

An additional category of evidence that supports a finding of racial discrimination is the evidence showing that the City's justifications for the Operations Plan are pretextual. *Reeves v.*

*Sanderson Plumbing Products, Inc.,* 530 U.S. 133, 147 (2000) (holding pretext is "one form of circumstantial evidence that is probative of intentional discrimination, and it may be quite persuasive"). Here, the failure of the City's Plan to meet its stated goals, and the fact that the City has offered several different sets of justifications for the Operations Plan is evidence of pretext. *See id.*; *E.E.O.C. v. Sears Roebuck & Co.*, 243 F.3d 846, 852–53 (4th Cir. 2001) (holding that the fact the defendant "has offered different justifications at different times for its failure to hire [plaintiff] is, in and of itself, probative of pretext.").

The City's explanations for the Operations Plan have shifted. Initially, as described above, the City sought to create a plan that would make attending Black Bike Week less appealing and lead to the end of the event. Recognizing that this is not a legitimate basis for the Operations Plan, the City has now disavowed this explanation. Ex. 5 (Crosby 30(b)(6) Dep.) at 147:24-148:6 (acknowledging that the City cannot lawfully seek to end the event). The City then asserted that the Plan was in response to the violence that occurred during the 2014 Black Bike Week. *See supra* p. 19. As common sense dictates and Plaintiffs' experts have confirmed, the Operations Plan, and the traffic patterns in particular, "are not deterrents to gang and gun violence." Ex. 28 (Brown Decl.) at ¶ 20. Indeed, the City has never attempted to address the other frequent acts of violence in the City with an operations plan and cannot explain why it has not. Ex. 5 (Crosby 30(b)(6) Dep.) at 93:20-94:4; PMF 13; *supra* p. 19-20.

Now, in the context of this litigation, the City asserts new justifications for the Operations Plan: reduce emergency call response times, and "keep traffic moving on Ocean Boulevard." Ex. 5 (Crosby 30(b)(6) Dep.) at 47:10-23, 48:10-15. The fact that these specific rationales for the traffic restrictions have first appeared in the context of litigation is probative of pretext. *Sears Roebuck & Co.,* 243 F.3d at 853 ("A factfinder could infer from the late appearance of [the

employer's] current justification that it is a post-hoc rationale," "invented for the purposes of litigation," and "not a legitimate explanation for [its] decision.")

There is also a substantial basis to disbelieve the City's explanations for the Operations Plan because the Plan does not actually accomplish the stated purposes. PMF 25. While the City maintains that the sole significant purpose of the one-way traffic pattern is to reduce emergency response times, the Plan fails to do so. The *City's* own experts admit that the average emergency response time has not decreased in any measurable way since the implementation of the Operations Plan. Ex. 127 (Alpert and McClean Rep.) at 8 ("average response time has no clear trend that can be found in the data"). The City's experts further confirm that emergency response times were never even an issue that needed to be addressed during Black Bike Week. "[Memorial Day Weekend] has the lowest average response time across every year [2011-2018] included in the analysis." Ex. 127 (Alpert and McClean Rep.) at 8; *see also* Ex. 127 (Alpert and McClean Rep.) at 21 (finding that the fire and EMS response times during Black Bike Week are "similar to other weekends throughout the 8 year period."). Black Bike Week emergency response times were never a problem and the Operations Plan has not improved them. Moreover, the City has maintained the one-way traffic pattern for five years even though it is having no effect on response times and even after its experts hired for this litigation established that it does not promote its purported goal.[8]

---

[8] The City's reaction to tropical storm Bonnie that made landfall at Myrtle Beach during the 2016 Black Bike Week directly contradicts the City's suggestion that it is concerned about the safety and welfare of Black Bike Week participants. Ex. 36 (James 2019 Decl.) at ¶24 (describing NAACP's efforts to have the City suspend the traffic plan during tropical storm Bonnie; the danger of leaving the plan in place, trapping visitors in the loop; and the City's refusal to suspend the loop).

