UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
FLORENCE DIVISION

|  |  |  |
|---|---|---|
| National Association for the Advancement of Colored People, Inc., by and through its Myrtle Beach Branch; Harry Briggs; Novice Briggs; Kenneth Coleman; Simuel Jones; Tyrone Kinard; William Lassiter; Cedric Stevenson; and Leslie Stevenson | ) ) ) ) ) ) ) ) ) ) | Case No.: 4:18-cv-00554-SAL |
| Plaintiffs, | ) ) | |
| v. | ) ) | **OPINION AND ORDER** |
| City of Myrtle Beach, a municipal corporation within the State of South Carolina; and City of Myrtle Beach Police Department, a department of the City of Myrtle Beach, | ) ) ) ) ) | |
| Defendants. | ) ) ) | |

This matter is before the Court on the Motion for Summary Judgment filed by the City of Myrtle Beach ("the City")[1] on August 13, 2019. ECF No. 129. The National Association for the Advancement of Colored People, Inc. ("NAACP"), Harry Briggs, Novice Briggs, Simuel Jones, Tyrone Kinard, William Lassiter, Cedric Stevenson, and Leslie Stevenson (collectively, "Plaintiffs") filed a Response in Opposition on September 18, 2019, ECF No. 134, and the City filed a Reply on September 27, 2019. ECF No. 142. Arguments were heard on July 2, 2020, and this matter is ripe for consideration.

**BACKGROUND**

---

[1] Defendants' counsel represented to the Court during the hearing on this matter that the City of Myrtle Beach Police Department is not a separate legal entity from the City of Myrtle Beach. The Court accordingly refers to named Defendants collectively as "the City." *See Christy v. City of Myrtle Beach*, No. 4:09-CV-1428-JMC-TER, 2012 WL 2149777, at *1 n.1 (D.S.C. Apr. 26, 2012) (noting "the City [of Myrtle Beach] and its Departments are not separate entities"), *report and recommendation adopted*, No. 4:09-CV-01428-JMC, 2012 WL 2149780 (D.S.C. June 13, 2012).

For decades, Myrtle Beach, South Carolina has been home to two motorcycle rallies: the Myrtle Beach Bike Week Spring Rally ("Harley Week"), and the Atlantic Beach Bikefest ("Bikefest"). The parties agree that most attendees of Harley Week are white, while most attendees of Bikefest are African-American. The City does not dispute that Bikefest, which occurs annually on Memorial Day weekend, is the only event during which the majority of persons in the area are African-American.

Plaintiffs filed this action in February of 2018, alleging that Defendants have violated their constitutional rights by employing discriminatory measures during Bikefest that are not employed during Harley Week or other busy weekends that bring many tourists to the area. Specifically, Plaintiffs challenge the traffic control plan ("Operations Plan") implemented during Bikefest, which consists of, among other features, one-way traffic along Ocean Boulevard within the City of Myrtle Beach. The Operations Plan also calls for a traffic loop that stretches approximately twenty-three miles. The traffic loop may be implemented only between the hours of 10:00 p.m. and 2:00 a.m. during Bikefest. Plaintiffs, in their controlling Amended Complaint, ECF No. 84, assert causes of action pursuant to 42 U.S.C. § 1983 for violations of the Dormant Commerce Clause, the expressive associational protections of the First Amendment, and the Equal Protection Clause of the Fourteenth Amendment. In addition, Plaintiffs assert discrimination claims under 42 U.S.C. § 2000d and 42 U.S.C. § 1981.

In 2003, the NAACP filed a similar lawsuit challenging the City's practice of allowing two-way traffic on Ocean Boulevard during Harley Week while restricting traffic to one direction during Bikefest. United States District Judge Terry L. Wooten granted the plaintiffs' motion for a preliminary injunction in that case, and the Court ordered the City to maintain a substantially similar traffic pattern during both events. *See* Order, *Nat'l Ass'n for Advancement of Colored People v. City of Myrtle Beach*, No. 4:03-1732-25TLW, 2006 WL 2038257, at *8 (D.S.C. May 9, 2005). The Fourth Circuit stayed the action pending appeal, *see* ECF No. 129-28,

2

and the parties to the 2003 litigation eventually settled before a final determination on the merits of the plaintiffs' claims. ECF No. 129-2. In the settlement agreement, the City agreed, with certain caveats, to implement the same traffic plan during both events. *Id.* at 3. In essence, the City agreed to treat both motorcycle rallies the same. The agreement further provided that it would be of no force as of July 31, 2010.

In 2008, while the settlement agreement was in effect, the City enacted a number of ordinances regulating motorcycle riding. The ordinances applied with equal force to participants of Harley Week and Bikefest alike. The City's ordinances so offended Harley Week participants that a boycott occurred, *see* ECF No. 129-3 at ¶ 5, and the sponsor of the Harley Week event moved it to New Bern, North Carolina. The record indicates that participation in both motorcycle events in Myrtle Beach declined as a result of the ordinances. Currently, the Harley Week events appear to have largely moved outside of the City limits, though the extent to which motorcyclists still cruise in Myrtle Beach during Harley Week is not clear. *See* ECF Nos. 134-24 at 3, 134-30.