Further, the evidence establishes that the traffic loop does not actually reduce traffic congestion on Ocean Boulevard, the sole reason the City articulates for having it. During Black Bike Week, the vehicle flow rate on Ocean Boulevard actually slows when the loop is in place as compared to those hours when it is not. *See* Ex. 97 (Clarke Rep.) at 32-33 (demonstrating that average vehicle flow rates increase each day from timeframes when loop is in place to when loop is not in place); *Id.* at 40. The "closure of cross streets very likely contributed to the degradation of Ocean Boulevard's performance…." and the additional side street closures when the loop is in place causes further gridlock. Ex. 97 (Clarke Rep.) at 34.[9] Clarke concludes that "[a]ll available evidence demonstrates that the plan implemented does not (and cannot) improve traffic flow." Ex. 97 (Clarke Rep.) at 27. Contrary to the City's assertions, Defs. Mot. 16, the fact that the City did not use the loop in 2019 does not negate a finding of discrimination; instead it confirmed that the loop is not necessary. Ex. 30 (Clarke Decl.) at ¶ 9-18 (finding similar traffic volumes in 2018 and 2019 and therefore no basis for different loop decision, and no change in traffic performance on Ocean Boulevard with the loop in 2018 and without the loop in 2019).

The City's justification for maintaining pedestrian barriers for five miles of Ocean Boulevard is also flawed. The same type of conduct that the City claims necessitates the pedestrian barricades during Black Bike Week also occurs during other events. Ex. 5 (Crosby 30(b)(6) Dep.) at 94:5-13 (acknowledging that pedestrian traffic was a factor in the 2017 Easter and Father's Day shootings). In contrast to the five miles of pedestrian barricades for Black Bike Week, the City's response to the Easter and Father's Day pedestrian-related violence was to put

---

[9] The travel times on Ocean Boulevard were also substantially slower than during other events even though the number of vehicles in the City are similar. "During Bikefest 2018, evening travel times between 29th Avenue North and 29th Avenue South averaged 69 minutes on Friday and 185 minutes on Saturday. In comparison, the travel times during Harley Week were 31 and 34 minutes respectively." Ex. 97 (Clarke Rep.) at 40.

27

up barricades along a four block stretch for one year of one event. Ex. 5 (Crosby 30(b)(6) Dep.) at 94:14-95:3; Ex. 4 (Crosby Dep.) at 251:8-15. Plaintiffs' experts Williams and Brown "observed nothing that justified the extensive use of pedestrian barricades to limit, restrict, and control pedestrian movement during Black Bike Week." Ex. 98 (Brown & Williams Rep.) at 9.

Substantial evidence supports a jury finding that the Operations Plan was not necessary, serves no useful purpose, does not enhance safety or traffic control, and instead frustrates and discourages potential visitors from traveling to the area.

### 2.    The City Cannot Establish as a Matter of Law that it Would Have Adopted the Operations Plan Absent Consideration of Race

Under the *Arlington Heights* framework "[o]nce racial discrimination is shown to have been a 'substantial' or 'motivating' factor behind enactment of the law, the burden shifts to the law's defenders to demonstrate that the law would have been enacted without this factor." *McCrory*, 831 F.3d at 221 (quoting *Hunter v. Underwood*, 471 U.S. 222, 228 (1985)). All of the evidence demonstrating the pervasive presence of race in the decision-making process discussed above, and particularly the evidence related to pretext, supports a finding that the City cannot establish, as a matter of law, that the Plan would have been adopted without consideration of race. *Arlington Heights*, 429 U.S. at 265–66 (finding that defendant's actual non-racial motivations must be scrutinized to determine whether they *alone* justify decision).

### 3.    The City Is the Decisionmaker

The City argues that the Taskforce, and not the City, was the sole decisionmaker for the Operations Plan. To the contrary, there is an abundance of evidence in the record demonstrating that the City is a decisionmaker with respect to every single aspect of the Operations Plan. The Taskforce, on the other hand, is merely an advisory group with no authority that is focused solely on facilitating communication about the loop.