After the settlement agreement expired, the City lifted one-way traffic restrictions on Ocean Boulevard between 2011 and 2014. During this period, law enforcement officers expressed concern for public safety during the event and proposed reinstating a one-way traffic pattern, *see* ECF Nos. 129-3 at ¶ 9, 134-17 at 3; however, Tom Leath, then the City Manager, rejected the proposals. ECF No. 129-4 at 9 ("I wasn't convinced that we needed it."). Then, in 2014, several shootings and three homicides occurred during the Bikefest event. The parties disagree whether the shootings had any causal relationship to the Bikefest event. The City argues the shootings amplified the need to enhance public safety during the event, and Plaintiffs argue the shootings are pretextual justification for discriminatory action. Within days of the shootings, City officials received numerous emails from the public, many of which were racially inflammatory on their face. *See* ECF Nos. 137-57 to -66. Mark Kruea, the City's Public Information Officer, forwarded a sampling of these emails to the Myrtle Beach City Council and

City Managers. *See* ECF Nos. 137-57, 137-61. On May 28, 2014, John Pedersen, then the Assistant City Manager,[2] emailed other public officials including Tom Leath and Chief of Police Warren Gall, indicating his desire to "mak[e] [Bikefest] go away" by "suck[ing] the fun completely out of the event." ECF No. 137-21. John Pedersen's proposed strategies included (1) reinstating an emergency lane on Ocean Boulevard; (2) forcing traffic to flow in one direction on Ocean Boulevard; (3) using barrels and barricades to force vehicles into one lane on nearby roads; (4) implementing a curfew; and (5) "[g]et[ting] our hands on as many drug dogs as possible" and "[u]s[ing] them in all traffic stops." Counsel for the City acknowledged during the hearing on this matter that the email is "egregious." With arguable inconsistency, John Pedersen later told the City's Public Information Officer in December of 2014 to "weave in the notion" that the Operations Plan was "a reaction to the violence" and that the City's "goal is to provide a safe experience for both our visitors and our residents." ECF No. 137-54 at 2.

After concerns were raised following the 2014 shootings, City officials began developing plans for the 2015 Bikefest event. They discussed Bikefest public safety plans during City Council meetings on August 12, 2014; August 18, 2014; and September 23, 2014, each time in executive session. ECF Nos. 137-48 to -50. On September 24, 2014, Randall Webster, Director of the Horry County Emergency Management Department, announced the formation of a Memorial Day Bikefest Task Force ("Task Force"), and he invited local jurisdictions to attend the first Task Force meeting set for October 13, 2014. ECF No. 137-31 at 3. Randall Webster emphasized that "while each local jurisdiction remains in charge of their response activities, the task force is designed to promote communication and collaboration to ensure a safe event." *Id.*

The parties disagree about the role and authority of the Task Force, but both sides agree that the City discussed the implementation of a traffic loop prior to the first meeting of the Task

---

[2] John Pedersen replaced Tom Leath as the City Manager for the City of Myrtle Beach in December of 2014. *See* ECF No. 134-13 at 5.

Force. For example, before the Task Force's first meeting, Myrtle Beach Mayor John Rhodes opened discussion of a forty-mile traffic loop during a meeting of the Coastal Alliance, which is a multi-jurisdictional coalition of local governments. ECF No. 137-28 at 3. Mark Lazarus, chairman of the Coastal Alliance, testified that ultimately, "the loop came because that's what the City of Myrtle Beach wanted to do." ECF No. 129-10 at 7. "[W]hen their original loop was presented, it created concerns for the county. And that's really where we became involved in that. And then the creation of the task force [was] for everybody to work together instead of independently." *Id.* The Task Force ultimately recommended a 23.1-mile traffic loop for Bikefest, which each affected jurisdiction implemented beginning in 2015. Mark Lazarus testified the final plan was an adaptation of a nine-mile loop he had proposed, which in turn was a "compromise" to the City's initial 40-mile plan. ECF No. 134-11 at 3, 5.

Ultimately, the Operations Plan was implemented, and it has remained in effect each year during Bikefest since 2015.[3] Plaintiffs filed this lawsuit on February 27, 2018, and they have moved for a preliminary injunction twice. On both occasions, their motion was denied. ECF Nos. 50, 122. On August 13, 2019, the City filed the instant motion for summary judgment as to all claims asserted in Plaintiffs' Amended Complaint. ECF No. 129. For the reasons stated herein, the Court grants the City's motion with respect to all claims other than those raised under the Equal Protection Clause and 42 U.S.C. § 2000d.

## SUMMARY JUDGMENT STANDARD

Rule 56 of the Federal Rules of Civil Procedure provides that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if proof of its existence or non-existence would affect disposition of the case under

---

[3] The traffic loop component of the Operations Plan was not implemented during the 2019 event. The 2020 Bikefest event is postponed until Labor Day weekend.

applicable law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). An issue of material fact is "genuine" if the evidence offered is such that a reasonable jury might return a verdict for the non-movant. *Id.* at 257. When determining whether a genuine issue has been raised, the court must construe all inferences and ambiguities against the movant and in favor of the non-moving party. *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962).

The party seeking summary judgment shoulders the initial burden of demonstrating to the court that there is no genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the movant has made this threshold demonstration, the non-moving party, to survive the motion for summary judgment, may not rest on the allegations averred in his pleadings. *Id.* at 324. Rather, the non-moving party must demonstrate specific, material facts exist that give rise to a genuine issue. *Id.* Under this standard, the existence of a mere scintilla of evidence in support of the non-movant's position is insufficient to withstand the summary judgment motion. *Anderson,* 477 U.S. at 252. Likewise, conclusory allegations or denials, without more, are insufficient to preclude granting the summary judgment motion. *Ross v. Commc'ns Satellite Corp.*, 759 F.2d 355, 365 (4th Cir. 1985), *overruled on other grounds*, 490 U.S. 228 (1989). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson*, 477 U.S. at 248.