28

The Taskforce was created only after the City had already announced a plan with all of the elements of the Operations Plan. PMF 18-19. The plan included a traffic loop that travelled through other jurisdictions and the Taskforce was created to facilitate communication among those entities. *Id.* The initial Taskforce invitations stated that "each local jurisdiction [would] remain in charge of their response activities". Ex. 92 (Horry_000069); PMF 19. As its Chairman testified, the Taskforce has "zero authority to do anything." Ex. 24 (Webster Dep.) at 184:11-184:13. Rather, the Taskforce exists to "promote communications and collaboration." Ex. 92 (Horry_000069). *See also* Ex. 6 (Eldridge Dep.) at 165:3-167:3. In practice, the City made its own decisions first and then reported those decisions to members of the Taskforce for coordination. Ex. 6 (Eldridge Dep.) at 167:4-15 ("Q:… Or was it that Myrtle Beach made a decision and then they reported back and you coordinated around whatever the decision was? A: Yea, I would say it was . . .  their decision."); Ex. 15 (Nell Dep.) at 60:3-18. The City has complete authority to end use of the loop. Ex. 6 (Eldridge Dep.) at 86:7-14 ("Q: If Myrtle Beach wanted to stop doing the loop . . . would there be any loop? No."). Further, the sole purpose of the loop—easing traffic on Ocean Boulevard—benefits the City and no one else. The other entities' interests are simply to limit the intrusion of a loop forcing traffic into their jurisdictions.

In addition to its limited role related to the loop, the Taskforce had no role in coordination regarding the other components of the Plan, which involve only the City. Ex. 6 (Eldridge Dep.) at 157:4-20; Ex. 16 (Pederson Dep.) at 174:21-175:11, 226:24 – 227:6; 349:9 – 350:9 (the City did not work with any other jurisdictions regarding its one-way plan, pedestrian barricades, or police officer increase).

Even if the Taskforce were a decisionmaker—and Plaintiffs have shown that it was not— courts have long recognized that more than one party may be held liable in a discriminatory

29

4:18-cv-00554-MGL    Date Filed 09/18/19    Entry Number 134    Page 35 of 42

decision. *See, e.g.*, *Saleh v. Univ. of Virginia,* No. Civ. A. 3:97-CV-460 R, 1999 WL 34798179, at *21 (E.D. Va. Feb. 25, 1999), *aff'd sub nom. Saleh v. Upadhyay*, 11 F. App'x 241 (4th Cir. 2001) (explaining that many discrimination claims involve more than one decisionmaker). The mere existence of multiple decisionmakers does not shield an individual defendant from liability. *See, e.g., Harper v. Albert*, 400 F.3d 1052, 1061–62 (7th Cir. 2005).

### 4. Plaintiffs Satisfy the Remaining Requirements of Section 1981

Contrary to the City's assertion (Defs.' Mot. 7), Plaintiffs' Section 1981 claim is not redundant of its Equal Protection Clause claim and may be considered by the Court as brought pursuant to Section 1983.[10] Where a Section 1981 claim is pled against a state actor, courts in the Fourth Circuit analyze the claim as having been brought under Section 1983, and consider it in concert with other Section 1983 claims, as they require many of the same elements. *See Alexander v. City of Greensboro*, 762 F. Supp. 2d 764, 781 (M.D.N.C. 2011).[11] As described above, *supra* n.3, the Section 1983 requirements are met here, and as such are met with regard to the Section 1981 claim.[12]

---

[10] Whether a Section 1981 claim is brought directly, as other circuits allow, or pursuant to Section 1983, does not substantively alter how the claim is analyzed. *See Fed'n of African Am. Contractors v. City of Oakland*, 96 F.3d 1204, 1214 (9th Cir. 1996) ("Allowing plaintiffs to bring suits against municipalities directly under § 1981 to enforce § 1981 rights instead of under § 1983 imposes no substantive change on federal civil rights law.").