## DISCUSSION

### I.     The Record Fails to Establish a Genuine Issue for Trial Regarding Plaintiffs' Claims Arising Under the Dormant Commerce Clause.

The Operations Plan does not discriminate against interstate commerce, and it is, therefore, not subject to a rule of virtual *per se* invalidity. Next, proceeding under the framework set forth in *Pike v. Bruce Church, Inc.*, 397 U.S. 137 (1970), the Court holds that the City is entitled to summary judgment on Plaintiff's dormant Commerce Clause claim because any

incidental effects on interstate commerce cannot be shown to be "clearly excessive" in relation to putative public safety benefits. *See id.* at 142.

The Commerce Clause grants Congress the power to "regulate commerce with foreign Nations, and among the several States, and with the Indian Tribes." U.S. Const. art I, § 8, cl. 3. Implicit in this grant of power is the dormant Commerce Clause; a prohibition against the states passing legislation that discriminates against or excessively burdens interstate commerce. *E.g.*, *Waste Mgmt. Holdings, Inc. v. Gilmore*, 252 F.3d 316, 333 (4th Cir. 2001) ("[A]lthough phrased as a grant of regulatory power to Congress, the Commerce Clause inherently 'denies the States the power unjustifiably to discriminate against or burden . . . interstate . . . commerce.'") (quoting *Oregon Waste Sys. v. Department of Envtl. Quality*, 511 U.S. 93, 98 (1994)). "The modern law of what has come to be called the dormant Commerce Clause is driven by concern about economic protectionism–that is, regulatory measures designed to benefit in-state economic interests by burdening out-of-state competitors." *Dep't of Revenue of Ky. v. Davis*, 553 U.S. 328, 337-38 (2008) (internal quotations and citations omitted). Restrictions on the interstate transportation of persons may sufficiently implicate "commerce" for purposes of the dormant Commerce Clause. *See Edwards v. California*, 314 U.S. 160, 172 n.1 (1941); *see also Fla. State Conference of NAACP Branches v. City of Daytona Beach, Fla.*, 54 F. Supp. 2d 1283, 1286-87 (M.D. Fla. 1999).

Determining whether a state action violates the dormant Commerce Clause involves a two-tiered analysis. *Brown-Forman Distillers Corp. v. New York State Liquor Auth.*, 476 U.S. 573, 578 (1986). The first inquiry is whether the state law "*discriminates* against interstate commerce." *Brown v. Hovatter*, 561 F.3d 357, 363 (4th Cir. 2009) (emphasis in original); *see also Davis*, 553 U.S. at 338 (noting a "discriminatory" law is one enacted for the "forbidden purpose"). Unless it is "demonstrably justified by a factor unrelated to economic protectionism, a 'discriminatory law is virtually *per se* invalid.'" *Brown*, 561 F.3d at 363 (quoting *Davis*, 553

U.S. at 338); *see also Yamaha Motor Corp., U.S.A. v. Jim's Motorcycle, Inc.*, 401 F.3d 560, 567 (4th Cir. 2005) ("[W]hen the state statute amounts to simple economic protectionism, a virtually *per se* rule of invalidity has applied.") (quoting *Wyoming v. Oklahoma*, 502 U.S. 437, 454-55 (1992)). When determining if a state action is "discriminatory" and thus subject to a rule of virtual *per se* invalidity, *see Davis*, 553 U.S. at 338, "[c]ourts are afforded some latitude to determine for themselves the practical impact of a state law, but in doing so they must not cripple the States' 'authority under their general police powers to regulate matters of legitimate local concern.'" *Colon Health Ctrs. of Am., LLC v. Hazell*, 813 F.3d 145, 152 (4th Cir. 2016).

Absent a finding of discrimination, a court then must consider whether the law unjustifiably burdens interstate commerce. Under the balancing test set forth in *Pike v. Bruce Church, Inc.*, a state law will be upheld if it serves a legitimate local public interest; the effects on interstate commerce are only incidental; and the burden on interstate commerce is not "clearly excessive in relation to the putative local benefits." 397 U.S. 137, 142 (1970).

First, the Operations Plan at issue in this action cannot reasonably be described as discriminatory within the ambit of the dormant Commerce Clause. Nothing in the record supports a conclusion that the state residency of Bikefest participants is related to the challenged state action in any way, and the Operations Plan cannot be characterized as economically protectionist in either its purpose or its effect. Plaintiffs' Amended Complaint alleges fault on the part of the City for its failure to acknowledge that Bikefest is an integral part of the area's tourism industry. *See* ECF No. 84 at ¶ 111. Drawing reasonable inferences in Plaintiffs' favor, one motivating factor behind the Operations Plan may have been to reduce participation in Bikefest. *See* ECF No. 137-21. The effect then–a reduction in participation–would fail to "benefit in-state economic interests by burdening out-of-state competitors." *Davis*, 553 U.S. at 338. The City would be working economic injury to itself by driving visitors away. Finally, although economic protectionism implicates the interests of consumers as well as merchants,

nothing in the record suggests out-of-state consumer interests were burdened for the benefit of in-state consumers. The Court concludes any such effect of the Operations Plan is purely incidental.