[11] The City's suggestion that the similarity of Plaintiffs' Section 1981 and Equal Protection Clause claims is grounds for dismissal has no basis. *See Alexander*, 762 F. Supp. 2d at 781; *Mhany Mgmt.*, 985 F. Supp. 2d at 428 (finding Section 1981 violated where discriminatory intent in violation of the Equal Protection Clause shown, and not dismissing claims based on similarity)

[12] Contrary to Defendants' Argument, Defs. Mot. 7, the discrimination Plaintiffs' challenge is plainly the result of the City's official policy—the Black Bike Week Operations Plan, unlike the employment discrimination claim in *Dennis v. Cty. of Fairfax. See* 55 F.3d 151, 156 (4th Cir. 1995) (finding no allegation or proof that the supposedly discriminatory employment decisions were pursuant to official county custom or policy).

The evidence also supports a finding of the additional factor necessary to prevail on a Section 1981 claim: proof that the discrimination at issue concerned an activity enumerated in the statute. *Baker v. McDonald's Corp.*, 686 F. Supp. 1474, 1481 (S.D. Fla. 1987), aff'd, 865 F.2d 1272 (11th Cir. 1988); 42 U.S.C. § 1981 ("All persons . . . have the same right . . . to the full and equal benefit of all laws . . . as is enjoyed by white citizens."). Courts have found violations of Section 1981 where people are deprived of equal access to publicly available resources, or treated differently within public spaces due to race. *See Jennings v. Patterson*, 488 F.2d 436, 442 (5th Cir. 1974) (finding violation where black persons deprived of access to road); *Mbacke v. Federated Dep't Stores, Inc.*, No. 2:07-CV-01118-RLH-LRL, 2008 WL 11449290, at *6 (D. Nev. Dec. 15, 2008) (denying summary judgment on Section 1981 claim that mall security personnel stopped and detained black shopper without cause). Here, the Operations Plan deprives Plaintiffs of the equal benefit of the law, in that they, unlike visitors during any other time of year, are unable to equally enjoy the benefits of the Myrtle Beach area, to accesses various roads and businesses, and to interact freely without the blanket pedestrian barriers and presence of hundreds of police officers. *See e.g.*, Jones Decl. X.

## B. Plaintiffs Can Establish their First Amendment Claim

The First Amendment protects the right to associate for expressive purposes. *Roberts v. U.S. Jaycees*, 468 U.S. 609, 623 (1984); *Spence v. Washington*, 418 U.S. 405, 409 (1974). Expressive association exists where there is an intent to convey a particularized message, and that message is understood by the audience. *Id.* To make out a right to associate claim, Plaintiffs must demonstrate that they were (1) engaged in expressive association; and (2) that the City impermissibly curtailed such expressive association. *See U.S. Jaycees*, 468 U.S. at 623. Here, the evidence supports a finding that people attend and participate in Black Bike Week in order to

31

express messages related to Black Bike Week's history and Black bike culture, and that the City infringes upon that expression by intentionally discouraging participation in the event.

### 1.     Participation in Black Bike Week is Protected Expressive Association

Participation in Black Bike Week through cruising and displaying motorcycles, attending events organized by motorcycle clubs, celebrating Black bike culture, and creating fellowship with other participants and motorcycle clubs, is a form of expressive association. Black Bike Week is the largest gathering of African-American motorcycle enthusiasts nationwide. Ex. 129 (PL_017160) (BlackBikeWeek.us, Black Bike Week History Details); Ex. 34 (James 2018 Decl.) at ¶ 9. The event began in part, to recognize Atlantic Beach's unique history of being the only city in the Grand Strand that welcomed African-American tourists and to celebrate Black bike culture. *Supra* p. 15; Ex. 7 (Evans Dep.) at 14:18-15:1; Ex. 36 (James 2019 Decl.) at ¶4; Ex. 25 (Armstrong Decl.) at ¶ 9. Black Bike Week participants congregate every year in Myrtle Beach for a celebration and communal expression of Black bike culture and belonging through customizing, detailing, and displaying their motorcycles which are understood as status symbols in the African-American biker community; wearing jackets, patches, and colors that communicate their motorcycle club affiliation; and meeting and forming fellowships with other bikers and motorcycle clubs who understand the unique experiences of African American bikers. Ex. 25 (Armstrong Decl.) ¶¶ 7, 17-18; Ex. 39 (Kinard Sep. 2019 Decl.) ¶¶ 7, 10-11, Ex. 44 (C. Stevenson 2019 Decl.) ¶ 10; Ex. 36 (James 2019 Decl.) at ¶4. Much of this occurs while riding down streets in order to display bikes and pride in motorcycle club affiliation, and to interact with other bikers and spectators. PMF 28; *see Hurley v. Irish-American Gay, Lesbian and Bisexual Group of Boston*, 515 U.S. 557, 568 (1995).