Having concluded that the Operations Plan is not discriminatory in either its purpose or effect, the Court proceeds to evaluate whether it is a justifiable action under the *Pike* balancing test. *See Yamaha Motor Corp., U.S.A.*, 401 F.3d at 567. There can be no question that Bikefest, like any large gathering of people in a concentrated area for an event, creates substantial public safety concerns for the City. *See, e.g.*, *United States v. Hosford*, 843 F.3d 161, 168 (4th Cir. 2016) ("[I]nterests in public safety and preventing crime are indisputably substantial governmental interests."). The lack of evidence in the record on the issue of economic burdens or benefits renders unreasonable a conclusion that any such incidental burden on interstate commerce is "clearly excessive" in relation to the Defendants' interest in maintaining public safety during Bikefest.

Plaintiffs' reliance on *Edwards* and *City of Daytona Beach*, *see* ECF No. 134 at 39-40, is inapposite. In *City of Daytona Beach*, the plaintiffs challenged a traffic management plan that the City of Daytona Beach applied during a reunion of historically black college alumni. *City of Daytona Beach*, 54 F. Supp. 2d at 1284-85. The challenged plan called for the closure of six bridges leading into the city; however, residents, business owners and employees, and registered hotel guest were given passes to cross into Daytona Beach. *Id.* at 1285. All others were required to take shuttles, walk, or to wait for the bridges into the city to open. *Id.* The district court enjoined the city from implementing the plan in 1999, finding that it violated the plaintiffs' "right to travel under the Dormant Commerce Clause of the Constitution." *Id.* at 1286. The finding relied exclusively on the *Edwards* case. *See id.* at 1286-87. Further, the *City of Daytona Beach* opinion did not analyze the plaintiffs' claims under the applicable two-tiered approach

described in *Brown-Forman Distillers Corp.*, 476 U.S. at 578. *See City of Daytona Beach*, 54 F. Supp. 2d at 1286-87.

First, *City of Daytona Beach* is distinguishable from the facts in the present case. Plaintiffs acknowledged during the hearing on this matter that the traffic management plan in *City of Daytona Beach* was a more extreme measure than that at issue here. The plan included restricting travel to Daytona Beach by closing all six access bridges. *Id.* at 1285. Exceptions to the plan were granted–with the exception of hotel guests–only to persons who were very likely to be Florida residents. *See id.* Here, all persons in the City of Myrtle Beach are equally affected by the Operations Plan on Memorial Day weekend. Plaintiffs submitted photographs of "No Thru Traffic" signs and barricades with their response, *see* ECF Nos. 137-46, 137-48; however, these appear to be primarily on residential streets where commercial activity is far less likely to occur.

Second, the sole authority on which *City of Daytona Beach* relied in finding a violation of the "right to travel" offers little support for Plaintiffs' dormant Commerce Clause claim. In *Edwards v. California*, the United States Supreme Court invalidated a California statute prohibiting the knowing transportation of indigent persons into the state. *See* 314 U.S. at 165-66. The admitted concept underlying the statute was, generally, "that each community should care for its own indigent," and the state's asserted purpose in enacting the statute was to rectify, among other things, "problems of . . . finance, the proportions of which are staggering." *Id.* at 167. The California policy at issue in *Edwards* thus embodied the risk of "economic isolation . . . that had plagued relations among the Colonies," which the dormant Commerce Clause was designed to mitigate. *See Davis*, 553 U.S. at 338 (internal quotations and citations omitted). The Court recognized the policy was "an open invitation to retaliatory measures" by other states. *Edwards*, 314 U.S. at 168. The Court's conclusion in *Edwards* did not rest on recognition of a fundamental right to travel under the dormant Commerce Clause; rather, the California statute was invalidated as an unconstitutional burden upon interstate commerce. *Id.* at 177.

Because the Operations Plan is not discriminatory–either in favor of domestic economic interests or against out-of-state economic interests–in purpose or effect, the *Pike* balancing test applies. After a thorough review of the record, the only reasonable inference to be drawn is that the Operations Plan does not impose a clearly excessive burden on interstate commerce in relation to legitimate public safety benefits, and the City is entitled to summary judgment on this claim.

**II.     The Predominant Purpose of Bikefest is Social in Nature Rather than Expressive, and to the Extent any Activity During Bikefest is Subject to First Amendment Protection, the City is Nevertheless Entitled to Summary Judgment on Plaintiffs' First Amendment Claim Under *United States v. O'Brien*.**

Viewing the record evidence in a light most favorable to Plaintiffs, the Court is unable to conclude that attending Bikefest is subject to expressive associational protection under the First Amendment. The primary purpose of the event reveals itself to be social in nature, and Plaintiffs have failed to demonstrate that participants, in the aggregate, harbor the requisite intent to convey a "particularized message." Even so, to the extent that activity during Bikefest might be subject to First Amendment protection, the Court finds the City entitled to summary judgment under *United States v. O'Brien*, 391 U.S. 367 (1969). The Operations Plan regulates noncommunicative conduct in furtherance of substantial governmental interests; the City's actions are unrelated to the suppression of free expression; and the Operations Plan is sufficiently tailored to further the City's interests without unduly burdening expressive conduct.