Additionally, participants in Black Bike Week attend the rally to dispel negative perceptions of African-American motorcycle clubs and Black bike culture. Ex. 44 (C. Stevenson 2019 Decl.) at ¶¶ 9-11; Ex. 39 (Kinard Sep. 2019 Decl.) at ¶11. To them, being part of Black Bike Week is "advocating for a true community, support, and fellowship." Ex. 44 (C. Stevenson 2019 Decl.) at ¶ 10. These messages are understood by participants and observers alike. Ex. 46 (Willis Decl.) at ¶18; Ex. 44 (C. Stevenson 2019 Decl.) at ¶¶ 10-11; Ex. 39 (Kinard Sep 2019 Decl.) at ¶11; *see Spence* 418 U.S. at 410-41 (expressive association protection where, as here, particularized message is communicated and received).

The City erroneously argues that Plaintiffs' claim fails because Black Bike Week is not connected to any organized association. First, affiliation with an organized association is not a necessary condition to establish protection for associational expression. *See City of Dallas v. Stanglin*, 490 U.S. 19, 24 (1989) (noting the absence of an organized association as one of many relevant facts in lawsuit involving separation of teenagers from adults at dance halls). The central inquiry for expressive association is whether a group of individuals is engaged in "some form of expression." *Boy Scouts of America v. Dale*, 530 U.S. 640, 648 (2000). Second, there is evidence that Black Bike Week is connected to associations. Black Bike Week was first "spearheaded" by two motorcycle clubs, the Carolina Knight Riders and Buffalo Riders, which collaborated with the City of Atlantic Beach to organize "a festival/bike rally to celebrate African American bike culture." Ex. 25 (Armstrong Decl.) at ¶¶ 9, 15. Many Black Bike Week participants are members of a motorcycle club, and travel and participate in Black Bike Week with their clubs. PMF 3.

### 2.    The City Impermissibly Curtails Plaintiffs' Expressive Association.

Local governments may only restrict the right to expressive association in narrow circumstances and "subject to the closest scrutiny." *Nat'l Ass'n for Advancement of Colored*

*People v. Ala. ex rel. Patterson*, 357 U.S. 449, 460–61 (1958). Restrictions must serve a compelling state interest, be content neutral (i.e. unrelated to the suppression of ideas) and be narrowly tailored so as to leave open alternative channels for the protected expression. *U.S. Jaycees* at 623; *Ward v. Rock Against Racism*, 491 U.S. 781, 791–92 (1989) (internal citations omitted); *Clark v. Community for Creative Non–Violence,* 468 U.S. 288, 293 (1984).

The Operations Plan restrictions are not "content neutral" because they were designed to end Black Bike Week. PMF 17. The restrictions do not leave alternative channels for expression, as riders are prohibited from riding freely on Ocean Boulevard and cannot engage with each other or spectators. PMF 28. As established in Section VI.A.1.e, the Operational Plan does not achieve its claimed goals, and therefore does not further any compelling government interest.