The First Amendment guarantees rights of free speech, assembly, petition for the redress of grievances, and the exercise of religion. U.S. Const. amend. I. In addition, it protects the right to associate in furtherance of these protected activities. *E.g.*, *Roberts v. U.S. Jaycees*, 468 U.S. 609, 618 (1984). "The Constitution guarantees freedom of association of this kind as an indispensable means of preserving other individual liberties." *Id.* Protection for "collective effort on behalf of shared goals is especially important in preserving political and cultural diversity . . . ." *Id.* at 623. To make out an expressive association claim, a plaintiff must first establish that the

activity undertaken by the association is itself entitled to First Amendment protection as some form of expression; the Constitution does not recognize a generalized right of social association. *Boy Scouts of Am. v. Dale*, 530 U.S. 640, 648 (2000); *City of Dallas v. Stanglin*, 490 U.S. 19, 19 (1989); *Willis v. Town Of Marshall, N.C.*, 426 F.3d 251, 258 (4th Cir. 2005) ("[A] constitutionally protected right to associate for expressive purposes exists if the activity for which persons are associating is itself protected by the First Amendment.").

Here, Plaintiffs contend that cruising and displaying motorcycles, attending events organized by motorcycle clubs, celebrating Black bike culture, and creating fellowship with other participants and motorcycle clubs constitute expressive association. ECF No. 134 at 32. A threshold question is thus whether these activities are protected by the First Amendment. Conduct may be expressive, and, therefore, protected as "speech" for purposes of the First Amendment, if the conduct in question is "sufficiently imbued with the elements of communication." *Spence v. State of Wash.*, 418 U.S. 405, 409 (1974). "[N]ot all conduct can be labeled speech," however, "just because the actor intends thereby to express an idea." *Maciariello v. Sumner*, 973 F.2d 295, 299 (4th Cir. 1992) (citations omitted). The inquiry is whether "[a]n intent to convey a particularized message was present, and [whether] the likelihood was great that the message would be understood by those who viewed it." *Texas v. Johnson*, 491 U.S. 397, 404 (1989) (quoting *Spence*, 418 U.S. at 410-11).

The record is equivocal about what components of Bikefest might be so "imbued with the elements of communication" that they may be considered speech within the meaning of the First Amendment. Plaintiffs direct the Court to a webpage describing the history of Bikefest. *See* ECF No. 129. It describes Bikefest as an event that includes "motorcycle racing, concerts, parties, and street festivals." *Id.* Jake Evans, the Mayor of Atlantic Beach, states Bikefest was "just something put into place to try to bring business to Atlantic Beach." ECF No. 134-7 at 4-5. Plaintiff Tyrone Kinard states the event "celebrates the heritage of Atlantic Beach being a

12

welcoming place for African American tourists while they were excluded from the other neighboring beaches." ECF No. 134-39 at ¶ 9. NAACP Chapter President Mickey James states Bikefest "provide[s] an opportunity . . . to gather for a celebration of identity, unity, and love of ridership." ECF No. 134-34 at ¶ 9. William McNeill states the event is "a car show, a bike show, a fashion show, and a beach vacation." ECF No. 134-42 at ¶ 5. Finally, Plaintiff Cedric Stevenson states that, to him, Bikefest is an opportunity to "dispel negative assumptions about African American motorcycle clubs" and to "advocate[e] for a true community, support, and fellowship." ECF No. 134-44 at ¶¶ 9-10.

The divergent nature of the foregoing evidence renders unreasonable any inference that Bikefest participants, as an aggregate association of persons, intend to express a *particular* message. No part of the record indicates that participants attend Bikefest for the purpose of communicating, by words or through conduct, any particular position on issues of social, political, or cultural significance. Drawing reasonable factual inferences in Plaintiffs' favor, the predominant purpose of Bikefest reveals itself to be social in nature with an emphasis on riding motorcycles. The City notes, and the Court agrees, that riding motorcycles is not protectable under the First Amendment. *See Shanks v. Forsyth Cty. Park Auth., Inc.*, 869 F. Supp. 1231, 1234 (M.D.N.C. 1994). Neither are predominantly social gatherings, the purposes of which cannot be said to include conveyance of a particular message. *See Stanglin*, 490 U.S. at 19.

Finally, regarding the display of motorcycle club insignia, the United States Supreme Court has long recognized that the display of symbols can constitute pure speech "entitled to comprehensive protection under the First Amendment." *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 505–06 (1969). Even so, the record contains no evidence at all about what particularized message is conveyed by any insignia that may be worn during Bikefest. Courts appear to be split on the question of whether motorcycle clubs are entitled to expressive associational protection. *Compare United States v. Mongol Nation*, 370 F. Supp. 3d 1090, 1101

(C.D. Cal. 2019) (denying Government's request to forfeit rights associated with Mongol Nation club insignia, noting "[t]he use and display of collective membership marks . . . directly implicate the First Amendment's right to freedom of association."), *with Kohlman v. Vill. of Midlothian*, 833 F. Supp. 2d 922, 937–38 (N.D. Ill. 2011) (granting summary judgment for defendants as to Hells Angels' expressive associational claim), *and Villegas v. City of Gilroy*, 363 F. Supp. 2d 1207, 1218 (N.D. Cal. 2005) (granting summary judgment for defendants as to Top Hatters motorcycle club members' expressive associational claim, holding "[f]raternity, freedom, equality, and/or death are not particularized messages" under the *Spence* standard), *aff'd*, 484 F.3d 1136 (9th Cir. 2007), *on reh'g en banc sub nom. Villegas v. Gilroy Garlic Festival Ass'n*, 541 F.3d 950 (9th Cir. 2008), *and aff'd sub nom. Villegas v. Gilroy Garlic Festival Ass'n*, 541 F.3d 950 (9th Cir. 2008). The record before the Court contains no evidence at all regarding a message sought to be conveyed by the display of any particular symbol, and the Court is, therefore, unable to even reach the questions of whether such a message is "particularized" or whether it was likely "understood by those who viewed it." *Spence*, 418 U.S. at 410-11. The Court, therefore, concludes attending Bikefest is not expressive association subject to First Amendment protection, and Defendants are entitled to summary judgment on this claim.