### C.     Plaintiffs Can Establish their Dormant Commerce Clause Claim.

The Dormant Commerce Clause prohibits states from enacting laws that favor their residents over nonresidents. *Edwards v. California*, 314 U.S. 160, 172 (1941). Courts employ two different methodologies in assessing whether the Dormant Commerce Clause is violated. *See, e.g.*, *Yamaha Motor Corp., U.S.A. v. Jim's Motorcycle, Inc.*, 401 F.3d 560, 567 (4th Cir. 2005). The first examines whether the government discriminates by explicitly favoring residents at the expense of burdening nonresidents. *Id.* This discrimination can manifest facially, in practical or predicted effect, or in purpose. If discrimination is shown, "a virtually per se rule of invalidity is applied," unless the government can show both that its action is serving a legitimate local purpose and that the purpose could not be served by a less discriminatory alternative. *Id.* at 567 (citing *Wyoming v. Oklahoma*, 502 U.S. 437, 454-55 (1992)); *Maine v. Taylor*, 477 U.S. 131, 138 (1986). The second methodology is used if the challenged government action appears as non-discriminatory but has incidental effects on interstate commerce. In that case, the action

is unlawful if it unjustifiably burdens interstate commerce and is excessive in relation to the local benefits. *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142 (1970).

The first methodology applies here because the Operations Plan is discriminatory in purpose and effect. The purpose of the Operations Plan is to eliminate or reduce the attendance at Black Bike Week, an event that draws nonresident tourists. PMF 17, 29; Ex. 25 (Armstrong Decl.) at ¶ 18; Ex. 36 (James 2019 Decl.) at ¶ 4. The Operations Plan also provides specific benefits only for locals, including exclusive road access, PMF 29, which the court found problematic in *Fla. State Conference of NAACP Branches v. City of Daytona Beach*, 54 F. Supp. 2d 1283, 1287 (M.D. Fla. 1999). *See* Ex. 107 ("signs"); Ex. 38 (W. Jones 2019 Decl.) ¶ 4.

The practical effect of the Operations Plan is also discriminatory as it restricts activity on the section of Ocean Boulevard with the most commercial activity. PMF 29. The City admits that non-locals are more likely to be affected by the traffic controls or to be trapped in the traffic loop. *Id.* A jury could therefore conclude that the Plan is discriminatory and, given the ineffectiveness of the Operations Plan, *see supra* p. 26-28, that it does not serve a legitimate purpose and/or that there are less discriminatory alternatives.

Even if the Operations Plan is found not to be discriminatory, a jury could find, under the second methodology, that the interstate burdens that result from the Operations Plan are not justified and/or are excessive when compared to any benefits because the Plan does not accomplish its stated goals and in fact makes traffic congestion and emergency response times worse. *See supra* p. 26-28; *see also Yamaha*, 401 F.3d at 569-574 (finding Dormant Commerce Clause violation where state law placed an undue burden on interstate commerce).

## V.     CONCLUSION

Based on the foregoing, the evidence is sufficient for a trier of fact to find for Plaintiffs on all claims and, therefore, Defendants' Motion for Summary Judgment should be denied.

DATED: September 17, 2019      /s/ Peter Wilborn
                                          D. Peters Wilborn, Jr. (ID #7609)
Law Office of Peter Wilborn
57 Cannon Street
Charleston, SC 29403
(843) 416-9060
peter@bikelaw.com

Reed N. Colfax (admitted *pro hac vice*)
Tara K. Ramchandani (admitted *pro hac vice*)
Kali Schellenberg (admitted *pro hac vice*)
Angela A. Groves (admitted *pro hac vice*)
Relman, Dane & Colfax, PLLC
1225 19th Street, N.W., Suite 600
Washington, D.C. 20036
(202) 728-1888
rcolfax@relmanlaw.com
tramchandani@relmanlaw.com
kschellenberg@relmanlaw.com
agroves@relmanlaw.com

Dorian L. Spence (admitted *pro hac vice*)
Maryum Jordan (admitted *pro hac vice*)
Lawyers' Committee for Civil Rights Under Law
1401 New York Avenue, NW, Suite 400
Washington, DC 20005
(202) 662-8600
dspence@lawyerscommittee.org
mjordan@lawyerscommittee.org

*Attorneys for Plaintiffs*

**CERTIFICATE OF SERVICE**

     I hereby certify that on September 17, 2019, a copy of the foregoing Brief in Opposition to Defendants' Motion for Summary Judgment was filed and served on all counsel of record using the Court's CM/ECF system.

/s/ Peter Wilborn
Peter Wilborn