Even assuming the association is entitled to some degree of First Amendment protection, the challenged state action in this case is sufficiently justified under the standard of scrutiny set forth in *United States v. O'Brien*, 391 U.S. 367, 376 (1969). Under *O'Brien*, a state actor is justified in regulating the nonspeech component of conduct in which speech and nonspeech elements are combined, provided (1) the regulation is within the constitutional power of the actor; (2) the regulation furthers an important or substantial governmental interest; (3) the interest is unrelated to the suppression of free expression; and (4) incidental restrictions on

alleged First Amendment freedoms is no greater than is essential to further the governmental interest. *Id.* at 377.

First, implementation of traffic and policing plans is wholly within the power of local government. State police power is general, and it "extends to all matters affecting the public health or the public morals." *Stone v. Mississippi*, 101 U.S. 814, 818 (1879). Second, as noted above, Bikefest is a large public gathering reputed to bring hundreds of thousands of visitors to the City, and it creates a substantial governmental public safety interest. *See Hosford*, 843 F.3d at 168. Third, there is no evidence in the record the Operations Plan has anything to do with hampering conduct during Bikefest that could conceivably be considered expressive. Finally, where conduct during Bikefest appears rarely expressive, if ever, and the traffic loop portion of the Operations Plan is only deployable between 10:00 p.m. and 2:00 a.m., the state action is sufficiently tailored to the City's public safety interest in policing the event.

Because Bikefest is not entitled to expressive associational protection, and, if it were, the challenged action would survive the applicable level of scrutiny under *O'Brien*, the City is entitled to summary judgment on Plaintiffs' First Amendment claim.

III. **Because a Reasonable Jury Could Find Race was at Least One of any Number of Motivating Factors in the City's Decision to Implement the Operations Plan, the City's Motion for Summary Judgment is Denied as to Plaintiffs' Causes of Action Arising Under the Equal Protection Clause and 42 U.S.C. § 2000d.**

Taking into consideration all relevant facts and circumstances surrounding the development and implementation of the Operations Plan, the Court is unable to conclude that Plaintiffs' claims under the Equal Protection Clause and 42 U.S.C. § 2000d raise no genuine factual disputes or that they fail as a matter of law. The City's motion is denied as to these claims.

The Equal Protection Clause of the Fourteenth Amendment provides that a state may not "deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. To prove that a governmental action violates the Equal Protection Clause, a plaintiff

must show that he or she was treated differently than other similarly situated persons and that the unequal treatment was the result of intentional or purposeful discrimination. *Morrison v. Garraghty*, 239 F.3d 648, 654 (4th Cir. 2001) (citations omitted). If a plaintiff can establish the foregoing, the burden shifts to the defendant to show that the challenged action would have occurred regardless of any impermissible consideration. *See Sylvia. Dev. Corp. v. Calvert Cty.*, 48 F.3d 810, 819 n.2 (4th Cir. 1995). If a plaintiff makes out his or her prima facie case, and the defendant cannot disprove causation, a court must then proceed to determine whether intentional disparity in treatment is justified under the requisite level of scrutiny. *Id.* Strict scrutiny applies to racial classifications, and any state action undertaken with race as a consideration is unconstitutional unless it is necessary to further a compelling governmental interest, and the action is narrowly tailored to that end. *See, e.g., Johnson v. California*, 534 U.S. 499, 514 (2005).

Plaintiffs prevail on the question of whether they were treated differently than other similarly situated persons at this stage. Reciting the evidence and argumentation bearing on this issue at the preliminary injunction stage of these proceedings, Judge A. Marvin Quattlebaum, Jr. found there to be a "significant factual dispute," *i.e.*, one not capable of resolution in favor of the moving party on a motion for summary judgment. *See* ECF No. 50 at 8.

The next question is whether any discriminatory impact was the result of intentional or purposeful discrimination. To substantiate this element, Plaintiffs need not prove that a discriminatory purpose is the "sole" or even "primary" motivation for the challenged action. *N. Carolina State Conference of NAACP v. McCrory*, 831 F.3d 204, 220 (4th Cir. 2016) (quoting *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265–66 (1977)). The requisite showing, rather, is that race was at least *one* of any number of other motivating factors behind the decision. *See id.* Direct evidence on this issue is a rarity. *See, e.g., Hunt v. Cromartie*, 526 U.S. 541, 553 (1999) ("Outright admissions of impermissible racial motivation are infrequent and plaintiffs often must rely upon other evidence."); *Arlington Heights*, 429 U.S. at

266 (demanding "a sensitive inquiry into such circumstantial and direct evidence of intent as may be available.").

As this issue involves a determination of individuals' subjective motivation, summary judgment is rarely appropriate, save in cases where the evidence is only susceptible to an interpretation favoring the movant. *See Cromartie*, 526 U.S. at 553; *see also Harlow v. Fitzgerald*, 457 U.S. 800, 816-17 (1982). "The judgments surrounding discretionary action almost inevitably are influenced by the decisionmaker's experiences, values, and emotions. These variables explain in part why questions of subjective intent so rarely can be decided by summary judgment." *Harlow*, 457 U.S. at 816-17.

On the issue of subjective intent to discriminate on the basis of race, the parties agree that the four non-exhaustive factual considerations set forth in *Arlington Heights* govern this fact-sensitive inquiry. Those considerations include (1) evidence, if any, of a consistent pattern of actions by the decisionmaking body disparately impacting a particular class; (2) the historical background of the decision, including any history of discrimination by the decisionmaking body or the jurisdiction it represents; (3) the specific sequence of events leading up to the challenged decision, including any departures from normal procedure; and (4) any contemporary statements by decisionmakers on the record or in minutes of their meetings.[4] *Sylvia Dev. Corp. v. Calvert Cty., Md.*, 48 F.3d 810, 819 (4th Cir. 1995) (quoting *Arlington Heights*, 429 U.S. at 266–68).

Historically, the City of Myrtle Beach and Atlantic Beach–where Bikefest originated–were racially segregated from one another. The record permits an inference that, approximately two decades ago under former Mayor Mark McBride, the City was more hostile toward Bikefest

---

[4] Plaintiffs argue the City intended to discriminate where the law presumes persons intend the natural and foreseeable consequences of voluntary actions. ECF No. 134 at 17. The United States Supreme Court specifically rejected the sufficiency of this argument in the equal protection context in *Pers. Adm'r of Massachusetts v. Feeney*, 442 U.S. 256, 278-79 (1979). In addition, *Arlington Heights* noted that unless there is an inexplicable pattern of disparate impact as stark as that in *Yick Wo v. Hopkins*, 118 U.S. 356 (1886) or *Gomillion v. Lightfoot*, 364 U.S. 339 (1960), a court "must" look to evidence beyond disparate impact. *Arlington Heights*, 429 U.S. at 266.

than Harley Week. McBride described Harley Week as an event drawing doctors and attorneys with a family-oriented demographic to the City, while Bikefest drew "law breakers" and "lewd people." ECF No. 134-14 at 5, 10. In 2005, the Honorable Terry L. Wooten enjoined the City from implementing different traffic plans during Bikefest and Harley Week, specifically concluding that race was a motivating factor in the decision to implement the traffic plans then at issue. In that litigation, Mr. Leath testified to his belief that "black crowds and white crowds . . . party differently." ECF No. 134-12 at 21. Mr. Leath continued as the City Manager until late 2014, and in 2019, Mr. Leath testified that the first idea to implement a traffic loop after the 2014 shootings originated with him. ECF No. 134-13 at 21.

In addition to historic evidence tending to show that race has played a role in the City's decisionmaking process regarding Bikefest, the Court must also look toward the factual circumstances surrounding the development of the challenged Operations Plan. The City maintains that the Operations Plan was developed in response to a rash of shootings during Memorial Day weekend in 2014 and for the sole purpose of enhancing public safety. John Pedersen, who replaced Mr. Leath as City Manager, however, authored an admittedly "egregious" email in May of 2014 about obtaining as many drug dogs as possible to use during Memorial Day weekend for the express purpose of making Bikefest participants want to stop attending the event. ECF No. 137-21 at 2. Former City Manager David Stradinger also wrote to City officials after the 2014 shootings, counseling that the City must either take a "soft approach or a hard one," but that in any event, the city "MUST make it very UNCOMFORTABLE for them to be here" and that "[n]obody cares about the race card." ECF No. 29-14 at 4 (capitalization in original). Mark Kruea thanked David Stradinger for his feedback and forwarded the letter to City Council. *Id.* at 2. Tom Leath also thanked a citizen who, in reference to Bikefest, wished to see Myrtle Beach "remain a 'Family' destination, rather than a run down slum that only thugs would support." ECF No. 137-62 at 2. In another 2014 email, which Mr.

Kruea forwarded to City Council, a visitor expressed their sickness and disgust over "what happened during [Bikefest]." ECF No. 137-65 at 2. "No one wants to attribute this to a particular race issue because of the political implications but face it, it is what it is." *Id.*

The Court notes that the overwhelming majority of racially inflammatory comments originated with non-state actors. *See* ECF Nos. 118-127. Non-state actors' intent, standing alone, is irrelevant. The record contains several acknowledgements by the City, however, that the Operations Plan was developed in part due to public outcry, and much of the public outcry in the record is racially inflammatory. A governmental body certainly need not rebuke each communication from the public evidencing a discriminatory motive in order to avoid potential liability; however, the record before the Court in this case contains wholly insufficient evidence with which to draw a clear line between the motivations of state and non-state actors. To illustrate, the Fourth Circuit noted in *Sylvia Dev. Corp.* that it would be difficult in any case to project discriminatory motivations of a single citizen onto a state actor for purposes of an equal protection challenge. 48 F.3d at 822. "[S]uch a task is made nearly impossible in this case given [the state actor]'s hasty dismissal" of the remark. *Id.* at 822-23. Here, however, the record contains evidence of not one, but several dozen racially charged comments, none of which were dismissed, and some of which were arguably received favorably by City officials.

Finally, the City argues it was not the relevant decisionmaker and that the Operations Plan is wholly attributable to the efforts and motives of the Task Force. The City would be entitled to summary judgment if it could establish that the challenged action would have occurred regardless of any impermissible consideration, *see Sylvia. Dev. Corp.*, 48 F.3d at 819 n.2, but this it cannot do. As the Coastal Alliance chairman testified, "the loop came because that's what the City of Myrtle Beach wanted to do." ECF No. 129-10 at 7. "[W]hen [the City's] original loop was presented, it created concerns for the county. And that's really where we became involved in that. And then the creation of the [Task Force was] for everybody to work

together instead of independently." *Id.* The chairman of the Task Force testified that the idea for

the traffic loop was in place before the Task Force was even created, and the Task Force "had no

authority to do anything . . . . [E]ach jurisdiction maintained its own autonomy." ECF No. 129-7

at 2. This evidence precludes a conclusion *at this stage* that the City's motivation is irrelevant or

that the Operations Plan would have been implemented regardless of any impermissible

consideration on the part of the City.

At this stage, it is not the role of the Court to determine the truth of the matter. *Anderson*,

477 U.S. at 249. Considering the record evidence and the highly fact-sensitive nature of

questions of subjective motivation, a reasonable jury could find for Plaintiffs on their equal

protection claim. The City's motion is also denied as to Plaintiffs' claim under 42 U.S.C. §

2000d. The parties agree that discrimination in violation of the Equal Protection Clause of the

Fourteenth Amendment also constitutes a violation of Title VI of the Civil Rights Act where

such discrimination is undertaken by an institution that accepts federal funds. *See Gratz v.

Bollinger*, 539 U.S. 244, 276 n.23 (2003) (citations omitted). The City acknowledges its receipt

of federal funds. ECF No. 134-50 at 2-3.

## IV.    Because 42 U.S.C. § 1981 does not Provide a Private Cause of Action Against State Actors, Defendants are Entitled to Summary Judgment on this Claim.

42 U.S.C. § 1981 does not afford a private right of action against a state actor in this

circuit. The City is, accordingly, entitled to summary judgment as to this claim.

42 U.S.C. § 1981 provides as follows:

All persons within the jurisdiction of the United States shall have the same right
in every State and Territory to make and enforce contracts, to sue, be parties, give
evidence, and to the full and equal benefit of all laws and proceedings for the
security of persons and property as is enjoyed by white citizens, and shall be
subject to like punishment, pains, penalties, taxes, licenses, and exactions of every
kind, and to no other.

The rights afforded by § 1981 are protected with respect to actions of private parties as

well as state actors. *See* 42 U.S.C. § 1981(c). These rights, however, are only enforceable against

state actors through 42 U.S.C. § 1983. "[T]he express cause of action for damages created by § 1983 constitutes the exclusive federal remedy for violation of the rights guaranteed in § 1981 by state governmental units . . . ." *Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 733 (1989); *see also Dennis v. Cty. of Fairfax*, 55 F.3d 151, 156 (4th Cir. 1995); *Roberson v. City of Goldsboro*, 564 F. Supp. 2d 526, 529 (E.D.N.C. 2008) (granting motion to dismiss pursuant to *Dennis* where plaintiff sought to bring action against a state actor under § 1981).

Plaintiffs cite *Fed'n of African Am. Contractors v. City of Oakland*, 96 F.3d 1204, 1214 (9th Cir. 1996) in opposition to summary judgment on their § 1981 claim. ECF No. 134 at 35. In *Fed'n of African Am. Contractors*, the Ninth Circuit held that the Civil Rights Act of 1991, by adding § 1981(c) to the statute, effectively superseded the holding in *Jett* and created a private cause of action against state actors for violations of § 1981. *Fed'n of African Am. Contractors*, 96 F.3d at 1205. The Fourth Circuit, among several other circuits,[5] expressly opposes this holding. *See Dennis*, 55 F.3d at 156 n.1.

Accordingly, because Plaintiffs' first cause of action is brought under a statute that does not afford one, Defendants are entitled to summary judgment on this claim.

## CONCLUSION

After a thorough review of the parties' arguments, the record, and the applicable law, and for the foregoing reasons, the Court GRANTS Defendants' Motion for Summary Judgment, ECF No. 129, with respect to Plaintiffs' claims arising under the dormant Commerce Clause, the First Amendment, and 42 U.S.C. § 1981. Defendants' motion is DENIED as to Plaintiffs' claims under the Equal Protection Clause and 42 U.S.C. § 2000d.

---

[5] Along with the Fourth Circuit, the majority of circuits to consider this issue have held that § 1981 does not contain an implied cause of action. *Compare Fed'n of African Am. Contractors v. City of Oakland*, 96 F.3d 1204, 1214 (9th Cir. 1996), *with Campbell v. Forest Pres. Dist. of Cook Cty., Ill.*, 752 F.3d 665, 671 (7th Cir. 2014); McCormick v. *Miami Univ.*, 693 F.3d 654, 661 (6th Cir. 2012); *McGovern v. City of Philadelphia*, 554 F.3d 114, 118 (3rd Cir. 2009); *Bolden v. City of Topeka*, 441 F.3d 1129, 1137 (10th Cir. 2006); *Oden v. Okibbeha Cty.*, 246 F.3d 459, 463–64 (5th Cir. 2001); *Butts v. Volusia Cty.*, 222 F.3d 891, 894 (11th Cir. 2000).

IT IS SO ORDERED.

/s/ Sherri A. Lydon
Sherri A. Lydon
United States District Judge

August 4, 2020

Florence, South Carolina